## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNIFORMED PROFESSIONAL FIRE FIGHTERS ASSOCIATION OF CONNECTICUT, STAMFORD PROFESSIONAL FIRE FIGHTERS ASSOCIATION, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS LOCAL 786, FAIRFIELD FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 1426, STRATFORD PROFESSIONAL FIRE FIGHTERS, IAFF LOCAL 998, HAMDEN PROFESSIONAL FIRE FIGHTERS, IAFF LOCAL 2687, CITY OF GROTON FIRE FIGHTERS UNION, IAFF LOCAL 1964, PETER BROWN, PAUL ANDERSON, STEVE MICHALOVIC, DAN TOMPKINS, and NELSON HWANG, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY), EIDP, INC., DUPONT DE NEMOURS, INC., CHEMOURS COMPANY, CHEMOURS COMPANY FC, LLC, CORTEVA, INC., , ELEVATE TEXTILES, INC., GENTEX CORPORATION, GLOBE MANUFACTURING COMPANY, LLC; W.L. GORE & ASSOCIATES, INC., FIRE-DEX GW, LLC, HONEYWELL SAFETY PRODUCTS USA, INC., INTERTECH GROUP, INC., LION GROUP, INC., MILLIKEN & COMPANY, MORNING PRIDE MANUFACTURING L.L.C., PBI PERFORMANCE PRODUCTS, INC., SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC., and STEDFAST USA, INC.,<br><br>                    Defendants. | Case No.:  24-cv-1101 |

## <u>COMPLAINT</u>

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Uniformed Professional Fire

Fighters Association of Connecticut ("UPFFA"); The Stamford Professional Fire Fighters

Association, International Association of Fire Fighters ("IAFF") Local 786; The Fairfield Fire Fighters Association, IAFF Local 1426; Stratford Professional Fire Fighters, IAFF Local 998; Hamden Professional Fire Fighters, IAFF Local 2687; The City of Groton Fire Fighters Union, IAFF Local 1964; Peter Brown; Paul Anderson; Steve Michalovic; Dan Tompkins; and Nelson Hwang (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon the investigation of Plaintiffs' counsel, information and belief, personal knowledge, and a review of publicly available information.

## **INTRODUCTION**

1.     Plaintiffs are the UPFFA, a statewide labor organization representing all Professional Firefighters in the state of Connecticut, five local fire fighter unions, which together represent the uniformed fire fighters currently serving the cities and towns of Stamford, Fairfield, Easton, Stratford, Hamden, and Groton, Connecticut, ("Union Plaintiffs") and five individual fire fighters ("Fire Fighter Plaintiffs").

2.     Plaintiffs bring this action against Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing Company), EIDP, Inc., DuPont de Nemours, Inc., the Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., Elevate Textiles, Inc., Gentex Corporation, Globe Manufacturing Company, LLC, W.L. Gore & Associates, Inc., Fire-Dex GW, LLC, Honeywell Safety Products USA, Inc., InterTech Group, Inc., Lion Group, Inc., Milliken & Company, Morning Pride Manufacturing L.L.C., PBI Performance Products, Inc., Safety Components Fabric Technologies, Inc., and StedFast USA, Inc. (collectively, "Defendants") for harm resulting from the use of and dependence upon certain personal protective equipment containing hazardous levels of toxic, carcinogenic chemicals.

3.     Defendants are the companies responsible for designing, manufacturing, selling, supplying, and/or distributing the equipment and/or the materials and/or chemicals used therein.

4.     Defendants knew the equipment, materials, and chemicals to be unsafe but represented the opposite.

5.     Defendants failed to warn Plaintiffs, Plaintiffs' members, and the public of specific, substantial risks to human health, profiting immensely.

6.     Plaintiffs thus bring this class action against Defendants pursuant to the Connecticut Product Liability Act, CONN. GEN. STAT. § 52-572m, *et seq.*, and other applicable law on behalf of all fire fighters in the state of Connecticut who have worn or continue to wear turnout gear that was manufactured, designed, or sold, in whole or in part, by any of the named Defendants in the course of performing their job duties (the "Class") during the relevant statutory period (the "Class Period").

## **PARTIES**

### I.     **Plaintiffs**

7.     Plaintiff Uniformed Professional Fire Fighters Association of Connecticut (UPFFA) is an unincorporated labor organization that represents nearly four thousand professional fire fighters in and throughout Connecticut. Members of some of the Connecticut local fire fighter unions comprise the Executive Board of the UPFFA. The UPFFA routinely represents and promotes the health, safety, and well-being of the locals and their members at the state and national level. UPFFA is an affiliate of the International Association of Fire Fighters ("IAFF"), a national labor union regulated by the U.S. Department of Labor. The IAFF represents over 344,000 full-time professional fire fighters and emergency medical workers in 3,500 affiliates across the United States and Canada. The UPFFA brings these claims on behalf of all of its members.

8.     Plaintiff The Stamford Professional Fire Fighters Association, IAFF Local 786 ("IAFF Local 786") is an unincorporated labor organization that represents the uniformed members of the Stamford Fire Department in Stamford, Connecticut. IAFF Local 786 is comprised of the 247 professional fire fighters that work for the Stamford Fire Department. IAFF Local 786 is an affiliate of the IAFF and a member of the UPFFA. IAFF Local 786 brings these claims on behalf of all of its members.

9.     Plaintiff The Fairfield Fire Fighters Association, IAFF Local 1426 ("IAFF Local 1426") is an unincorporated labor organization that represents the uniformed members of the Fairfield Fire Department in Fairfield, Connecticut, and the Easton Fire Department in Easton, Connecticut. IAFF Local 1426 is comprised of the 105 professional fire fighters that work for the Fairfield Fire Department and Easton Fire Department. IAFF Local 1426 is an affiliate of the IAFF and a member of the UPFFA. IAFF Local 1426 brings these claims on behalf of all of its members.

10.     Plaintiff Stratford Professional Fire Fighters, IAFF Local 998 ("IAFF Local 998"), is an unincorporated labor organization that represents the uniformed members of the Stratford Fire Department in Stratford, Connecticut. IAFF Local 998 is comprised of the 97 professional fire fighters that work for the Stratford Fire Department. IAFF Local 998 is an affiliate of the IAFF and a member of the UPFFA. IAFF Local 998 brings these claims on behalf of all of its members.

11.     Plaintiff Hamden Professional Fire Fighters, IAFF Local 2687 ("IAFF Local 2687"), is an unincorporated labor organization that represents the uniformed members of the Hamden Fire Department in Hamden, Connecticut. IAFF Local 2687 is comprised of 99 professional fire fighters that work for the Hamden Fire Department. IAFF Local 2687 is an affiliate of the IAFF and a member of the UPFFA. IAFF Local 2687 brings these claims on behalf of all of its members.

4

12.     Plaintiff Groton Fire Fighters Union, IAFF Local 1964 ("IAFF Local 1964") is an unincorporated labor organization that represents the uniformed members of the City of Groton Fire Department. IAFF Local 1964 is comprised of the 23 professional firefighters that work for the City of Groton Fire Department. IAFF Local 1964 is an affiliate of the IAFF and a member of the UPFFA. IAFF Local 1964 brings these claims on behalf of all of its members.

13.     Plaintiff Peter Brown is a professional fire fighter and Connecticut resident. Brown is President of UPFFA. Brown has been a uniformed member of the Norwalk Fire Department for over 27 years.

14.     Plaintiff Paul Anderson is a professional fire fighter and Connecticut resident. Anderson is President of IAFF Local 786. Anderson has been a uniformed member of the Stamford Fire Department for over 20 years.

15.     Plaintiff Steve Michalovic is a professional fire fighter and Connecticut resident. Michalovic is President of IAFF Local 998. Michalovic has been a uniformed member of the Stratford Fire Department for 17 years.

16.     Plaintiff Dan Tompkins is a professional fire fighter and Connecticut resident. Tompkins is the president of IAFF Local 1964. Tompkins was a uniformed member of the Norwich Fire Department for three years and has been a uniformed member of the City of Groton Fire Department for 31 years.

17.     Plaintiff Nelson Hwang is a professional fire fighter and Connecticut resident. Hwang is President of IAFF Local 2687.

## II.    Defendants

18.    Defendant 3M Company ("3M"), formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation that does business throughout the United States, including in Connecticut. 3M has its principal place of business in St. Paul, Minnesota.

19.    Defendant EIDP, Inc. ("Old DuPont"), formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation that does business throughout the United States, including in Connecticut. Old DuPont has its principal place of business in Wilmington, Delaware.

20.    Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation that does business throughout the United States, including in Connecticut. New DuPont has its principal place of business in Wilmington, Delaware.

21.    Defendant The Chemours Company, L.L.C. ("Chemours") is a Delaware corporation that does business throughout the United States, including in Connecticut. Chemours has its principal place of business in Wilmington, Delaware. In 2015, Old DuPont spun off its performance chemical business as a new, publicly traded company, Chemours. In connection with the transfer, Chemours assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit.

22.    Defendant The Chemours Company, FC, LLC ("Chemours FC") is a Delaware corporation that does business throughout the United States, including in Connecticut. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours and manufactures certain materials and/or chemicals that are the subject of this lawsuit.

23.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States, including in Connecticut. Corteva has its principal place of business in Wilmington, Delaware. In 2019, New DuPont spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit. This Complaint refers to EIDP, Inc., DuPont de Nemours, Inc., the Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc., collectively, as "DuPont."

24.     Defendant Elevate Textiles, Inc. ("Elevate Textiles") is a Delaware corporation that does business throughout the United States, including in Connecticut. Elevate Textiles has its principal place of business in Charlotte, North Carolina. Elevate Textiles is the corporate parent of Defendant Safety Components Fabric Technologies, Inc.

25.     Defendant Fire-Dex GW, LLC, ("Fire-Dex") is an Ohio Limited Liability Company that does business throughout the United States, including in Connecticut. Fire-Dex has its principal place of business in Medina, Ohio.

26.     Defendant Gentex Corporation ("Gentex") is a Michigan corporation that does business throughout the United States, including in Connecticut. Gentex has its principal place of business in Zeeland, Michigan.

27.     Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including in Connecticut. Globe has its principal place of business in Pittsfield, New Hampshire.

28.     Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including in Connecticut. Gore has its principal place of business in Newark, Delaware.

29.     Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including in Connecticut. Honeywell has its principal place of business in Charlotte, North Carolina.

30.     Defendant The InterTech Group, Inc. ("InterTech") is a South Carolina corporation that does business throughout the United States, including in Connecticut. InterTech has its principal place of business in North Charleston, South Carolina. InterTech is the corporate parent of Defendant PBI Performance Products, Inc.

31.     Defendant Lion Group, Inc. ("Lion") is an Ohio corporation that does business throughout the United States, including in Connecticut. Lion has its principal place of business in Dayton, Ohio.

32.     Defendant Milliken & Company ("Milliken") is a Delaware corporation that does business throughout the United States, including in Connecticut. Milliken has its principal place of business in Spartanburg, South Carolina.

33.     Defendant Morning Pride Manufacturing L.L.C. ("Morning Pride") is a Delaware Limited Liability Company that does business throughout the United States, including in Connecticut. Morning Pride has its principal place of business in Golden Valley, Minnesota.

34.     Defendant PBI Performance Products, Inc. ("PBI") is a Delaware corporation that does business throughout the United States, including in Connecticut. PBI has its principal place of business in Charlotte, North Carolina. PBI is a wholly owned subsidiary of Defendant InterTech.

35.     Defendant Safety Components Fabric Technologies, Inc. ("Safety Components") is a Delaware corporation that does business throughout the United States, including in Connecticut. Safety Components has its principal place of business in Greenville, South Carolina. Safety Components is a subsidiary of Defendant Elevate Textiles.

36.     Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including in Connecticut. StedFast has its principal place of business in Piney Flats, Tennessee.

37.     Defendant Ten Cate Protective Fabrics USA d/b/a Southern Mills, Inc. ("Tencate") is a Georgia corporation that does business throughout the United States, including in Connecticut. Tencate has its principal place of business in Senoia, Georgia.

38.     Plaintiffs allege that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused injuries to Plaintiffs, Plaintiffs' members, and members of the Class, as alleged herein.

39.     Plaintiffs allege that each named Defendant derived substantial revenue from the equipment, materials, and/or chemicals that are the subjects of this lawsuit. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the equipment, materials, and/or chemicals in Connecticut and caused harm to Plaintiffs, Plaintiffs' members, and members of the Class in Connecticut.

40.     Defendants expected or should have expected their actions to have consequences in Connecticut.

41.     Defendants purposefully availed themselves of the privilege of conducting activities in Connecticut, thus invoking the benefits and protections of its laws.

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interests and costs, and the Plaintiffs and most members of the proposed Class are citizens of a state different from each Defendant.

43.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to this Complaint took place within this District.

44.     This Court has personal jurisdiction over Defendants because Defendants have maintained substantial contacts, and/or committed overt acts in furtherance of the conduct alleged in the Complaint throughout the United States, including within Connecticut. The conduct was directed at, or had the effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including within Connecticut.

## SUBSTANTIVE ALLEGATIONS

I.    **General Allegations Regarding Per- and Polyfluoroalkyl Substances**

45.     Per- and polyfluoroalkyl substances ("PFAS" or "PFAS Chemicals") are a class of thousands of synthetic chemical compounds, which consist of nearly indestructible chains of carbon and fluorine atoms.

46.     PFAS do not exist naturally in the environment.

47.     PFAS were first developed in the 1930s and 1940s.

48.     PFAS' high chemical and thermal stability have led to their use in a wide range of commercial products and industries.

49.     PFAS' same qualities cause them to persist in the environment and in the human body for long (if not indefinite) periods of time, earning them the nickname "forever chemicals."

50.     In recent decades, researchers, environmentalists, and government agencies have all raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to absorb into and bioaccumulate in the human body.

51.     Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

52.     Peer-reviewed scientific research reflecting the best and most recent scientific information available has cautioned that any amount of PFAS exposure is hazardous to human health.

53.     PFAS exposure in humans can occur via dermal absorption, as well as ingestion and inhalation. PFAS also spread through humans by crossing the placenta from mother to fetus and by passing to infants through breast milk.

54.     When exposed to heat, PFAS can off-gas, break down, and degrade into highly mobile and toxic particles and dust,[1] *increasing* the risk of PFAS exposure via dermal absorption, ingestion, and inhalation.

55.     PFAS exposure has been linked to multiple, serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

56.     PFAS have been found to concentrate in human blood, bones, and organs.

57.     Presently, the vast majority of people in the United States are exposed to background levels of PFAS via drinking water, food, and other sources. However, certain populations have higher levels of PFAS exposure, including as an occupational hazard.

---

[1] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7.

58.     The thousands of PFAS in existence can be divided into two categories: non-polymeric and polymeric.

59.     Thus far, most research has focused on the adverse effects of non-polymeric PFAS on human health rather than polymeric PFAS.

60.     Non-polymeric PFAS include the two most widely used PFAS Chemicals: Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS").

61.     PFOA and PFOS bioaccumulate in humans' blood and organs, including the kidneys and the liver.

62.     PFOA and PFOS interfere with the human body's functions, including the functions of the organs and immune systems, leading to adverse health outcomes.

63.     PFOA or PFOS exposure in any detectable amount is hazardous to human health. In fact, negative health effects may occur because of exposure to PFOA and PFOS at levels below most laboratories' ability to detect at this time.

64.     The following is a non-exhaustive list of adverse health outcomes that can result from exposure to PFOA and PFOS, many of which can manifest after years of exposure:

    a.      increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate cancer, bladder cancer, breast cancer, and ovarian cancer;

    b.      reduced ability of the body's immune system to fight off infections, including reduced vaccine response;

    c.      interference with the body's natural hormones and liver enzymes;

    d.      changes in liver enzymes;

    e.      reproductive effects including decreased fertility;

    f.     developmental effects or delays in children, including low birthweight, accelerated puberty, bone variations, or behavioral changes;

    g.    increased cholesterol levels and/or risk of obesity;

    h.    increased risk of high blood pressure or pre-eclampsia in pregnant women; and

    i.     interference with and suppression of vaccine response (decreased serum antibody concentrations) in children.

65.    PFOA has additionally been observed to cause Leydig cell tumors, pancreatic cancer cell tumors, and hepatocellular adenomas in rats.

66.    PFOS has additionally been observed to cause potentially human relevant tumors, including hepatocellular tumors in male and female rats and pancreatic islet cell carcinomas in male rats.

67.    The United States Environmental Protection Agency ("EPA") has classified both PFOA and PFOS as likely human carcinogens.

68.    The EPA has concluded that there is *no safe level* of PFOA or PFOS exposure in human beings.

69.    In 2022, the EPA initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act. In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

70.    On or around April 10, 2024, the EPA finalized a National Primary Drinking Water Regulation (NPDWR) establishing legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water. The EPA also finalized health-based, non-

enforceable Maximum Contaminant Level Goals (MCLGs) for the six PFAS. Notably, the MCLGs for both PFOA and PFOS were listed as "Zero":

| Compound | Final MCLG | Final MCL (enforceable levels) |
|---|---|---|
| PFOA | Zero | 4.0 parts per trillion (ppt) (also expressed as ng/L) |
| PFOS | Zero | 4.0 ppt |
| PFHxS | 10 ppt | 10 ppt |
| PFNA | 10 ppt | 10 ppt |
| HFPO-DA (commonly known as GenX Chemicals) | 10 ppt | 10 ppt |
| Mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS | 1 (unitless) Hazard Index | 1 (unitless) Hazard Index |

71.     The International Agency for Research on Cancer ("IARC") has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.

72.     The IARC has classified PFOS as "possibly carcinogenic to humans" based on strong evidence that it has some key properties of a carcinogen in people who are exposed to it and limited evidence that it can cause cancer in lab animals.

73.     In 2022, the California Office of Environmental Health Hazard Assessment ("OEHHA") listed PFOA as a chemical known to the state of California to cause cancer.

74.     While most research has focused on the adverse effects of non-polymeric PFAS on human health (e.g., PFOA and PFOS), the production, manufacturing, and use of polymeric PFAS is also hazardous to human health.[2]

75.     Polymeric PFAS include fluoropolymers and side-chain fluorinated polymers.

---

[2] Lohmann R, Cousins IT, DeWitt JC, Glüge J, Goldenman G, Herzke D, Lindstrom AB, Miller MF, Ng CA, Patton S, Scheringer M, Trier X, Wang Z. *Are Fluoropolymers Really of Low Concern for Human and Environmental Health and Separate from Other PFAS?* Environ Sci Technol. 2020 Oct 20;54(20):12820-12828. doi: 10.1021/acs.est.0c03244. Epub 2020 Oct 12. PMID: 33043667; PMCID: PMC7700770.

76. Fluoropolymers include polytetrafluoroethylene ("PTFE"), one of the most well-known and commonly used PFAS Chemicals.

77. The use of fluoropolymers (including PTFE) in manufacturing and commercial products poses substantial risks to human health.

78. When PTFE is used in commercial products such as textiles, other PFAS used in the manufacturing process will generally be present and pose substantial risks to human health.

79. Peer-reviewed scientific research has cautioned that:

   a. "there is no sufficient evidence to consider fluoropolymers as being of low concern for environmental and human health";

   b. "a blanket statement that [fluoropolymers] cannot enter cells is factually inaccurate";

   c. "there is no scientific basis to separate and subsequently remove fluoropolymers from discussions of other PFAS as a class or in terms of their impacts on human or environmental health";

   d. "[t]he conclusion that all fluoropolymers are of low concern . . . ignores major [PFAS] emissions linked to their production," among other issues; and

   f. it would be impossible to verify the safety of all fluoropolymer products on the market based on the information available in the public domain.[3]

80. The use of side-chain fluorinated polymers in manufacturing and commercial products poses substantial risks to human health.

---

[3] *Id.*

81.     The use of side-chain fluorinated polymers in manufacturing and commercial products such as textiles can lead (and often leads) to the formation of non-polymeric PFAS (e.g., PFOA and PFOS), which can then contaminate (and often contaminate) human beings, as well as the environment.

82.     The EPA has denied certain exemptions to side-chain fluorinated polymers as a result of the serious risks involved in their use.[4]

83.     The EPA has cautioned that it "can no longer conclude that [side-chain fluorinated polymers] 'will not present an unreasonable risk to human health or the environment.'"[5]

## II.     General Allegations Regarding PFAS-Containing Turnout Gear

84.     Turnout gear is the personal protective equipment (PPE) used by fire fighters.

85.     Turnout gear includes several components, namely helmets, hoods, jackets, pants (with suspenders), boots, and gloves.

86.     These components are made up of three layers: a durable water repellant outer shell, a middle moisture barrier, and an inner thermal liner closest to the wearer's skin.

87.     The primary purpose of the outer shell is to protect the fire fighter from direct flame.

88.     The primary purpose of the middle moisture barrier is to block the penetration of water, liquid chemicals, and heat, while also allowing perspiration and body heat to escape. Liquid resistance and vapor permeability are particularly important for the prevention of steam burns, which can occur if water and heat get trapped inside the turnout gear.

89.     The primary purpose of the thermal liner is to protect the fire fighter from ambient heat.

---

[4] US EPA. *Premanufacture Notification Exemption for Polymers; Amendment of Polymer Exemption Rule to Exclude Certain Perfluorinated Polymers*; 2010; Vol. 75.
[5] *Id.*

90.    Peer-reviewed scientific research has confirmed that *all three* layers of the turnout gear contain PFAS.

91.    In a 2020 study[6] conducted by a group of physicists at the University of Notre Dame (the "Peaslee study"), turnout gear (specifically, jackets and pants) was collected from fire fighters across the United States and tested. The study included turnout gear manufactured by Defendants Globe, Lion, and Honeywell, as well as turnout gear manufactured with specialty fabrics from Defendant Gore, over several production years.

92.    In the Peaslee study, the researchers found significant quantities of PFAS in every layer of both new (still in the original packaging) and used turnout gear.

93.    In "every textile sample tested," the researchers found "very high" total fluorine levels (a reliable indicator of total PFAS concentration) in both the moisture barrier and outside shell layers.[7]

94.    The turnout gear also contained significant levels of PFAS Chemicals including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFBS, 6:2 FTS, and 8:2 FTS.

95.    In the middle moisture barriers, total fluorine levels were typically greater than 30%, a result too high to be quantified by particle induced gamma-ray emission and consistent with use of PTFE in the middle moisture barriers.

---

[6] Graham F. Peaslee, John T. Wilkinson, Sean R. McGuinness, Meghanne Tighe, Nicholas Caterisano, Seryeong Lee, Alec Gonzales, Matthew Roddy, Simon Mills, and Krystle Mitchell
Environmental Science & Technology Letters 2020 7 (8), 594-599
DOI: 10.1021/acs.estlett.0c00410.
[7] *Id.*

96.     In all three layers of tested turnout gear, PFOA was present at alarmingly high levels—for instance, in one set of gear that was tested the outer shell contained 182 parts per billion and the thermal liner contained 78 parts per billion.

97.     To put these numbers into perspective, the EPA has set the MCL for PFOA in drinking water at 4 parts per trillion. The amount of PFOA present in the turnout gear that was tested was 182,000 parts per trillion (182 parts per billion) in the outer shell and 78,000 parts per trillion (78 parts per billion) in the thermal liner. In the thermal liners, "significant fluorine signatures" were found, indicating that "PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[8]



Credit: *Environ. Sci. Technol. Lett.*

98.     "Startlingly, garment-to-hand transfer of total fluorine [] was also observed when researchers simply manipulated the textiles in our laboratory," which is an observation that

---

[8] *Id.*

"strongly supports the premise that side-chain fluoropolymers and the PFAS they bind do release to the environment upon wear."[9]

99.      Lead researcher Graham Peaslee commented that fire fighter turnout gear is composed of "the most highly fluorinated textiles [he had] ever seen"[10] and that the level of PFAS in the turnout gear means that fire fighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high . . . ."[11]

100.     Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in fire fighters, with dermal absorption through direct contact between the fire fighters' skin and turnout gear being "a key exposure route."[12]

101.     Occupational cancer is presently the leading cause of line-of-duty death in the fire service.[13]

102.     Over the past thirty to forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to cancer.[14]

103.     From 2015 to 2020, 75% of the fire fighters added to the IAFF Fallen Fire Fighter Memorial died from occupational cancer.

104.     Seventy percent of firefighters are predicted to die eventually from cancer, which is significantly higher than the general population.[15]

---

[9] *Id.*
[10] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26?fbclid=IwAR3ktyIcasjnxHiv3RNDRJldZmunQleAEoS3Av225uOscj2hFbffVcO3-Go.
[11] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.
[12] G.E. Campbell, S. Glazer, B. Stinger, M. Thompson, and S. Thompson, *PFAS-free Moisture Barriers in Structural Firefighting Gear, in Toward a PFAS-free Future: Safer Alternatives to Forever Chemicals*, Green Chemistry Series No. 81 (Simona A. Bălan, Thomas A. Bruton, and Kimberly G. Hazard, ed., 2024).
[13] Peaslee, *supra* note 6.
[14] *Id*.
[15] *Id.*

105.    There are established links between PFOA and testicular cancer, mesothelioma, non-Hodgkin's lymphoma, and prostate cancer. These are four of the top eight cancers that firefighters contract more than the general public.[16]

106.    In recent years, the composition of turnout gear has been scrutinized by researchers, fire fighter interest groups, and government officials due to the adverse effects of PFAS on human health.

## III.    Defendants' Harm to Plaintiffs, Plaintiffs' Members, and Members of the Class

107.    As alleged above, Plaintiffs are the UPFFA, five fire fighter unions, which together represent the uniformed fire fighters currently serving the cities and towns of Stamford, Fairfield, Easton, Hartford, Stratford, Hamden, and Groton, Connecticut, and the Fire Fighter Plaintiffs.

108.    The Stamford Fire Department provides fire protection and emergency medical services to a city of over 136,000 residents.

109.    The Fairfield Fire Department provides fire protection and emergency medical services to a town of over 61,000 residents.

110.    The Easton Fire Department provides fire protection and emergency medical services to a town of approximately 7,600 residents.

111.    The Stratford Fire Department provides fire protection and emergency medical services to a town of over 52,000 residents.

112.    The Hamden Fire Department provides fire protection and emergency medical services to a town of over 61,000 residents.

113.    The City of Groton Fire Department provides fire protection and emergency medical services to a city of over 9,000 residents.

---

[16] *Id.*

114.   The Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class used and wore turnout gear (including helmets, hoods, jackets, pants, boots, and gloves) designed, manufactured, marketed, distributed, and sold by Defendants Fire-Dex, Globe, Honeywell, and/or Lion, which contained PFAS-contaminated materials supplied by Defendants 3M, Dupont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, MorningPride, PBI, Safety Components, StedFast, and/or Tencate, as well as PFAS supplied by Defendants 3M and/or DuPont (hereinafter, "the turnout gear").

115.   The Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class routinely used and wore the turnout gear in the ordinary course of their duties as fire fighters.

116.   The Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class routinely used and wore the turnout gear for training purposes and in responding to fire situations and other emergencies.

117.   The Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class routinely depended upon the turnout gear for protection from extreme heat, flames, and other hazards.

118.   The Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class routinely stored the turnout gear in the bunk rooms of fire departments, as well as in their homes and vehicles.

119.   The Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class often used the turnout gear for a period of several years without replacement.

120.   The Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class often washed the turnout gear at fire stations and in their homes along with their daily station wear uniforms and other clothing.

121.    The turnout gear was made from PFAS, was treated with PFAS, and contained PFAS.

122.    The turnout gear was embedded with significant concentrations of PFAS in all three layers, including the thermal liners where PFAS comes into direct contact with skin.

123.    The turnout gear was manufactured with and contained PTFE. Whenever PTFE is present in turnout gear, other PFAS used in the PTFE manufacturing process will generally be present and pose serious health risks to the wearer.[17]

124.    The turnout gear was manufactured with and contained side-chain fluoropolymers.

125.    The turnout gear was manufactured with and contained PFOA and PFOS.

126.    The PFAS present in the turnout gear (including PFOA and PFOS) migrated from the turnout gear to the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class and to the environment, causing PFAS exposure and contamination.

127.    The PFAS present in the turnout gear (including PFOA and PFOS) contaminated the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class via dermal absorption.

128.    The PFAS present in the turnout gear (including PFOA and PFOS) contaminated the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class via ingestion and inhalation.

129.    The Union Plaintiffs, the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class did not know, and in the exercise of reasonable diligence could not have known, that the turnout gear posed serious health risks when used as they were intended to be used (i.e., in the ordinary course of a fire fighter's duties) and in a foreseeable manner.

---

[17] *See, e.g.*, S D. J. Muensterman, I. A. Titaley, G. F. Peaslee, L. D. Minc, L. Cahuas, A. E. Rodowa, Y. Horiuchi, S. Yamane, T. N. J. Fouquet, J. C. Kissel, C. C. Carignan and J. A. Field, Environ. Sci. Technol., 2022, 56, 974-983.

130.    The Union Plaintiffs, the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class did not know, and in the exercise of reasonable diligence could not have known, that the turnout gear contained significant levels of PFAS and, specifically, PFOA and PFOS.

131.    The Union Plaintiffs, the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class did not know, and in the exercise of reasonable diligence could not have known, that the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class routinely suffered exposure to PFAS and, specifically, PFOA and PFOS, as a result of using and wearing the turnout gear.

132.    The turnout gear does not contain any labeling information or warnings indicating that the gear is manufactured with PFAS, treated with PFAS, or contains PFAS.

133.    The turnout gear does not contain any labeling information or warnings indicating that the gear specifically contains or may specifically contain PFOA or PFOS.

134.    The turnout gear does not contain any labeling information or warnings regarding the health risks associated with exposure to PFAS.

135.    The turnout gear does not contain any labeling information or warnings regarding the health risks associated with exposure to PFOA or PFOS.

136.    As a result of using and wearing the turnout gear, the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class routinely suffered exposure to unsafe levels of PFAS and, specifically, PFOA and PFOS.

137.    As a result of such exposure, PFAS, including PFOA and PFOS, have accumulated in the blood and bodily tissue of the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class.

138.   As a result of such accumulation, the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class have experienced subclinical cellular changes in their bodies which put them at increased risk of developing adverse health conditions, including but not limited to various cancers.

139.   Accordingly, Plaintiffs seek monetary damages and appropriate equitable and injunctive relief for the harm caused by Defendants' wrongful conduct, as further detailed herein.

## IV.   Defendants' Contributions to PFAS-Containing Turnout Gear

140.   In 1938, a chemist employed by Defendant DuPont invented PTFE. Less than a decade later, DuPont commercialized PTFE.

141.   By the 1950s, PFAS were widely used in commercial manufacturing, including by Defendants 3M and Dupont. Prior to the 1950s, PFAS had never been detected in the bodies or blood of human beings.

142.   Since the 1950s, 3M and Dupont have continued to manufacture, market, and sell PFAS.

143.   In 1966, Defendant Globe began manufacturing, marketing, and selling turnout gear containing PFAS.

144.   Since 1966, Globe has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M, DuPont, Gore, InterTech, PBI, and Tencate and PFAS manufactured by Defendants 3M and/or DuPont.

145.   In 1969, Robert Gore, an employee of his father's company, Defendant Gore, invented an expanded form of PTFE ("ePTFE"). Shortly thereafter, Gore commercialized ePTFE.

146.   In 1970, Defendant Lion began manufacturing, marketing, and selling turnout gear containing PFAS.

147.    Since 1970, Lion has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont and Gore and PFAS manufactured by Defendants 3M and/or DuPont.

148.    In 1983, Defendant Fire-Dex began manufacturing, marketing, and selling turnout gear containing PFAS.

149.    Since 1983, Fire-Dex has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, PBI, Safety Components, StedFast, and Tencate and PFAS manufactured by Defendants 3M and/or DuPont.

150.    In 2008, Defendant Honeywell acquired Norcross Safety Products LLC and began manufacturing, marketing, and selling turnout gear containing PFAS.

151.    Since 2008, Honeywell has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont, Gore, InterTech, MorningPride, PBI, and StedFast and PFAS manufactured by Defendants 3M and/or DuPont.

152.    In 2009, Defendant DuPont began the commercial development of a potential replacement for PFOA, another PFAS compound known as HFPO-DA, under the trademark name "GenX." Studies have repeatedly shown that GenX is hazardous to human health; like other PFAS, GenX accumulates in human blood, may cause damage to the kidneys, liver, immune system, and reproductive organs, and may cause cancer.

153.    In 2013, DuPont announced that it was planning to spin off its "performance chemicals business" into a new publicly traded company, which ultimately became Defendant Chemours.

154.    In 2015, Chemours began manufacturing, marketing, and selling performance chemicals including PFAS.

155.    Since 2015, Chemours has continued to manufacture, market, and sell performance chemicals including PFAS.

156.    Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the turnout gear worn by the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class and/or the PFAS-containing materials therein and/or the PFAS therein.

157.    Defendants 3M and Dupont expected their PFAS to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class.

158.    Defendants 3M, DuPont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, MorningPride, PBI, Safety Components, StedFast, and Tencate expected their PFAS-containing materials to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class.

159.    Defendants Fire-Dex, Globe, Honeywell, and Lion expected their turnout gear to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class.

V.      **Defendants' Knowledge of the Dangers of PFAS**

A.      **Defendant 3M's Long-Standing Knowledge of the Dangers of PFAS**

160.    Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

161.    3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

162.    As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. The findings of these studies were discussed internally (and often shared with DuPont) but were not publicized or shared with any regulatory agencies. Notably:

a.      In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

b.      In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack."

c.      By the 1970s, 3M had documented PFAS in fish and were aware that PFAS were hazardous to marine life.

d.      In 1975, 3M learned that there was a "universal presence" of PFAS in human blood samples taken from across the United States.

e.      In 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about potential health effects.

f.      In 1978, 3M conducted multiple PFOA and PFOS studies in monkeys and rats. The studies showed that PFOA and PFOS affected the liver and

gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."

g.  In 1978, 3M had to abort a study when all of the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of PFOS.

h.  In 1979, an internal 3M report discussing the studies on PFOA and PFOS stated that the PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies [] be undertaken as soon as possible."[18]

i.  In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."[19]

j.  In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal researching showing that PFAS were causing birth defects in rats.

k.  In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

---

[18] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show*, THE INTERCEPT (July 31, 2018, 12:23 PM), https://www.typeinvestigations.org/investigation/2018/07/31/3m-knew-dangers-pfoa-pdos-decades-ago-internal-documents-show/.
[19] *Id.*

l.      In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

163.    Section 8(e) of the Toxic Substances Control Act (TSCA) requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting requirement has been included in the TSCA since its enactment in 1976. See Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

164.    Despite the decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

165.    In 1998, the EPA first learned that PFAS was in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

166.    In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS.

167.    In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette

released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[20]

168.    The same year, 3M announced that it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, 3M fell far short of transparency: Mike Roman, 3M's chairman and chief executive officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape for those we serve."[21] In connection with the announcement, 3M falsely maintained that "3M's products are safe for their intended uses."[22]

**B.    Defendant DuPont's Long-Standing Knowledge of the Dangers of PFAS**

169.    Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.

170.    Dupont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

171.    In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried over the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[23]

172.    In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."[24]

---

[20] *California sues 3M, DuPont over toxic 'forever chemicals'*, CNN (Nov. 10, 2022, 7:48 PM), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.
[21] *3M to Exit PFAS Manufacturing by the End of 2025*, 3M (Dec. 20, 2022), https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025.
[22] *Id.*
[23] Sheron Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception*, THE INTERCEPT (Aug. 11, 2015, 6:35 PM), https://theintercept.com/2015/08/11/dupont-chemistry-deception/.
[24] *Id.*

173.   As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. Notably:

a.   In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house researchers at DuPont had confirmed that PFOA was associated with the enlargement of various, specific organs in rats.[25]

b.   In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to a poison.

c.   In 1978, Dupont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns including increased rates of endocrine disorders.

d.   By 1979, Dupont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[26]

---

[25] *Id.*
[26] *Id.*

e.  In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study which suggested an association between PFAS exposure and birth defects.

f.  By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[27]

g.  By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

h.  In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[28]

i.  In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which

---

[27] *Id.*

[28] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, THE NEW YORK TIMES MAGAZINE (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

included study finding an association between prostate cancer and exposure to PFOA.[29]

174.    In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[30]

175.    In 2001, a class action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

176.    In 2003, a consultant service with substantial experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia.
> . . .
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[31]

---

[29] Lerner, *supra* note 23.

[30] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

[31] Letter from P. Terrance Gaffney, Esq. of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

177.    In 2005, the EPA reached a settlement with Dupont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute, $10.25 million, and further required DuPont to perform supplemental environmental projects worth $6.25 million.

178.    In 2015, DuPont spun off its "performance chemicals" business, as well as two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours.

179.    In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

180.    In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing DuPont, along with 3M, for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role and maintain that California's claims were without merit:

> DuPont has never manufactured PFOA, PFOS or firefighting foam, said spokesperson Daniel Turner, referring to two PFAS substances. He added the company believes the complaint incorrectly names it as a defendant. "We believe these complaints are without merit . . . We look forward to vigorously defending our record of safety, health and environmental stewardship."[32]

### C.    The Remaining Defendants' Knowledge of the Dangers of PFAS

181.    Beyond 3M and DuPont, the remaining Defendants knew or should have known of the dangers of PFAS.

---

[32] *California sues 3M, DuPont over toxic 'forever chemicals'*, *supra* note 20.

182.    In fact, over the years, many of the remaining Defendants have publicly acknowledged, whether in consumer advertising and/or product promotion, lobbying efforts, litigation, or otherwise, their awareness of increasing medical, environmental, governmental, and public concern regarding PFAS use and exposure.

183.    For example, in or around 2020, the City of Burlington, North Carolina enlisted Duke University scientists to investigate potential sources of PFAS that were discharging into the City's wastewater treatment plants. The City pinpointed Defendant Elevate Textiles as "its largest source of PFAS."[33] Thereafter, a settlement agreement required Elevate Textiles to install a closed-loop system to capture contaminated wastewater from its production lines, and it was announced that Elevate Textiles would phase out its use of PFAS in *some of its products* by June 15, 2025.[34]

184.    Defendant Fire-Dex recently defended an action brought by its insurer seeking to effectively avoid its defense obligation for PFAS-related claims against the company. In its complaint, the insurer alleged that Fire-Dex had been repeatedly named in lawsuits brought by firefighters and/or their spouses alleging bodily injuries due to PFAS exposure.

185.    Defendant Gore openly advertises that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]."[35] For example, in efforts to garner support for its open, long-standing commercial use of PTFE, Gore asserts:

> The present paper brings together fluoropolymer toxicity data, human clinical data, and physical, chemical, thermal, and biological data for review and assessment to show that fluoropolymers satisfy widely accepted assessment criteria to be considered as "polymers of low concern" (PLC) and to show that fluoropolymers

---

[33] Lisa Org, *Burlington will curb PFAS discharges, per legal settlement with Haw River Assembly*, NC NEWSLINE (Aug. 2, 2023), https://ncnewsline.com/2023/08/02/burlington-will-curb-pfas-discharges-per-legal-settlement-with-haw-river-assembly/.

[34] *Id.*

[35] *Gore's Commitment to Material Stewardship*, GORE, https://www.gore.com/about/materials-stewardship (last visited June 13, 2024).

are distinctly different enough from other classes of PFAS to not be grouped with them for hazard assessment or regulatory purposes.

Scientists, regulators, and concerned communities often fall into one of two groups: one says all PFAS should be banned and the other says PFAS are so different that each must be evaluated, classified, and regulated individually. Barbara J. Henry, PhD, a toxicologist with [Gore], says there's a middle way forward if PFAS are grouped by their properties.[36]

186.    Defendant Honeywell has lobbied state officials, submitted comments, and indicated its intent to seek exemptions regarding a recently passed Minnesota law banning all non-essential uses of PFAS in 11 product categories, which will take full effect in 2032.[37]

187.    In 2023, Honeywell (along with manufacturing company Saint Gobain) reached a $45 million agreement with New York's Department of Environmental Conservation to implement a new water supply for the Hoosick Falls Village Water System and reimburse state taxpayers for the cost of the state's response to PFOA contamination in Hoosick Falls, New York.

188.    In or around 2021, Defendant StedFast spokesperson Mike Salvato presented on the topic of PFAS, PFOS, PFOA, and PTFE in turnout gear, acknowledging that "PFOS and PFOA have been found to be 'potentially harmful,'" but arguing that "[i]t is important to consider the trade-off of performance with perceived health risk if eliminating PFAS in gear." Salvato acknowledged that the "Peaslee study shows that turnout gear may 'shed' some PFAS" but argued "[o]rganizations should properly put into perspective the assumed risk with PFAS in turnout gear with other risks fire fighters face . . . . with the current materials available, PFAS is essential."

189.    Moreover, all Defendants were aware of an ongoing *global* movement toward eliminating PFAS from a myriad of consumer products, including textiles. Many private

---

[36] *Id.*
[37] Deena Winter, *Honeywell and other companies want exemptions to Amara's Law banning 'forever chemicals'*, MINNESOTA REFORMER (Mar 12. 2024), https://minnesotareformer.com/2024/03/12/honeywell-and-other-companies-want-exemptions-to-amaras-law-banning-forever-chemicals/.

companies, including Home Depot, Lowes, and Staples, have recently begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co.), shoe companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g., Johnson & Johnson and Oral-B), and textile manufacturing companies.

190.    All Defendants knew or should have known that turnout gear containing PFAS was extremely dangerous to fire fighters such as the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class in that it placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

191.    All Defendants knew or should have known that exposure to PFAS-contaminated materials and/or PFAS places humans at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

192.    All Defendants knew or should have known that the turnout gear, PFAS-containing materials, and/or PFAS therein would be used in the ways Plaintiffs have alleged they were used.

## VI.    Defendants' Failure to Warn Plaintiffs, Plaintiffs' Members, and Members of the Class of Substantial Risks

193.    As alleged above, Defendants knew or should have known that turnout gear containing PFAS was extremely dangerous to fire fighters such as the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class in that it placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers. However, Defendants *did not warn the Union Plaintiffs, the Union Plaintiffs' members, the Fire Fighter Plaintiffs, or members of the Class at any point* of such risks.

37

194.    Quite the opposite—Defendants have continued to misrepresent the safety of PFAS and engaged in campaigns aimed to direct the public's attention away from the issue of PFAS in their products.

195.    Defendant 3M maintains and publicly advertises that "[PFAS] are safely used in many modern products for their important properties and can be safely manufactured."[38]

196.    As to PFOA and PFOS, 3M maintains and publicly advertises that:

Researchers from around the world have studied these materials for decades and haven't found a definitive causal relationship between PFOA or PFOS exposure and any health condition . . . . While some research shows that these materials are associated with negative health outcomes, other studies don't reach the same conclusions.[39]

197.    Defendant New DuPont maintains and publicly advertises that:

In June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi-industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFO or firefighting foam. While DuPont is not a PFAS commodity chemical manufacture, it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society.[40]

198.    Defendant Chemours maintains and publicly advertises that: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030." Chemours further maintains and publicly

---

[38] *Health, Safety & Environmental Stewardship*, 3M, https://pfas.3m.com/health-safety-and-environmental-stewardship (last visited June 17, 2024).
[39] *How Fluorochemistries Are Safely Used*, 3M, https://pfas.3m.com/how-fluorochemistries-are-safely-used (last visited June 17, 2024).
[40] *DuPont de Nemours, Inc. Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS)*, DUPONT, https://www.dupont.com/pfas.html (last visited June 17, 2024).

advertises that "not all PFAS are the same," arguing that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."[41]

199.    In 2017, Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of The Columbus Dispatch demanding the newspaper's *retraction* of a story headlined "Lawyer: Firefighters' gear may be hazardous." Schwartz asserted:

> PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile. All textiles we use are woven or knit with technical fibers that are engineered to be heat, flame and abrasion resistant, some of which are treated with a PTFE durable water repellant finish . . . . [B]ecause these manufacturers used PFOA in their manufacturing process as a processing aid, it is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn-out gear. However, based on all available scientific data, such nominal trace amounts . . . would not have posed any health risks to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear.
>
> . . . .
>
> We, as a part of the fire protective equipment industry, are concerned and saddened by the undeniable scientific evidence that firefighters have elevated cancer risks . . . . However, the elevated risks derives from the hazardous substances produced by the fire, not the turn out gear that protects firefighters.

200.    In 2017, Lion launched its NOT IN OUR HOUSE initiative to "spread awareness of the cancer threat facing the fire service" and "educat[e] firefighters on the actions they can take to reduce their exposure to cancer-causing agents."

201.    Since 2017, Lion's NOT IN OUR HOUSE initiative has emphasized raising awareness of fire fighters' exposure to Polycyclic Aromatic Hydrocarbons (PAHs), naturally occurring carcinogens, during fire situations, likely in order to distract from the issue of fire fighters' occupational exposure to PFAS.

---

[41] *Our Commitment to Responsible Chemistry*, CHEMOURS, https://www.chemours.com/en/sustainability/sustainability-safety/our-commitment-to-pfas-stewardship (last visited June 17, 2024).

202.    In 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job":

## HERE'S ALL YOU NEED TO KNOW
## ABOUT PFOA AND YOUR TURNOUT GEAR.

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products.** The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PFTE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

**LION does not use PFOA or PFOS in our turnout gear or any of our protective products.**

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

203.    In 2019, Defendant Gore issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant."

204.    In 2020, Paul Chrostowski, Ph.D., a consultant hired by Lion, took out a full page in the publication Firefighter Nation to argue that turnout gear is completely safe and that any evidence to the contrary, including the Peaslee study, is unreliable fearmongering. Chrostowski argued:

> The evidence [] shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population. So even if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population
> . . . .

At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.

205.    In 2021, Lion confirmed that the representations articulated by Chrostowski reflect the company's position.

206.    In 2021, Defendant Gore maintained in a New York Times article that its turnout gear products were safe for wearers.

207.    In 2022, Defendant 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

208.    Moreover, Defendants have repeatedly represented to the Union Plaintiffs' members, the Fire Fighter Plaintiffs, members of the Class, and the public that their products were safe for their intended uses, including the ways in which Plaintiffs have alleged they were used.

209.    For example, Defendant DuPont maintains and publicly advertises that turnout gear manufactured with DuPont's materials "work hard to help keep your professionals safe, inside and out," "help protect professionals even when the fire is out," and "are helping keep first responders safe."

210.    Defendant Fire-Dex maintains and publicly advertises that its turnout gear is made with "the best materials the industry has to offer" and provides the specific benefit of "reduc[ing] [] carcinogen exposure." Fire-Dex advertises that the company goes "beyond industry standards to ensure a proper fit for your comfort and safety," making its turnout gear products "key to keeping your crew safe!"

211.    Defendant Globe maintains and publicly advertises that the company is "committed to firefighter health & safety," and that:

At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health.

212.    Defendant Gore maintains and publicly advertises that the company's protective fabrics enable fire fighters "to stay safe and engaged," emphasizing that to do their jobs, fire fighters "need protective garments that keep them protected with a limited amount of physiological burden."

213.    Defendant Honeywell maintains and publicly advertises that the company's "safety solutions protect the future of 500 million workers" and that its fire fighter turnout gear is "[d]esigned to provide safety," referring to its turnout gear products as "the pioneer of safety by design."

214.    Defendant Lion maintains and publicly advertises that the company "makes the gear emergency service providers, civilian responders and militaries need to stay safe in the line of duty," emphasizing that "[w]hen it comes to firefighting, safety is a top concern."

215.    Defendant StedFast maintains and publicly advertises that all of its products "are manufactured with safety in mind," asserting that "[k]eeping people safe is a core value of our business."

## VII.    Defendants' Failure to Provide Safety Warnings on Product Labels

216.    As alleged above, the turnout gear worn by the Union Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Class does not contain any labeling information or warnings:

      a.      indicating that the gear contains or may contain PFAS,

      b.      indicating that the gear specifically contains or may specifically contain PFOA or PFOS,

      c.     regarding the health risks associated with exposure to PFAS, or

      d.     regarding the health risks associated with exposure to PFOA or PFOS.

217.    Below are photos typical of warning labels for turnout gear designed, manufactured, marketed, sold, and distributed by Defendants Globe, Honeywell, and Lion. As depicted below, the labels do not disclose that the turnout gear contains PFAS or PFAS-containing materials, and contain no warning that handling, wearing, or using the turnout gear as it was intended to be handled, worn, or used can result in exposure to PFAS and adverse effects to human health. Further, while the labels provide washing instructions, they do not advise that the turnout gear should be washed in a commercial extractor to prevent cross-contamination and PFAS exposure to family members who handle or wash the turnout gear with other garments in in-home washing machines.





Garment Safety Label

**⚠ DANGER**



Garment Cleaning Label

Garment Liner Attachment Safety Label

**⚠ WARNING**

FOR COMPLIANCE WITH THE STRUCTURAL FIRE FIGHTING GARMENT REQUIREMENTS OF NFPA 1971, THE FOLLOWING PROTECTIVE ITEMS MUST BE WORN IN CONJUNCTION WITH THIS GARMENT: OUTER SHELL 7.0 OZ MINIMUM WEIGHT

MADE IN THE U.S.A.
DO NOT REMOVE OR WRITE ON THIS LABEL!

Drag Rescue Device (DRD) Label

## VIII.   Defendants' Ability to Design Safer Turnout Gear

218.    Despite Defendants' apparent position that PFAS is "essential" in turnout gear, safer, PFAS-free turnout gear was, at all relevant times, technologically and economically feasible.

219.    In fact, multiple Defendants already offer PFAS-free options for waterproof fabrics, durable fabrics, and/or outer shells in turnout gear.

220.    For example, in or around 2021, Defendant Gore announced its upcoming launch of a PFAS-free fabric-waterproofing technology, which was praised for its apparent potential to "greatly increase the availability of PFAS-free water-repellant garments."[42]

221.    In or around 2021, Todd Herring, Vice President of Product Innovation and Strategy at Defendant Fire-Dex stated in a press release that the company had "partnered with Milliken to develop a non-fluorinated version of our exclusive materials . . . that meets the increasing market demand for PFAS free PPE material options."[43]

222.    In or around 2021, Deana Stankowski, Senior Offering Manager for first responder gear at Defendant Honeywell spoke out about Honeywell's newly available PFAS-free outer shell layer "options," explaining: "We are making sure that we have every PFAS-free outer shell available in the market as *part of our portfolio* . . . . We have customers field testing PFAS-free outer shells, and we will eventually transition over completely to PFAS free." Stankowski added:

> There's no reason to offer both options . . . . Any minor tradeoffs with PFAS-free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way . . . . The color fastness and wear remain the same.[44]

---

[42] *WL Gore to release PFAS-free waterproof material for apparel*, ENHESA (Oct. 4, 2021), https://product.enhesa.com/346695/wl-gore-to-release-pfas-free-waterproof-material-for-apparel.
[43] *Fire-Dex Launches Non-Fluorinated PPE Fabrics*, FIREHOUSE (Feb. 17, 2021), https://www.firehouse.com/safety-health/ppe/turnout-gear/press-release/21210722/fire-dex-fire-dex-launches-non-fluorinated-ppe-fabrics (emphasis added).
[44] Ronnie Wendt, *Innovations in Turnout Gear*, INDUSTRIAL FIRE WORLD (Mar. 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear.

223.    In or around 2022, a group of students at UC Berkley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in turnout gear and were able to offer multiple, alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of fire fighter turnout gear.

## CLASS ALLEGATIONS

224.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of themselves, their members, and the following individuals (the "Class"):

> All firefighters in the state of Connecticut who have worn or continue to wear turnout gear that was manufactured, designed, or sold, in whole or in part, by any of the named Defendants during the Class Period.

225.    Plaintiffs reserve the right to expand, narrow, or otherwise modify or refine the definition of the Class based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

226.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

227. **Ascertainability.** The proposed Class is readily ascertainable because it is defined using objective criteria, so as to allow class members to determine if they are part of the Class. Further, the members of the class can be readily identified through records and information in Defendants' possession, custody, or control.

228. **Numerosity.** The Class is so numerous that joinder of individual members is impracticable. While the exact number of members of the Class is not known to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of class members.

229. **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including the following:

a. Whether each Defendants' conduct was negligent;

b. Whether Defendants' conduct was willful, wanton, reckless, intentional, malicious, and/or outrageous conduct in utter indifference to and/or conscious disregard for the health, safety, and well-being of others;

c. Whether Defendants owed a duty of care to the members of the Class;

d. Whether the duty of care owed to the members of the Class included the duty to protect against exposures to unsafe and unreasonably high levels of PFAS;

e. Whether Defendants breached their duty to warn the members of the Class of, and protect the members of the Class from, the long-

48

term health risks and consequences of exposure to high levels of
PFAS;

    f.    Whether medical monitoring and early detection will provide
benefits to the members of the Class.

230.   **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs, Plaintiffs' members, and members of the Class sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiffs, Plaintiffs' members, and each member of the Class were directly caused by Defendants' wrongful conduct, and Plaintiffs and members of the Class assert similar claims for relief.

231.   **Adequacy.** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel has any interest adverse to those of the other members of the Class.

232.   **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action is manageable. Plaintiffs know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

**TOLLING AND ESTOPPEL OF APPLICABLE STATUTE OF LIMITATIONS**

DISCOVERY RULE TOLLING

233.    Defendants had knowledge of the hazard to the health and safety of Plaintiffs, Plaintiffs' members, and Class members caused by exposure to PFAS Chemicals for decades.

234.    Beginning in the 1960s and continuing through to the 1990s, Defendants conducted internal studies that demonstrated the toxicity of PFAS Chemicals.

235.    Defendants knew or should have known that they were creating an unacceptable health risk to Plaintiffs, Plaintiffs' members, and Class members by designing, manufacturing, and selling turnout gear that was "swimming" in PFAS.

236.    Defendants intentionally concealed this information from Plaintiffs, Plaintiffs' members, Class members, and the public.

237.    Defendants intentionally and continuously misrepresented the safety of the turnout gear, PFAS-contaminated materials, and/or PFAS therein, assuring firefighters, the government, and the public that the turnout gear, PFAS-contaminated materials, and PFAS were safe.

238.    At all relevant times, Plaintiffs, Plaintiffs' members, and the Class members did not know or have reason to know of the Defendants' conduct that caused PFAS contamination.

239.    Neither Plaintiffs, Plaintiffs' members, nor any other Class members, through the exercise of reasonable care, could have discovered the conduct by Defendants alleged herein. Further, Plaintiffs, Plaintiffs' members, and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

240.    For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs and the Class members.

FRAUDULENT CONCEALMENT TOLLING

241.    Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiffs, Plaintiffs' members, and Class members for decades.

242.    Because of Defendants' active and ongoing concealment of the hazards of PFAS Chemicals, and the unique dangers posed to fire fighters through dermal absorption, ingestion, and inhalation of PFAS Chemicals through off-gassing and migration, Plaintiffs could not have reasonably discovered the causes of action alleged herein.

243.    For this reason, applicable limitations of actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of Plaintiffs or Class members should be tolled.

**FIRST CLAIM FOR RELIEF**

**THE CONNECTICUT PRODUCT LIABILITY ACT**
**CONN. GEN. STAT. § 52-572m, *et seq.***
**(Against All Defendants)**

244.    Plaintiffs and the members of the Class re-allege and incorporate here the allegations set forth above.

245.    At all relevant times, each Defendant was a "Product Seller" and a "Manufacturer" as to the turnout gear used and worn by Plaintiffs, Plaintiffs' members, and members of the Class within the meaning of the CPLA. *See* CONN. GEN. STAT. § 52-572m(b), (e).

**A.  CPLA STRICT LIABILITY**

246.    Plaintiffs and the members of the Class re-allege and incorporate here the allegations set forth above.

51

247.    The dangerous levels of PFAS present in the turnout gear and/or components of turnout gear designed, manufactured, and sold by the Defendants poses significant danger to human health and well-being by threatening to expose the human body to PFAS Chemicals via dermal absorption, ingestion and inhalation during normal and intended use of turnout gear.

248.    Therefore, because the turnout gear and/or components of turnout gear developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and supplied by the Defendants contained demonstrably unacceptable concentrations of PFAS Chemicals, the turnout gear was and remains dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

249.    The accumulation of PFAS Chemicals in the bodies of Plaintiffs, Plaintiffs' members, and members of the Class was a probable and foreseeable consequence of each Defendant's development, testing, assembly, manufacturing, packaging, labeling, preparation, distribution, marketing, and supply of the defective PFAS-contaminated turnout gear and/or PFAS-contaminated components of turnout gear, to Plaintiffs, Plaintiffs' members, and members of the Class.

250.    Defendants are therefore strictly liable to Plaintiffs and members of the Class for the harm caused to them by their design, manufacture, and sale of the defective PFAS-contaminated turnout gear and/or PFAS-contaminated components of turnout gear.

## B.  CPLA – NEGLIGENCE

251.    As a Product Seller and/or Manufacturer as defined by the CPLA, each Defendant had a duty of reasonable care to avoid manufacturing and selling turnout gear and/or components of turnout gear contaminated with detectable, unsafe levels of PFAS to its customers and end users, which include Plaintiffs, Plaintiffs' members, and members of the Class.

252.    Members of the Class were known customers or end users of each Defendant's products and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent manufacture and design of the PFAS-contaminated turnout gear and/or PFAS-contaminated components of turnout gear.

253.    Each Defendant owed its customers, including Plaintiffs, Plaintiffs' members, Class members, and other foreseeable users a duty of reasonable care to eliminate or minimize PFAS contamination in the turnout gear sold to its customers.

254.    Defendants breached their duty to use reasonable care in one or more of the following ways:

      a.    By failing to prevent the contamination of turnout gear and/or component parts of turnout gear used by Plaintiffs, Plaintiffs' members, and Class members;

      b.    By failing to cease the manufacture, sale, and/or distribution of PFAS-contaminated turnout gear and/or PFAS-contaminated component parts of turnout gear after learning of the adverse health consequences associated with exposure to PFAS;

      c.    By failing to reduce or minimize the PFAS contamination in turnout gear and/or the component parts of turnout gear manufactured, sold and distributed by each Defendant;

      d.    By failing to design and manufacture PFAS-free turnout gear and/or component parts of turnout gear as an alternative to the PFAS-contaminated gear and/or PFAS-contaminated component parts of turnout gear after

learning of the adverse health consequences associated with PFAS exposure;

e.      By negligently failing to warn their products' users, including Plaintiffs, Plaintiffs' members, and members of the Class, that they were being exposed to dangerous levels of PFAS and the heightened risk of disease the Plaintiffs and Class members acquired because of that exposure.

255.    As a direct and proximate result of each Defendant's negligence, Plaintiffs, Plaintiffs' members, and members of the Class have suffered, presently suffer, and will continue to suffer, *inter alia*, out of pocket expenses, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

256.    Defendants are thus liable to Plaintiffs and members of the Class for fair compensation for the resulting injuries, which includes pain and suffering, reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury, diminution in earning capacity, and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

## C.  CPLA – FAILURE TO WARN

257.    As a Product Seller and/or Manufacturer as defined by the CPLA, each Defendant had a duty to adequately warn foreseeable users of its turnout gear, including Plaintiffs, Plaintiffs' members, and members of the Class, of the dangers posed by the PFAS-contaminated turnout gear and/or PFAS-contaminated components of turnout gear sold for use by Plaintiffs, Plaintiffs' members, and members of the Class.

258.    Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and supplied the PFAS-contaminated turnout gear and/or PFAS-contaminated components of turnout gear for sale and sold the PFAS-contaminated turnout gear

and/or PFAS-contaminated components of turnout gear for use by Plaintiffs, Plaintiffs' members, and Class members.

259.    Plaintiffs, Plaintiffs' members, and members of the Class utilized the turnout gear and/or components of turnout gear developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed by Defendants in a reasonably foreseeable and intended manner.

260.    The turnout gear and/or components of turnout gear developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and supplied by Defendants was unreasonably dangerous to Plaintiffs, Plaintiffs' members, and members of the Class, without adequate warnings and instructions related to preventing the accumulation inside the bodies of Plaintiffs, Plaintiffs' members, and members of the Class and the increased risk of development of adverse health conditions resulting therefrom.

261.    Defendants knew or should have known that the PFAS-contaminated turnout gear and/or components of turnout gear that they developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and supplied would result in the absorption through the skin, ingestion, and/or inhalation of unacceptable quantities of PFAS that would accumulate in the bodies of fire fighters, including Plaintiffs, Plaintiffs' members, and Class members, who were required to wear the turnout gear.

262.    Defendants failed to advise those foreseeably exposed to their PFAS-contaminated turnout gear and/or PFAS-contaminated components of turnout gear, including Plaintiffs, Plaintiffs' members, and members of the Class, about the risk that wearing PFAS-contaminated turnout gear would result in accumulation of PFAS Chemicals in their bodies, including their blood serum and bodily tissues.

263.    Defendants had actual knowledge of the health hazards that can result from exposure to PFAS Chemicals and the PFAS-contaminated turnout gear and/or components of turnout gear that they developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and supplied, but failed to share such information with the Plaintiffs, Plaintiffs' members, and members of the Class who were foreseeably exposed to their turnout gear.

264.    Defendants acted with reckless indifference to the health and safety of Plaintiffs, Plaintiffs' members, and Class members by failing to provide adequate warnings of the known dangers of the PFAS-contaminated turnout gear and/or PFAS-contaminated components of turnout gear.

265.    As a direct and proximate result of each Defendant's acts and omissions, Plaintiffs, Plaintiffs' members, and members of the Class suffered, presently suffer, and will continue to suffer damages.

### D.  CPLA – NEGLIGENT DESIGN AND MANUFACTURE

266.    As a Product Seller and/or Manufacturer as defined by the CPLA, each Defendant engaged in testing, developing, designing, marketing, distributing, manufacturing, promoting, and selling the PFAS-contaminated turnout gear and/or PFAS-contaminated components of the turnout gear worn by Plaintiffs, Plaintiffs' members, and members of the Class.

267.    As a Product Seller and/or Manufacturer pursuant to the CPLA, each Defendant had a duty to make and sell turnout gear and/or component parts for turnout gear which were reasonably fit, suitable, and safe for their intended and/or foreseeable uses.

268.    Each Defendant owed that duty to: (1) purchasers of the turnout gear and (2) reasonably foreseeable users of the turnout gear.

269.    The turnout gear and/or components of turnout gear manufactured and sold by the Defendants was used in a reasonably foreseeable manner and without substantial change in the condition thereof by Plaintiffs, Plaintiffs' members, and members of the Class, and the turnout gear was defective and unfit for its foreseeable use.

270.    At the time Defendants manufactured, distributed and sold the turnout gear and/or components of turnout gear used by Plaintiffs, Plaintiffs' members, and Class members, Defendants knew of the defective and unreasonably dangerous condition of the turnout gear and/or components of turnout gear that they manufactured and distributed.

271.    Defendants therefore knew or should have known that use of the turnout gear worn by Plaintiffs, Plaintiffs' members, and members of the Class would result in exposure of Plaintiffs, Plaintiffs' members, and members of the Class to unsafe, dangerous concentrations of PFAS Chemicals.

272.    The turnout gear and/or components of turnout gear developed, manufactured, distributed and sold by Defendants was defective in design and unreasonably dangerous because, among other things:

      a.    PFAS Chemicals, including but not limited to PFOA and PFOS, cause extensive and persistent contamination when they come into contact with skin or are ingested or inhaled;

      b.    Turnout gear contaminated with detectable levels of PFAS Chemicals, including PFOA and PFOS, poses a significant threat to the health, safety, and welfare of firefighters, who absorb PFAS Chemicals through their skin and/or ingest and inhale it when the PFAS Chemicals migrate out of the fabric; and

c.     The Defendants did not design the turnout gear and/or components of turnout gear to prevent the dermal absorption, ingestion, or inhalation of PFAS Chemicals by Plaintiffs, Plaintiffs' members, and members of the Class.

273.   The Defendants failed and refused to implement changes in the design of the turnout gear and/or component parts of turnout gear that would have reduced or eliminated the dangers posed by the presence of PFAS in the turnout gear, further exposing Plaintiffs, Plaintiffs' members, and members of the Class to dangerous levels of PFAS Chemicals through their use of the turnout gear and components of turnout gear designed, manufactured, distributed, and sold by the Defendants.

274.   Throughout their conduct, Defendants failed to utilize the care required of a reasonably prudent manufacturer and seller of firefighter turnout gear and/or components of firefighter turnout gear under the circumstances, and the turnout gear worn by Plaintiffs, Plaintiffs' members, and members of the Class was, as a result of Defendants' conduct, defective and unreasonably dangerous.

275.   The defective and unreasonably dangerous condition of the turnout gear and its component parts existed at the time the turnout gear and the component parts of the turnout gear were manufactured, distributed, and sold by Defendants.

276.   Defendants expected the turnout gear to reach its ultimate users without substantial change in the condition in which the turnout gear and components of the turnout gear were designed and manufactured, and the turnout gear and components of turnout gear did reach Plaintiffs, Plaintiffs' members, and members of the Class without substantial change in condition.

277.     The foreseeable risk to the health and welfare of Plaintiffs, Plaintiffs' members, and members of the Class posed by Defendants' turnout gear and components of turnout gear outweighs the cost to Defendants of reducing or eliminating such risk.

278.     Defendants knew or should have known about reasonably safer and feasible alternatives to the turnout gear and/or components of turnout gear manufactured and sold during the Class Period.

279.     As a direct and proximate result of Defendants' conduct, Plaintiffs, Plaintiffs' members, and members of the Class have and will continue to suffer injuries and damages.

### E.   CPLA – MEDICAL MONITORING

280.     As a direct and proximate result of Defendants' conduct, including the design, manufacture, distribution, and sale of the PFAS-contaminated turnout gear and/or the PFAS-contaminated components of turnout gear, Plaintiffs, Plaintiffs' members, and Class members have been exposed to hazardous levels of PFAS Chemicals through the dermal absorption, ingestion, and inhalation of PFAS Chemicals.

281.     Plaintiffs, Plaintiffs' members, and Class members' exposure to PFAS described herein has produced subclinical cellular changes in their bodies that substantially increase the risk of Plaintiffs, Plaintiffs' members, and Class members developing cancers and other serious diseases, illnesses, and injuries linked to PFAS exposure.

282.     Due to these subclinical cellular changes, Plaintiffs, Plaintiffs' members, and Class members are at an increased risk of developing cancers and other illnesses, diseases, and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

283.     Effective medical testing for reliably early detection of cancers and other diseases and conditions related to PFAS Chemical exposure exists.

284.     Early detection, combined with prompt and effective treatment, will significantly decrease the risk of death and the severity of diseases, illnesses, and injuries for Plaintiffs, Plaintiffs' members, and members of the Class.

285.     Such testing is not routinely performed in the absence of known exposure to PFAS Chemicals but is reasonable, periodically necessary, and conforms with the standard of medical and scientific care when such exposures are known.

286.     Diagnostic testing of Plaintiffs, Plaintiffs' members, and the members of the Class for early detection of cancers and other illnesses, diseases, and disease processes caused by exposure to PFAS Chemicals is thus reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

287.     A medical monitoring program will allow for early detection and prompt and effective treatment of any serious disease, illness, or injury caused by PFAS exposure. A medical monitoring program will save lives, decrease the severity of illness, decrease the impact of illness on lives and families, and reduce the costs of caring for such illnesses, and are periodically necessary.

288.     The present value of the reasonable cost of such tests now and into the future can be calculated and known with reasonable certainty after further discovery is made.

289.     In the event that a stand-alone claim for medical monitoring cannot be maintained, Plaintiffs request in the alternative that medical monitoring be awarded as a form of relief in connection with their remaining claims.

### F.  CPLA – STATUTORY PUNITIVE DAMAGES

290.    The harm suffered by Plaintiffs, Plaintiffs' members, and Class Members was the result of Defendants' reckless disregard for the safety of their product users and consumers, who were injured by their conduct.

291.    At all times relevant, the Defendants owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs, Plaintiffs' members, and members of the Class.

292.    Defendants were at all relevant times aware of the considerable health risks that can result from exposure to PFAS Chemicals and PFAS-contaminated turnout gear, including the risk of causing various forms of cancer to fire fighters who were forced to wear PFAS-contaminated turnout gear repeatedly and over a span of years and decades.

293.    Defendants were at all relevant times aware that the turnout gear and/or components of turnout gear that they were selling for use by Plaintiffs, Plaintiffs' members, and members of the Class was contaminated with significant quantities of PFAS.

294.    Defendants therefore at all relevant times knew that their design, manufacture, and sale of PFAS-contaminated turnout gear and/or PFAS-contaminated components of turnout gear would be likely to result in the exposure of Plaintiffs, Plaintiffs' members, and members of the Class to unreasonably dangerous levels of PFAS Chemicals, including PFOA and PFOS, via dermal absorption, inhalation, and ingestion, which would likely cause significant personal injury to Plaintiffs, Plaintiffs' members, and members of the Class.

295.    Notwithstanding this knowledge, Defendants acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or

conscious disregard of the health, safety, and well-being of Plaintiffs, Plaintiffs' members, and members of the Class by, among other things:

a.  Failing to take reasonable steps to minimize and/or eliminate the presence of PFAS Chemicals in firefighter turnout gear and/or the components of firefighter turnout gear;

b.  Selling turnout gear and/or components of turnout gear for use by Plaintiffs, Plaintiffs' members, and members of the Class that Defendants knew had significant and detectable (and therefore dangerous) concentrations of PFAS Chemicals and were thus likely to cause personal injury to Plaintiffs, Plaintiffs' members, and members of the Class;

c.  Failing and refusing to implement changes in the design of the turnout gear and/or the components of the turnout gear, including the utilization of alternative materials, that would have reduced the PFAS exposure to Plaintiffs, Plaintiffs' members, and Class members to non-detectable levels despite knowing that the failure to do so would result in significant personal injury to Plaintiffs, Plaintiffs' members, and members of the Class; and

d.  Failing to warn Plaintiffs, Plaintiffs' members, and members of the Class that the turnout gear and/or component parts of the turnout gear that they were routinely required to wear and that was designed, manufactured, and sold by Defendants, would result in significant personal injury to Plaintiffs, Plaintiffs' members, and members of the Class.

296.   As a direct and proximate result of Defendants' willful, wanton, and reckless conduct, Plaintiffs, Plaintiffs' members, and members of the Class suffered, presently suffer, and

will continue to suffer personal injuries, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves, their members, and members of the Class, seek monetary and equitable relief, including:

1.      Compensatory damages;

2.      Attorneys' fees and costs pursuant to CONN. GEN. STAT. § 52-240a;

3.      Statutory punitive damages pursuant to CONN. GEN. STAT. § 52-240b;

4.      Equitable relief in the form of orders directing each Defendant to: a) correct its practices and to cease manufacturing turnout gear or any component turnout gear with PFAS Chemicals, b) contribute to the establishment of a diagnostic medical testing program and medical monitoring protocol for Plaintiffs and the Class to monitor individuals' health and diagnose at an early stage any ailments that can result from exposure to PFAS Chemicals; and

5.      Such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury as to all issues so triable as a matter of right.

DATED:      June 25, 2024                Respectfully submitted,

SILVER GOLUB & TEITELL LLP

*/s/ Ian W. Sloss*
Ian W. Sloss (ct31244)
Jennifer Sclar (ct31554)
Kate Sayed (ct31667)
SILVER GOLUB & TEITELL LLP

ONE LANDMARK SQUARE, FLOOR 15
STAMFORD, CONNECTICUT 06901
Tel. (203) 325-4491
isloss@sgtlaw.com
jsclar@sgtlaw.com
ksayed@sgtlaw.com

*Counsel for Plaintiffs*