## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNIFORMED PROFESSIONAL FIRE FIGHTERS ASSOCIATION OF CONNECTICUT, STAMFORD PROFESSIONAL FIRE FIGHTERS ASSOCIATION, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS LOCAL 786, FAIRFIELD FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 1426, STRATFORD PROFESSIONAL FIRE FIGHTERS, IAFF LOCAL 998, HAMDEN PROFESSIONAL FIRE FIGHTERS, IAFF LOCAL 2687, CITY OF GROTON FIRE FIGHTERS UNION, IAFF LOCAL 1964, PETER BROWN, PAUL ANDERSON, STEVE MICHALOVIC, DAN TOMPKINS, and NELSON HWANG, individually and on behalf of all others similarly situated, | Case No: 24-cv-1101 Judge Alvin W. Thompson Magistrate Judge Robert M. Spector |
| Plaintiffs, | |
| v. | |
| 3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY), EIDP, INC., DUPONT DE NEMOURS, INC., CHEMOURS COMPANY, CHEMOURS COMPANY FC, LLC, CORTEVA, INC.,, ELEVATE TEXTILES, INC., GLOBE MANUFACTURING COMPANY, LLC; W.L. GORE & ASSOCIATES, INC., FIRE-DEX GW, LLC, HONEYWELL SAFETY PRODUCTS USA, INC., INTERTECH GROUP, INC., LION GROUP, INC., MILLIKEN & COMPANY, MORNING PRIDE MANUFACTURING LLC, PBI PERFORMANCE PRODUCTS, INC., SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC., and STEDFAST USA, INC., | |
| Defendants. | |

## PLAINTIFFS' OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND TO STRIKE

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................8

I.     PLAINTIFFS ESTABLISH "TRACEABILITY" FOR ALL CLAIMS.............................8

II.    THE COURT HAS PERSONAL JURISDICTION OVER ALL
       DEFENDANTS.........................................................................................13

       A.     Multiple Defendants have consented to personal jurisdiction .............................13

       B.     Connecticut may constitutionally require a foreign corporation or
              LLC to consent to personal jurisdiction when it registers to do
              business in the state.........................................................................15

       C.     In the absence of a federal law conflict, an Erie analysis mandates compliance with
              clear Connecticut precedent.................................................................18

       D.     Connecticut's Long-arm Statutes ..........................................................19

              1.     Jurisdiction over Corporate Defendants based on § 33-929(f)(3)...............22

              2.     Jurisdiction over Corporate Defendants based on § 33-929(f)(2).............24

              3.     Jurisdiction over LLC Defendants based on § 52-59b(a)(1)......................26

              4.     Jurisdiction over LLC Defendants based on § 52-59b(a)(3)......................27

       E.     Due Process....................................................................................28

       F.     Minimum Contacts............................................................................29

       G.     Reasonableness ...............................................................................35

III.   PLAINTIFFS' CLAIMS ARE SUFFICIENTLY STATED ................................................36

IV.    PLAINTIFFS' CPLA CLAIMS SURVIVE SCRUTINY ...................................................38

       A.     The Fire Fighter Plaintiffs' allegations establish "injury-in-fact" and
              standing to seek equitable relief............................................................38

       B.     Plaintiffs' allegations establish associational standing ...........................................45

C.    The Fire Fighter Plaintiffs' theory of injury and medical monitoring claims survive scrutiny ...................................................48

1.    The Fire Fighter Plaintiffs Sufficiently Plead Cognizable Injury Under the CPLA ...................................................48

2.    The Fire Fighter Plaintiffs Sufficiently Plead a Cause of Action for Medical Monitoring ...................................................53

D.    3M's separate arguments are unavailing ...................................................54

1.    Strict Liability ...................................................54

2.    Negligence ...................................................55

3.    Failure to Warn ...................................................56

4.    Punitive Damages ...................................................57

V.    PLAINTIFFS' WARRANTY CLAIMS SURVIVE SCRUTINY ...................................................58

A.    Connecticut recognizes a claim for breach of the implied warranty of usability ...................................................58

B.    Connecticut does not require Plaintiffs to provide notice of breach to Manufacturers ...................................................58

C.    Connecticut law does not require the Purchaser Plaintiffs to allege transactional privity with 3M ...................................................59

D.    The Amended Complaint establishes that the complete turnout gear products and their components were not merchantable ...................................................61

E.    Defendants fraudulently concealed their misconduct giving rise to Plaintiffs' warranty claims ...................................................65

VI.    THE PURCHASER PLAINTIFFS' CUTPA CLAIM SURVIVES SCRUTINY ...................................................67

A.    Defendants' conduct violated CUTPA ...................................................68

B.    Defendants' violations caused the Purchaser Plaintiffs' injuries ...................................................72

C.    The Purchaser Plaintiffs have standing to sue 3M ...................................................72

D.    3M engaged in trade or commerce in Connecticut ................................. 74

E.    Defendants engaged in a continuing course of conduct with respect to their CUTPA violations ................................................................................ 75

F.    Defendants' motion to strike ............................................................... 77

CONCLUSION .................................................................................................... 77

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                    Page(s)

*Adam v. Barone*,
    41 F.4th 230 (3d Cir. 2022) ................................................................... 9

*Adkins v. Nestle Purina PetCare Co.*,
    973 F. Supp. 2d 905 (N.D. Ill. 2013) ............................................... 60

*In re Agent Orange Prod. Liab. Litig.*,
    996 F.2d 1425 (2d Cir. 1993) ........................................................... 41

*Am. Booksellers Ass'n v. Houghton Mifflin Co.*,
    1995 WL 92270 (S.D.N.Y. Mar. 3, 1995) ...................................... 47

*Arrowsmith v. United Press Int'l*,
    320 F.2d 219 (2d Cir. 1963) ............................................................. 20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................... 36

*Atuahene v. City of Hartford*,
    10 F. App'x 33 (2d Cir. 2001) .................................................... 36, 37

*Austen v. Catterton Partners V, LP*,
    729 F. Supp. 2d 548 (D. Conn. 2010) ............................................. 21

*Bailey Emp. Sys., Inc. v. Hahn*,
    545 F. Supp. 62 (D. Conn. 1982) .................................................... 71

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990) ............................................................. 19

*Bank of New York v. Nat'l Funding*,
    No. X01CV000171525S, 2005 WL 527749 (Conn. Super. Ct. 2005) ................................ 68

*Bano v. Union Carbide Corp.*,
    361 F.3d 696 (2d Cir. 2004) ....................................................... 45, 46

*Barnstable Cnty. v. 3M Co.*,
    2017 WL 6452245; Barnstable Cnty. v. 3M Co., (D. Mass. Dec. 18, 2017) ................ 37, 38

*Bartold v. Wells Fargo Bank, N.A.*,
    No. 14-CV-00; 2015 WL 7458504 (VAB) ...................................... 76

*Bausch v. Stryker Corp.*,
  630 F.3d 546 (7th Cir. 2010) ............................................................ 38

*Beerman v. Tauck, Inc.*,
  No. 3:20-CV-00713, 2021 WL 3773293 (D. Conn. Aug. 25, 2021) ................................. 71

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................... 36

*Bell v. 3M Co.*,
  344 F. Supp. 3d 1207 (D. Colo. 2018) ..................................................... 43

*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................. 9, 13

*Bensmiller v. EI Dupont de Nemours & Co.*,
  47 F.3d 79 (2d Cir. 1995) ................................................................ 20

*Berry v. Chicago*,
  133 N.E.3d 1201 (Ill. App. 2019) ......................................................... 51

*Best Produce, Inc. v. DiSapio*,
  540 F.3d 115 (2d Cir. 2008) .............................................................. 13

*Bifolck v. Philip Morris, Inc.*,
  324 Conn. 402; 152 A.3d 1183 (2016)................................................... 54, 55

*Blanchette v. Barrett*,
  229 Conn. 256; 640 A.2d 74 (1994) ....................................................... 76

*Bly v. Otis Elevator Co.*,
  713 F.2d 1040 (4th Cir. 1983)............................................................ 63

*Bower v. Westinghouse Electric Corp.*,
  206 W.Va. 133; 522 S.E.2d 424 (1999)..................................................... 53

*Bowerman v. United Illuminating*,
  1998 WL 910271 (Conn. Super. Ct. Dec. 15, 1998)...................................... 49, 50

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009)....................................................... 12, 57, 62

*Broad. Mktg. Intern., Ltd. v. Prosource Sales & Mktg., Inc.*,
  345 F. Supp. 2d 1053 (D. Conn. 2004) ................................................. 24, 30

*Brown v. C.R. Bard, Inc.*,
    942 F. Supp. 2d 549 (E.D. Pa. 2013) .................................................................. 44

*Brown v. Coty, Inc., No. 22*,
    2023 WL 2691581 (S.D.N.Y. Mar. 29, 2023 2023) ............................................ 64

*Brown v. Lockheed Martin Corp.*,
    814 F.3d 619 (2d Cir. 2016) ................................................................ 15, 16, 18

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ............................................................................................ 35

*Carrano v. Boehringer Ingelheim Corp.*,
    2024 WL 3948911 (Conn. Super. Ct. Aug. 21, 2024) .................................... 14, 15

*Carter v. HealthPort Techs., LLC*,
    822 F.3d 47 (2d Cir. 2016) .................................................................................8, 11

*Case No.*,
    24-cv-1101 ............................................................................................................ 1

*Castle v. Boehringer Ingelheim Pharms., Inc.*,
    No. X08196041722S, 2020 WL 6712426 (Conn. Super. Ct. Sept. 2, 2020) ...................... 57

*Cenatiempo v. Bank of Am., N.A.*,
    333 Conn. 769; 219 A.3d 767 (2019) ................................................................ 68

*CFD*,
    2000 WL 1576395 (D. Conn. Sept. 14, 2000) ................................................... 24

*Charles Schwab Corp. v. Bank of America Corp.*,
    883 F.3d 68 (2d Cir. 2018) ................................................................................. 28

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ......................................................................................... 42, 43

*Clinger v. Edgewell Pers. Care. Brands, LLC*,
    No. 3:21-CV-1040, 2023 WL 2477499 (D. Conn. Mar. 13, 2023) ................... 42, 43

*Cole v. City of Memphis*,
    2013 WL 2443242 (W.D. Tenn. 2013) ............................................................... 37

*Coleman v. Bos. Sci. Corp.*,
    No. 1:10-CV-01968, 2011 WL 1532477 (E.D. Cal. Apr. 20, 2011) ................11, 38

*Communico, Ltd. v. DecisionWise, Inc.*,
  No. 3:14-CV-1887, 2018 WL 1525711 (D. Conn. Mar. 28, 2018) .............................. 32, 34

*Corneliuson v. Arthur Drug Stores, Inc.*,
  153 Conn. 134; 214 A.2d 676 (Conn. 1965) ........................................................ 64

*CutCo Indus., Inc. v. Naughton*,
  806 F. 2d 361 (2d Cir. 1986) .................................................................... 19, 20

*Daddona v. Liberty Mobile Home Sales, Inc.*,
  209 Conn. 243 .................................................................................... 68

*Daimler AG v. Bauman*,
  571 U.S. 117; 134 S. Ct. 746; 187 L.Ed.2d 624 (2014) ...................................... 16

*Danforth v. Minnesota*,
  552 U.S. 264; 128 S. Ct. 1029; 169 L.E.2d 859 (2008) ...................................... 17

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ................................................................... 44

*Divicino v. Polaris Indus.*,
  129 F. Supp. 2d 425 (D. Conn. 2001) .......................................................... 22

*Doe v. City of Stamford*,
  241 Conn. 692; 699 A.2d 52 (1997) ........................................................ 52, 53

*Donovan v. Philip Morris USA, Inc.*,
  455 Mass. 215; 914 N.E.2d 891 (2009) ........................................................ 51

*Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013) .................................................................... 19

*Dougan v. Sikorsky Aircraft Corp.*,
  337 Conn. 27; 251 A.3d 583 (2020) ........................................................... 51

*Dougan v. Sikorsky Aircraft Corp.*,
  2017 WL 7806431 (Conn. Super. Mar. 28, 2017)................................................ 51

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
  438 U.S. 59 (1978)............................................................................ 40

*Duksa v. Middletown*,
  173 Conn. 124; 376 A.2d 1099 (1977) ......................................................... 71

*In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*,
  87 F.4th 315 (6th Cir. 2023) ............................................................... 9

*Edberg v. Neogen Corp.*,
  17 F. Supp. 2d 104 (D. Conn. 1998) ..................................................... 19

*Edwards v. N. Am. Power & Gas, LLC*,
  120 F. Supp. 3d 132 (D. Conn. 2015) ...................................... 68, 72, 75

*EKDJS*,
  2018 WL 2926289 (N.D.N.Y. June 11, 2018)....................................11, 12

*Erie R. Co. v. Tompkins*,
  304 U.S. 64; 58 S. Ct. 817; 82 L. Ed. 1188 (1938).............................. 18

*Est. of Mechling v. U.S. Bank Nat'l Ass'n*,
  No. 3:23-cv-25, 2024 WL 404539 (D. Conn. Feb. 2, 2024)........................ 26, 28

*Est. of Metzermacher v. National R.R. Passenger Corp.*,
  570 F. Supp. 2d 292 (D. Conn. 2008) ..................................................... 22

*Evergreen Media Holdings, LLC v. Warren*,
  105 F. Supp. 3d 192 (D. Conn. 2015) ............................... 31, 32, 33, 34

*Fairchild v. Quinnipiac Univ.*,
  16 F. Supp. 3d 89 (D. Conn. 2014) ......................................................... 36

*Ferro v. Ry. Express Agency, Inc.*,
  296 F.2d 847 (2d Cir. 1961) ................................................................... 36

*Fichera v. Mine Hill Corp.*,
  207 Conn. 204; 541 A.2d 472 (1988) ..................................................... 77

*Fidrych v. Marriot International, Inc.*,
  952 F.3d 124 (4th Cir. 2020) ......................................................... 15, 16

*Friends for All Child., Inc. v. Lockheed Aircraft Corp.*,
  746 F.2d 816 (D.C. Cir. 1984)........................................................ 43, 44

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................................ 42

*Fuld v. Palestine Liberation Organization*,
  82 F.4th 74 (2d Cir. 2023) ........................................................... 14, 17

*Ganim v. Smith & Wesson Corp.*,
258 Conn. 313; 780 A.2d 98 (2001) ................................................................. 73

*General Electric Co. v. Knight*,
499 U.S. 961 (1991) ........................................................................................ 53

*Gerber Sci. Int'l, Inc. v. Roland DGA Corp.*,
No. 3:06-CV-2024, 2010 WL 3928071 (D. Conn. Sept. 20, 2010) .................... 29

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915; 131 S. Ct. 2846; 180 L.Ed.2d 796 (2011)............................. 16, 29

*Gramazio v. Sikorsky Aircraft Corp.*,
No. X01CV000160391, 2001 WL 195011 (Conn. Super. Ct. Feb. 7, 2001) ....... 69

*Granger v. Marriott*,
1993 WL 454236 (Conn. Super. Ct. Oct. 21, 1993)........................................... 15

*Greene v. Orsini*,
50 Conn. ........................................................................................................ 70

*Grey v. Stamford Health Sys., Inc.*,
282 Conn. 745; 924 A.2d 831 (2007) ............................................................... 76

*Haesche v. Kissner*,
229 Conn. 213; 640 A.2d 89 (1994) ................................................................. 56

*Hagwood-El v. Allied Interstate, Inc.*,
No. 3:19-CV-01311, 2020 WL 5300256 (D. Conn. Sept. 4, 2020) .................... 66

*Hahn v. Leighton*,
723 F.2d 895 (2d Cir. 1983) ............................................................................ 71

*Hamon v. Digliani*,
148 Conn. 710; 174 A.2d 294 (Conn. 1961)................................................. 59, 60

*Heldman v. Sobol*,
962 F.2d 148 (2d Cir. 1992) ............................................................................... 9

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408; 104 S. Ct. 1868; 80 L. Ed. 2d 404 (1984)............................. 17, 29

*Helling v. McKinney*,
509 U.S. 25 (1993)........................................................................................... 40

*Henningsen v. Bloomfield Motors, Inc.*,
    32 N.J. 358; 161 A.2d 69 (1960)................................................................. 60

*Higgins v. Huhtamaki, Inc.*,
    No. 1:21-CV-00369-NT; 2022 WL 2274876 (D. Me. June 23, 2022)............................... 51

*Hinchliffe v. Am. Motors Corp.*,
    184 Conn. 607; 440 A.2d 810 (1981) .......................................................... 69

*Hubbard-Hall, Inc. V. Monsanto Co.*,
    98 F. Supp. 3d 480 (D. Conn. 2015) ........................................................... 66

*Hunt v. Washington State Apple Advertising Comm'n*,
    432 U.S. 333 (1977).......................................................................... 45

*Hunte v. Abbott Lab'ys, Inc.*,
    556 F. Supp. 3d 70 (D. Conn. 2021) .......................................................... 57

*iMerchandise LLC v. TSDC, LLC*,
    No. 3:20-cv-248; 2021 WL 1222197 (D. Conn. Mar. 31, 2021) .............................. 4, 23

*Inset Sys., Inc. v. Instruction Set, Inc.*,
    937 F. Supp. 161 (D. Conn. 1996) ............................................................ 24

*Interactive Gaming Council v. Commonwealth ex rel. Brown*,
    425 S.W.3d 107 (Ky. Ct. App. 2014) ....................................................... 46, 47

*International Shoe Co. v. Washington*,
    326 U.S. 310; 66 S.Ct. 154; 90 L.Ed. 95 (1945)........................................... 16, 29

*International Union, United Auto. v. Brock*,
    477 U.S. 274 (1986).......................................................................... 45

*Izzarelli v. R.J. Reynolds Tobacco Co.*,
    117 F. Supp. 2d 167 (D. Conn. 2000) ..................................................... 76, 77

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984).......................................................................... 29

*Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ.*,
    338 Conn. 189; 257 A.3d 874 (2021) ...................................................... 68, 68

*Kernan v. Kurz-Hastings, Inc.*,
    175 F.3d 236 (2d Cir. 1999) ........................................................... 20, 30, 35

*Kimca v. Sprout Foods, Inc., (SRC)*,
    2022 WL 1213488 (D.N.J. Apr. 25, 2022) ........................................................................ 41

*Koronthaly v. L'Oreal USA, Inc.*,
    374 F. App'x 257 (3d Cir. 2010) ........................................................................ 41

*Kreppein v. Celotex Corp.*,
    969 F.2d 1424 (2d Cir. 1992) ........................................................................ 12

*Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002) ........................................................................ 29

*Lamontagne v. E.I. Du Pont de Nemours & Co.*,
    834 F. Supp. 576 (D. Conn. 1993) ........................................................................ 74

*Lawrence v. O & G Indus., Inc.*,
    319 Conn. 641; 126 A.3d 569 (2015) ........................................................................ 56

*Leslie v. Medline Indus., Inc.*,
    No. 20-CV-01654; 2021 WL 4477923 (N.D. Ill. Sept. 30, 2021) ........................................ 40

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2012) ........................................................................ 29

*Lombard Bros., Inc. v. Gen. Asset. Mgmt. Co.*,
    460 A.2d 481 (Conn. 1983) ........................................................................ 21

*Lucey v. Saint-Gobain Performance Plastics Corp.*,
    No. 117CV1054 ........................................................................ 11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................ 9, 13

*Macomber v. Travelers Property and Cas. Corp.*,
    261 Conn. 620 (2002) ........................................................................ 72

*Maddox v. Bank of New York Mellon Tr. Co., N.A.*,
    19 F.4th 58 (2d Cir. 2021) ........................................................................ 39

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122; 143 S. Ct. 2028; 216 L. Ed. 2d 815 (2023) .......................... 14, 16, 17, 18

*Marten Transp., Ltd. v. MacDermid, Inc.*,
    No. CV000160172, 2001 WL 438826 (Conn. Super. Ct. Mar. 26, 2001) ............................ 69

*Mather v. Griffin Hospital*,
    207 Conn. 125; 540 A.2d 666 (1988) ................................................ 56

*McArthur v. Yale New Haven Hospital*,
    No. 3:20-cv-998, 2021 WL 3725996 (D. Conn. Aug. 23, 2021) .................................... 4, 23

*McCullough v. World Wrestling Ent., Inc.*,
    172 F. Supp. 3d 528 (D. Conn. 2016) ................................................ 66

*McGee v. S-L Snacks Nat'l*,
    982 F.3d 700 (9th Cir. 2020) ................................................ 41

*Metropolitan Life Ins. Co. v. Robertson-CECO Corp.*,
    84 F.3d 560 (2d Cir. 2006) ................................................ 20, 35

*Meyer ex rel. Coplin v. Fluor Corp.*,
    220 S.W.3d 712 (Mo. 2007) ................................................ 51, 53

*Naples v. Keystone Bldg. & Dev. Corp.*,
    295 Conn. 214; 990 A.2d 326 (2010) ................................................ 68

*National Association of College Bookstores, Inc. v. Cambridge University Press*,
    990 F. Supp. 245 (S.D.N.Y. 1997) ................................................ 47

*Needle v. True N. Equity, LLC*,
    No. 3:19-cv-372, 2020 WL 1550219 (D. Conn. April 1, 2020) ........................................ 26

*New York State National Organization for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989) ................................................ 47

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ................................................ 43

*NovaFund Advisors, LLC v. Capitala Grp., LLC*,
    No. 3:18-cv-1023, 2019 WL 1173019 (D. Conn. Mar. 13, 2019) ...................................... 21

*O'Brien v. National Gypsum Co.*,
    944 F.2d 69 (2d Cir. 1991) ................................................ 12

*OneBeacon Ins. Group v. Tylo AB*,
    731 F. Supp. 2d 250 (D. Conn. 2010) ................................................ 22, 33

*In re Paoli Railroad Yard PCB Litigation*,
    916 F.2d 829 (3d Cir. 1990) ................................................ 53

*Partitions, Inc. v. Blumberg Assocs.*,
    2001 WL 1332174 (Conn. Super. Ct. Oct. 9, 2011) ............................................................. 76

*Peeler v. SRG Glob. Coatings, LLC*,
    No. 1:23-CV-23-SNLJ; 2024 WL 4625640 (E.D. Mo. Oct. 30, 2024) ................................ 40

*In re Pennsylvania Baycol Third-Party Payor Litig.*,
    2005 WL 852135 (Pa. Com. Pl. Apr. 4, 2005) ................................................................... 58

*Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*,
    243 U.S. 93 ( 1917) .................................................................................................... 15, 16

*Petito v. A.H. Robins Co.*,
    750 So. 2d 103 (Fla. Dist. Ct. App. 1999) ...................................................................... 43, 51

*Phelan ex rel. Est. of Phelan v. Daimler Chrysler Corp.*,
    323 F. Supp. 2d 335 (D. Conn. 2004) ............................................................................. 77

*Philadelphia Indem. Ins. Co. v. Lennox Indus., Inc.*,
    No. 3:18-CV-00217, 2019 WL 1258918 (D. Conn. Mar. 18, 2019) ................................... 56

*Plusgrade L.P. v. Endava Inc.*,
    No. 1:21-CV-1530, 2023 WL 2402879 (S.D.N.Y. May 8, 2023) ....................................... 37

*Poce v. O & G Indus., Inc.*,
    210 Conn. App. 82; 269 A.3d 899 ........................................................................ 48, 49, 50

*Prantil v. Arkema France S.A.*,
    No. 4:17-CV-02960, 2022 WL 1570022 (S.D. Tex. May 18, 2022) ................................... 40

*Pritchard v. Liggett & Myers Tobacco Co.*,
    295 F.2d 292 (3d Cir. 1961) ......................................................................................... 63

*Prods. Liab. Litig.*,
    155 F. Supp. 3d 772 (N.D. Ill. 2016) ............................................................................. 59

*Prysmian Cables & Sys. USA LLC v. ADT Com. LLC*,
    665 F. Supp. 3d 236 (D. Conn. 2023) .................................................................... 69, 70, 71

*Rent Stabilization Ass'n v. Dinkins*,
    5 F.3d 591 (2d Cir. 1993) ............................................................................................ 45

*Rhodes v. E.I. du Pont de Nemours & Co.*,
    657 F. Supp. 2d 751 (S.D.W. Va. 2009) ......................................................................... 44

*Robinson v. Overseas Military Sales Corporation*,
  21 F.3d 502 (2d. Cir. 1994) ................................................................ 20

*Romulan Realty, LLC v. Old Lyme Prods., Inc.*,
  No. CV115014161S, 2011 WL 6934754 (Conn. Super. Ct. Dec. 7, 2011) ....................... 72

*Ruderman v. Warner-Lambert Pharmaceutical Co.*,
  23 Conn. Supp. 416; 184 A.2d 63 (1962) ................................................ 59

*Ruiz v. Victory Properties, LLC*,
  315 Conn. 320; 107 A.3d 381 (2015) ................................................... 56

*Ryan v. Greif, Inc.*,
  708 F. Supp. 3d 148 (D. Mass. 2023) .................................................. 51

*Sadler v. PacifiCare of Nev.*,
  340 P.3d 1264 .......................................................................... 51

*Schenck v. Pelkey*,
  176 Conn. 245; 405 A.2d 665 (1978) ................................................... 61

*SEC v. Caterinicchia*,
  613 F.2d 102 (5th Cir. 1980) ......................................................... 44

*Smith v. Wells Fargo Bank, N.A.*,
  158 F. Supp. 3d 92 (D. Conn. 2016) ................................................... 67

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) .................................................................. 38

*Suri v. Wolters Kluwer ELM Sols., Inc.*,
  No. 3:20-cv-1694, 2022 WL 526497 (D. Conn. Feb. 22, 2022) ............................ 27

*Sutton v. St. Jude Med. S.C., Inc.*,
  419 F.3d 568 (6th Cir. 2005) ......................................................... 44

*Syngenta Crop Prot., Inc. v. Henson*,
  537 U.S. 28 (2002) ................................................................... 41

*Szollosy v. Hyatt Corp.*,
  No. 399CV870 ......................................................................... 24

*Talenti v. Morgan & Brother Manhattan Storage Co.*,
  113 Conn. App. 845; 968 A.2d 933 ........................................... 13, 15, 18

*This, LLC v. HolaBelle, Inc.*,
    No. 3:23-CV-1579, 2024 WL 2957037 (D. Conn. June 12, 2024) ..................................... 33

*Titan Sports, Inc. v. Turner Broad. Sys., Inc.*,
    981 F. Supp. 65 (D. Conn. 1997) ...................................................................... 75

*Tomczuk v. Town of Cheshire*,
    26 Conn. Supp. 219; 217 A.2d 71 (Super. Ct. 1965) .......................................... 59

*Tomra of N. Am., Inc., v. Env't Prods. Corp.*,
    4 F. Supp. 2d 90 (D. Conn. 1998) .................................................................... 21

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ......................................................................................... 39

*Tripathy v. McKoy*,
    103 F.4th 106 (2d Cir. 2024) ........................................................................... 39

*Trzcinski v. Richley*,
    190 Conn. 285; 460 A.2d 1269 (1983) ............................................................. 56

*Ulbrich v. Groth*,
    310 Conn. 375; 78 A.3d 76 (2013) ................................................................... 69

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) ......................................................................................... 46

*United States v. Taylor*,
    596 U.S. 845; 142 S. Ct. 2015; 213 L. Ed. 2d 349 (2022) .................................. 17

*Univ. of Tex. S.W. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ........................................................................................... 9

*V.S. v. Muhammad*,
    595 F.3d 426 (2d Cir. 2010) ............................................................................ 19

*Vacco v. Microsoft Corp.*,
    260 Conn. 59; 793 A.2d 1048 (2002) ........................................................... 73, 73

*Valtec Int'l, Inc. v. Allied Signal Aerospace Co.*,
    No. 3:93CV01171; 1997 WL 288627 (D. Conn. Mar. 7, 1997) .......................... 75

*Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*,
    406 F. Supp. 2d 175 (D. Conn. 2005) .............................................................. 75

*W. Dermatology Consultants P.C. v. VitalWorks, Inc.*,
    146 Conn. App. 169; 78 A.3d 167 (2013)........................................................... 74

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008) ............................................................................... 9

*Wallenta v. Avis Rent A Car System, Inc.*,
    10 Conn. App. 201; 522 A.2d 820 (1987)........................................................ 18

*Warth v. Seldin*,
    422 U.S. 490 (1975)........................................................................................... 46

*Wender v. Trading Cove Assocs.*,
    No. 549346, 1999 WL 353474 (Conn. Super. Ct. May 21, 1999) ...................... 15

*Wessel v. Village of Monee*,
    2010 WL 2523574 (N.D. Ill. 2010).................................................................... 38

*Wilkins v. Yale Univ.*,
    No. CV106014646S, 2011 WL 1087144 (Conn. Super. Ct. Feb. 25, 2011) ....... 68

*Winans v. Ornua Foods N. Am. Inc.*,
    731 F. Supp. 3d 422 (E.D.N.Y. 2024) ............................................................... 42

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)........................................................................................... 30

*Wright v. Brooke Grp. Ltd.*,
    652 N.W.2d 159 (Iowa 2002)............................................................................. 63

*Zito v. United Techs. Corp.*,
    No. 3:15-CV-744, 2016 WL 2946157 (D. Conn. Mar. 11, 2016) ...................... 62

## STATUTES

Conn. Gen. Stat. 33-290................................................................................... 13, 14

Conn. Gen. Stat. 33-926........................................................................................ 14

Conn. Gen. Stat. 33-929(f)........................................................................... 20, 21, 24

Conn. Gen. Stat. 33-929(f)(2) ........................................................................... 24, 25

Conn. Gen. Stat. 33-929(f)(3)............................................................................... 22

Conn. Gen. Stat. 34-275a...................................................................................... 14

Conn. Gen. Stat. 34-275b(5) ........................................................................ 14

Conn. Gen. Stat. 42-110a ........................................................................... 67

Conn. Gen. Stat. 42-110a(4) ...................................................................... 74

Conn. Gen. Stat. 42-110b(a) ................................................................. 67, 74

Conn. Gen. Stat. 42-110g(a) ...................................................................... 67

Conn. Gen. Stat. 42-110g(f) ....................................................................... 75

Conn. Gen. Stat. 42a-2 ................................................................. 58, 61, 63, 65

Conn. Gen. Stat. 52-572q(c) ...................................................................... 56

Conn. Gen. Stat. 52-595 ............................................................................. 66

Conn. Gen. Stat. 52-59b(a) .................................................................. 20, 21

Conn. Gen. Stat. 52-59b(a)(1) ................................................................... 26

Conn. Gen. Stat. 52-59b(a)(3) ................................................................... 27

Iowa Code 554.2314 (1999) ....................................................................... 63

## FEDERAL RULES

Fed. R. Civ. P. 8 ....................................................................................... 36

Fed. R. Civ. P. 12 (b)(1) .............................................................................. 8

Fed. R. Civ. P. 12 (b)(2) ............................................................................ 13

Fed. R. Civ. P. 12 (b)(6) ............................................................................ 36

## OTHER AUTHORITIES

U.C.C. § 2-314 ......................................................................................... 58

Plaintiffs[1] respectfully submit this Memorandum in Opposition to the Motions to Dismiss and Strike the above-captioned action ("Action") that were filed by Defendants Honeywell Safety Products USA, Inc.; Morning Pride Manufacturing LLC; EIDP, Inc.; DuPont de Nemours, Inc.; The Chemours Company, L.L.C.; The Chemours Company FC, LLC; Corteva, Inc.; Elevate Textiles, Inc.; Fire-Dex GW, LLC; Globe Manufacturing Company, LLC; W.L. Gore & Associates, Inc.; Lion Group, Inc.; Milliken & Company; Safety Components Fabric Technologies, Inc.; and StedFast USA, Inc. (the "Group Defendants"), Defendants InterTech Group, Inc. and PBI Performance Products, Inc.; and Defendant 3M Company's Motion to Dismiss ("3M") (collectively, "Defendants'"). *See* ECF Nos. 110, 112, 113, 114, 118.

## <u>INTRODUCTION</u>

Plaintiffs are Connecticut fire fighters and municipalities that purchased and used PFAS-contaminated fire fighter turnout gear manufactured and distributed, in whole or in part, by Defendants. Amended Complaint, ECF No. 9 ("AC") at ¶¶ 89–131. Defendants are indispensable participants in the turnout gear manufacture and distribution chain. AC at ¶¶ 112–31. PFAS chemicals are hazardous, man-made chemicals that have been shown to cause negative health outcomes, including cancer, disruption of the endocrine system, and interference with the immune system. AC ¶¶ 50-88. PFAS chemicals in turnout gear migrate into the human body via skin absorption and inhalation. AC at ¶¶ 223–25. PFAS manufacturers (of which 3M and Dupont are the largest by an order of magnitude) and other Defendants have known PFAS are dangerous and harmful to human health for decades. AC at ¶¶ 132–64. In recognition of these dangers and the

---

[1] Plaintiffs are the Uniformed Professional Fire Fighters Association of Connecticut ("UPFFA"); The Stamford Professional Fire Fighters Association, International Association of Fire Fighters ("IAFF") Local 786; The Fairfield Fire Fighters Association, IAFF Local 1426; Stratford Professional Fire Fighters, IAFF Local 998; Hamden Professional Fire Fighters, IAFF Local 2687; The City of Groton Fire Fighters Union, IAFF Local 1964; The City of Stamford; The Old Mystic Fire District; The Reliance Fire Company, Inc.; Peter Brown; Paul Anderson; Steve Michalovic; Dan Tompkins; and Nelson Hwang.

unreasonable risk of harm PFAS-laden turnout gear poses to Connecticut fire fighters, Connecticut has outlawed the purchase or manufacture of turnout gear that contains PFAS in the state of Connecticut beginning in 2028.  AC at ¶¶ 193–97.

Defendants do not dispute any of this.  Rather, Defendants seek dismissal based largely on their assertion that the allegations are not specific enough or individualized enough to establish standing, general or specific jurisdiction, or to sustain Plaintiffs' claims.  They do not argue (nor could they) that their products do not contain PFAS, that their products are not sold into Connecticut and used by fire fighters in Connecticut, or that they do not actively market their products to fire fighters and municipalities throughout Connecticut—because they do.  Nor do they deny awareness of the dangers of PFAS, because they are.  Instead, they argue that Plaintiffs' factual allegations are not specific enough to meet the pleading standard at this stage. Defendants criticize Plaintiffs' purported group pleading as though Defendants were randomly named in this action without regard to their responsibility for the PFAS in the turnout gear purchased and/or used by Plaintiffs. The absurdity of Defendants' position is underscored by Plaintiffs' declarations filed concurrently with this opposition, which further establish that Defendants' turnout gear was sold to the Connecticut municipalities and/or fire districts where Plaintiffs' serve and that Plaintiffs personally used the turnout gear manufactured by Defendants.  *See* Declaration of Peter Brown, Declaration of Paul Anderson, Declaration of Nelson Hwang and Declaration of William Tuttle, filed in support of Plaintiffs' Opposition.

Each Defendant has participated for decades—some for more than a century—in the design, manufacture and distribution of turnout gear, forming a small ecosystem of interdependent

entities that produce a highly specialized product for a niche group of users and purchasers.[2] AC at ¶¶ 112–31.  The market for turnout gear is highly concentrated because the National Fire Protection Association ("NFPA") sets stringent standards for fire fighter PPE that are difficult to meet, creating significant barriers to entry.  Moreover, the research and development required to innovate in this space is a barrier to all but the most established players.  Thus, a few players, such as Globe (owned by MSA Safety), Honeywell (manufacturer of Morning Pride), Lion, and Fire-Dex dominate the manufacture of turnout gear. To produce turnout gear, the manufacturer defendants buy highly technical fabrics, components, and other materials from DuPont, 3M, PBI Performance Products (owned by Intertech Group), Elevate, W.L. Gore, Safety Components Fabric Technologies, and Stedfast. The manufacturing and distribution activities of the Defendants target a nationwide market of a million fire fighters and are purposefully directed to each state in the United States, including Connecticut.

**Defendants are Partners in the Manufacture, Production, and Distribution of the PFAS-Contaminated Turnout Gear Provided to Connecticut Fire Fighters**

Turnout gear is a sophisticated finished product that incorporates highly specialized materials and manufacturing processes.  3M and DuPont ("Chemical Manufacturer Defendants") manufacture PFAS, a class of synthetic chemical compounds that were developed in the 1930s and 1940s, and which have been known by Defendants to cause harmful health effects since the early 1960s.  AC at ¶¶ 60–88, 141–64.  PFAS is incorporated into the materials, including the textiles that are used to make turnout gear by 3M, DuPont, Elevate Textiles, Gore, InterTech Milliken, PBI Safety Components, and Stedfast (Materials Manufacturer Defendants).  AC ¶ 130, 212–13. Globe, Morning Pride (Honeywell), Lion, and Fire-Dex (Turnout Gear Manufacturer Defendants)

---

[2] According to the U.S. Government, there are just over a million paid and volunteer fire fighters in the United States. *See* https://apps.usfa.fema.gov/registry/summary#f.

use the materials and textiles provided by the Materials Manufacturer Defendants to create the turnout gear that is manufactured, marketed, sold, and worn by fire fighters in Connecticut and throughout the United States and the world. AC at ¶ 131. Each of the Defendants, often working in partnership, participated in the design, development, manufacture, testing, promotion, advertising, and distribution or sale of turnout gear to the Plaintiffs. AC at ¶¶ 128–31, 212–13.

**The Chemical and Turnout Gear Manufacturer Defendants**

3M and DuPont are the largest PFAS manufacturers in the United States. AC at ¶ 132, 141. DuPont manufactures Nomex® and Kevlar®, materials that are ubiquitous in fire fighter PPE, including turnout gear. Visitors to DuPont's website can navigate to a section that contains information about its "Personal Protection" products where it states that "DuPont is proud to *partner with the manufacturers* listed below to bring the latest technological breakthroughs to emergency responders. For more information on PPE for emergency responders, visit the websites of our partners.*" See* screenshots of DuPont website content attached to the Declaration of Jennifer Sclar ("Sclar Dec.") as Exhibit 12. (Emphasis added). It contains links to Fire-Dex, Globe, Lion, and Honeywell, among others, and boasts that these manufacturers make products using DuPont's Nomex® and Kevlar®.[3] *Id.*

Globe has been manufacturing, marketing, and selling turnout gear using PFAS-containing materials supplied by Defendants 3M, DuPont, Gore, InterTech, and PBI, which in turn use PFAS manufactured by 3M and/or DuPont since 1966. AC at ¶ 116. Plaintiffs Peter Brown and Paul Anderson have been issued and have worn turnout gear manufactured by Globe. Globe turnout

---

[3] A Court may take judicial notice of information posted on a litigant's website. *See McArthur v. Yale New Haven Hospital*, No. 3:20-cv-998 (SRU), 2021 WL 3725996, at *6 n.5 (D. Conn. Aug. 23, 2021) (taking notice of representations made on the defendant's website, such as representations about its services, because a court can "take judicial notice of facts 'not subject to reasonable dispute' because they 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"); *iMerchandise LLC v. TSDC, LLC*, No. 3:20-cv-248(RNC), 2021 WL 1222197, at *5 n.5 (D. Conn. Mar. 31, 2021) (stating that courts generally have discretion to take judicial notice of websites and their contents).

gear has been issued and worn by fire fighters in the Stamford Fire Department, and the Norwalk Fire Department.  *See* Declaration of Peter Brown and Declaration of Paul Anderson.  Globe's website (linked to the DuPont website), provides the name, phone number, and address of the nearest seller of Globe equipment in the state of Connecticut.  *See* screenshots of Globe Manufacturing Co., Inc's website content attached the Sclar Dec. as Exhibit 13.

Honeywell acquired Norcross Safety Products LLC in 2008, and began to manufacture, market, and sell PFAS-contaminated turnout gear.  AC at ¶ 122.  Since 2008, Honeywell has continued to manufacture, market, and sell PFAS-contaminated turnout gear using materials supplied by DuPont, Gore, InterTech, PBI, and Stedfast, and PFAS manufactured by 3M and/or DuPont.  AC at ¶ 123.  The link to the Honeywell website from DuPont's website features Honeywell's Morning Pride® turnout gear.  Plaintiffs Peter Brown, Paul Anderson, Nelson Hwang, and William Tuttle along with others in the Norwalk Fire Department, the Stamford Fire Department, the Hamden Fire Department, and the Fairfield Fire Department have been issued and have worn Morning Pride turnout gear. *See* Declarations of Peter Brown, Paul Anderson, Nelson Hwang and William Tuttle.  Moreover, the Honeywell website contains information about authorized dealers of its personal protective equipment based on location.  A search for authorized dealers in Connecticut directs buyers to 28 locations in the state.  *See* screenshots of Honeywell Safety Products, Inc.'s website content attached to the Sclar Dec. as Exh. 14.

Lion has manufactured, marketed, and sold turnout gear using PFAS-contaminated materials supplied by DuPont and Gore and PFAS manufactured by 3M and/or DuPont since 1970.  AC at ¶¶ 118–19.  Plaintiffs Paul Anderson as well as others in the Stamford Fire Department has been issued and worn turnout gear manufactured by Lion.  *See* Declaration of Paul Anderson.  Lion is a manufacturing partner with a link on the DuPont website and provides users with the name and

contact information of a local sales representative in Connecticut.  *See* screenshots of Lion Group, Inc's website content attached to the Sclar Dec. as Exh. 15.

Fire-Dex has been manufacturing, marketing, and selling turnout gear using PFAS-contaminated materials supplied by DuPont, Elevate Textiles, Gore, InterTech, Milliken, PBI, Safety Components, and StedFast and PFAS manufactured by 3M and/or DuPont since 1983.  AC at ¶¶ 120–21.  The Fire-Dex website, that is linked to the DuPont website, allows you to request a quote for turnout gear pricing.  When you input the zip code for Stamford, CT, the website offers a drop-down menu that lists each fire service within the vicinity of the zip code by name.  *See* screenshots of Fire-Dex GW, LLC's website content attached to the Sclar Dec. at Exh. 16.

**The Materials Manufacturer Defendants**

PBI boasts on its website that "PBI-blended products have been the preferred choice of active fire departments across the Americas and around the world for over 30 years . . . PBI Performance Products has long partnered with premier turnout gear and protective apparel manufacturers to provide the ultimate in PPE protection for firefighters."  Visitors to the PBI website looking to purchase turnout gear are linked to the websites of its partner turnout gear manufacturers including, among others, Honeywell/Morning Pride, and Fire-Dex.  PBI states that its fabrics protect 41% of all firefighters in North America, or "[m]ore firefighters . . . than any other fabrics."  *See* screenshots of PBI Performance Products, Inc.'s website content attached to the Sclar Dec. at Exh. 19.

PBI's website displays a banner declaring "No PFOA/PFAS" and states, without providing any documentation or evidence, that "PBI has never used Perfluroroalkyl Substances or Polyfluoroalkyl Substances, collectively known as PFAS (which includes Perfluorooctanoic acid, or PFOA), in the manufacture of PBI…PFAS are not contained in any form of PBI, including

textile fibers."  PBI's website assertions are difficult to square with its own description of how "PBI Fiber Becomes Yarn," which PBI states involves spinning the PBI fiber into yarn that is "intimately blended with Kevlar® and other para-aramids*." Id.*  DuPont's Kevlar contains PFAS.

Elevate Textiles (parent of Safety Components), advertises itself as "The World's Leading Developer and Producer of FR Material," boasting that the "largest fire departments in the world trust in and wear FR materials made by Safety Components."  It contains a representative list of fire departments that includes cities and countries throughout the world, as well as cities throughout the United States.  The website contains testimonials from DuPont, PBI, and Fire-Dex. *See* screenshots of Elevate Textiles, Inc.'s website content attached to the Sclar Dec. at Exh. 20.

Milliken Textiles states on its website that it has "been a trusted resource for hundreds of fire departments, firefighters, and municipalities all over the United States for more than 50 years*."* Further, its website states that it is the "exclusive manufacturer of TECGEN FR™ fabrics for FireDex®." *Id.*

Milliken's website also contains a press release posted on December 20, 2024, proudly announcing that it has become the "First Textile Manufacturer to Offer Non-PFAS Materials for Every Layer of Firefighter Turnout Gear," and specifically references legislation in **Connecticut** and Massachusetts that have banned PFAS in turnout gear.  It also asserts that "our certification results prove that firefighters don't have to compromise on health, protection, or comfort when choosing the right turnout gear."  It states that Milliken "eliminated the use of PFAS chemistry from its fire service fabrics in 2021, and across its entire textile fibers and finishes portfolio in 2023."  Before that time, Milliken textiles contained PFAS chemicals. *Id.*

Like DuPont, the Gore-Tex website lists its manufacturing partners, with links to sites. Among the Gore-Tex partners listed on its website are MSA Safety, Globe, Fire-Dex, Honeywell

(Morning Pride), and Lion. *See* screenshots of Goretex website content attached to Sclar Dec. as Exh. 22.

Stedfast's website describes its STEDAIR® Gold[c] fabric "blended with PBI & Nomex/Kevlar" as "the most innovative moisture barrier available to the Fire Service worldwide.*"* See screenshots of Stedfast USA, Inc.'s website, attached to the Sclar Dec. as Exh. 23. Thus, Stedfast's fabric incorporates PFAS-contaminated materials from DuPont and PBI.

In sum, Defendants have worked together throughout the Class Period to design, manufacture, market, and distribute a product for sale and use in the state of Connecticut that has harmed and will continue to harm purchasers and users, including thousands of fire fighters and the municipalities that support their life-saving work through tax-payer funding.  In the face of this, Defendants' characterization of the Amended Complaint as a fishing expedition that seeks to improperly haul them into court in Connecticut must be rejected.

## ARGUMENT

## I.    PLAINTIFFS ESTABLISH "TRACEABILITY" FOR ALL CLAIMS.

Defendants move under Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' Action for lack of subject matter jurisdiction, arguing that Plaintiffs lack constitutional standing to bring their claims.  Where, as here, a Rule 12(b)(1) motion is based solely on the allegations in the complaint, "[t]he task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal quotation marks omitted). The "irreducible constitutional minimum" of Article III standing consists of three elements; the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Defendants broadly argue that Plaintiffs' allegations fail to establish the second element of Article III standing, or "traceability," for purposes of any claim. *See* ECF Nos. 112 at 6–8 and 118-1 at 6–8.  Traceability is easy to establish, especially at the pleading stage. Traceability requires only a "causal nexus between the defendant's conduct and the injury." *See Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992). It is "akin to but-for causation," which is "established whenever an injury would not have occurred without the alleged action or event." *See Adam v. Barone*, 41 F.4th 230, 235 n.5 (3d Cir. 2022) (citing *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)). As such, traceability imposes a "relatively modest" burden on a motion to dismiss based upon the pleadings, where a court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *See Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) *and W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008).

Defendants forego any meaningful analysis of these well-established principles and, instead, analogize to an out-of-circuit case addressing an extreme set of circumstances. Defendants rely on *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 87 F.4th 315, 319 (6th Cir. 2023), wherein a plaintiff alleged that his exposure to firefighting foams caused five PFAS chemicals to enter his bloodstream. *See* ECF No. 112 at 7; *see also* ECF No. 118-1 at 8. The plaintiff did not know what companies manufactured the PFAS chemicals or what companies manufactured the firefighting foams, nor was he aware of whether the five specific PFAS chemicals at issue were present in the foams he used. *See id.* at 318–19. Despite this lack of knowledge, the plaintiff sued ten PFAS manufacturers, seemingly at random. *See id.* at 318. After the district court granted, in

part, the plaintiff's motion to certify a class, the Sixth Circuit vacated the order, reasoning that the plaintiff had failed to establish traceability. *Id.* at 319–21. The Sixth Circuit noted the plaintiff's choice to "treat the defendants as a collective," emphasizing that the plaintiff "lump[ed] [all defendants] together in his allegations" and "referr[ed] to the actions of 'Defendants'" generally, attempting to establish standing "in gross." *Id.* at 320.

The Group Defendants argue that Plaintiffs similarly "lump[] [all defendants] together," *see* ECF No. 112 at 7, but their analogy to *In re E.I. du Pont* is misplaced. Plaintiffs allege (1) that the Turnout Gear Manufacturer Defendants manufactured their complete turnout gear products, (2) that the Material Manufacturer Defendants manufactured the PFAS-contaminated materials used in the complete turnout gear products, and (3) that the PFAS Manufacturer Defendants manufactured the PFAS compounds that were incorporated into the materials that were used to create the complete turnout gear. *See, e.g.*, AC ¶¶ 112–31. Then, Plaintiffs allege that the complete turnout gear products were not fit for their ordinary, intended use and, in fact, were extremely unsafe, insofar as they were contaminated with high levels of PFAS which entered the bodies and bloodstreams of fire fighters through ingestion, inhalation, and dermal absorption. *See id.* ¶¶ 89–111, 233. Finally, Plaintiffs explain, in detail, why the Purchaser Plaintiffs have suffered monetary losses and why high levels of PFAS in the bodies and bloodstreams of human beings are harmful. *See id.* ¶¶ 232–36.

Defendants take issue with Plaintiffs' use of "and/or" and the summary assertion that each named Defendant is "in some manner responsible" for Plaintiffs' injuries. *See* ECF No. 112 at 7; *see also* ECF No. 118 at 7. In doing so, Defendants ignore the rest of the Amended Complaint, which unequivocally establishes that each and every named defendant is part of a supply chain that culminated in PFAS-contaminated products being purchased or worn by named plaintiffs and

named plaintiffs' members. *See, e.g.*, AC ¶¶ 43, 44, 112–31, 212–17. As such, Plaintiffs have alleged facts that "affirmatively and plausibly suggest" each named Defendants' actions and inactions contributed to Plaintiffs' injuries. *See Carter*, 822 F.3d at 56. Plaintiffs' allegations are more than enough to sustain the causes of action asserted in the Amended Complaint at this stage of the litigation.

The Group Defendants imply, in the absence of any supporting legal authority, that to satisfy "traceability" Plaintiffs must allege which defendant made, "in whole or in part, [each] piece of specific gear at issue" and each "component[]" of each piece of specific gear at issue. *See* ECF No. 112 at 7. This is not the law; nor should it be, as this case involves thousands of Connecticut fire fighters with many thousands of "piece[s] of specific gear" and an even larger number of "components." *See, e.g., Coleman v. Bos. Sci. Corp.*, No. 1:10-CV-01968, 2011 WL 1532477, at *3 (E.D. Cal. Apr. 20, 2011) (emphasizing that "the unremarkable proposition that a plaintiff must allege that a particular defendant caused her injury" is distinct from improperly imposing a requirement on plaintiffs "to 'specifically identify' the products at issue"). The pleading standard the Group Defendants suggest would put the cart before the horse—requiring Plaintiffs to have a level of knowledge at the pleading stage that could be achieved only through the discovery process.

3M argues the Amended Complaint leaves open the possibility that "any of Plaintiffs' turnout gear could contain PFAS that was supplied by unnamed nonparties." *See* ECF No. 118-1 at 7. 3M recently lost a very similar argument in the Northern District of New York. *See Lucey v. Saint-Gobain Performance Plastics Corp.*, No. 117CV1054LEKDJS, 2018 WL 2926289, at *8 (N.D.N.Y. June 11, 2018). In *Lucey*, the plaintiff brought claims against 3M, DuPont, and other defendants for allegedly contributing to hazardous PFOA contamination in the air and groundwater

in her village, causing her to suffer physical injuries. *Id.* at *1. The defendants moved to dismiss, arguing, *inter alia*, that the plaintiff's strict products liability claim should fail because she failed to "identify the exact defendant" who supplied the PFOA that "caused [her] injury." *Id.* at *8. The Court denied the motions, explaining:

> Plaintiff is not required to allege that she only consumed PFOA manufactured by 3M or DuPont, or that there were no other proximate causes of her [injury]. Rather, because Plaintiff has alleged that 3M and DuPont produced the majority of the PFOA used . . . it is reasonable to infer that much of the PFOA in the [contamination site] was produced by 3M and DuPont. It is also reasonable to infer that much of the PFOA accumulated in Plaintiff's body came from PFOA manufactured by DuPont and 3M. ***It is irrelevant that the Amended Complaint leaves open the possibility that Plaintiff also consumed PFOA sold . . . by other suppliers.***

*See id.* at *9 (emphasis added). The *Lucey* court found Second Circuit opinions discussing causation in asbestos exposure cases instructive. *See id.* at *8–9 (citing *Kreppein v. Celotex Corp.*, 969 F.2d 1424, 1425–26 (2d Cir. 1992) and *O'Brien v. National Gypsum Co.*, 944 F.2d 69, 72–73 (2d Cir. 1991)). In *Kreppein* and *O'Brien*, the Second Circuit found that the plaintiffs established causation despite the possibility that the plaintiffs were also exposed to asbestos by a number of unnamed parties. *See Kreppein*, 969 F.2d at 1425–26 and *O'Brien*, 944 F.2d at 72–73.

Similarly, 3M argues that the Amended Complaint leaves open the possibility that "3M supplied the manufacturers with . . . PFAS . . . that never wound up in Plaintiffs' turnout gear." *See* ECF No. 118-1 at 8. The Court should reject this argument outright on the basis that it urges the Court to draw inferences in 3M's favor. *See, e.g., Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (concluding district court erred when, on a motion to dismiss, it "ignored reasonable inferences supported by the facts alleged" and, separately, "drew inferences in [the defendant's] favor").

In sum, Plaintiffs' allegations are more than enough to establish traceability, which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof,

i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Bennet v. Spear*, 520 U.S. 154, 168 (1997). Indeed, at the pleading stage, even "general factual allegations of injury resulting from the defendant's conduct may suffice," insofar as on a motion to dismiss a court will presume "that general allegations embrace those specific allegations that are necessary to support the claim." *Id.* at 168 (quoting *Lujan*, 504 U.S. at 561).

## II. THE COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS.

All Defendants, except for 3M,[4] (the "Moving Defendants") move under Rule 12(b)(2) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' claims against them for lack of personal jurisdiction. *See* ECFs Nos.110, 112, 113, and 114. This Court has personal jurisdiction over many of the defendants because they consented via registration. This Court has jurisdiction over all of the defendants based on the reach of Connecticut's long-arm statutes due to Defendants' business activities that took place in Connecticut and/or resulted in their products being sold into and used in Connecticut.

### A. Multiple Defendants Have Consented to Personal Jurisdiction.

The Group Defendants briefly argue, in a footnote, that registration to do business in Connecticut pursuant to Conn. Gen. Stat. § 33-290 does not constitute consent to personal jurisdiction. *See* ECF No. 112 at 9 n.4. But this position is contrary to the plain language of Connecticut's business registration statutes as interpreted by the Connecticut Appellate Court (with certiorari denied by the Connecticut Supreme Court), that held registration to do business in Connecticut *does* constitute consent to general jurisdiction. *See Talenti v. Morgan & Brother Manhattan Storage Co.*, 113 Conn. App. 845, 854–56, 968 A.2d 933, *cert. denied*, 292 Conn. 908,

---

[4] 3M has waived the defense of personal jurisdiction. *See, e.g., "R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 123 (2d Cir. 2008) ("It is well settled that the defense of personal jurisdiction can be waived.").

973 A.2d 105 (2009). Thus, pursuant to Conn. Gen. Stat. § 33-290, the defendants that have registered to do business in Connecticut have consented to the general jurisdiction of Connecticut courts.  *See* Registration Statements of Group Defendants attached to the Sclar Dec. at Exhs. 1-11. The Supreme Court recently affirmed, in a landmark decision, that such a result is consistent with constitutional due process principles. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 138 (2023).

Defendants Chemours Company, Corteva, Inc., EIDP, Inc., W.L. Gore & Associates, Inc., Honeywell Safety Products USA, Inc., and Lion Group, Inc. are foreign corporations and each registered with the Connecticut Secretary of State pursuant to Conn. Gen. Stat. § 33-290, and these defendants have appointed institutional registered agents for service of process in Connecticut pursuant to Conn. Gen. Stat. § 33-926. *See* Sclar Dec. Exhs. 1–7. Similarly, Defendants Chemours Company FC, LLC, Fire-Dex GW, LLC, and Morning Pride Manufacturing LLC are foreign limited liability companies (LLCs) and each registered with the Connecticut Secretary of State to do business in Connecticut pursuant to Conn. Gen. Stat. § 34-275a, and these defendants have appointed institutional registered agents for service of process in Connecticut pursuant to Conn. Gen. Stats. §§ 34-275b(5) and 34-243n. *See* Sclar Dec. Exhs. 8–11.

One Connecticut state court recently exercised "consent jurisdiction" over a corporation and an LLC on the ground that they were registered to do business in the state. *See Carrano v. Boehringer Ingelheim Corp.*, No. X10-UWY-CV-23-6075772 S, 2024 WL 3948911, at *8, *13 (Conn. Super. Ct. Aug. 21, 2024).  The Court reasoned that the U.S. Supreme Court recognizes a variety of legal arrangements that have been taken to represent express or implied consent to personal jurisdiction, including "*where a defendant accepts a benefit from the forum in exchange for its amenability to suit in the forum's courts.*" *See id.* at *8 (quoting *Fuld v. Palestine Liberation Organization*, 82 F.4th 74, 89 (2d Cir. 2023)). Under Supreme Court precedent, "obtaining the

necessary certification to conduct business in a given state amounts to consent to general jurisdiction in that state only if that condition is explicit *or the state courts have interpreted the statute as imposing that condition*." *See id.* at *9 (quoting *Fidrych v. Marriot International, Inc.*, 952 F.3d 124, 137 (4th Cir. 2020)) (emphasis added).

The latter circumstance is met in Connecticut; in *Talenti v. Morgan & Brother Manhattan Storage Co.*, a Connecticut appellate court "interpreted the legal effect of registering to do business as a foreign corporation under Connecticut statutes, as well as the appointment of an agent for service of process" as imposing the condition of consent to general personal jurisdiction. *See id.* (citing *Talenti v. Morgan & Brother Manhattan Storage Co.*, 113 Conn. App. 845, 854–56, 968 A.2d 933, *cert. denied*, 292 Conn. 908, 973 A.2d 105 (2009)); *see also Wender v. Trading Cove Assocs.*, No. 549346, 1999 WL 353474, at *2 (Conn. Super. Ct. May 21, 1999); *Granger v. Marriott*, No. CV91-0398893S, 1993 WL 454236, at *1 (Conn. Super. Ct. Oct. 21, 1993). Thus, a corporation or LLC that registers to do business in Connecticut consents to general personal jurisdiction in the state. *See Carrano*, 2024 WL 3948911, at *13.

After *Talenti* was decided, but before *Mallory* was decided, the Second Circuit, citing due process concerns, held that Connecticut's business registration statute did not constitute a corporation's consent to submit to the general personal jurisdiction of Connecticut courts. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 623 (2d Cir. 2016). But, as detailed herein, *Brown* was recently abrogated by U.S. Supreme Court opinion.

**B. Connecticut may constitutionally require a foreign corporation or LLC to consent to personal jurisdiction when it registers to do business in the state.**

Over a century ago, in *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, a unanimous Supreme Court held that an out-of-state plaintiff could sue a Pennsylvania corporation in Missouri because the defendant corporation had agreed to accept

15

service of process in Missouri on any suit as a condition of doing business there. 243 U.S. 93, 95 (1917). In so holding, the Court explained that the defendant's constructive consent to jurisdiction, "even if it took the defendant by surprise," raised no due process concerns. *Id.*

Over time, courts began to question *Pennsylvania Fire*'s continued viability. Given the Supreme Court's emphasis on the limited nature of general personal jurisdiction and related due process concerns in *International Shoe Co. v. Washington*[5] and subsequent cases,[6] some courts, including the Second Circuit, expressly declined to follow *Pennsylvania Fire* in cases where it would otherwise have been determinative. *See Brown*, 814 F.3d at 639 ("The sweeping interpretation that a state court gave to a routine registration statute and an accompanying power of attorney that *Pennsylvania Fire* credited as a general 'consent' has yielded to the doctrinal refinement reflected in *Goodyear* and *Daimler* and the Court's 21st Century approach to general and specific jurisdiction in light of expectations created by the continuing expansion of interstate and global business."); *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 136 (4th Cir. 2020) ("[W]e find it difficult to reconcile the *Pennsylvania Fire* approach with the modern view of general jurisdiction expressed in the Supreme Court's recent cases."). These courts erred.

More recently, in *Mallory v. Norfolk Southern Railway Co.*, the Supreme Court held that a Pennsylvania statute which required foreign entities to register to do business in the state, and, simultaneously, provided that such registration amounted to the entity's consent to personal jurisdiction, did not violate due process. 600 U.S. at 135. In so holding, the Court clarified that *Pennsylvania Fire* and *International Shoe*, along with its progeny, "sit comfortably side by side." *Id.* at 137. As explained by the *Mallory* plurality:

---

[5] *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

[6] *See, e.g., Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S. Ct. 2846, 180 L.Ed.2d 796 (2011); *Daimler AG v. Bauman*, 571 U.S. 117, 134 S. Ct. 746, 187 L.Ed.2d 624 (2014).

> [A]ll *International Shoe* did was stake out an additional road to jurisdiction over
> out-of-state corporations. *Pennsylvania Fire* held that an out-of-state corporation
> that has consented to in-state suits in order to do business in the forum is susceptible
> to suit there. *International Shoe* held that an out-of-state corporation that has not
> consented to in-state suits may also be susceptible to claims in the forum state based
> on "the quality and nature of [its] activity" in the forum.

*Id.* at 138. As a result, "express or implied consent," standing alone, can continue to ground

personal jurisdiction. *Id.*

With this new guidance from the Supreme Court, the due process question that this case

presents "is easily answered." *Cf. id.* at 149 (Jackson, J., concurring). To decide the issue of

personal jurisdiction over Defendants Chemours Company, Chemours Company FC, LLC,

Corteva, Inc., EID, Inc., W.L. Gore & Associates, Inc., Fire-Dex GW, LLC, Honeywell Safety

Products USA, Inc., Lion Group, Inc., and Morning Pride Manufacturing LLC, this Court need

only decide whether these defendants, by registering to do business in Connecticut and/or

designating registered agents in Connecticut, consented to personal jurisdiction. There is no

constitutional issue. Whether this Court could have asserted personal jurisdiction over these

defendants absent their consent (the focus of Defendants' motion) is "beside the point." *Cf. id.*

(Jackson, J., concurring).[7]

---

[7] While *Brown* may still await a formal burial, Plaintiffs respectfully suggest that it could not have survived *Mallory*.
Where a lower court's ruling is inconsistent with "a precedent of [the U.S Supreme Court which] has direct
application in a case," this Court must "follow the [Supreme Court] case which directly controls." *Mallory*, 600 U.S.
at 136. And it is likely that *Brown* would be decided differently today: Since *Mallory*, the Second Circuit has
acknowledged that *Pennsylvania Fire* remains good law and that "when a potential defendant accepts a government
benefit conditioned on submitting to suit in the forum, such conduct may fairly be understood as consent to
jurisdiction there" consistent with due process. *Fuld v. Palestine Liberation Org.*, 82 F.4th at 97.

Importantly, it is not within *any federal court's* province to repudiate the Connecticut state courts' broad
interpretation of Connecticut's long-arm statute in the absence of a constitutional issue. *Cf. Helicopteros Nacionales
de Colombia, S.A. v. Hall*, 466 U.S. 408, 413 n.7, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984) ("It is not within our
province [] to determine whether the Texas Supreme Court correctly interpreted the State's long-arm statute. We
therefore accept that court's holding that the limits of the Texas statute are coextensive with those of the Due Process
Clause."); *see also United States v. Taylor*, 596 U.S. 845, 859, 142 S. Ct. 2015, 213 L. Ed. 2d 349 (2022)
(recognizing the "respect due state courts as the final arbiters of state law in our federal system"); *Danforth v.
Minnesota*, 552 U.S. 264, 291, 128 S. Ct. 1029, 169 L.E.2d 859 (2008) (Roberts, C.J., dissenting) ("State courts are
the final arbiters of their own state law").

**C. In the absence of a federal law conflict, an Erie analysis mandates compliance with clear Connecticut precedent.**

The Second Circuit's decision in *Brown v. Lockheed* should no longer be regarded as controlling precedent because its conclusion—that Connecticut's registration regime did not constitute consent by registration—rested on the erroneous assumption that *Pennsylvania Fire* was no longer good law and that finding otherwise would trigger a federal conflict. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 626, 638-9 (2d Cir. 2016) ("We believe that *Pennsylvania Fire* is now simply too much at odds with the approach to general jurisdiction adopted in *Daimler* to govern as categorically as Brown suggests[.]").

In effect, *Brown* amounted to a flawed *Erie* guess that improperly ignored Connecticut intermediate appellate court decisions by presuming a conflict between Connecticut's statutory interpretation and federal due process principles. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938) (holding that where no conflict with federal law exists "the law to be applied in any case is the law of the state" as "declared by its Legislature in a statute or by its highest court[].");  *see also Talenti v. Morgan & Bro. Manhattan Storage Co.,* 113 Conn. App. 845, 855, 968 A.2d 933, 940 (2009) ("a foreign corporation is authorized to conduct business in this state and has appointed a registered agent, nothing in § 33–929(f) limits the court's exercise of personal jurisdiction over the corporation"); *Wallenta v. Avis Rent A Car System, Inc*., 10 Conn. App. 201, 207–208, 522 A.2d 820 (1987) ("This consent [to jurisdiction] is effective even though no other basis exists for the exercise of jurisdiction over the corporation.")

But there is not now, nor has there ever been a conflict between state and federal law, as underscored by the Supreme Court's decision in *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 146, 143 S. Ct. 2028, 2045, 216 L. Ed. 2d 815 (2023) (holding Pennsylvania's consent-by-

registration statute constitutional and observing that the Supreme Court's *Pennsylvania Fire* decision "remains the law[.]") And, while the Connecticut Supreme Court has not opined on this issue, District Courts are "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." *V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010). No such persuasive evidence exists here, and Connecticut's intermediate appellate courts have twice held that Connecticut registration statute confers general jurisdiction, and *Mallory* decisively erases any possibility of a federal law conflict.

A proper *Erie* analysis, therefore, confirms that Connecticut's statutory scheme amounts to consent by registration, which is constitutional and controlled by the Connecticut Appellate Court decision in *Talenti* and *Wallenta*.

### D. Connecticut's Long-arm Statutes.

General personal jurisdiction exists over all Defendants based on Connecticut's long-arm statutes. The showing a plaintiff must make to defeat a defendant's claim that a court lacks jurisdiction over it "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). At this stage in the proceedings, "the plaintiffs must make out only a prima facie showing of personal jurisdiction through their own affidavits and pleadings and supporting materials, and all affidavits and pleadings must be construed in the plaintiffs' favor." *Edberg v. Neogen Corp.*, 17 F. Supp. 2d 104, 110 (D. Conn. 1998) (citing *CutCo Industries, Inc. v. Naughton*, 806 F. Supp. 361, 365 (2d Cir. 1986)). This prima facie showing requires "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Dorchester Fin. Sec. Inc.*, 722 F.3d at 85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). In

considering whether a plaintiff has made such a prima facie showing, the pleadings and any affidavits submitted "are construed in the light most favorable to [the] plaintiff and all doubts are resolved in its favor." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986); *see also Robinson v. Overseas Military Sales Corporation*, 21 F.3d 502, 507 (2d. Cir. 1994) (drawing "argumentative inferences" in plaintiff's favor and "constru[ing] jurisdictional allegations liberally"). The allegations in the Amended Complaint easily pass this bar.

It is well-established that "the amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits," with federal law considered "only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999) (quoting *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir. 1963)). In Connecticut, the Court makes a two-step inquiry to determine whether personal jurisdiction exists. *Bensmiller v. EI Dupont de Nemours & Co.*, 47 F.3d 79, 81 (2d Cir. 1995). The Court first determines whether the exercise of jurisdiction over the party is conferred by Connecticut's long-arm statutes. If jurisdiction is permissible under the long-arm statutes, the Court determines whether the exercise of personal jurisdiction comports with due process. *Metropolitan Life Ins. Co. v. Robertson-CECO Corp.*, 84 F.3d 560, 567 (2d Cir. 2006). The Defendants argue that, under this two-step inquiry, this Court lacks personal jurisdiction over them as to Plaintiffs' claims. *See* ECF Nos. 112 at 8–12, 113 at 4, and 114-1 at 6–13.

Connecticut has two long-arm statutes. Connecticut General Statutes § 33-929(f) governs personal jurisdiction in suits against foreign corporations and Connecticut General Statutes § 52-

59b(a) governs personal jurisdiction over foreign LLCs.[8] Connecticut General Statutes § 33-929(f) confers personal jurisdiction over defendants Old DuPont, New DuPont, Corteva, Elevate Textiles,, Gore, Honeywell, InterTech, Lion, Milliken, PBI, Safety Components, and StedFast, ("Corporate Defendants"). Connecticut General Statutes § 52-59b(a) confers personal jurisdiction over defendants Chemours, Chemours FC, Fire-Dex, Globe, and Morning Pride ("LLC Defendants").

Here, the applicable long-arm statutes require merely a "nexus" between the cause of action alleged and the conduct of the defendant within the state. *See Tomra of N. Am., Inc., v. Env't Prods. Corp.*, 4 F. Supp. 2d 90, 93 (D. Conn. 1998); *see also NovaFund Advisors, LLC v. Capitala Grp., LLC*, No. 3:18-cv-1023 (MPS), 2019 WL 1173019, at *9 (D. Conn. Mar. 13, 2019) (finding a "substantial nexus" when the plaintiff's claims, including breach of contract and CUTPA, arose out of an alleged breach of an agreement under which the defendant conducted its business in Connecticut). Thus, the statutes "confer[] jurisdiction over designated causes of action without regard to whether a foreign corporation [or LLC] transacts business in Connecticut and without regard to a causal connection between the plaintiff's cause of action and the defendant's presence in this state." *See Lombard Bros., Inc. v. Gen. Asset. Mgmt. Co.*, 460 A.2d 481, 485 (Conn. 1983) (discussing Conn. Gen. Stat. § 33-929(f)).

The Moving Defendants' conduct is sufficient to satisfy the requirements of the Connecticut long-arm statutes on the following two grounds.

---

[8] *Austen v. Catterton Partners V, LP*, 729 F. Supp. 2d 548, 553–59 (D. Conn. 2010) (analyzing Connecticut courts' varying decisions as to which long-arm statute applies to LLCs and concluding that "Connecticut's general long-arm jurisdiction provision, § 52-59b(a), applies to foreign LLCs.").

1.    **Jurisdiction over Corporate Defendants based on § 33-929(f)(3)**

This Court has jurisdiction over the Corporate Defendants under Connecticut General Statutes § 33-929(f)(3), so the exercise of jurisdiction is proper, even if a foreign corporation never transacted business in Connecticut, when a cause of action arises out of the following:

> production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers.

*Id.*; *Est. of Metzmacher v. National R.R. Passenger Corp.*, 570 F. Supp. 2d 292, 297 (D. Conn. 2008) (finding that the supplier of vehicle detection systems was subject to jurisdiction under § 33–929(f)(3) because it was aware its systems were being implemented by other companies in locations throughout Connecticut). "The purpose of Conn. Gen. Stat. § 33–929(f)(3) is to enable Connecticut courts to exercise jurisdiction over manufacturers in product liability suits which did not themselves directly ship their products to Connecticut." *OneBeacon Ins. Group v. Tylo AB*, 731 F. Supp. 2d 250, 255–57 (D. Conn. 2010) (finding jurisdiction under § 33-929(f)(3) where product was manufactured in Sweden, the manufacturer worked with a distributor to distribute throughout the U.S., including in the Northeast, and the manufacturer had an English-language website).

Connecticut courts have established that foreign corporations may be subject to jurisdiction under § 33–929(f)(3) based on limited sales to Connecticut residents. *Divicino v. Polaris Indus.*, 129 F. Supp. 2d 425, 430 (D. Conn. 2001). To establish jurisdiction under § 33–929(f)(3), plaintiffs must demonstrate:

> (1) that the defendant could reasonably have anticipated being brought into court in Connecticut by a person who had used goods that it had distributed with the reasonable expectation that they would be used in Connecticut, and (2) that the plaintiff's cause of action is not materially different from an action that might have resulted directly from that use.

*Divicino*, 129 F. Supp. 2d at 430.

Plaintiffs allege that they purchased and used the PFAS-contaminated products that the Corporate Defendants manufactured, distributed, and/or supplied the necessary chemicals and materials for. AC ¶ 6, 212-213. Lion and Honeywell (through its Morning Pride brand), sell finished turnout gear in the state of Connecticut. The remaining Corporate Defendants, working in partnership with each other and with the LLC Defendants, provide the necessary materials for the manufacture and distribution of turnout gear. The Material Manufacturer Defendants cannot deny knowledge that their products would be sold into Connecticut—they are not manufacturing zippers. In many cases they are manufacturing highly specialized, single-purpose materials. Each of the Corporate Defendants supply materials for and distribute fire safety gear and clothing on a national scale, with many listing one of their sales markets as the northeast United States (including Connecticut). Their websites demonstrate that they are aware their products have or are likely to be purchased in Connecticut by, *inter alia*, providing links to their turnout gear manufacturer "partners" on their websites, providing consumers with contact information for Connecticut sales representatives, displaying a map of sales markets including Connecticut, and/or listing locations in Connecticut that sell their products. [9] The Corporate Defendants know that their products are purchased and used in Connecticut, or at least that their products are made available to customers in Connecticut, so that the Corporate Defendants can reasonably expect their products to be used in Connecticut.

---

[9] The Court may, within its discretion, take judicial notice of information posted on the Defendants' websites. *See, e.g., McArthur v. Yale New Haven Hospital*, No. 3:20-cv-998 (SRU), 2021 WL 3725996, at *6 n.5 (D. Conn. Aug. 23, 2021) (taking notice of representations made on the defendant's website, such as representations about its services, because a court can "take judicial notice of facts 'not subject to reasonable dispute' because they 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"); *iMerchandise LLC v. TSDC, LLC*, No. 3:20-cv-248(RNC), 2021 WL 1222197, at *5 n.5 (D. Conn. Mar. 31, 2021) (stating that courts generally have discretion to take judicial notice of websites and their contents).

The relevant information from the Corporate Defendants' websites that the Court should take judicial notice of are provided in the Sclar Declaration and accompanying exhibits. *See* Sclar Dec. Exhs. 12, 14–15, 19–24.

Additionally, Plaintiffs' causes of action are not materially different from an action arising from the use of their products if obtained directly from the Corporate Defendants. Plaintiffs' harms stem from the purchase of and exposure to materials and products containing PFAS. Their injuries were caused by standard use of the products and were not materially changed based on where they bought the products. Given the Corporate Defendants' awareness of their products' presence in Connecticut, and the typical nature of Plaintiffs' causes of action, it is proper for the Court to exercise jurisdiction over the Corporate Defendants under § 33–929(f)(3).

### 2.    Jurisdiction over Corporate Defendants based on § 33-929(f)(2)

Additionally, Connecticut General Statutes § 33-929(f)(2) establishes that jurisdiction is proper when a cause of action arises "out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state." The Corporate Defendants repeatedly solicited and continue to solicit business from Connecticut consumers by, *inter alia*, advertising on the internet and in publications. Continuous advertising on the internet, especially when paired with conducting regular business in Connecticut, constitutes solicitation for purposes of personal jurisdiction. *Inset Sys., Inc. v. Instruction Set, Inc.*, 937 F. Supp. 161, 164 (D. Conn. 1996) ("advertising via the Internet is solicitation of a sufficient repetitive nature to satisfy subsection [(f)(2)][10] of the Connecticut long-arm statute"); *Szollosy v. Hyatt Corp.*, No. 399CV870 CFD, 2000 WL 1576395, at *2–6 (D. Conn. Sept. 14, 2000) (finding that defendants solicited Connecticut residents through, *inter alia*, the creation and maintenance of interactive websites that allow Connecticut consumers to purchase their products); *Broad. Mktg. Intern., Ltd. v. Prosource Sales*

---

[10] This case was decided under Connecticut's corporation-specific long-arm statute that was identical to and preceded Connecticut General Statutes § 33-929(f).

& *Mktg., Inc.*, 345 F. Supp. 2d 1053, 1061 (D. Conn. 2004) (describing the different levels of website interactivity, and stating that the exercise of personal jurisdiction is typically proper in "cases where individuals can directly interact with a company over their Internet site, download, transmit or exchange information, and enter into contracts with the company via computer . . . particularly when combined with evidence of sales from the forum state").

The Corporate Defendants are subject to the personal jurisdiction of this Court based on their solicitation efforts throughout Connecticut, which resulted in injuries to Plaintiffs. In the Amended Complaint, Plaintiffs detailed public advertising statements that the Corporate Defendants have made on their websites, which are accessible to Connecticut consumers. AC ¶¶ 166–87, 212–13. The Corporate Defendants' websites are interactive, with most of them providing information and resources for consumers to download, as well as contact information and forms for consumers to use to interact with the Corporate Defendants.[11] Plaintiffs also alleged that some Corporate Defendants have advertised in publications that are accessible throughout Connecticut.[12] The solicitations made by Corporate Defendants throughout Connecticut resulted in Plaintiffs' purchase of the PFAS-contaminated products, which led to the alleged harms and causes of action in this case. AC ¶¶ 6, 212. Given the combination of the Corporate Defendants' interactive websites available to Connecticut consumers, as well as Plaintiffs' actual purchase of the products in Connecticut, the Corporate Defendants are subject to jurisdiction under Connecticut General Statutes § 33-929(f)(2).

---

[11] *See supra* note 10.

[12] For example, a consultant for Lion took out a full page in the publication Firefighter Nation, a newsletter available in Connecticut, to argue Lion's turnout gear is safe. AC ¶ 176.

### 3.    Jurisdiction over LLC Defendants based on § 52-59b(a)(1)

Connecticut General Statutes § 52-59b(a)(1) confers jurisdiction over foreign LLCs that transact any business within Connecticut. This requirement is interpreted broadly and can be fulfilled by a single business transaction. *Est. of Mechling v. U.S. Bank Nat'l Ass'n*, No. 3:23-cv-25 (VAB), 2024 WL 404539, at *10 (D. Conn. Feb. 2, 2024) (holding that jurisdiction was proper over an Ohio-based bank because it had engaged in ongoing business relationships with an entity in Connecticut, even though the entity was not a party in the case); *Needle v. True N. Equity, LLC*, No. 3:19-cv-372 (MPS), 2020 WL 1550219, at *3–5 (D. Conn. April 1, 2020) (holding that jurisdiction was proper over a foreign LLC when it represented it had a Connecticut office and contact person in documents and business cards, raised a substantial portion of its capital from Connecticut residents, and conducted business by sending memorandums to Connecticut residents). "In determining whether the plaintiffs' cause of action arose from the defendants' transaction of business within [Connecticut], Connecticut courts do not resort to a rigid formula, but rather . . . balance considerations of public policy, common sense, and the chronology and geography of the relevant factors." *Estate of Mechling*, 2024 WL 404539, at *10. To determine whether a business transaction qualifies as purposeful, courts "examine the nature and quality, rather than the amount of Connecticut contacts to determine whether there was purposeful activity." *Needle*, 2020 WL 1550219, at *3 (quotations and internal citation omitted).

Here, the LLC Defendants, including three turnout gear manufacturers, regularly transact business in Connecticut by partnering with distributors throughout the state to sell their products to Connecticut consumers, providing forms on their website through which customers can contact them and request a quote for products, and in some cases listing points of contact for Connecticut

consumers on their websites.[13] This conduct is purposeful, as the LLC Defendants are directly targeting consumers in Connecticut. Moreover, Plaintiffs' causes of action arise from this conduct because the LLC Defendants ensured their staff and their products were available to Connecticut consumers, Plaintiffs sought out and purchased turnout gear in Connecticut, and Plaintiffs were harmed by the LLC Defendants' products in Connecticut..

### 4. Jurisdiction over LLC Defendants based on § 52-59b(a)(3)

Alternatively, Connecticut General Statutes § 52-59b(a)(3) confers jurisdiction over a foreign LLC when the LLC committed tortious acts outside of Connecticut that have caused injury to Plaintiffs within Connecticut, if the LLC:

> (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

*Id.*; *Suri v. Wolters Kluwer ELM Sols., Inc.*, No. 3:20-cv-1694 (OAW), 2022 WL 526497, at *4 (D. Conn. Feb. 22, 2022) (finding that the defendant was subject to the long-arm statute provision § 52-59b(a)(3) when the defendant negotiated with insurance companies in Connecticut and intentionally inflicted emotional distress outside of Connecticut, causing injury to Plaintiff in Connecticut. The court ultimately determined that jurisdiction was not proper on other grounds).

Here, the LLC Defendants engaged in  tortious conduct outside of Connecticut by breaching their duty of reasonable care in failing to prevent or reduce the PFAS contamination of the turnout gear and negligently failing to warn customers and users about the PFAS contamination. AC ¶ 299. This conduct occurred outside of Connecticut because the LLC Defendants developed and manufactured their products in other states. However, the harms

---

[13] The relevant information from the LLC Defendants' websites that the Court should take judicial notice of are provided in the Sclar Declaration and accompanying exhibits. *See* Sclar Dec.; Exhs. 13, 14, 16.

occurred to, and are still felt by, Plaintiffs in Connecticut because that is where Plaintiffs purchased and used the PFAS-contaminated turnout gear.  AC ¶¶ 300–301.

As stated, the LLC Defendants conduct regular, purposeful, and targeted business in Connecticut. Even if the Court were to find that is not the case, the LLC Defendants' connections to Connecticut create a reasonable expectation that the LLC Defendants would face consequences in Connecticut from any wrongdoing arising from their sales in the state. Finally, because of the LLC Defendants' extensive distribution of their products in Connecticut, they likely have gained substantial revenue from interstate commerce.

Defendants argue that Plaintiffs have not alleged specific actions by each defendant sufficient to establish their contribution to Plaintiffs' harms (*see, e.g.*, DuPont MTD 10–11; Elevate MTD 2), but this is incorrect.[14] Plaintiffs allege throughout the Amended Complaint which defendants participated in the various parts of the supply chain. *See* AC ¶¶ 112–29 (stating, *inter alia*, the specific defendants responsible for manufacturing, marketing, and selling the turnout gear purchased by Plaintiffs).

### E.  Due Process

Having established that this Court has jurisdiction over Defendants pursuant to Connecticut's long-arm statutes, the Court must next determine whether the exercise of personal jurisdiction over each defendant is consistent with due process principles. *Cf., e.g., Est. of Mechling v. U.S. Bank Nat'l Ass'n*, No. 3:23-CV-25 (VAB), 2024 WL 404539, at *12 (D. Conn.

---

[14] Furthermore, the cases that defendants cite to support this argument are distinguishable from the instant case. *See Fleming v. HD Supply Waterworks, Ltd.*, at *3 (D. Conn. Oct. 15, 2018) (The court held that the plaintiff used impermissible group pleading to lump all defendants together and failed to allege that business was solicited or that goods were used in Connecticut. In the immediate case, Plaintiffs have distinguished each defendant's role in the supply chain and detailed specific conduct as to how Defendants solicited business and how their goods were used in Connecticut.); *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 84 (2d Cir. 2018) (determining that the plaintiff only referenced the defendants as grouped entities throughout the complaint without distinguishing between the parent company and the wholly owned subsidiary; however, Plaintiffs in the Amended Complaint did differentiate among defendants throughout the complaint).

Feb. 2, 2024). Personal jurisdiction over a non-resident defendant comports with due process if the defendant has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (U.S. 1945)). Where a court exercises personal jurisdiction over a foreign defendant in a suit "arising out of or related to the defendant's contacts with the forum," it does so under "specific jurisdiction." *See Helicopteros Nacionales v. Hall*, 466 U.S. 408, 414 n.8 (1984).[15]

## F. Minimum Contacts

To establish the requisite minimum contacts for a finding of specific jurisdiction, a plaintiff must show that the out-of-state defendant has "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2012) (quoting Bank v. Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002)). The contacts must arise out of the defendant's own actions, rather than the "unilateral activity of another party or a third person," and they may not be "random, isolated, or fortuitous." *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) *and Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984).

Specific jurisdiction is warranted over the Turnout Gear Manufacturer Defendants insofar as these entities "sold and distributed products directly" to Connecticut and "used an interactive

---

[15] Plaintiffs allege that the defendants manufactured PFAS compounds, PFAS-contaminated materials, and complete turnout gear products that were incorporated into products sold in Connecticut or sold directly to consumers in Connecticut. Plaintiffs' claims "arise from" and "relate to" these contacts with Connecticut. *Cf., e.g., Gerber Sci. Int'l, Inc. v. Roland DGA Corp.*, No. 3:06-CV-2024, 2010 WL 3928071, at *5 (D. Conn. Sept. 20, 2010) (emphasizing allegations that products at issue were sold throughout the United States, including in Connecticut, and concluding that the plaintiff's claim related to the defendant's contacts with the forum).

website to both advertise its business and produce sales." *See, e.g., Broad. Mktg. Int'l, Ltd. v. Prosource Sales & Mktg., Inc.*, 345 F. Supp. 2d 1053, 1062 (D. Conn. 2004).

Moreover, specific jurisdiction over *all* defendants is warranted pursuant to a "stream of commerce" theory. As the Supreme Court has explained, a forum state "does not exceed its power under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its product into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980). If the sale of a product of a manufacturer or distributor "is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has been the source of injury to its owners or others." *Id.*

Courts in this District and in the Second Circuit support the application of specific jurisdiction based on a "stream of commerce" theory. In *Kernan v. Kurtz-Hastings*, a manufacturer was sued for products liability after selling an allegedly defective machine to a third-party distributor based in Pennsylvania, who then sold the machine to New York. *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 238 (2d Cir. 1999). The manufacturer moved to dismiss for lack of personal jurisdiction, claiming that it was "a corporation existing under the laws of Japan with its principal place of business in Japan," was "not licensed or registered to do business in New York," had "[n]ever directly transacted or solicited business in New York," had "never provided any services nor rendered any contract in New York," and "had no specific knowledge of what would become of the . . . machine after it was sold to [the distributor] in Pennsylvania, beyond the general knowledge that [the distributor] would resell it somewhere in Pennsylvania or one of the other 49 states in the United States." *See id.* at 239 (quotation marks omitted); *cf.* ECF No. 113 ("Neither

[Elevate Textiles nor Safety Components] maintains offices, facilities, or any physical presence in the State . . . All Product development, manufacturing, and testing for Elevate Textiles is managed exclusively from its headquarters in Charlotte, NC,, while Safety Components conducts all activities from its headquarters in Greenville, SC."); ECF No. 114-2 ("PBI does not produce, manufacture, or distribute PBI fiber within Connecticut and has never done so."); and ECF No. 114-3 ("InterTech has never produced[,] manufactured, or distributed goods within Connecticut."). The Second Circuit found that New York had specific jurisdiction. It noted the manufacturer had entered into an exclusive sales agreement with the distributor, "which contemplate[d] that [the distributor] w[ould] sell [the manufacturer's] machines in North America and throughout the world" and "serve[d] as evidence of [the manufacturer's] attempt to serve the New York market, albeit indirectly," *id.*, and therefore was "the type of purposeful action sufficient to support a finding of minimum contacts," *id.* at 244.

In *Evergreen Media Holdings, LLC v. Warren*,, the District of Connecticut (Shea, C.J.) found that the requisite minimum contacts for specific jurisdiction existed over a defendant that had entered into a distribution agreement with a retailer where the retailer sold directly to consumers in Connecticut. *Evergreen Media Holdings, LLC v. Warren*, 105 F. Supp. 3d 192, 201 (D. Conn. 2015). The Court in *Evergreen* analogized the circumstances before it to the facts in *Kernan*, concluding:

> According to [the plaintiff's] allegations, read in the light most favorable to him and with doubts about the nature of [the defendant's] distribution arrangements resolved in his favor, [the defendant] supplied infringing copies of [the book] to [the retailer] in contemplation of the fact that they would be distributed to consumers nationwide, including in Connecticut. This constitutes a prima facie showing of sufficient minimum contacts for Connecticut to assert specific jurisdiction over [the defendant] in a suit arising from the alleged infringement that occurred when the books were offered for sale in Connecticut.

*Id.*; *see also Communico, Ltd. v. DecisionWise, Inc.*, No. 3:14-CV-1887 (RNC), 2018 WL 1525711, at *6 (D. Conn. Mar. 28, 2018) ("Construing the record in a light most favorable to Communico, Communico may be able to show that Decisionwise has attempted to serve the Connecticut market through its distribution arrangements with Amazon and Barnes & Noble . . . . Communico's allegations are sufficient to establish a prima facie case of minimum contacts."). As part of its analysis, the Court in *Evergreen* held that sufficient minimum contacts exist where: "an out-of-state defendant is sued in connection with the in-state sale of products by a third-party distributor, where there is evidence that the defendant attempted to serve the state's market through the distributor, *even in the absence of an express agreement to deliver the products into that specific state.*" *Evergreen*, 105 F. Supp. 3d at 201 (emphasis added).

Here, it is indisputable that Defendants' business operations reach Connecticut. Plaintiffs have submitted declarations establishing that they personally used the fire fighter turnout gear manufactured by Defendants and distributed into Connecticut. *See* Declaration of Peter Brown (stating he used and wore turnout gear manufactured by Globe); Declaration of Paul Anderson (stating he used and wore turnout gear manufactured by Globe); Declaration of Nelson Hwang (stating he used and wore turnout gear manufactured by Morning Pride); Declaration of William Tuttle (stating he used and wore turnout gear manufactured by Morning Pride). These declarations confirm that Defendants' products entered Connecticut's stream of commerce and reached Plaintiffs within the state, thereby satisfying the requirements for specific jurisdiction. And Defendants' own marketing materials and website confirm that they targeted Connecticut. *See, e.g.,* Exh. 15. (providing contact information for Connecticut-based Lion sales representative); Exh. 16 (celebrating "Shipman's Fire Equipment Co." as "the exclusive full-line distributor of Fire-Dex PPE in Connecticut"); Exh. 18 (congratulating Connecticut fire department on its recent

delivery of Globe turnout gear from authorized distributor "Firematic Supply Company, Inc."); Exh. 17 (providing contact information for Firematic Supply sales representatives servicing Connecticut); Exh. 14 (displaying and listing location information for twenty-eight authorized distributors of Honeywell safety products in Connecticut); Exh. 21 (referencing Connecticut's PFAS ban in turnout gear as a reason for Milliken's design and manufacture of PFAS-free materials); Exh. 12 (displaying names and links of "partner" manufacturers of turnout gear on DuPont's website, including Morning Pride, Fire-Dex, Globe and Lion); Exh. 22 (displaying names and links of "partner" manufacturers of turnout gear on Gore's website, including Defendants Fire-Dex, Globe, Honeywell, and Lion).

It is also indisputable that, within the Second Circuit, manufacturers cannot escape specific jurisdiction by placing their products into the stream of commerce for ultimate sale by distributors. *See, e.g.*, *This, LLC v. HolaBelle, Inc.*, No. 3:23-CV-1579 (SVN), 2024 WL 2957037, at *6 (D. Conn. June 12, 2024) (noting that defendants could not escape jurisdiction "simply because they dealt solely through a distributor"); *Evergreen,* 105 F. Supp. 3d at 201 (finding minimum contacts where out-of-state defendant was sued in connection with in-state sale of products by a third-party distributor); *OneBeacon Ins. Grp. v. Tylo AB*, 731 F. Supp. 2d 250, 258–60 (D. Conn. 2010) (finding minimum contacts where foreign company sold products through agreement with distributor with knowledge that distributor would resell them in a region including Connecticut); *cf., e.g.*, ECF No. 113 at 3 ("[B]oth Elevate Textiles and Safety Components operate in business-to-business contexts, selling their products to distributors, wholesalers, and other intermediaries . . . . Neither entity *directly* markets, distributes, or sells products to Connecticut consumers.") (emphasis added).

Rather than address any of this, the Group Defendants boldly assert that Plaintiffs' Amended Complaint "lacks any allegations about whether the plaintiffs' claims arise from any defendant's contacts with Connecticut." *See* ECF No. 112 at 11. Plaintiffs disagree; the Amended Complaint adequately notifies the defendants that Plaintiffs are alleging the existence of several supply chains culminating in the manufacture of hazardous materials and products that have caused harm to purchasers and users. AC ¶¶ 112–31. Each defendant in this case manufactures a specialized product intended for a niche market. Every competitor in this market must sell to as many of them as possible, as the entire U.S. market numbers scarcely over a million users. Further, these same paragraphs adequately notify each named defendant of its alleged role in such supply chains. Construing these allegations and the entire record now before the Court in a light most favorable to Plaintiffs, it is clear that each named defendant has attempted to serve the Connecticut market. As such, Plaintiffs have established a prima facie case of minimum contacts. *Cf. Evergreen*, 105 F. Supp. 3d at 201; *Communico, Ltd.*, 2018 WL 1525711, at *6.

Beyond their unavailing reliance on a string of "group pleading" cases, *see* ECF No. 112 at 10–11, the Group Defendants offer nothing to aid the Court in its specific jurisdiction analysis. Thus, the Group Defendants do not deny (because they cannot deny) that they work in partnership with each other and ultimately with distributors in Connecticut to sell their products into Connecticut for use by Connecticut fire fighters. Rather than offer the Court useful information, the Group Defendants request that this case be dismissed. Although they have asked that it be dismissed with prejudice, the Group Defendants are well aware that, at best, they will succeed in getting this case dismissed, only to have it refiled, leading to another round of motion practice on

these same issues. This would be an unnecessary waste of time and effort by the parties and by

this Court.[16]

### G. Reasonableness

Once the requisite minimum contacts have been established, the burden shifts to the

defendant to present a "compelling case" that " the presence of some other considerations would

render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). In

such contexts, the Second Circuit employs five "reasonableness" factors, namely:

> (1) the burden that the exercise of jurisdiction will impose on the defendant;
> (2) the interests of the forum state in adjudicating the case;
> (3) the plaintiff's interest in obtaining convenient and effective relief;
> (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and
> (5) the shared interest in the states in furthering social substantive policies.

*See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 244 (2d Cir. 1999).

The five factors weigh in favor of exercising jurisdiction in this case, and Defendants offer

no persuasive argument to the contrary. The first factor, alone, dictates a finding of reasonableness.

*Cf. id.; see, e.g., Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996)

(noting that "the conveniences of modern life and transportation ease what would have been a

serious burden only a few decades ago"). The second, third, and fourth factors weigh heavily in

favor of a finding of reasonableness. Connecticut's interest in this dispute is "a strong one"; each

named plaintiff is a Connecticut resident, and all parties acknowledge that Connecticut law applies.

*Cf. Kernan*, 175 F.3d at 244. Moreover, much of the "the witnesses and evidence are likely to be

located" in Connecticut. *Cf. id.* at 245. The fifth and final factor also weighs heavily in favor of a

finding of reasonableness; Connecticut has a strong interest in protecting its fire fighters from

---

[16] In the event this Court determines that additional facts are needed to make a determination with respect to personal jurisdiction, Plaintiffs have filed a Motion for Jurisdictional Discovery.  This will permit the Court to make a determination on the merits based on a more complete record should the Court find it necessary.

hazardous products and adverse health effects. Moreover, as Plaintiffs explain in the Amended Complaint, the Connecticut Legislature has signaled a desire to promote the same substantive social policies that Plaintiffs seek to advance in prosecuting this Action. *See* AC ¶¶ 193–97.

## III.    PLAINTIFFS' CLAIMS ARE SUFFICIENTLY STATED.

The Group Defendants move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), broadly arguing that all of the claims fail due to "group pleading." *See* ECF No. 112 at 12–13. In deciding a Rule 12(b)(6) motion to dismiss, the Court must determine whether the Complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a complaint pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). In deciding whether a complaint has stated a claim upon which relief can be granted, courts must accept the complaint's allegations as true and draw all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 555; *see also Fairchild v. Quinnipiac Univ.*, 16 F. Supp. 3d 89, 93 (D. Conn. 2014) (Underhill, J.) (citing *Ashcroft*, 556 U.S. at 678–79 and *Twombly*, 550 U.S. at 555–56). Although Rule 8 of the Federal Rules of Civil Procedure "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)).

Rather than meaningfully engage with these principles that control the Court's analysis, the Group Defendants analyze to a string of extreme cases.[17] The Group Defendants then incorrectly assert that the Amended Complaint similarly relies on "general, conclusory allegations" and fails to specify how any defendant was "involved" in causing Plaintiffs' injuries. *See* ECF No. 112 at 13. To the contrary, Plaintiffs' seventy-five page Amended Complaint contains specific factual allegations that belie the contention that Plaintiffs' allegations are conclusory. For instance, paragraphs 112–131 (when read, as they must be, alongside Plaintiffs' other allegations) adequately notify Defendants that Plaintiffs are alleging the existence of several supply chains culminating in the manufacture and distribution of hazardous products and materials that harmed Plaintiffs in the state of Connecticut. Further, these same paragraphs adequately notify each named defendant of its alleged role in the supply chains that ultimately resulted in harm to Connecticut purchasers and users of the materials and products that were manufactured and distributed by Defendants. In another section of the Amended Complaint, each Defendant is given sufficient notice of every claim asserted against it and the factual and legal bases upon which every claim is asserted. *See* AC ¶¶ 261–339. This level of specificity is, even after *Twombly*, beyond what the Federal Rules require. *See, e.g., Cole v. City of Memphis*, 2013 WL 2443242, at *3 (W.D. Tenn.

---

[17] *See Attuahene v. City of Hartford*, 10 F. App'x at 34 (The original complaint "failed to differentiate among the defendants, alleging instead violations by 'the defendants,' and failed to identify any factual basis for the legal claims made." In amending, the plaintiff "replaced the allegations against 'the defendants' with the names of all of the defendants, still failing to identify which defendants were alleged to be responsible for which alleged violations."); *Plusgrade L.P. v. Endava Inc.*, No. 1:21-CV-1530 (MKV), 2023 WL 2402879, at *4, 6 (S.D.N.Y. May 8, 2023) ("Plaintiff's Amended Complaint fails to provide fair notice of which claims pertain to which defendants[,] . . . [and] rarely specifies which defendant engaged in what conduct. Rather, most of the allegations ambiguously state that the alleged misconduct was carried out by 'defendants,' or by numerous defendants placed into makeshift groups[.]" The "salient point is that it is impossible to tell . . . what is being alleged[.]") (emphasis added); *Barnstable Cnty. v. 3M Co.*, No. 17-CV-40002, 2017 WL 6452245, at *11 (D. Mass. Dec. 18, 2017) ("The complaint alleges that AFFF was developed and then used on the Property from the 1960s through 2009 but without any specification as to which defendants' products were used on the premises throughout that fifty-year period . . . . The complaint likewise omits any specifics regarding why [the plaintiff] believes each of the named defendants were the manufacturers of the AFFF . . . .").

2013) (since complaint contained specific claims against all defendants, defendants had sufficient notice that each claim pertained to them and complaint survived scrutiny); *Wessel v. Vill. of Monee*, 2010 WL 2523574, at *5 (N.D. Ill. 2010) (although complaint did not specify to whom claims were directed, defendants could glean from facts and, therefore, were put on notice).

Defendants also indicate that Plaintiffs must, for purposes of a Rule 12(b)(6) motion to dismiss, allege how each defendant "manufactured, sold, distributed, or was otherwise involved with the *specific* turnout gear [sets] that the plaintiffs bought or wore . . . or their component parts." *See* ECF No. 112 at 13. That is not the law. *See, e.g., Barnstable Cnty. v. 3M Co.*, No. CV 17-40002, 2017 WL 6452245, at *12 (D. Mass. Dec. 18, 2017) (noting that "a plaintiff need not provide specific details relating to the offending product to survive a 12(b)(6) motion"); *Coleman v. Bos. Sci. Corp.*, No. 1:10-CV-01968, 2011 WL 1532477, at *3 (E.D. Cal. Apr. 20, 2011) (establishing that it is improper to "impos[e] on plaintiffs the burden of specifically identifying a device by reference to a specific product line or model number, without the benefit of discovery" and that general information about a malfunctioning product is sufficient); *Bausch v. Stryker Corp.*, 630 F.3d 546, 558–60 (7th Cir. 2010) (explaining that it is not a "fatal defect" when a plaintiff "does not specify the precise defect" but provides basic information as to an allegedly offending product).

## IV.    PLAINTIFFS' CPLA CLAIMS SURVIVE SCRUTINY.

### A.    The Fire Fighter Plaintiffs' allegations establish "injury-in-fact" and standing to seek equitable relief.

Defendants attack Plaintiffs' Connecticut Products Liability Act (CPLA) claims on multiple, distinct bases. First, Defendants move to dismiss Plaintiffs' CPLA claims pursuant to Rule 12(b)(1) on the basis that "no plaintiff has alleged an injury-in-fact" for purposes of Article III standing. *See* ECF No. 112 at 13–16 and ECF No. 118–1 at 9; *see also Spokeo, Inc. v. Robins*,

578 U.S. 330, 338 (2016) (asserting that "irreducible constitutional minimum" of standing includes a requirement that a plaintiff has suffered an "injury in fact").

3M cites *TransUnion LLC v. Ramirez* for the proposition that the Fire Fighter Plaintiffs' theory of harm is not sufficiently "concrete" to qualify as an injury-in-fact. *See* ECF No. 118-1 at 9 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 (2021)). *TransUnion* held that "[t]he mere presence of an inaccuracy in an internal credit file, if not disclosed to a third party, causes no concrete harm" in roughly the same way that "a defamatory letter [] stored in a desk drawer" causes no concrete harm. 594 U.S. at 434.[18]

As the *TransUnion* Court explained, there is a significant difference between "a mere risk of future harm" and "an actual harm that has occurred but is not readily quantifiable." *Id.* at 437. This case involves the latter circumstance because the PFAS contaminated gear has been purchased and worn by Plaintiffs. The exposure has occurred—the only issue is how to monitor and remediate. Just a few months ago, the Eastern District of Missouri explicitly rejected 3M's argument that *TransUnion* forecloses standing for medical monitoring claims, explaining:

> [P]laintiffs have standing to bring their medical monitoring claims. This case is not so much like *TransUnion*'s fact pattern where inaccuracies in credit reports had not been sent out to third parties—it is more like the other *TransUnion* plaintiffs that <u>did</u> establish standing. Those plaintiffs' inaccurate credit reports were published to third parties, and the Court held they had Article III standing to bring their claim for damages.
>
> . . . .
>
> Here, plaintiffs allege they have actually been exposed to harmful chemicals, and they seek to mitigate their harm by monitoring their health . . . . This is not unlike cases in which a data breach allowed a third party to access and distribute personal

---

[18] The Second Circuit cases 3M cites are no closer to the one before the Court. *See Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 64–65 (2d Cir. 2021) (citing *TransUnion* for the proposition that "plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm" in action against bank for delayed recordings of mortgage satisfaction in records that were "so far as is known, [] read by no one"); *Tripathy v. McKoy*, 103 F.4th 106, 117 (2d Cir. 2024) (former inmate lacked Article III standing to sue based on his enrollment in the moderate-risk tier of prison's sex-offender program instead of low-risk program).

> identifying information; at least one court held that "purported time and effort monitoring [credit/financial] accounts" as the result of such data breach "can qualify as an injury to support Plaintiffs' claims." *Baldwin v. Nat'l W. Life Ins. Co.*, No. 2:21-CV-04066-WJE, 2021 WL 4206736, at *3 (W.D. Mo. Sept. 15, 2021).

*Peeler v. SRG Glob. Coatings, LLC*, No. 1:23-CV-23-SNLJ, 2024 WL 4625640, at *8 (E.D. Mo. Oct. 30, 2024) (internal citations omitted); *see also Prantil v. Arkema Fr. S.A.*, No. 4:17-CV-02960, 2022 WL 1570022, at *36 (S.D. Tex. May 18, 2022) (discussing *TransUnion* and noting plaintiffs "suffered a concrete, particularized, and actual or imminent injury-in-fact through chemical exposure . . . which allegedly creates severe health risks," and holding that such an injury "*cannot be speculative, because it has already occurred*.") (internal quotation marks omitted) (emphasis added).

The Group Defendants acknowledge, without citation, that "some courts" have held that "[w]here a plaintiff alleges exposure to known toxins linked to disease," such allegations establish an injury-in-fact. *See* ECF No. 112 at 14 (citing *Leslie v. Medline Indus., Inc.*, No. 20-CV-01654, 2021 WL 4477923, at *7 (N.D. Ill. Sept. 30, 2021)). In fact, the Supreme Court has concluded, on multiple occasions, explicitly or implicitly, that exposure to a toxin is sufficient to confer Article III standing. *See Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74 (1978) ("And the emission of non-natural radiation into appellees' environment would also seem a direct and present injury, given our generalized concern about exposure to radiation and the apprehension flowing from the uncertainty about the health and genetic consequences of even small emissions . . . .") and *Helling v. McKinney*, 509 U.S. 25, 35 (1993) ("We affirm the holding of the Court of Appeals that McKinney states a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of [second-hand tobacco smoke] that pose an unreasonable risk of serious damage to his future health."). The Second Circuit has likewise acknowledged that exposure to toxins establishes an injury-in-fact sufficient to confer

Article III standing. *See, e.g., In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425, 1434 (2d Cir. 1993), *abrogated on other grounds by Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28 (2002) (addressing toxic exposure case and explicitly rejecting argument that "injury in fact" means "injury that is manifest, diagnosable, or compensable").

In light of this authority, the Fire Fighter Plaintiffs' allegations are more than sufficient to establish an injury-in-fact. *See, e.g.*, AC ¶¶ 232–39. Ignoring these allegations, the Group Defendants reference a handful of cases in other jurisdictions where plaintiffs failed to overcome *contradictory information* that undermined their theories of toxic exposure. *See* ECF No. 112 at 14 (citing *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 709–10 (9th Cir. 2020) (plaintiffs' argument that her consumption of artificial trans-fat was unsafe was belied by study cited in complaint indicating plaintiffs' consumption levels were not dangerous); *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010) (plaintiff's argument that trace amounts of lead made lipstick unsafe was belied by FDA report finding the lead levels were not dangerous); *In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig.*, 831 F. Supp. 2d 507, 511–12 (D. Mass. 2011) (plaintiff's argument that trace amounts of lead made juice and fruit products unsafe belied by FDA report finding the lead levels were not dangerous); *Kimca v. Sprout Foods, Inc.*, No. CV 21-12977 (SRC), 2022 WL 1213488, at *7 (D.N.J. Apr. 25, 2022) (plaintiff's argument that trace amounts of lead made baby food unsafe belied by FDA's statement that the levels posed no immediate health risk to children). None of the cited cases addressed circumstances analogous to those presented in the instant case, where Plaintiffs' allegations, taken together, establish that the defendants' products are "scarily" contaminated with PFAS compounds (including, specifically, PFOS, PFOA, and PTFE) for which there are "no safe level[s]" of contamination or exposure. *See* AC ¶¶ 73-75, 89–111.

The Group Defendants propose a rule that would require plaintiffs to provide laboratory testing results of the products at issue to satisfy standing. *See* ECF No. 112 at 15 (emphasizing that "the complaint makes no allegations about the levels of PFOA or PFOS in any turnout gear that any firefighter bought or wore . . . ."). These Defendants cite *Fruit Juice* for the argument that "a complaint does not allege injury-in-fact if it does not allege 'the amount of [the toxin] actually in Defendants' products' or that 'any specific amount has caused actual injuries to any plaintiff.'" *See* ECF No. 112 at 15 (quoting *Fruit Juice Prods. Mtkg. & Sales Pracs. Litig.*, 831 F. Supp. 2d at 511). But the Group Defendants omit important context for this single sentence in *Fruit Juice*; the plaintiffs in that case had brought action based on lead contamination in products that the FDA had investigated and found to contain "a small amount of lead . . . [at a] level [that] would not pose an unacceptable risk to health." *Fruit Juice Prods. Mtkg. & Sales Pracs. Litig.*, 831 F. Supp. 2 at 509. Nothing in the record contradicted the FDA's conclusion, so the plaintiffs' theory of harm was entirely speculative. *See id.* The Massachusetts court's analysis in *Fruit Juice* has no bearing on the circumstances presented here. Moreover, courts within the Second Circuit have expressly declined to impose a laboratory testing requirement in similar cases.[19] Indeed, far from a government finding that small amounts of PFAS do not pose a risk to health, the EPA has recently stated that there is no safe amount of PFAS. *See* AC ¶¶ 73-75.

3M also argues that the Fire Fighter Plaintiffs lack standing to seek prospective equitable relief (ECF No. 118-1 at 10) because there is no "real or immediate threat" of injury. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) *and City of Los*

---

[19] *See, e.g., Winans v. Ornua Foods N. Am. Inc.*, 731 F. Supp. 3d 422, 428 (E.D.N.Y. 2024) (expressly declining, in PFAS contamination case, to impose "a rule that would require plaintiffs to provide laboratory testing results of the product to satisfy standing"); *Clinger v. Edgewell Pers. Care Brands, LLC*, No. 3:21-CV-1040 (JAM), 2023 WL 2477499, at *3 (D. Conn. Mar. 13, 2023) (explaining, in benzene contamination case, that "the fact that the plaintiffs did not actually test the products that they purchased does not mean that they lack standing.").

*Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983). 3M references the Second Circuit's decision in *Nicosia v. Amazon* for the proposition that a plaintiff's past exposure to illegal conduct is insufficient, alone, to establish standing for prospective relief. *See* ECF No. 118-1 at 10 (citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016)). What 3M fails to account for is that past wrongs, though insufficient by themselves to grant standing, are often "evidence bearing on whether there is a real and immediate threat" of injury. *See Lyons*, 461 U.S. at 102 (internal quotation marks omitted).

It follows that a plaintiff seeking medical monitoring can, based on her past exposure to a toxic product or substance, establish standing for such prospective relief on either of two bases. *See Bell v. 3M Co.*, 344 F. Supp. 3d 1207, 1224–25 (D. Colo. 2018). The first is the cost of the medical monitoring itself.[20] Perhaps the best illustration of this theory of injury is a hypothetical posed by the U.S. Court of Appeal for the District of Columbia in *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*:

> Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.

*See Friends for All Child., Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 825 (D.C. Cir. 1984). In this example, "it is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations proximately caused by Smith's negligent action." *Id.* Where injury is understood to mean "the invasion of any legally protected interest of

---

[20] *See, e.g., id.* (holding that "[the] plaintiffs' asserted injury of the cost of the medical care they seek is a valid and quantifiable injury that confers standing to assert this claim."); *Petito v. A.H. Robins Co.*, 750 So. 2d 103, 105 (Fla. Dist. Ct. App. 1999) (awarding group of plaintiffs exposed to the drug Fen-Phen medical monitoring costs since the plaintiffs demonstrated that such costs were "reasonably necessary," despite fact that plaintiffs "[had] yet to suffer physical injuries").

another," it is indisputable that an individual has an interest in avoiding expensive diagnostic examinations, and the need to undergo such examinations constitutes an injury. *See id.* at 826. The second basis by which a medical monitoring plaintiff can establish standing for prospective relief is the increased risk of future harm.[21]

Under either theory, the Fire Fighter Plaintiffs' allegations are sufficient to confer standing to seek medical monitoring. *See, e.g.*, AC ¶¶ 224–225, 233–234, 323–331. Similarly, the Fire Fighter Plaintiffs can, based on allegations describing a defendant's unfair and deceptive business practices, seek equitable relief in the form of an order directing each defendant to correct its behavior. *See* AC at 75 (seeking relief in the form of an order directing each named defendant to "correct its unfair and deceptive practices"). As the Fifth Circuit has observed, a "defendant's past conduct [can] indicate[] that there is a reasonable likelihood of further violations in the future." *See SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980). Taken together, Plaintiffs' allegations establish that the Fire Fighter Plaintiffs must continue wearing turnout gear in responding to fires and other emergencies and that the named defendants cannot be trusted to mitigate (or, at the very least, be truthful about) the risks involved in doing so. *See* AC ¶¶ 89–94, 132–189 (detailing how turnout gear is necessary to protect fire fighters, and how the named defendants misrepresented the safety of their products). Under such circumstances, it is both appropriate and necessary for the Court to intervene on Plaintiffs' behalf. *Cf., e.g.*, *Davidson v. Kimberly-Clark Corp.*, 889 F.3d

---

[21] *See, e.g., Rhodes v. E.I. du Pont de Nemours & Co.*, 657 F. Supp. 2d 751, 759 (S.D.W. Va. 2009), judgment entered, No. 6:06-CV-00530, 2010 WL 11622804 (S.D.W. Va. Jan. 6, 2010), and aff'd in part, appeal dismissed in part, 636 F.3d 88 (4th Cir. 2011) (holding, in case asserting medical monitoring claim against DuPont, that the "weight of authority suggests that an increased risk of injury constitutes an injury-in-fact under Article III"); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 575 (6th Cir. 2005) (explaining that alleging "an increased risk of harm when comparing those individuals implanted with [an unreasonably dangerous medical] device to those" not implanted with the device constituted an injury sufficient to satisfy Article III); *Brown v. C.R. Bard, Inc.*, 942 F. Supp. 2d 549, 551 (E.D. Pa. 2013) (holding that class of Pennsylvania citizens with potentially defective implants had standing to seek medical monitoring "even if a court cannot quantify the increased risk of injury.").

956 (9th Cir. 2018) (holding consumer alleged imminent or actual threat of future harm caused by manufacturer's false advertising and, as such, had standing to seek injunctive relief).

### B.    Plaintiffs' allegations establish associational standing.

Defendants move to dismiss the CPLA claims of the "plaintiffs who are not firefighters" on the basis that they lack associational standing to bring claims for their members for compensatory damages or for medical monitoring. *See* ECF No. 112 at 13, 16–18; *see also* ECF No. 118-1 at 11–12. As the Second Circuit has explained, an association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit" (hereinafter referred to as the "*Hunt* test"). *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). The purpose of the associational standing doctrine is "to facilitate, in a fair and efficient manner, the collective adjudication of the common rights of an association's members," a goal which can be served by allowing a collective suit even in situations where a class action would be inappropriate. *International Union, United Auto. v. Brock*, 477 U.S. 274, 288 (1986).

Relying on *Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004), Defendants broadly argue that claims for compensatory damages and medical monitoring are incompatible with the third prong of the *Hunt* test. *See* ECF No. 112 at 16–17 and ECF No. 118-1 at 11–12. In *Bano*, an individual and three organizations sued Union Carbide and its former president for personal injuries and property damage allegedly caused by the corporation's pollution of groundwater with toxic chemicals and by-products that were dumped, stored, or abandoned at its plant in India. *Id.*

at 702–703. The district court dismissed the claims, holding, *inter alia*, that the organizations lacked standing to pursue claims on behalf of their members for personal injuries and property damage and that the plaintiffs' request for medical monitoring was not feasible. *Id.* at 708. Upon review, the Second Circuit agreed that the organizations lacked associational standing to seek damages for their members under the circumstances. *Id.* at 714–15. The Second Circuit emphasized that, insofar as the claims were that individuals "suffered bodily harm and damage to real property that they own," each of those individuals "would have to be involved in the proof of his or her claims." *Id.* The Second Circuit observed that it was not aware of any case where the United States Supreme Court had expressly recognized associational standing for a damages claim; it did not "squarely hold" that such a result was impossible, as 3M asserts. *See id.* (citing *Warth v. Seldin*, 422 U.S. 490, 515 (1975) (suggesting that *Hunt*'s third element is readily satisfied in cases seeking prospective relief)*; see also* ECF No. 118-1 at 11–12. The Second Circuit also concluded that the organizations lacked associational standing to seek medical monitoring, reasoning that New York law would require certain individualized inquiries. *Bano*, 361 F.3d at 715.

The U.S. Supreme Court has explained that, while the first two prongs of the *Hunt* test are constitutionally mandated and absolute prerequisites to associational standing, the third prong is merely a prudential consideration. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996) ("[T]he associational standing test's third prong is a prudential one . . . . once an association has satisfied *Hunt*'s first and second prongs assuring adversarial vigor in pursuing a claim for which member Article III standing exists, it is difficult to see a constitutional necessity for anything more."). The third prong is applied "on a case-by-case basis[,] keeping in mind its prudential purposes of efficiency and fair representation." *Cf. Interactive Gaming Council v. Commonwealth ex rel. Brown*, 425 S.W.3d 107, 115 (Ky. Ct. App.

2014). Thus, case law in this area strongly and consistently indicates that "[t]he fact that some individualized proof may be required should not automatically foreclose associational standing where the first two prongs have been satisfied and the case can be decided on broad legal determinations that are equally applicable to all members." *Cf. id.*

In line with this approach, in *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1349 (2d Cir. 1989), the Second Circuit upheld a finding that abortion rights organizations had representative standing to seek injunctions on behalf of their members against defendants who were blocking access to abortion facilities, despite the necessity of limited evidence from individual members. Representative standing was also established despite limited member participation in *National Association of College Bookstores, Inc. v. Cambridge University Press*, 990 F. Supp. 245, 250 (S.D.N.Y. 1997), a case concerning an association of college bookstores seeking an injunction against publishers that were allegedly overcharging association members for books. There, the court acknowledged that "[s]ome individuated proof may be required . . . but not nearly enough to require each [] member to bring suit separately." *Id.* The court emphasized that "[e]specially in light of the alternative . . . there is no question that associational representation will better facilitate fair and efficient adjudication" of the plaintiffs' claim. *Id.* Like in *National Association of College Bookstores*, Plaintiffs' Action is one where "[s]ome individuated proof may be required" to show that Connecticut fire fighters are entitled to damages and medical monitoring, but "not nearly enough to require [every Connecticut fire fighter] to bring suit separately." *Cf. id.*; *see also Am. Booksellers Ass'n v. Houghton Mifflin Co.*, No. 94 CIV.8566(JFK), 1995 WL 92270, at *5 (S.D.N.Y. Mar. 3, 1995) (finding associational standing appropriate despite some need for individuated proof; "[a]t some point, the [individuated proof] will become redundant.").

C. **The Fire Fighter Plaintiffs' theory of injury and medical monitoring claims survive scrutiny.**

Defendants present a series of interrelated arguments to advance their position that, even assuming Plaintiffs' toxic exposures resulted in adverse physiologic changes that warrant medical surveillance, Connecticut law provides them no remedy and no claim. This argument is without merit.

1. **The Fire Fighter Plaintiffs Sufficiently Plead Cognizable Injury Under the CPLA**

Plaintiffs first address Defendants' argument that Plaintiffs' CPLA claims are legally deficient because adverse physiologic changes do not present a cognizable injury under Connecticut law. *See* ECF No. 112 at 13, 18–20 (moving to dismiss Plaintiffs' CPLA claims, arguing "the threat of injury that these plaintiffs allege is not a cognizable injury under Connecticut law") *and* ECF No. 118-1 at 10 ("the Fire Fighter Plaintiffs have not alleged any injury sufficient to state a CPLA claim").  Both the Group Defendants and 3M rely on *Poce v. O & G Indus., Inc.*, 210 Conn. App. 82, 269 A.3d 899, *cert. denied*, 342 Conn. 920, 271 A.3d 663 (2022), and both mischaracterize the Appellate Court of Connecticut's decision in that case. *See* ECF No. 112 at 18–19 (arguing the *Poce* court held that "subclinical or exposure-only harm . . . is legally insufficient" under Connecticut law) and ECF No. 118-1 at 10 (arguing the *Poce* court held that "'absent the manifestation of symptoms' of some medical condition" no injury exists under Connecticut law).

*Poce* is a motion to strike decision in which the Appellate Court of Connecticut adopted the trial court's opinion in full. The *Poce* action was brought by a group of mason laborers against a project manager and alleged the laborers were repeatedly exposed to asbestos during a construction project. *Poce*, 269 A.3d at 904. The trial court granted the defendant's motion to strike

as to the plaintiff's claims for negligence, premises liability, and recklessness, reasoning that such claims required an "actual physical injury" and that the plaintiffs had failed to allege one. *Id.* at 910. Because the operative complaint was insufficient, the trial court emphasized that the issue before it was *not* whether "Connecticut law recognizes claims for subclinical injuries" and explained:

> [T]he court *need not decide* whether . . . presymptomatic and subclinical injury constitutes actionable harm, for the simple reason that the plaintiff has no allegations that any physical manifestation occurred as a result of the exposure. That is, the complaint is devoid of any allegation of scarring to the lungs, implantation of asbestos fiber, pleural thickening or any other physical component following the exposure . . . .

*Id.* Contrary to Defendants' assertions, *Poce* does not preclude claims like those asserted by the Fire Fighter Plaintiffs in this Action, i.e., those alleging adverse physiologic changes as a result of significant and prolonged exposure to known toxins and carcinogens. *See, e.g.,* AC ¶¶ 224–225, 233–234, 323–331.

Nor do the other cases Defendants cite. For instance, both the Group Defendants and 3M cite *Bowerman v. United Illuminating*, No. X04CV 940115436S, 1998 WL 910271 (Conn. Super. Ct. Dec. 15, 1998), for the argument that claims for medical monitoring fail as a matter of law absent the manifestation of physical symptoms of a disease. *See* ECF No. 112 at 19 and ECF No. 118-1 at 10. The *Bowerman* court, deciding a motion for summary judgment, stand for the opposite conclusion. In *Bowerman,* 109 plaintiffs brought claims against multiple defendants for their alleged exposure to asbestos while working at a power plant. *Bowerman*, 1998 WL 910271, at *1. The complaint explained that the exposure had resulted in, *inter alia*, scarring of the plaintiffs' lung tissue and permanent implantation of asbestos fibers in the lungs, warranting future medical surveillance. *Id.*

The "critical issue" before the court on a motion for summary judgment, was "whether the plaintiffs, who claim exposure to asbestos, can maintain an action in negligence absent the manifestation of symptoms of any asbestos-related disease." *Id.* The court surveyed two conflicting lines of cases, one of which held that "asymptomatic plaintiffs have no actionable claims under such circumstances" and a second which held that "whether injuries [such] as those alleged by the plaintiffs in the present case are actionable injuries is a question of fact rather than a matter of law." *Id.* at *3, *5. The court endorsed the *second* line of cases, explaining:

> [T]he better line of reasoning warrants the conclusion that whether or not the scarring of lung tissue and implantation of asbestos fibers in the lungs constitute a compensable legal harm *is an issue of fact* if there is evidence showing such conditions to be detrimental and if there is evidence showing the existence of such conditions in the plaintiffs.

*Id.* at *5 (emphasis added). The Court concluded that the *Bowerman* plaintiffs did not present sufficient evidence to establish their claims for purposes of summary judgment. The *Bowerman* Court's ruling presumes that, given sufficient evidence, plaintiffs may maintain a cause of action for medical monitoring. *Id.* at *6.

The only reasonable reading of *Poce* and *Bowerman* is that both courts embraced medical monitoring as a theory of injury but determined that the plaintiffs in those respective actions had failed to meet the (different) applicable burdens of proof at different stages of litigation. *Poce* stands for the proposition that a plaintiff seeking medical monitoring must, at a minimum, allege that some "physical manifestation" (e.g., "scarring to the lungs, implantation of asbestos fiber, pleural thickening or any other physical component") occurred as a result of exposure. *See Poce*, 269 A.3d at 910. And *Bowerman* supports this conclusion, but adds that to survive at summary judgment, plaintiffs must present adequate expert testimony to establish the "physical manifestation" alleged, which the *Bowerman* plaintiffs failed to do. *See Bowerman*, 1998 WL

910271, at *5. This reasoning is consistent with the Connecticut Supreme Court's opinion in *Dougan v. Sikorsky Aircraft Corp.*, 337 Conn. 27, 29, 251 A.3d 583, 585 (2020) ("*Dougan II*"), yet another Connecticut case that Defendants misinterpret.

In *Dougan v. Sikorsky Aircraft Corp.*, 2017 WL 7806431 (Conn. Super. Mar. 28, 2017) ("*Dougan I*"), the trial court granted defendants' motion for summary judgment as to plaintiffs' medical monitoring claim. *See Dougan I*, 2017 WL 7806431, at *7. In *Dougan II*, the plaintiffs "claim[ed] that their asbestos exposure caused them to suffer a subclinical injury, which is one that is 'not detectable or [that is] producing effects that are not detectable by the usual clinical tests'" and asked the Connecticut Supreme Court to adopt the legal framework set forth in *Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 914 N.E.2d 891 (2009) to determine "the proof necessary to establish a claim for medical monitoring . . . ." *Dougan II*, 251 A.3d at 585, 592. To decide the question, the *Dougan II* Court "assume[d], without deciding, that [1] Connecticut law recognizes a claim for subclinical cellular injury that substantially increased the plaintiffs' risk of cancer and other asbestos related diseases [and] [2] that the *Donovan* elements govern proof of a medical monitoring claim." *Dougan II*, 251 A.3d at 593–94. Under this framework, the *Dougan II* court found that the plaintiffs had failed to state a medical monitoring claim, noting that they had failed to establish through expert testimony that "early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury," and that "such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care . . . ." *Id*. at 597.[22] A fair reading of *Dougan II* is

---

[22] This is consistent with other courts' decisions recognizing that a medical monitoring claim requires expert testimony and factual development at a later stage of the proceeding. *See, e.g., Ryan v. Greif, Inc.*, 708 F. Supp. 3d 148, 172–73 (D. Mass. 2023) (denying motion to dismiss, recognizing that expert testimony is required to establish medical monitoring and "Plaintiffs do not bear the burden of providing any such evidence at this stage of the litigation"); *Higgins v. Huhtamaki, Inc.*, No. 1:21-CV-00369-NT, 2022 WL 2274876, at *11 (D. Me. June 23, 2022) (denying motion to dismiss because opportunity for "further factual development" was warranted); *see also Berry v.*

that the Connecticut Supreme Court found *Donovan* to be a viable framework for evaluating whether a plaintiff had sufficiently alleged a claim for medical monitoring, *not* that the Court "signaled its reluctance to allow for claims based on subclinical injuries." *See* ECF No. 112 at 19.

While Defendants urge the Court to conclude that subclinical injuries warranting medical surveillance are never recoverable under Connecticut law, this conclusion would be irreconcilable with Connecticut Supreme Court precedent. In *Doe v. City of Stamford*, the Connecticut Supreme Court confronted the "sole issue" of whether, under the state's Worker's Compensation Act, an employee has suffered a "compensable injury for purposes of recovering expenses for medical testing and treatment at a time when he has been exposed to, but has not yet contracted, a potentially fatal contagious disease," answering in the affirmative. *See Doe v. City of Stamford*, 241 Conn. 692, 693, 699 A.2d 52, 53 (1997).

The claimant in *Doe* was a City of Stamford police officer who had been exposed to the human immunodeficiency virus (HIV) and, on a separate occasion, tuberculosis, in the performance of police duties. *Id.* at 53. The officer underwent testing for both diseases and did not test positive; however, the police officer incurred bills for medical treatment and laboratory work, and the defendant refused to compensate him. Accordingly, the police officer's compensation claim proceeded to a formal hearing before the commissioner. *Id.* at 53–54. The commissioner denied the claim on the basis that, *as a matter of law*, "mere exposure to infectious diseases does not give rise to a viable claim that the [c]laimant has suffered an injury . . . ." *Id.* at 54. The review board affirmed, and the police officer appealed to the Connecticut Supreme Court. *Id.* Upon

---

*Chicago*, 133 N.E.3d 1201 (Ill. App. 2019) (dismissed on the pleadings, reversed on appeal); *Sadler v. PacifiCare of Nev.*, 340 P.3d 1264, 1271 (Nev. 2014) (reversing trial court's dismissal on the pleadings); *Donovan*, 914 N.E.2d at 902 (medical monitoring permitted to proceed, decided on the pleadings); *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 718 (Mo. 2007) (reversing class certification denial): *Petito v. A.H. Robins Co.*, 750 So. 2d 103 (Fla. App. 1999) (motion to dismiss on the pleadings denied).

review, the Connecticut Supreme Court reversed, interpreting the word "injury" in the Worker's Compensation Act as encompassing "exposure to potentially fatal contagious diseases." *Id.* at 56–57. The Court emphasized that the police officer's injury was "no less real or cognizable because it was not attended by puncture or abrasion." *Id.* at 56. Notably, the Court cited favorably in its analysis to a Third Circuit case that allowed, "in the context of *tort law*," medical monitoring in the absence of present injury. *See id.* at 699 n.8 (discussing *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 852 (3d Cir. 1990), *cert. denied sub nom. General Electric Co. v. Knight*, 499 U.S. 961 (1991)).

*City of Stamford* is analogous to the Fire Fighter Plaintiffs' CPLA claims based on PFAS exposure and resulting adverse physiological changes. Notably, the courts that have approved medical monitoring claims recognize that "significant economic harm may be inflicted on those exposed to toxic substances, notwithstanding the fact that the physical harm resulting from such exposure is often latent." *See Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 716 (Mo. 2007) (quoting *Bower v. Westinghouse Electric Corp.*, 206 W.Va. 133, 522 S.E.2d 424, 429 (1999)). In other words, a toxic exposure injury is "no less real or cognizable because it [is] not attended by [physical symptoms of disease]." *Cf. City of Stamford*, 699 A.2d at 700.

### 2. The Fire Fighter Plaintiffs Sufficiently Plead a Cause of Action for Medical Monitoring.

Defendants contend that the Court must dismiss the medical monitoring claim. *See* ECF No. 12 at 20 and ECF No. 18 at 24–25. As previously explained, in *Dougan II*, the Connecticut Supreme Court found the Massachusetts Supreme Judicial Court's opinion in *Donovan v. Philip Morris USA, Inc.* to be a viable framework for evaluating whether a plaintiff had sufficiently alleged a claim for medical monitoring. Because Plaintiffs' Amended Complaint satisfies the elements set forth in *Donovan*, Plaintiffs should be permitted to test their claims in discovery.

At this stage of proceedings, Plaintiffs are not required to prove their claims in full but merely to show that they are plausible—a burden Plaintiffs have clearly met. Any further evaluation of the evidence, including the presentation of expert testimony, is appropriate for the summary judgment stage, not a motion to dismiss. Plaintiffs are confident in their ability to meet that burden at the appropriate time.

**D.      3M's separate arguments are unavailing.**

**1.      Strict Liability**

3M urges the Court to dismiss the CPLA claims against it for various reasons, each of which is addressed in turn.

3M argues that the CPLA claim based on a strict liability theory fails for lack of any "unreasonable danger." ECF No. 118-1 at 20–22. In asserting a CPLA claim based on strict liability, plaintiff may establish a "design defect" under Connecticut's "risk-utility test" or "consumer expectation" test. *Bifolck v. Philip Morris*, Inc., 324 Conn. 402, 434, 152 A.3d 1183, 1202–03 (2016). Under the risk-utility test, a product is in "a defective condition unreasonably dangerous to the consumer" if: (1) "a reasonable alternative design was available that would have avoided or reduced the risk of harm"; *or* (2) "[t]he product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product." *See id.* As to the latter, a jury may consider factors including, without limitation:

> the magnitude and probability of the risk of harm, the instructions and warnings accompanying the product, the utility of the product in relation to the range of consumer choices among products, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing.

*Id.* at 1203. Plaintiffs' allegations establish that every one of these factors weighs in favor of a finding that PFAS and the products that incorporate it are manifestly unreasonable in design. There is scientific consensus that PFAS, a substance that was not widely available prior to the 1950's, persist in the environment and human body *forever* and will contribute to immeasurable consequences to human health, well-being, and quality of life *forever*.  Exposure to PFAS has been shown to lead to an increased risk of cancer, disruption of the endocrine system, and reduced immune response. These concerns are not (and will never be) outweighed by any benefit provided by PFAS.  *See* AC ¶¶ 54, 57, 60–61, 66–73, 84, 87–88.

Alternatively, under the consumer expectation test, a product is in a defective condition unreasonably dangerous to the consumer if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer . . . with the ordinary knowledge common to the community as to its characteristics." *Bifolck*, 152 A. 3d at 1203. Plaintiffs allegations, taken together, are sufficient under this test as well. *See id.* ("The product must fail to meet legitimate, commonly held, minimum safety expectations . . . . informed by the consumers' experience with the product, the seller's express representations, and product safety laws.").

Even assuming 3M correctly argues that Plaintiffs "effectively . . . . claim that 3M never should have produced PFAS at all," *see* ECF No. 118-1 at 21, this would not preclude liability. The Connecticut Supreme Court has explained that "although the availability of an alternative design could be relevant under either of our tests . . . neither requires such proof." *Bifolck*, 152 A.3d at 1196.

### 2.    Negligence

Similarly unavailing is 3M's argument that the CPLA claim against it based on negligence must be dismissed because 3M is too "remote" from the Purchaser Plaintiffs to have owed them

any legal duty. *See* ECF No. 118-1 at 22. The Amended Complaint adequately "explains the relationship" between 3M and Plaintiffs—Plaintiffs allege that it is 3M's PFAS that has contaminated the turnout gear and harmed the Connecticut Fire Fighter Plaintiffs. *See* ECF No. 118-1 at 22 (citing *Philadelphia Indem. Ins. Co. v. Lennox Indus., Inc.*, No. 3:18-CV-00217 (CSH), 2019 WL 1258918, at *7 (D. Conn. Mar. 18, 2019)). The Fire Fighter Plaintiffs were foreseeable victims of 3M's negligence as 3M's products were sold to Material Manufacturer Defendants and Turnout Gear Manufacturer Defendants for the express purpose of contributing to the manufacture and distribution of turnout gear. *See* AC ¶¶ 119, 121, 123, 129, 130, 212-213; *see also Ruiz v. Victory Properties, LLC*, 315 Conn. 320, 328, 107 A.3d 381, 388 (2015) ("[O]ur threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant."). Cases finding the "measure of attenuation" between the defendant and the plaintiffs' injuries so significant as to foreclose a duty of care are easily distinguishable. *See, e.g., Lawrence v. O & G Indus., Inc.*, 319 Conn. 641, 659, 126 A.3d 569, 580 (2015) (declining to recognize duty that "fail[ed] to provide a corresponding increase in safety.").

### 3.    Failure to Warn

Plaintiffs next address 3M's argument that the CPLA claim against it based on a failure to warn theory fails because "any warning would have been futile." *See* ECF No. 118-1 at 23–24. The issue of causation in warnings cases is governed by Conn. Gen. Stat. § 52-572q(c), which states that "the [plaintiff] shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the [plaintiff] would not have suffered the harm." *Haesche v. Kissner*, 229 Conn. 213, 218, 640 A.2d 89, 92 (1994). Generally, "questions regarding the existence of a causal link are reserved for the trier of fact. *Id.* (citing *Mather v. Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988); *Trzcinski v. Richley*, 190 Conn. 285, 295, 460 A.2d

56

1269 (1983)). In asserting that any warning from 3M would have been futile, *see* ECF No. 118-1 at 24, 3M inappropriately urges the Court to draw an inference in its favor. *See, e.g., Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (concluding district court erred when, on a motion to dismiss, it "ignored reasonable inferences supported by the facts alleged" and, separately, "drew inferences in [the defendant's] favor"). Even assuming, for the sake of argument, that 3M was "not in the position to control [any other defendant's] behavior [in adding 3M's products to the turnout gear]" 3M could have provided a warning that reached the Fire Fighter Plaintiffs. *Cf. Hunte v. Abbott Lab'ys, Inc.*, 556 F. Supp. 3d 70, 87 (D. Conn. 2021) (allegations that, over time, manufacturer of infant formula became increasingly aware of dangers of formulas containing cow's milk but, instead of warning "consumers or medical professionals," continued selling and distributing its cow's milk-based products without warning, were sufficient to state a CPLA claim).

### 4.    Punitive Damages

Lastly, 3M does not contest the adequacy of the factual allegations of Plaintiffs' cause of action labeled "CPLA – Statutory Punitive Damages" but argues that it should be dismissed because it does not assert a cognizable "standalone" theory of relief. *See* ECF No. 118-1 at 24–25. In *Castle v. Boehringer Ingelheim Pharms., Inc.*, a Connecticut court rejected a similar argument, explaining:

> [Conn. Gen. Stat. § 52-240(b)] expressly allows a plaintiff to bring a claim for reckless disregard and punitive damages . . . . Furthermore, there is a valid rationale for separately pleading a recklessness claim because there is an element of required proof different from other CPLA claims . . . . [Thus,] the court finds it preferable to allow a claim for punitive damages under the CPLA to be pleaded in a separate count.

*Castle v. Boehringer Ingelheim Pharms., Inc.*, No. X08196041722S, 2020 WL 6712426, at *5–6 (Conn. Super. Ct. Sept. 2, 2020) (collecting cases).

V.     **PLAINTIFFS' WARRANTY CLAIMS SURVIVE SCRUTINY.**

Defendants argue that the Court should dismiss the Purchaser Plaintiffs' implied warranty claims for various reasons, each of which is addressed in turn.

A.     **Connecticut recognizes a claim for breach of the implied warranty of usability.**

Defendants move to dismiss the Purchaser Plaintiffs' claim for the implied warranty of usability on the basis that "no such cause of action exists." ECF No. 112 at 21; *see also* ECF No. 118-1 at 15–16. The implied warranty of usability arises under U.C.C. § 2-314(3), which has been codified in Connecticut. *See* Conn. Gen. Stat. §§ 42a-2-314(3). Here, Plaintiffs allege that "[t]he turnout gear contained toxic levels of PFAS chemicals, rendering the gear unusable for its intended purpose," and that the Purchaser Plaintiffs would not have purchased the turnout gear if they had known it was unusable. *See* AC ¶¶ 272–75. "The law of every state, in one form or another, clearly requires any seller of a product to warrant that the product should be used." *See In re Pennsylvania Baycol Third-Party Payor Litig.*, No. 1874 SEPT.TERM 2001, 2005 WL 852135, at *5 (Pa. Com. Pl. Apr. 4, 2005).

B.     **Connecticut does not require Plaintiffs to provide notice of breach to manufacturers.**

Plaintiffs next address Defendants' argument that the Court should dismiss their implied warranty claims because the Amended Complaint "does not allege that any plaintiff gave notice of breach to any defendant." *See* ECF No. 112 at 21; *see also* ECF No. 118 at 12–13. Defendants emphasize that under Connecticut law, a "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach." *See* ECF No. 112 (citing Conn. Gen. Stat. § 42a-2-607(3)). While the Purchaser Plaintiffs are "buyers," Defendants do not argue that any of them is a "seller" for purposes of this provision. As one Connecticut court has explained, the term "seller" in this provision "obviously refers to the person who made the

*immediate sale* to one who is his buyer." *Tomczuk v. Town of Cheshire*, 26 Conn. Supp. 219, 222,

217 A.2d 71, 73 (Super. Ct. 1965) (emphasis added). As a result, the provision does *not* impose a

requirement to "give notice of an alleged breach to the manufacturer." *Id.* at 73. Other courts have

interpreted the notice requirement similarly. *See, e.g., Ruderman v. Warner-Lambert*

*Pharmaceutical Co.*, 23 Conn. Supp. 416, 419, 184 A.2d 63, 65 (1962) ("This is not an action by

a *buyer* against a *seller*. It is an action by a consumer against the manufacturer . . . for breach of

implied warranty . . . [where the] product was purchased by the consumer from a retailer. [The

notice requirement] does not apply.").

> ### C.   Connecticut law does not require the Purchaser Plaintiffs to allege transactional privity with 3M.

3M argues the implied warranty claims against it should be dismissed because the

Amended Complaint does not allege transactional privity between the Purchaser Plaintiffs and 3M.

*See* ECF No. 118-1 at 13. But Plaintiffs allege circumstances where the transactional privity

requirement does not apply, rendering a "summary dismissal" of the claims on a motion to dismiss

improper. *Cf., e.g., In re Rust-Oleum Restore Mktg., Sales Pracs. & Prods. Liab. Litig.*, 155 F.

Supp. 3d 772, 807 (N.D. Ill. 2016) (denying dismissal of implied warranty claims for states

requiring privity where plaintiffs' allegations supported exceptions to privity requirement).

In *Hamon v. Digliani*, 148 Conn. 710, 718, 174 A.2d 294, 297 (Conn. 1961), the

Connecticut Supreme Court held that where a manufacturer puts a commodity for personal use or

consumption on the market in a sealed package or other closed container, it should be "held to

have impliedly warranted to the ultimate consumer that the product is reasonably fit for the purpose

intended *and that it does not contain any harmful and deleterious ingredient of which due and*

*ample warning has not been given*." The Court held that lack of privity is not a bar to suit under

such circumstances. *Id.* at 298 (emphasis added). The Court in *Hamon* also cited favorably to a

decision of the New Jersey Supreme Court, *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960). In *Henningsen*, the New Jersey Supreme Court ruled:

> [W]here the commodities sold are such that if defectively manufactured they will be dangerous to life or limb, then society's interests can only be protected by eliminating the requirement of privity between the maker and his dealers and the reasonably expected ultimate consumer. In that way the burden of losses consequent upon use of defective articles is borne by those who are in a position to either control the danger or make an equitable distribution of the losses when they do occur.

*Id.* at 81.

The common thread connecting the *Hamon* and *Henningsen* decisions is that "[the fact that] the defect existed when the product left defendants' control . . . *is what justifies the privity exception* . . . ." *See Adkins v. Nestle Purina PetCare Co.*, 973 F. Supp. 2d 905, 922 (N.D. Ill. 2013) (denying motion to dismiss implied warranty claims under Illinois, New York, Connecticut, Florida, and Alabama law for lack of privity) (emphasis added). Moreover, both courts were concerned with furthering the public policy of protecting consumers from remote manufacturers in the context of modern merchandising. *See Hamon*, 174 A.2d at 297; *Henningson*, 161 A.2d at 81. Here, Plaintiffs allege that 3M manufactured PFAS, which was incorporated into materials, textiles, and, ultimately, complete turnout gear products sold to unknowing consumers. *See, e.g.,* AC ¶¶ 128-131. Plaintiffs also allege that the hazard existed when the PFAS left 3M's control. *See id.* The concern for the consumer that gave rise to the *Hamon* and *Henningsen* decisions applies equally in this case. Thus, an adverse ruling with respect to privity that would bar the Purchaser Plaintiffs' implied warranty claim against 3M under these circumstances would be irreconcilable with the approach taken by the Connecticut Supreme Court in *Hamon* and by the New Jersey Supreme Court in *Henningsen*, and would be against public policy.

**D.    The Amended Complaint establishes that the complete turnout gear products and their components were not merchantable.**

The Connecticut Supreme Court has held that "the warranty of merchantability is the broadest and most important warranty in the Uniform Commercial Code." *Schenck v. Pelkey*, 176 Conn. 245, 253–54, 405 A.2d 665, 671 (1978). Connecticut General Statute § 42a-2-314(1) establishes the warranty and provides that "[u]nless excluded or modified as provided by section 42a-2-316, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind . . . ." Section 42a-2-314(2) specifies a list of minimum standards that goods must meet to be merchantable including, *inter alia*, that the goods "are fit for the ordinary purposes for which such goods are used."

Defendants argue the Purchaser Plaintiffs' claim under these provisions should be dismissed; they contend that the claim is not specific to the Defendants' products but is, rather, a challenge to the general risks inherent to all turnout gear, turnout gear components, and PFAS. *See* ECF 112 at 21–22 (arguing the turnout gear "conformed to generally accepted industry standards"); *see also* ECF No. 118-1 at 14 (arguing that PFAS are "ubiquitous in the turnout-gear industry and other commercial settings because of their efficacy"). But the Amended Complaint cannot be read to establish that all similar products on the market present the same risks to fire fighters' health and wellbeing as Defendants' products (and that all similar products on the market lack adequate warnings). On the contrary, Plaintiffs' allegations establish that safer options exist. *See* AC ¶¶ 198–203 (alleging that Defendants Fire-Dex and Honeywell advertise "PFAS free" turnout gear components available as part of their "portfolio[s].")  Moreover, safer options could have and should have existed much sooner, but for Defendants' efforts to conceal information about the dangers of PFAS that were known to them for decades.  By urging the Court to infer that their products "conform to the quality of other brands[,]" *see* ECF No. 112 at 23, Defendants seek

to warp the applicable standard of review. *See, e.g., Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (concluding district court erred when, on a motion to dismiss, it "ignored reasonable inferences supported by the facts alleged" and, separately, "drew inferences in [the defendant's] favor").

Even assuming, for the sake of argument, that Defendants' products are substantially interchangeable with others on the market, this fact would not shield Defendants from liability. Defendants rely on *Zito v. United Techs. Corp.*, No. 3:15-CV-744 (AWT), 2016 WL 2946157 (D. Conn. Mar. 11, 2016), *aff'd*, 673 F. App'x 117 (2d Cir. 2016). *See* ECF No. 112 at 22–23 and ECF No. 118-1 at 14–15. In *Zito*, the plaintiffs brought claims including breach of the implied warranty of merchantability against manufacturers of ionization smoke alarms, one of two primary types of smoke alarms sold in the United States. *Zito*, 2016 WL 2946157, at *1. The plaintiffs argued that the ionization smoke alarms were not merchantable because a more modern variety was better at detecting the presence of certain fires quickly. *Id.* at *1–2. Addressing the defendants' motion to dismiss, the court concluded that the plaintiffs had not adequately alleged that the ionization smoke alarms were not merchantable. In its analysis, the court observed that a product "which conforms to the quality of other brands on the market" will "*normally* be merchantable." *See id.* at *8 (emphasis added). The court emphasized that "a product need not be the best version of that product in order to be merchantable" and may fall "short of perfection" and yet be merchantable. *Id.*

Defendants' reliance on *Zito* is misplaced—Plaintiffs allege that Defendants' products are not merely "short of perfection" and are, in fact, unnecessarily toxic and carcinogenic, significantly increasing the risk of adverse health effects, various cancers, and death for Connecticut fire fighters. *See* AC ¶¶ 95–110, 234. Under these circumstances, a much closer analogy than a case

involving slightly antiquated smoke alarm technology is cigarettes. In *Wright v. Brooke Group Ltd.*, the Iowa Supreme Court addressed whether a cigarette manufacturer may be held liable for breach of the implied warranty of merchantability where the plaintiff alleges that the cigarettes at issue are "substantially interchangeable" with all cigarettes.[23] *See Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 182 (Iowa 2002). The defendant tobacco companies in *Wright* argued that "when a product is manufactured as intended and is like all other products of that type, there [can be] no breach of the implied warranty of merchantability." *See id.* at 180. The Iowa Supreme Court rejected this argument, emphasizing the broad obligation on manufacturers to avoid health hazards inherent in the use of their products. *Id.* at 181. The Iowa Supreme Court, thus, answered the certified question of:

> Does Iowa law allow a plaintiff to recover from a cigarette manufacturer for breach of implied warranty of merchantability when the cigarettes smoked by the plaintiff were in the condition intended by the manufacturer and the plaintiff alleges the defendants' cigarettes are "substantially interchangeable"?

as follows:

> If the breach is based on a manufacturing defect, recovery is not allowed. If the breach is based on a defective design or inadequate instructions or warnings, recovery is not precluded under the stated facts.

*Id.* at 183. This case is also analogous to those involving cigarettes because it involves defendants who had knowledge of the dangers of their products and sought to conceal that information from the public. Other courts have reached similar conclusions in the context of products alleged to be unreasonably dangerous to human health or to lack adequate warnings.[24]

---

[23] Like Connecticut, Iowa derives its implied warranty of merchantability from the Uniform Commercial Code; the applicable provisions in the two states are identical. *See* Conn. Gen. Stat. § 42a-2-314 and Iowa Code § 554.2314 (1999).

[24] *See, e.g., Bly v. Otis Elevator Co.*, 713 F.2d 1040, 1045 (4th Cir. 1983) ("A manufacturer may breach its implied warranty of merchantability by failing to warn or instruct concerning dangerous propensities or characteristics of a product even if that product is flawless in design and manufacture."); *Pritchard v. Liggett & Myers Tobacco Co.*, 295

Defendants cite no case law that remotely suggests that Connecticut would take a different view from that of the Iowa Supreme Court in *Wright*. Defendants' argument that they should be exempted from liability on the theory that other manufacturers may have placed equally dangerous products on the market contravenes Connecticut's longstanding public policies of protecting its consumers and placing "the risk of injurious consequences" on manufacturers.[25] *See, e.g., Corneliuson v. Arthur Drug Stores, Inc.*, 153 Conn. 134, 137, 214 A.2d 676, 678 (Conn. 1965).

Finally, the Group Defendants cite *Brown v. Coty, Inc.* for the argument that "nonspecific allegations" about PFAS do not bear on merchantability. *See* ECF No. 112 at 23–24 (citing *Brown v. Coty, Inc.*, No. 22 CIV. 2696 (AT), 2023 WL 2691581 (S.D.N.Y. Mar. 29, 2023)). In *Brown*, the plaintiff brought various claims against a mascara manufacturer, alleging the mascara contained PFAS. *See Brown*, 2023 WL 2691581, at *1–2. The New York court held that the plaintiff's allegations were insufficient to state a claim for breach of the implied warranty of merchantability, explaining:

> [The plaintiff] does not specify which PFAS were present in Lash Blast or at what levels . . . . The complaint [also] acknowledges that PFAS differ in the type and severity of harm that may produce and the level of exposure at which they are harmful.

*Id.* at *5.

*Brown* is readily distinguishable. Here, Plaintiffs allege that the turnout gear at issue was "embedded with significant concentrations of PFAS in all three layers, including the thermal

---

F.2d 292, 296, 297 n.14 (3d Cir. 1961) (reversing dismissal of claim for breach of implied warranty of merchantability based on allegation that cigarettes were unfit because they caused physical injury to the smoker, notwithstanding lack of allegation that the cigarettes "smoked by plaintiff were not the same quality as those generally sold").

[25] This argument has especially troubling implications with respect to manufacturers like Defendants 3M and DuPont who, together, appear to comprise nearly the entire market for PFAS in the United States. *See, e.g.*, AC ¶ 132 ("Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.") *and* AC ¶ 141 ("Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.").

liners" and that the turnout gear at issue "was intentionally manufactured with and contained" PFOA, PFOS, PTFE, and side-chain fluorinated polymers at "toxic levels." *See* AC ¶¶ 218–222, 264, 272. The Group Defendants cite no authority that would suggest that these allegations, taken together with the entire Amended Complaint, are insufficient because they are "nonspecific."

Moreover, the Group Defendants incorrectly assert that, "[t]he complaint [] lacks any allegation that other PFAS substances [beyond PFOA and PFOS]" present health risks. *See* ECF No. 112 at 24. Plaintiffs allegations regarding PTFE include, *inter alia*, that "[t]he use of fluoropolymers (including PTFE) in manufacturing and commercial products poses substantial risks to human health" and that "[w]hen PTFE is used in commercial products such as textiles, other PFAS used in the manufacturing process will generally be present and pose substantial risks to human health." *See* AC ¶¶ 79–84. Plaintiffs allegations regarding side-chain fluorinated polymers include, *inter alia*, that "[t]he use of side-chain fluorinated polymers in manufacturing and commercial products poses substantial risks to human health" and that such use "can lead (and often leads) to the formation of non-polymeric PFAS (e.g., PFOA and PFOS), which can then contaminate (and often contaminate) human beings . . . ." *See* AC ¶¶ 79, 85–88. Plaintiffs also allege that the EPA has denied certain exemptions to side-chain fluorinated polymers "as a result of the serious risks involved in their use" and has cautioned that it "can no longer conclude that [side-chain fluorinated polymers] 'will not present an unreasonable risk to human health or the environment." AC ¶¶ 87–88.

**E.    Defendants fraudulently concealed their misconduct giving rise to Plaintiffs' warranty claims.**

The Group Defendants argue that a breach of warranty claim accrues at the same time the tender of delivery is made, and an action for breach of a contract for sale must be brought within four years of accrual. ECF No. 112 at 25 (citing Conn. Gen. Stat. § 42a–2–725(1)–(2)). As

Plaintiffs plead in the Amended Complaint, the statute of limitations for Plaintiffs' warranty claims is tolled by Defendants' fraudulent concealment. [26] AC ¶¶ 258–60. *See* Conn. Gen. Stat. § 52-595. To allege fraudulent concealment, a plaintiff must demonstrate that the defendant:

> (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the cause of action, (2) intentionally concealed those facts from the plaintiff and (3) concealed those facts for the purpose of obtaining delay on the part of the plaintiff in filing a cause of action against the defendant.

*McCullough v. World Wrestling Ent., Inc.*, 172 F. Supp. 3d 528, 555 (D. Conn. 2016) (internal citation omitted) (stating that fraudulent concealment may be inferred, even if supported by circumstantial evidence).[27]

Here, Plaintiffs have alleged that Defendants had actual knowledge of the existence of PFAS in their products, as well as the harm caused by PFAS. AC ¶¶ 132–64. Defendants concealed their knowledge from Plaintiffs and the public, and they did so to prevent Plaintiffs (and others) from filing actions for damages resulting from contamination and exposure to PFAS. AC ¶¶ 165–87, 190–91, 258-260.

Plaintiffs have alleged fraud with sufficient particularity for purposes of Rule 9(b), which imposes heightened pleading standards for allegations of fraud. [28] The Amended Complaint contains specific allegations about statements made by the Defendants including where the

---

[26] The case Defendants cite to support their argument that Plaintiffs' warranty claims are time-barred is inapplicable here. *Hagwood-El v. Allied Interstate, Inc.*, No. 3:19-CV-01311 (JAM), 2020 WL 5300256, at *4 (D. Conn. Sept. 4, 2020) (determining that time-barred claims should be dismissed when the plaintiff did not even raise a tolling argument, which is not the case here).

[27] The court in *McCullough* found that the defendant fraudulently concealed the link between concussive trauma and degenerative neurological conditions. The court determined that various misleading statements by the defendant, such as public comments and interviews downplaying the harm of concussive trauma, plausibly alleged intent to "conceal a cause of action for the purpose of obtaining delay."

[28] "A plaintiff alleging a fraudulent misstatement must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Hubbard-Hall, Inc. V. Monsanto Co.*, 98 F. Supp. 3d 480, 488 (D. Conn. 2015) (internal citations omitted) (providing guidance as to the heightened pleading requirement of fraudulent concealment, though the court ultimately found that the timeline provided by plaintiffs did not demonstrate the defendant knew of the cause of action, unlike the immediate case).

statements were made, when they were made, and the contents. AC ¶¶ 167–178, 181–87. These statements were fraudulent because, as alleged in the Amended Complaint, the dangers of PFAS are well-documented and understood by Defendants when they made those statements. *See* AC ¶¶ 54–88, 132-164. Finally, Plaintiffs' due diligence would not have led to the discovery of the cause of action because Defendants continuously, intentionally, and falsely claimed that their products were free of harm. AC ¶¶ 254-256. Should the Court find that the fraudulent concealment doctrine does not apply here, Plaintiffs' warranty claims should still be upheld for conduct up to four years prior to the filing of this action.

## VI.    THE PURCHASER PLAINTIFFS' CUTPA CLAIM SURVIVES SCRUTINY.

The Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stats. §§ 42-110a, *et seq.*, provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Conn. Gen. Stat. § 42-110b(a), and provides a private cause of action for "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b[.]" *Id.* § 42-110g(a). "To state a claim under CUTPA, a plaintiff must plead that she (1) suffered an ascertainable loss of money or property, (2) that was caused by, (3) an unfair method of competition or an unfair or deceptive act in the conduct of any trade or commerce." *See Smith v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 92, 200 (D. Conn. 2016), *aff'd*, 666 Fed. App'x 84 (2d Cir. 2016). Defendants present a series of arguments regarding the second and third elements,[29] each of which is addressed in turn.

---

[29] Defendants appear to concede that Plaintiffs have sufficiently pled an ascertainable loss of money or property.

## A.    Defendants' conduct violated CUTPA.

To determine whether conduct is unfair under CUTPA, Connecticut courts follow the "cigarette rule" formerly used by the Federal Trade Commission. *See Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ.*, 338 Conn. 189, 232, 257 A.3d 874 (2021). Under this rule, courts consider three factors:

> (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].

*Id.* (alterations in original). A practice need not meet all three criteria to constitute an unfair practice under CUTPA, and "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 227–28, 990 A.2d 326 (2010) (citation and internal quotation marks omitted). Because CUTPA is "a self-avowed remedial measure," it must be "construed liberally in an effort to effectuate its public policy goals." *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 791, 219 A.3d 767, 783 (2019).

For an act or practice to be deceptive[30] (1) "there must be a representation, omission or other practice likely to mislead consumers," (2) "consumers must interpret the message reasonably under the circumstances," and (3) "the misleading representation, omission, or practice must be material—that is, likely to affect consumer decisions or conduct." *Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 141 (D. Conn. 2015) (quoting *Bank of New York v. Nat'l Funding*,

---

[30] "A subset of unfair practices, recognized by our Supreme Court, is deceptive practices." *See Wilkins v. Yale Univ.*, No. CV106014646S, 2011 WL 1087144, at *4 (Conn. Super. Ct. Feb. 25, 2011) ("A subset of unfair practices, recognized by our Supreme Court, is deceptive practices") (citing *Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 254, 550 A.2d 1061 (1988)).

No. X01CV000171525S, 2005 WL 527749, at *5 (Conn. Super. Ct. 2005)). To allege deceptive conduct, a plaintiff "need not prove [and therefore need not plead] reliance or that the representation became part of the basis of the bargain." *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 617, 440 A.2d 810 (1981).

CUTPA is not displaced by the Uniform Commercial Code but, rather, provides supplemental remedies where a breach of contact is "accompanied by aggravating circumstances." Depending on the nature of the plaintiff's allegations, the same facts that establish a breach of warranty may also establish a CUTPA violation. *Prysmian Cables & Sys. USA LLC v. ADT Com. LLC,* 665 F. Supp. 3d 236, 254 (D. Conn. 2023). In cases where the plaintiff's loss arises from a breach of contract, allegations that would support "a finding of intentional, reckless, unethical or unscrupulous conduct" will support a CUTPA claim under the second prong of the cigarette rule. *Ulbrich v. Groth*, 310 Conn. 375, 410, 78 A.3d 76, 100–01 (2013).

In *Gramazio v. Sikorsky Aircraft Corp.*, the plaintiff alleged that one of the defendants had negligently caused water to become contaminated and that the defendant failed to warn the public so that members of the public could avoid injury and failed to respond with adequate personnel to mitigate the harm. *Gramazio v. Sikorsky Aircraft Corp.*, No. X01CV000160391, 2001 WL 195011, at *1 (Conn. Super. Ct. Feb. 7, 2001). The court held that the conduct following the negligent acts could be found to be "immoral, unethical, oppressive or unscrupulous." *See id.* at *4. Similarly, in *Marten Transport, Ltd. v. MacDermid, Inc.*, the plaintiff alleged that the defendant negligently packed chemical storage drums for transport by the plaintiff on three occasions, resulting in damages and cleanup costs. *Marten Transp., Ltd. v. MacDermid, Inc.*, No. CV000160172, 2001 WL 438826, at *1 (Conn. Super. Ct. Mar. 26, 2001). The court found allegations regarding the defendant's "conscious disregard of the first chemical spill . . . and willful disregard[] [of] the

probability that it would occur again" with risk of injury to the plaintiff were sufficient to state a CUTPA claim. *See id.* at *3–4. As in *Gramazio* and *Marten*, Plaintiffs allege that Defendants failed to avoid a known risk. *See, e.g.*, AC ¶¶ 132–64, 198–203. These allegations establish that each Defendant's conduct was at least reckless, supporting a CUTPA claim under the second prong of the cigarette rule. *Cf. Prysmian*, 665 F. Supp. 2d at 254 (denying dismissal of CUTPA claim where plaintiff plausibly alleged defendant's conduct was reckless).

Alternatively, the Amended Complaint establishes deceptive conduct sufficient to elevate a breach of contract to a CUTPA violation.[31] Defendants acted deceptively in two distinct ways. First, certain Defendants made misrepresentations in the marketing and sale of their products which led the Purchaser Plaintiffs to believe they were purchasing a product that was safe for fire fighters to use in the course of their job duties and in responding to fire emergencies when, in fact, the opposite was true. *See* AC ¶¶ 165–87; *Greene*, 926 A.2d at 711–12 (denying motion to strike CUTPA claim based on breach of contract where plaintiff plausibly alleged that defendants "misrepresented their intentions" related to contract). Second, *all* Defendants intentionally and misleadingly failed to do disclose the hazards presented by their products, and the Purchaser Plaintiffs' would not have purchased the turnout gear if they had known that it was contaminated with PFAS and unsafe for use. *See, e.g.,* AC ¶¶ 188–89, 238; *Prysmian*, 665 F. Supp. 2d at 254–55 (denying motion to dismiss CUTPA claim based on breach of contract where plaintiff plausibly alleged failure to disclose pertinent information).

---

[31] *See, e.g., Greene v. Orsini*, 50 Conn. Supp. 312, 926 A.2d 708, 711 (Super. Ct. 2007) ("A misrepresentation can constitute an aggravating circumstance that would allow a simple breach of contract claim to be treated as a CUTPA violation; it would, in effect, be a deceptive act."); *Prysmian*, 665 F. Supp. 2d at 254 ("Connecticut courts have concluded that a '[n]egligent misrepresentation suffices as a basis for a CUTPA claim and as an aggravating factor making a breach of contract action also the basis of a CUTPA claim.").

CUTPA allows for deception claims based on an omission where, "in light of all the circumstances, there is a duty to disclose." *Beerman v. Tauck, Inc.*, No. 3:20-CV-00713 (JAM), 2021 WL 3773293, at *4 (D. Conn. Aug. 25, 2021). In *Bailey Employment System, Inc. v. Hahn*, the court held that a franchise seller's failure to disclose the attrition rate among franchises and the fact that several other franchisees had brought CUTPA claims against the seller violated CUTPA because they had the "tendency or capacity to deceive the buyer as to the value of the franchise." *See Bailey Emp. Sys., Inc. v. Hahn*, 545 F. Supp. 62, 67 (D. Conn. 1982), *aff'd*, 723 F.2d 895 (2d Cir. 1983), *and aff'd sub nom. Hahn v. Leighton*, 723 F.2d 895 (2d Cir. 1983). The court explained that while certain failures to disclose pertinent information involved in a sale "may not be actionable under the common law theory of misrepresentation or fraud," they are actionable under CUTPA. *Id.* at 68. Plaintiffs' allegations are analogous; Defendants' failure to disclose the hazards presented by their products had the "tendency or capacity to deceive" the Purchaser Plaintiffs as to the value of the turnout gear. *See* AC ¶ 280.

Moreover, a duty to disclose "is imposed on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make a full and fail disclosure as to the matters about which he assumes to speak." *See Duksa v. Middletown*, 173 Conn. 124, 127, 376 A.2d 1099, 1101 (1977). Plaintiffs allege that certain Defendants undertook to create advertisements and advise the public and potential consumers, including the Purchaser Plaintiffs, on various topics including the safety of their products and ability of their products to keep fire fighters "safe." In so advertising and advising, these Defendants completely omitted to mention that their products were toxic, carcinogenic, and/or contaminated with toxins and carcinogens including PFOA and PFOS, and that use of their products presented serious health risks. These omissions were at least negligent. *See* AC ¶¶ 165–187; *cf. Prysmian*, 665 F. Supp. 3d at 225 (holding that negligent

71

misrepresentation claim based on omissions related to sale sufficed "as a basis for a CUTPA claim and as an aggravating factor making a breach of contract action also the basis of a CUTPA claim") (quoting *Romulan Realty, LLC v. Old Lyme Prods., Inc.*, No. CV115014161S, 2011 WL 6934754, at *2 (Conn. Super. Ct. Dec. 7, 2011)). Thus, the Group Defendants' argument that the Amended Complaint lacks no duty to disclose "as to any defendant" is unavailing. *See* ECF No. 112 at 30.

In sum, Plaintiffs allegations, taken together, are more than sufficient to establish a CUTPA violation.[32] *See Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 142 (D. Conn. 2015) (the proper inquiry at the motion to dismiss stage is not whether "as a matter of law . . . [the] conduct, as alleged, actually violated CUTPA" but instead whether the plaintiff "has alleged facts to 'raise a reasonable expectation that discovery will reveal evidence' supporting this claim").

**B.    Defendants' violations caused the Purchaser Plaintiffs' injuries.**

Group Defendants wrongly argue the Amended Complaint "lacks [causation] allegations." *See* ECF No. 112 at 29. Plaintiffs' allegations establish Defendants' failure to avoid a known risk has placed Purchaser Plaintiffs in their current situation where they must purchase new, safe, turnout gear. Moreover, Plaintiffs explicitly allege that they would not have purchased the turnout gear had Defendants disclosed pertinent information about its dangerous qualities. AC ¶ 238.

**C.    The Purchaser Plaintiffs have standing to sue 3M.**

3M argues that Plaintiffs' injuries are not a direct result of its conduct and that, as a result, Purchaser Plaintiffs lack statutory standing to bring their CUTPA claim. *See* ECF No. 118-1 at 19–20. "CUTPA imposes no requirement of a consumer relationship." *Macomber v. Travelers Property and Cas. Corp.*, 261 Conn. 620, 643 (2002). Instead, Connecticut require CUTPA

---

[32] With respect to 3M specifically, *see* AC ¶¶ 129–30, 132–40, 167–68, 179; these allegations belie 3M's contention that the Amended Complaint offers nothing against it but "generalities." *See* ECF No. 118-1 at 17.

plaintiffs alleging indirect injuries to show that their injuries are neither "remote" nor merely

"derivative" of harm suffered by other persons or entities. *See, e.g., Vacco v. Microsoft Corp.,* 260

Conn. 59, 91, 793 A.2d 1048, 1067 (2002) (holding that plaintiff's indirect injuries from an alleged

price-fixing scheme were too remote and derivative to support standing). Here, Plaintiffs'

allegations establish that the Purchaser Plaintiffs' injuries are a direct result of 3M's failure to avoid

a known risk and failure to disclose the hazards presented by its products. But even if Plaintiffs'

injuries could be considered indirect—which Plaintiffs emphatically contest—Plaintiffs still have

standing. In *Vacco*, the Connecticut Supreme Court endorsed a three-part "policy analysis" to

determine whether plaintiffs asserting indirect injuries nonetheless had standing:

> First, the more direct an injury is, the more difficult it becomes to determine the
> amount of [the] plaintiff's damages attributable to the wrongdoing as opposed to
> other, independent factors. Second, recognizing claims by the indirectly injured
> would require courts to adopt complicated rules apportioning damages among
> plaintiffs removed at different levels of injury from the violative acts, in order to
> avoid the risk of multiple recoveries. Third, struggling with the first two problems
> is unnecessary whe[n] there are directly injured parties who can remedy the harm
> without these attendant problems.

*Id.* at 1066 (quoting *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 373, 780 A.2d 98 (2001)).

Plaintiffs address each consideration in turn. First, Plaintiffs allege that, *regardless* of their claims

against others in the supply chain, the Purchaser Plaintiffs would not have purchased contaminated

gear if 3M had not failed to avoid a known risk or failed to disclose pertinent information; thus,

there are not "numerous steps between the defendant's conduct and the plaintiff's injury." *See id.*

at 1067. Second, Plaintiffs' allegations present no difficulty with "apportioning damages among

plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of

multiple recoveries" because there only exists one level of financial injury. *See id.* Third, there are

no entities more directly injured by 3M's conduct than the Purchaser Plaintiffs. Plaintiffs allege

that the Material Manufacturing Defendants and Turnout Gear Manufacturing Defendants

knowingly used PFAS in their products and are similarly culpable; thus, these other parties are not "directly injured parties who can remedy the harm."

Finally, 3M seems to cite *Lamontagne v. E.I. Du Pont de Nemours and Co., Inc.* for the contention that its PFAS were "process[ed]" by other parties into a "new substance" as they traveled through the supply chain, suggesting "remoteness." *See* ECF No. 118-1 at 20 (citing *Lamontagne v. E.I. Du Pont de Nemours & Co.*, 834 F. Supp. 576 (D. Conn. 1993), *aff'd*, 41 F.3d 846 (2d Cir. 1994)). The Amended Complaint establishes that it is impossible that the PFAS would have transformed into a new substance. *See, e.g.*, AC ¶¶ 53–56. Moreover, *Lamontagne* is distinguishable. *See Lamontagne*, 834 F. Supp. at 589 ("The plaintiffs nowhere argue, nor do they suggest, that Teflon is a dangerous product, except as it was used by Vitek in the Proplast TMJ Implant.").

### D.    3M engaged in trade or commerce in Connecticut.

3M argues Plaintiffs "fail to allege that 3M undertook any of its challenged acts or practices 'in Connecticut' as required by CUTPA." *See* ECF No. 118-1 at 18.[33] CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of *any trade or commerce*." Conn. Gen. Stat. § 42-110b(a) (emphasis added). "Trade" and "commerce" is broadly defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn.

---

[33] 3M references *W. Dermatology Consultants P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169, 201, 78 A.3d 167, 188 (2013), *aff'd but criticized*, 322 Conn. 541, 153 A.3d 574 (2016), which is factually inapt and held that there was no "trade" or "commerce" in the state where "Connecticut only served as the corporate headquarters" of defendant "at the time of the execution of the contract and for about a year after" and the plaintiff was not a resident of Connecticut. On appeal, having disposed of the issue on other grounds, the Connecticut Supreme Court did not address plaintiff's argument that "the Appellate Court incorrectly concluded that CUTPA was not implicated on the ground that the defendants had not engaged in any trade or commerce in Connecticut." *Id.* at 576 n.3.

Gen. Stat. § 42-110a(4). Plaintiffs' allegations establish that 3M engaged in trade or commerce in Connecticut and that, as a result, the turnout gear is contaminated with 3M's PFAS. *See, e.g.*, AC ¶¶ 22, 114, 119, 121, 123, 129–30. *Cf. Titan Sports, Inc. v. Turner Broad. Sys., Inc.*, 981 F. Supp. 65, 71–72 (D. Conn. 1997) (rejecting defendants' argument that alleged conduct occurred at principal place of business in Georgia, not Connecticut, where "Defendants' allegedly deceptive television programs air in Connecticut, their pay-per-views are broadcast in Connecticut, Connecticut residents call the 900-number hot line and Plaintiff has its principal place of business in Connecticut.").

And if that alone is insufficient, courts within this District have recognized that "CUTPA does not require that a violation actually occur in Connecticut[] if the violation 'is tied to a form of trade or commerce intimately associated with Connecticut,' or if . . . Connecticut choice of law principles . . . dictate application of Connecticut law." *See Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 175, 200 (D. Conn. 2005), *opinion adhered to as modified on reconsideration*, 409 F. Supp. 2d 112 (D. Conn. 2006) (internal citations omitted).[34]

### E.   Defendants engaged in a continuing course of conduct with respect to their CUTPA violations.

The Group Defendants argue that the Purchaser Plaintiffs' CUTPA claim is "time-barred as to any alleged violations that occurred more than three years before the original complaint was filed." *See* ECF No. 112 at 31 (citing Conn. Gen. Stat. § 42-110g(f)). Conn. Gen. Stat. § 42-110g(f)

---

[34] *See also Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 145 (D. Conn. 2015) (allegations "raise a plausible inference that [plaintiff] subscribed to the plan with respect to property he lived in, in the state of Connecticut and, therefore, that [defendant's] allegedly deceptive trade or business practice occurred in the state of Connecticut."); *Valtec Int'l, Inc. v. Allied Signal Aerospace Co.*, No. 3:93CV01171(WWE), 1997 WL 288627, at *7 (D. Conn. Mar. 7, 1997) ("[W]here choice-of-law principles dictate that the law of Connecticut should be applied, a cause of action may exist under CUTPA even though none of the acts complained of took place in Connecticut.").

provides that an action for damages under CUTPA "may not be brought more than three years after the occurrence of a violation of [CUTPA]." But the Connecticut Supreme Court "has recognized that under certain circumstances, the limitations period may be tolled under the continuing course of conduct doctrine." *Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 177 (D. Conn. 2000) (citing *Blanchette v. Barrett*, 229 Conn. 256, 640 A.2d 74, 80 (1994), *overruled on other grounds by Grey v. Stamford Health Sys., Inc.*, 282 Conn. 745, 924 A.2d 831 (2007)). Such tolling may be appropriate "in situations in which, because of a continuous course of contacts or dealings, it cannot be said with precision when a specific act or omission occurred in the course of the relationship"; in such cases, "the statute may be tolled until the time of the last act within the course of the relationship." *Bartold v. Wells Fargo Bank*, N.A., No. 14-CV-00865 (VAB), 2015 WL 7458504, at *4 (D. Conn. Nov. 24, 2015) (quoting *Partitions, Inc. v. Blumberg Assocs.*, No. CV-98-0576664-S, 2001 WL 1332174, at *3 (Conn. Super. Ct. Oct. 9, 2011)) (citations omitted). Alternatively, a plaintiff may establish a continuing course of conduct when a defendant's duty to the plaintiff remained in existence after an initial harmful act because later wrongful conduct by the defendant related to the original act. *Izzarelli*, 117 F. Supp. 2d at 177.

Here, Plaintiffs allege that, for many years, they bought turnout gear that was manufactured and sold by Defendants Fire-Dex, Globe, Honeywell, Morning Pride, and/or Lion, containing PFAS-contaminated materials supplied by Defendants 3M, Dupont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, PBI, Safety Components, and/or StedFast, as well as PFAS supplied by Defendants 3M and/or DuPont. AC ¶¶ 212–213. The continuous purchases indistinguishably gave rise to the harm caused by the PFAS-contaminated products. AC ¶¶ 233, 300–01. Plaintiffs' allegations are sufficient to bring a CUTPA claim within the continuing course of conduct doctrine because the multiple purchases of PFAS-contaminated materials over the course of many years

created a continuous series of contacts and dealings between Plaintiffs and Defendants. *Cf. Izzarelli*, 117 F. Supp. 2d at 177.[35] Alternatively, Plaintiffs' subsequent purchases related back to their original purchases, and thereby the original unfair conduct committed by Defendants, because each was part of a series of dealings between the same parties for similar types of products. AC ¶¶ 281–87. Through these dealings, Defendants' unfair conduct caused Plaintiffs to purchase harmful products.

### F.      Defendants' motion to strike.

"Out of an abundance of caution," the Group Defendants move to strike, under Rule 12(f), "any request for medical-monitoring relief on a nationwide basis," arguing that Plaintiffs lack class standing to seek such relief. ECF No. 112 at 31, 33–34. As Plaintiffs do not seek certification of a nationwide medical monitoring class, this issue is moot and the Court need not address it.

## CONCLUSION

For the above reasons, Plaintiffs request that this Court deny Defendants Motions to Dismiss in their entirety.

DATED:        February 28, 2025                    Respectfully submitted,

                                                                    SILVER GOLUB & TEITELL LLP

---

[35] The cases cited by Defendants in support of their argument are distinguishable here. *Phelan ex rel. Est. of Phelan v. Daimler Chrysler Corp.*, 323 F. Supp. 2d 335, 341–42 (D. Conn. 2004) (The plaintiff only alleged that, after the defendant fraudulently induced the plaintiff into purchasing a product, the defendant continued to fraudulently induce other customers. The plaintiff did not allege that the defendant continued to interact with the plaintiff in a way that repeated the harm or in a way that created a nexus with the original wrongful conduct. This is distinguishable from the immediate case, where Plaintiffs allege they have continuously purchased products from Defendants over a period of many years.); *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 216-17, 541 A.2d 472, 477–78 (1988) (stating that the only CUTPA violations alleged in the complaint were false representations prior to the plaintiffs' purchase of the property at issue, while the complaint in the immediate case includes false representations made throughout the class period).

_/s/ Jennifer Sclar_
Ian W. Sloss (ct31244)
Jennifer Sclar (ct31554)
Kate Sayed (ct31667)
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, CT  06901
Tel. (203) 325-4491
isloss@sgtlaw.com
jsclar@sgtlaw.com
ksayed@sgtlaw.com

_Attorneys for Plaintiffs_