**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNIFORMED PROFESSIONAL FIRE FIGHTERS ASSOCIATION OF CONNECTICUT; STAMFORD PROFESSIONAL FIRE FIGHTERS ASSOCIATION, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS LOCAL 786; FAIRFIELD FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 1426; STRATFORD PROFESSIONAL FIRE FIGHTERS, IAFF LOCAL 998; HAMDEN PROFESSIONAL FIRE FIGHTERS, IAFF LOCAL 2687; CITY OF GROTON FIRE FIGHTERS UNION, IAFF LOCAL 1964; HARTFORD FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 760; NEW CANAAN FIRE DEPARTMENT, IAFF LOCAL 3224; TORRINGTON FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 1567; WESTPORT UNIFORMED FIREFIGHTERS ASSOCIATION, IAFF LOCAL 1081; WILTON FIRE FIGHTERS, IAFF LOCAL 2233; SIKORSKY AIRCRAFT FIRE FIGHTERS, IAFF LOCAL I-68; NORWALK PROFESSIONAL FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 830; CITY OF STAMFORD;  OLD MYSTIC FIRE DISTRICT; THE RELIANCE FIRE COMPANY, INC.; PETER BROWN; PAUL ANDERSON; STEVE MICHALOVIC; DAN TOMPKINS; NELSON HWANG; WILLIAM TUTTLE; BRIAN DOANE; ARTURO ROSA; TIMOTHY E. O'DONNELL; JOE ROUSSO; MATTHEW WILLE; AND TOM REICH individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY); EIDP, INC.; DUPONT DE NEMOURS, INC.; CHEMOURS COMPANY, L.L.C.; CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; ELEVATE TEXTILES, INC; GENTEX CORPORATION; GLOBE MANUFACTURING COMPANY, LLC; W.L. GORE & ASSOCIATES, INC.; FIRE-DEX GW, LLC; HONEYWELL SAFETY PRODUCTS USA, INC.; INNOTEX CORP.; INTERTECH GROUP, INC.; LION GROUP, INC.; | Case No.:  3:24-cv-01101-AWT |

LAKELAND INDUSTRIES, INC.; MILLIKEN & COMPANY; MORNING PRIDE MANUFACTURING L.L.C.; PBI PERFORMANCE PRODUCTS, INC.; SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC.; STEDFAST USA, INC.; TENCATE PROTECTIVE FABRICS USA D/B/A SOUTHERN MILLS, INC.; AND VIKING LIFE-SAVING EQUIPMENT AMERICA, INC.

Defendants.

## SECOND AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Uniformed Professional Fire Fighters Association of Connecticut ("UPFFA"); The Stamford Professional Fire Fighters Association, International Association of Fire Fighters ("IAFF") Local 786; The Fairfield Fire Fighters Association, IAFF Local 1426; Stratford Professional Fire Fighters, IAFF Local 998; Hamden Professional Fire Fighters, IAFF Local 2687; Groton Firefighters Union, IAFF Local 1964; Hartford Fire Fighters Association, IAFF Local 760; New Canaan Fire Department, IAFF Local 3224; Torrington Fire Fighters Association, IAFF Local 1567; Westport Uniformed Firefighters Association, IAFF Local 1081; Wilton Fire Fighters, IAFF Local 2233; Sikorsky Aircraft Fire Fighters, IAFF Local I-68; Norwalk Professional Fire Fighters Association, IAFF Local 830 (collectively, the "Union Plaintiffs"); the City of Stamford; The Old Mystic Fire District; The Reliance Fire Company Inc. (collectively, the "Purchaser Plaintiffs"), on behalf of themselves and other purchasers nationwide (the "Nationwide Purchaser Class") and on behalf of purchasers in Connecticut (the "Connecticut Purchaser Subclass"); Peter Brown; Paul Anderson; Steve Michalovic; Dan Tompkins; Nelson Hwang; William Tuttle; Brian Doane; Arturo Rosa; Timothy E. O'Donnell; Joe Rousso; Matthew Wille; and Tom Reich (collectively, the "Fire Fighter Plaintiffs") (all together, "Plaintiffs"), individually and on behalf of all others similarly situated,

allege the following based upon the investigation of Plaintiffs' counsel, information and belief, personal knowledge, and a review of publicly available information.

**INTRODUCTION**

1.  Plaintiffs include the UPFFA, a statewide labor organization representing all Professional Firefighters in the state of Connecticut, twelve professional local fire fighter unions, (collectively, the "Union Plaintiffs"), the Purchaser Plaintiffs, the Nationwide Purchaser Class, and the Connecticut Purchaser Subclass (together, the "Purchaser Class"). Plaintiffs also include twelve individual fire fighters ("Fire Fighter Plaintiffs"), who sue on behalf of themselves and other Connecticut firefighters who are similarly situated (the "Fire Fighter Class").

2.  Plaintiffs bring this action against Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing Company), EIDP, Inc., DuPont de Nemours, Inc., the Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., Elevate Textiles, Inc., Gentex Corporation, Globe Manufacturing Company, LLC; W.L. Gore & Associates, Inc.; Fire-Dex GW, LLC; Honeywell Safety Products USA, Inc.; Innotex Corp.; InterTech Group, Inc.; Lakeland Industries, Inc.; Lion Group, Inc.; Milliken & Company; Morning Pride Manufacturing L.L.C.; PBI Performance Products, Inc.; Safety Components Fabric Technologies, Inc.; StedFast USA, Inc.; TenCate Protective Fabrics USA d/b/a Southern Mills, Inc.; and Viking Life-Saving Equipment America, Inc. (collectively, "Defendants") for harm resulting from the purchase, use of, and dependence upon certain fire fighter personal protective equipment ("PPE") containing hazardous levels of toxic, carcinogenic per- and polyfluoroalkyl substances ("PFAS" or "PFAS Chemicals.").

3.  Defendants are the companies responsible for designing, manufacturing, selling, supplying, and/or distributing the equipment and/or the materials and/or chemicals used therein.

3

4.      Defendants knew the equipment, materials, and chemicals to be unsafe but represented the opposite.

5.      Defendants failed to warn Plaintiffs, Plaintiffs' members, and the public of specific, substantial risks to human health, profiting immensely.

6.      The Purchaser Plaintiffs, Connecticut Purchaser Subclass, Union Plaintiffs, Fire Fighter Plaintiffs and the Fire Fighter Class thus bring this action against Defendants pursuant to the Connecticut Product Liability Act, CONN. GEN. STAT. § 52-572m, *et seq.*, on behalf of themselves and the Fire Fighter Class, whose members have worn or continue to wear fire fighter PPE, including turnout gear, fire proximity suits, and station wear, that was manufactured, designed, or sold, in whole or in part, by any of the named Defendants in the course of performing their job duties.

7.      The Purchaser Plaintiffs and the Connecticut Purchaser Subclass sue pursuant to the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a, *et seq.*, and the common law on behalf of themselves and all people and/or entities who purchased PFAS-contaminated fire fighter PPE that was manufactured, designed, or sold, in whole or in part, by any of the named Defendants (together, the "Class") during the relevant statutory period (the "Class Period").

8.      The Purchaser Plaintiffs and the Purchaser Class bring this action for breaches of the warranty of merchantability and the warranty of usability, under each applicable state's law.

## PARTIES

### I.    PLAINTIFFS

9.      Plaintiff Uniformed Professional Fire Fighters Association of Connecticut (the "UPFFA") is an unincorporated labor organization that represents nearly four thousand professional fire fighters in and throughout Connecticut. Members of some of the Connecticut

local fire fighter unions comprise the Executive Board of the UPFFA. A primary focus of the UPFFA is the health, safety, and well-being of its members, and the UPFFA has a direct interest in protecting and safeguarding its members against all occupational hazards. The UPFFA routinely advocates for and promotes the health, safety, and well-being of its members and the fire service, both at the state and national levels. The UPFFA has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. The UPFFA brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members. The UPFFA is an affiliate of the International Association of Fire Fighters ("IAFF"), a national labor union regulated by the U.S. Department of Labor.

10.    The IAFF represents over 344,000 full-time professional fire fighters and emergency medical workers in 3,500 affiliates across the United States and Canada.

11.    The IAFF's Constitution and By-Laws provide that the objects of the International Association shall be to:

a.    organize all fire fighters and emergency medical and rescue workers;

b.    secure just compensation for their services and equitable settlement of their grievances;

c.    promote as safe and healthy a working environment for fire fighters and emergency medical and rescue workers as is possible through modern technology;

d.    place the members of the Association on a higher plane of skill and efficiency;

5

e.   promote harmonious relations between fire fighters and emergency medical and rescue workers and their employers;

f.   encourage the formation of local unions, state and provincial associations and joint councils;

g.   encourage the formation of sick and death benefit funds; to promote the research and treatment of burns and other related health problems common to fire fighters and emergency medical and rescue workers;

h.   encourage the establishment of schools of instruction for imparting knowledge of modern and improved methods of fire fighting and prevention and emergency medical and rescue technology; and

i.   cultivate friendship and fellowship among its members.

12.   All affiliates of the IAFF, along with their officers, representatives, and members, recognize, observe, and are bound by the provisions of the Constitution and By-Laws of the International Association.

13.   In January 2021, the IAFF's membership voted on two resolutions, Resolution 28 and Resolution 31.

14.   Resolution 28, calling for the IAFF to no longer accept sponsorships from the chemical industry, textile manufacturers, or personal protective equipment manufacturers that utilize PFAS, passed by a margin of 1,536 to 10.

15.   Resolution 31, calling for the IAFF to actively oppose the use of PFAS chemicals in turnout gear, passed by a margin of 1,472 to 4.

16. All affiliates of the IAFF, along with their officers, representatives, and members, recognize, observe, and are bound by resolutions of the International Association, including Resolution 28 and Resolution 31.

17. Plaintiff The Stamford Professional Fire Fighters Association, IAFF Local 786 ("IAFF Local 786") is an unincorporated labor organization that represents the uniformed members of the Stamford Fire Department in Stamford, Connecticut. IAFF Local 786 is comprised of the 247 professional fire fighters that work for the Stamford Fire Department. IAFF Local 786 is an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 786 is the health, safety, and well-being of its members, and IAFF Local 786 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 786 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local 786 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

18. Plaintiff The Fairfield Fire Fighters Association, IAFF Local 1426 ("IAFF Local 1426") is an unincorporated labor organization that represents the uniformed members of the Fairfield Fire Department in Fairfield, Connecticut, and the Easton Fire Department in Easton, Connecticut. IAFF Local 1426 is comprised of the 105 professional fire fighters that work for the Fairfield Fire Department and Easton Fire Department. IAFF Local 1426 is an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 1426 is the health, safety, and well-being of its members, and IAFF Local 1426 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 1426 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other

initiatives. IAFF Local 1426 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

19.     Plaintiff Stratford Professional Fire Fighters, IAFF Local 998 ("IAFF Local 998"), is an unincorporated labor organization that represents the uniformed members of the Stratford Fire Department in Stratford, Connecticut. IAFF Local 998 is comprised of the 97 professional fire fighters that work for the Stratford Fire Department. IAFF Local 998 is an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 998 is the health, safety, and well-being of its members, and IAFF Local 998 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 998 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local 998 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

20.     Plaintiff Hamden Professional Fire Fighters, IAFF Local 2687 ("IAFF Local 2687"), is an unincorporated labor organization that represents the uniformed members of the Hamden Fire Department in Hamden, Connecticut. IAFF Local 2687 is comprised of 99 professional fire fighters that work for the Hamden Fire Department. IAFF Local 2687 is an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 2687 is the health, safety, and well-being of its members, and IAFF Local 2687 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 2687 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local 2687 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

8

21.     Plaintiff Groton Fire Fighters Union, IAFF Local 1964 ("IAFF Local 1964") is an unincorporated labor organization that represents the uniformed members of the City of Groton Fire Department. IAFF Local 1964 is comprised of the 23 professional fire fighters that work for the City of Groton Fire Department. IAFF Local 1964 is an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 1964 is the health, safety, and well-being of its members, and IAFF Local 1964 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 1964 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local 1964 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

22.     Plaintiff Hartford Fire Fighters Association, IAFF Local 760 ("IAFF Local 760"), is an unincorporated labor organization that represents the uniformed members of the Hartford Fire Department in Hartford, Connecticut. IAFF Local 760 is comprised of the 360 professional fire fighters that work for the Hartford Fire Department. IAFF Local 760 is an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 760 is the health, safety, and well-being of its members, and IAFF Local 760 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 760 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local 760 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

23.     Plaintiff New Canaan Fire Department, IAFF Local 3224 ("IAFF Local 3224"), is an unincorporated labor organization that represents the uniformed members of the New Canaan Fire Department in New Canaan, Connecticut. IAFF Local 3224 is comprised of the 26

9

professional fire fighters that work for the New Canaan Fire Department. IAFF Local 3224 is an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 3224 is the health, safety, and well-being of its members, and IAFF Local 3224 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 3224 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local 3224 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

24.     Plaintiff Torrington Fire Fighters Association, IAFF Local 1567 ("IAFF Local 1567"), is an unincorporated labor organization that represents the uniformed members of the Torrington Fire Department in Torrington, Connecticut. IAFF Local 1567 is comprised of the 56 professional fire fighters that work for the Torrington Fire Department. IAFF Local 1567 is an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 1567 is the health, safety, and well-being of its members, and IAFF Local 1567 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 1567 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local 1567 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

25.     Plaintiff Westport Uniformed Firefighters Association, IAFF Local 1081 ("IAFF Local 1081"), is an unincorporated labor organization that represents the uniformed members of the Westport Fire Department in Westport, Connecticut. IAFF Local 1081 is comprised of the 63 professional fire fighters that work for the Westport Fire Department. IAFF Local 1081 is an

10

affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 1081 is the health, safety, and well-being of its members, and IAFF Local 1081 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 1081 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local 1081 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

26.    Plaintiff Wilton Fire Fighters, IAFF Local 2233 ("IAFF Local 2233"), is an unincorporated labor organization that represents the uniformed members of the Wilton Fire Department in Wilton, Connecticut. IAFF Local 2233 is comprised of the 26 professional fire fighters that work for the Wilton Fire Department. Fire fighters in the Wilton Fire Department have used and worn turnout gear manufactured by Defendants Fire-Dex and Innotex. IAFF Local 2233 is an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local 2233 is the health, safety, and well-being of its members, and IAFF Local 2233 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 2233 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local 2233 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

27.    Plaintiff Sikorsky Aircraft Fire Fighters, IAFF Local I-68 ("IAFF Local I-68"), is an unincorporated labor organization that represents the uniformed members of the Sikorsky Aircraft Fire Department in Stratford, Connecticut. IAFF Local I-68 is comprised of the 27 professional fire fighters that work for the Sikorsky Aircraft Fire Department. IAFF Local I-68 is

an affiliate of the IAFF and a member of the UPFFA. A primary focus of IAFF Local I-68 is the health, safety, and well-being of its members, and IAFF Local I-68 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local I-68 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives. IAFF Local I-68 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

28.    Plaintiff Norwalk Professional Fire Fighters Association, IAFF Local 830, is an unincorporated labor organization that represents the uniformed members of the City of Norwalk Fire Department.  IAFF Local 830 is comprised of 143 professional fire fighters that work for the Norwalk Fire Department.  IAFF Local 830 is an affiliate and member of the UPFFA. A primary focus of IAFF Local 830 is the health, safety, and well-being of its members, and IAFF Local 830 has a direct interest in protecting and safeguarding its members against all occupational hazards. IAFF Local 830 has had to divert its resources to researching the dangers of PFAS in fire fighter PPE and to educating its membership, among other initiatives.  IAFF Local 830 brings these claims to recover its costs and to further its core mission of fostering the health and safety of fire fighters, especially its members.

29.    Plaintiff City of Stamford is a municipality in Fairfield County, Connecticut covering nearly 40 miles, with approximately 136,000 residents. Its residents are protected by over 270 career fire fighters staffing nine fire stations and hundreds of volunteer fire fighters staffing five stations. The City of Stamford purchases and provides firefighting equipment to its fire fighters and has responsibility for injuries and disease suffered by its fire fighters in the course of their duties. During the Class Period, the City of Stamford purchased turnout gear manufactured

12

by Defendants Honeywell and Morning Pride, Lion, and Globe, containing materials manufactured by Defendants Gore, PBI, and DuPont, and station wear manufactured, in whole or in part, by Defendant DuPont. The City of Stamford brings this action to recover for its own damages and on behalf of the Nationwide Class and the Connecticut Purchaser Subclass.

30.     Plaintiff The Reliance Fire Company, Inc. is a corporation registered in the state of Connecticut with its principal business address at the Old Mystic Fire Department. It provides fire prevention, fire suppression, code enforcement, rescue, and first emergency medical response to the properties within the 26 square miles of the Old Mystic Fire District. It is made up of 9 professional firefighters and 46 active volunteers.

31.     Old Mystic Fire District is a taxing district within the City of Groton that purchases and provides firefighting equipment and funding for the activities of The Reliance Fire Company, Inc. and has responsibility for injuries and disease suffered by The Reliance Fire Company, Inc.'s fire fighters in the course of their duties. During the Class Period, Old Mystic Fire District purchased turnout gear manufactured by Defendants Honeywell and Morning Pride, Globe, and Lion. The Old Mystic Fire District brings this action to recover for its own damages and on behalf of the Purchaser Class.

32.     Plaintiff Peter Brown is a professional fire fighter and Connecticut resident. Brown is President of the UPFFA. Brown has been a uniformed member of the Norwalk Fire Department for over 27 years. During the Class Period, Brown and other professional fire fighters in the Norwalk Fire Department used and wore turnout gear manufactured by Defendants Honeywell and Morning Pride, as well as Globe, in the course of their job duties. Brown has consequently suffered exposure to PFAS as alleged herein. As a result of Brown's exposure to PFAS, Brown has suffered subcellular injury that creates and increases the risk that Brown will develop cancers and other

13

diseases. Brown brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

33.     Plaintiff Paul Anderson is a professional fire fighter and Connecticut resident. Anderson is President of IAFF Local 786. Anderson has been a uniformed member of the Stamford Fire Department for over 20 years. During the Class Period, Anderson and other professional fire fighters in the Stamford Fire Department used and wore turnout gear manufactured by Defendants Honeywell and Morning Pride, Globe, and Lion and Nomex® station gear manufactured in whole or in part by DuPont in the course of their job duties. Anderson has consequently suffered exposure to PFAS as alleged herein. As a result of Anderson's exposure to PFAS, Anderson has suffered subcellular injury that creates and increases the risk that Anderson will develop cancers and other diseases. Anderson brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

34.     Plaintiff Steve Michalovic is a professional fire fighter and Connecticut resident. Michalovic is President of IAFF Local 998. Michalovic has been a uniformed member of the Stratford Fire Department for 17 years. During the Class Period, Michalovic and other professional fire fighters in the Stratford Fire Department used and wore turnout gear manufactured by Defendants Fire-Dex and Morning Pride in the course of their job duties. Michalovic has consequently suffered exposure to PFAS as alleged herein. As a result of Michalovic's exposure to PFAS, Michalovic has suffered subcellular injury that creates and increases the risk that Michalovic will develop cancers and other diseases. Michalovic brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

35.     Plaintiff Dan Tompkins is a professional fire fighter and Connecticut resident. Tompkins is President of IAFF Local 1964. Tompkins was a uniformed member of the Norwich

14

Fire Department for three years and has been a uniformed member of the City of Groton Fire Department for 31 years.  During the Class Period, Tompkins and other professional fire fighters in the Groton Fire Department used and wore turnout gear manufactured by Defendants Globe and Morning Pride in the course of their job duties. Tompkins has consequently suffered exposure to PFAS as alleged herein. As a result of Tompkins's exposure to PFAS, Tompkins has suffered subcellular injury that creates and increases the risk that Tompkins will develop cancers and other diseases. Tompkins brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

36.    Plaintiff Nelson Hwang is a professional fire fighter and Connecticut resident. Hwang is President of IAFF Local 2687. During the Class Period, Hwang and other professional fire fighters in the Hamden fire department used and wore turnout gear manufactured by Defendants Honeywell and Morning Pride, as well as Viking, in the course of their job duties. Hwang has consequently suffered exposure to PFAS as alleged herein. As a result of Hwang's exposure to PFAS, Hwang has suffered subcellular injury that creates and increases the risk that Hwang will develop cancers and other diseases. Hwang brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

37.    Plaintiff William Tuttle is a professional fire fighter and Connecticut resident. Tuttle is the President of IAFF Local 1426. Tuttle has been a uniformed member of the Fairfield Fire Department for 22 years. During the Class Period, Tuttle and other professional fire fighters in the Fairfield Fire Department used and wore turnout gear manufactured by Defendants Honeywell and Morning Pride in the course of their job duties. Tuttle has consequently suffered exposure to PFAS as alleged herein. As a result of Tuttle's exposure to PFAS, Tuttle has suffered subcellular injury that creates and increases the risk that Tuttle will develop cancers and other

15

diseases. Tuttle brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

38.    Plaintiff Brian Doane is a professional fire fighter and Connecticut resident. Doane is a uniformed member of IAFF Local 3224. During the Class Period, Doane and other professional fire fighters in the New Canaan Fire Department used and wore turnout gear manufactured by Defendants Globe and Morning Pride and Nomex® station gear manufactured in whole or in part by DuPont in the course of their job duties. Doane has consequently suffered exposure to PFAS as alleged herein. As a result of Doane's exposure to PFAS, Doane has suffered subcellular injury that creates and increases the risk that Doane will develop cancers and other diseases. Doane brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

39.    Plaintiff Arturo Rosa is a professional fire fighter and Connecticut resident. Rosa is a uniformed member of IAFF Local 760.  During the Class Period, Rosa and other professional fire fighters in the Hartford Fire Department have used and wore gear manufactured by Honeywell in the course of their job duties. Rosa has consequently suffered exposure to PFAS as alleged herein. As a result of Rosa's exposure to PFAS, Rosa has suffered subcellular injury that creates and increases the risk that Rosa will develop cancers and other diseases. Rosa brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

40.    Plaintiff Timothy E. O'Donnell is a professional fire fighter and Connecticut resident. O'Donnell is President of IAFF Local 1567. During the Class Period, O'Donnell and other professional fire fighters in the Torrington Fire Department used and wore turnout gear manufactured by Defendant Innotex and station wear manufactured, in whole or in part, by Defendant DuPont, in the course of their job duties. O'Donnell has consequently suffered exposure to PFAS as alleged herein. As a result of O'Donnell's exposure to PFAS, O'Donnell has suffered

16

subcellular injury that creates and increases the risk that O'Donnell will develop cancers and other diseases. O'Donnell brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

41.    Plaintiff Joe Rousso is a professional fire fighter and Connecticut resident. Rousso is President of IAFF Local I-68. During the Class Period, Rousso and other professional fire fighters in the Sikorsky Aircraft Fire Department used and wore turnout gear manufactured by Defendants Globe and Innotex, as well as fire proximity suits manufactured in whole or in part by Defendant Lakeland, in the course of their job duties. Rousso has consequently suffered exposure to PFAS as alleged herein. As a result of Rousso's exposure to PFAS, Rousso has suffered subcellular injury that creates and/or increases the risk that Rousso will develop cancers and other diseases. Rousso brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

42.    Plaintiff Matthew Wille is a professional fire fighter and Connecticut resident. Wille is President of IAFF Local 1081. During the Class Period, Wille and other professional fire fighters in the Westport Fire Department used and wore turnout gear manufactured by Defendants Globe and Morning Pride in the course of their job duties. Wille has consequently suffered exposure to PFAS as alleged herein. As a result of Wille's exposure to PFAS, Wille has suffered subcellular injury that creates and increases the risk that Wille will develop cancers and other diseases. Wille brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

43.    Plaintiffs Tom Reich is a professional fire fighter and Connecticut resident. Reich is Vice President of IAFF Local 830. During the Class Period, Reich other professional fire fighters in the Norwalk Fire Department used and wore turnout gear manufactured by Defendants Globe and Morning Pride in the course of their job duties. Reich has consequently suffered exposure to

PFAS as alleged herein. As a result of Reich's exposure to PFAS, Reich has suffered subcellular injury that creates and increases the risk that Reich will develop cancers and other diseases. Reich brings this action to recover for his own damages and on behalf of the Fire Fighter Class.

## II.   DEFENDANTS

44.   Defendant 3M Company ("3M"), formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation that does business throughout the United States, including in Connecticut. 3M has its principal place of business in St. Paul, Minnesota.

45.   Defendant EIDP, Inc. ("Old DuPont"), formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation that does business throughout the United States, including in Connecticut. Old DuPont has its principal place of business in Wilmington, Delaware.

46.   Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation that does business throughout the United States, including in Connecticut. New DuPont has its principal place of business in Wilmington, Delaware.

47.   Defendant The Chemours Company, L.L.C. ("Chemours") is a Delaware corporation that does business throughout the United States, including in Connecticut. Chemours has its principal place of business in Wilmington, Delaware. In 2015, Old DuPont spun off its performance chemical business as a new, publicly traded company, Chemours. In connection with the transfer, Chemours assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit.

48.   Defendant The Chemours Company, FC, LLC ("Chemours FC") is a Delaware corporation that does business throughout the United States, including in Connecticut. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC operates as a

subsidiary of Chemours and manufactures certain materials and/or chemicals that are the subject of this lawsuit.

49.    Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States, including in Connecticut. Corteva has its principal place of business in Wilmington, Delaware. In 2019, New DuPont spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit.

50.    This Second Amended Complaint refers to EIDP, Inc., DuPont de Nemours, Inc., the Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc., collectively, as "DuPont" and/or the "DuPont Defendants."

51.    Defendant Elevate Textiles, Inc. ("Elevate Textiles") is a Delaware corporation that does business throughout the United States, including in Connecticut. Elevate Textiles has its principal place of business in Charlotte, North Carolina. Elevate Textiles is the corporate parent of Defendant Safety Components Fabric Technologies, Inc.

52.    Defendant Fire-Dex GW, LLC, ("Fire-Dex") is an Ohio Limited Liability Company that does business throughout the United States, including in Connecticut. Fire-Dex has its principal place of business in Medina, Ohio.

53.    Defendant Gentex Corporation ("Gentex") is a Delaware corporation that does business throughout the United States, including in Connecticut. Gentex has its principal place of business in Carbondale, Pennsylvania.

19

54.     Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation that does business throughout the United States, including in Connecticut. Globe has its principal place of business in Pittsfield, New Hampshire.

55.     Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware corporation that does business throughout the United States, including in Connecticut. Gore has its principal place of business in Newark, Delaware.

56.     Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation that does business throughout the United States, including in Connecticut. Honeywell has its principal place of business in Charlotte, North Carolina.

57.     Defendant Innotex Corp. ("Innotex") is a Delaware corporation that does business throughout the United States, including in Connecticut. Innotex has its principal place of business in Ohatchee, Alabama.

58.     Defendant The InterTech Group, Inc. ("InterTech") is a South Carolina corporation that does business throughout the United States, including in Connecticut. InterTech has its principal place of business in North Charleston, South Carolina. InterTech is the corporate parent of Defendant PBI Performance Products, Inc.

59.     Defendant Lakeland Industries, Inc. ("Lakeland") is a Delaware corporation that does business throughout the United States, including in Connecticut. Lakeland has its principal place of business in Huntsville, Alabama.

60.     Defendant Lion Group, Inc. ("Lion") is an Ohio corporation that does business throughout the United States, including in Connecticut. Lion has its principal place of business in Dayton, Ohio.

20

61.    Defendant Milliken & Company ("Milliken") is a Delaware corporation that does business throughout the United States, including in Connecticut. Milliken has its principal place of business in Spartanburg, South Carolina.

62.    Defendant Morning Pride Manufacturing L.L.C. ("Morning Pride") is a Delaware Limited Liability Company that does business throughout the United States, including in Connecticut. Morning Pride has its principal place of business in Golden Valley, Minnesota.

63.    Defendant PBI Performance Products, Inc. ("PBI") is a Delaware corporation that does business throughout the United States, including in Connecticut. PBI has its principal place of business in Charlotte, North Carolina. PBI is a wholly owned subsidiary of Defendant InterTech.

64.    Defendant Safety Components Fabric Technologies, Inc. ("Safety Components") is a Delaware corporation that does business throughout the United States, including in Connecticut. Safety Components has its principal place of business in Greenville, South Carolina. Safety Components is a subsidiary of Defendant Elevate Textiles.

65.    Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including in Connecticut. StedFast has its principal place of business in Piney Flats, Tennessee.

66.    Defendant TenCate Protective Fabrics USA d/b/a Southern Mills, Inc. ("TenCate") is a Georgia corporation that does business throughout the United States, including in Connecticut. Tencate has its principal place of business in Senoia, Georgia.

67.    Defendant Viking Life-Saving Equipment America, Inc. ("Viking") is a Florida corporation that does business throughout the United States, including in Connecticut. Viking has its principal place of business in Medley, Florida.

68.     Plaintiffs allege that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused injuries to Plaintiffs, Plaintiffs' members, and members of the Class, as alleged herein.

69.     Plaintiffs allege that each named Defendant derived substantial revenue from the equipment, materials, and/or chemicals that are the subjects of this lawsuit. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the equipment, materials, and/or chemicals in Connecticut and caused harm to Plaintiffs, Plaintiffs' members, and members of the Class in Connecticut.

70.     Defendants expected or should have expected their actions to have consequences in Connecticut.

71.     Defendants purposefully availed themselves of the privilege of conducting activities in Connecticut, thus invoking the benefits and protections of its laws.

## SUBJECT MATTER JURISDICTION AND VENUE

72.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interests and costs, and the Plaintiffs and most members of the proposed Class are citizens of a state different from each Defendant.

73.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to this Second Amended Complaint took place within this District.

## PERSONAL JURISDICTION

74.     Defendants have participated for many years in the design, manufacture, and distribution of fire fighter PPE, which is subject to national testing and certification standards.

75.    To produce fire fighter PPE, including turnout gear, fire proximity suits, and station wear, Defendants Fire-Dex, Globe, Honeywell, Innotex, Lakeland, Lion, Morning Pride, and Viking purchase and use highly technical materials from Defendants 3M, DuPont, PBI (owned by InterTech), Elevate Textiles, Gore, Safety Components, and StedFast. Defendants thus form a small ecosystem of interdependent entities that produce specialized products for a niche group of purchasers and users.

76.    Each Defendant intends and reasonably expects its manufacturing and distribution activities to reach fire fighters nationwide, including in Connecticut.

77.    During the Class Period, Defendant 3M was in the business of manufacturing and selling PFAS and PFAS-containing materials, including Scotchlite™ Reflective Material, with the knowledge, intention, and reasonable expectation that such PFAS and PFAS-containing materials would be incorporated into fire fighter PPE sold, used, and worn in Connecticut. At all relevant times, 3M knew and reasonably expected that its PFAS and PFAS-containing materials would significantly increase various health risks for Connecticut residents, including fire fighters.

78.    This Court has personal jurisdiction over 3M insofar as the tortious acts and injuries forming the basis of this Complaint arise from 3M's contacts with Connecticut.

79.    Moreover, 3M has consented to personal jurisdiction in Connecticut by registering with the Secretary of State of Connecticut to do business in Connecticut. *See* Conn. Gen. Stat. § 33-920. 3M has appointed a registered agent for service of process in Connecticut pursuant to Conn. Gen. Stat. § 33-926.

80.    During the Class Period, Defendant DuPont was in the business of manufacturing and selling PFAS and PFAS-containing materials, including Nomex® and Kevlar®, with the knowledge, intention, and reasonable expectation that such PFAS and PFAS-containing materials

would be incorporated into fire fighter PPE sold, used, and worn in Connecticut. At all relevant times, DuPont knew and reasonably expected that its PFAS and PFAS-containing materials would significantly increase various health risks for Connecticut residents, including fire fighters.

81.    This Court has personal jurisdiction over DuPont insofar as the tortious acts and injuries forming the basis of this Complaint arise from DuPont's contacts with Connecticut.

82.    Moreover, the DuPont Defendants have consented to personal jurisdiction in Connecticut by registering with the Secretary of State of Connecticut to do business in Connecticut. *See* Conn. Gen. Stat. §§ 33-920 and 34-275a. The DuPont Defendants have appointed registered agents for service of process in Connecticut pursuant to Conn. Gen. Stat. §§ 33-926, 34-275b(5), and 34-243n.

83.    During the Class Period, Defendant Elevate Textiles was in the business of manufacturing and selling PFAS-containing materials with the knowledge, intention, and reasonable expectation that such materials would be incorporated into fire fighter PPE sold, used, and worn in Connecticut. At all relevant times, Elevate Textiles knew or should have known that its PFAS-containing materials would significantly increase various health risks for Connecticut residents, including Connecticut fire fighters.

84.    This Court has personal jurisdiction over Elevate Textiles insofar as the tortious acts and injuries forming the basis of this Complaint arise from Elevate Textiles' contacts with Connecticut.

85.    During the Class Period, Defendant Fire-Dex was in the business of manufacturing and selling PFAS-containing turnout gear with the knowledge, intention, and reasonable expectation that such PFAS-containing turnout gear would be sold, used, and worn in Connecticut.

24

At all relevant times, Fire-Dex knew or should have known that its PFAS-containing turnout gear would significantly increase various health risks for Connecticut residents, including fire fighters.

86.     This Court has personal jurisdiction over Fire-Dex insofar as the tortious acts and injuries forming the basis of this Complaint arise from Fire-Dex's contacts with Connecticut.

87.     Moreover, Fire-Dex has consented to personal jurisdiction in Connecticut by registering with the Secretary of State of Connecticut to do business in Connecticut. *See* Conn. Gen. Stat. § 34-275a. Fire-Dex has appointed a registered agent for service of process in Connecticut pursuant to Conn. Gen. Stat. §§ 34-275b(5) and 34-243n.

88.     During the Class Period, Defendant Gentex was in the business of manufacturing and selling PFAS-containing materials with the knowledge, intention, and reasonable expectation that such materials would be incorporated into fire fighter PPE sold, used, and worn in Connecticut. At all relevant times, Gentex knew or should have known that its PFAS-containing materials would significantly increase various health risks for Connecticut residents, including fire fighters.

89.     This Court has personal jurisdiction over Gentex insofar as the tortious acts and injuries forming the basis of this Complaint arise from Gentex's contacts with Connecticut.

90.     During the Class Period, Defendant Globe was in the business of manufacturing and selling PFAS-containing turnout gear with the knowledge, intention, and reasonable expectation that such turnout gear would be sold, used, and worn in Connecticut. At all relevant times, Globe knew or should have known that its PFAS-containing turnout gear would significantly increase various health risks for Connecticut residents, including fire fighters.

91.     This Court has personal jurisdiction over Globe insofar as the tortious acts and injuries forming the basis of this Complaint arise from Globe's contacts with Connecticut.

92.     During the Class Period, Defendant Gore was in the business of manufacturing and selling PFAS-containing materials, including GORE-TEX® products, with the knowledge, intention, and reasonable expectation that such PFAS-containing materials would be incorporated into fire fighter PPE sold, used, and worn in Connecticut. At all relevant times, Gore knew or should have known that its PFAS-containing materials would significantly increase various health risks for Connecticut residents, including fire fighters.

93.     This Court has personal jurisdiction over Gore insofar as the tortious acts and injuries forming the basis of this Complaint arise from Gore's contacts with Connecticut.

94.     Moreover, Gore has consented to personal jurisdiction in Connecticut by obtaining a certificate of authority from the Secretary of State of Connecticut to do business in Connecticut. *See* Conn. Gen. Stat. § 33-920. Gore has appointed a registered agent for service of process in Connecticut pursuant to Conn. Gen. Stat. § 33-926.

95.     During the Class Period, Defendant Honeywell was in the business of manufacturing and selling PFAS-containing turnout gear with the knowledge, intention, and reasonable expectation that such PFAS-containing turnout gear would be sold, used, and worn in Connecticut. At all relevant times, Honeywell knew or should have known that its PFAS-containing turnout gear would significantly increase various health risks for Connecticut residents, including fire fighters.

96.     This Court has personal jurisdiction over Honeywell insofar as the tortious acts and injuries forming the basis of this Complaint arise from Honeywell's contacts with Connecticut.

97.     Moreover, Honeywell has consented to personal jurisdiction in Connecticut by registering with the Secretary of State of Connecticut to do business in Connecticut. *See* Conn.

Gen. Stat. § 33-920. Honeywell has appointed a registered agent for service of process in Connecticut pursuant to Conn. Gen. Stat. § 33-926.

98.     During the Class Period, Defendant Innotex was in the business of manufacturing and selling PFAS-containing turnout gear with the knowledge, intention, and reasonable expectation that such PFAS-containing turnout gear would be sold, used, and worn in Connecticut. At all relevant times, Innotex knew or should have known that its PFAS-containing turnout gear would significantly increase various health risks for Connecticut residents, including fire fighters.

99.     This Court has personal jurisdiction over Innotex insofar as the tortious acts and injuries forming the basis of the Complaint arise from Innotex's contacts with Connecticut.

100.    During the Class Period, Defendant Lakeland was in the business of manufacturing and selling PFAS-containing fire proximity suits with the knowledge, intention, and reasonable expectation that such PFAS-containing fire proximity suits would be sold, used, and worn in Connecticut. At all relevant times, Lakeland knew or should have known that its PFAS-containing fire proximity suits would significantly increase various health risks for Connecticut residents, including fire fighters.

101.    This Court has personal jurisdiction over Lakeland insofar as the tortious acts and injuries forming the basis of the Complaint arise from Lakeland's contacts with Connecticut.

102.    During the Class Period, Defendant Lion was in the business of manufacturing and selling PFAS-containing turnout gear with the knowledge, intention, and reasonable expectation that such PFAS-containing turnout gear would be sold, used, and worn in Connecticut. At all relevant times, Lion knew or should have known that its PFAS-containing turnout gear would significantly increase various health risks for Connecticut residents, including fire fighters.

103. Moreover, Lion has consented to personal jurisdiction in Connecticut by registering with the Secretary of State of Connecticut to do business in Connecticut. *See* Conn. Gen. Stat. § 33-920. Lion has appointed a registered agent for service of process in Connecticut pursuant to Conn. Gen. Stat. § 33-926.

104. This Court has personal jurisdiction over Lion insofar as the tortious acts and injuries forming the basis of the Complaint arise from Lion's contacts with Connecticut.

105. During the Class Period, Defendant Milliken was in the business of manufacturing and selling PFAS-containing materials with the knowledge, intention, and reasonable expectation that such PFAS-containing materials would be incorporated into fire fighter PPE sold, used, and worn in Connecticut. At all relevant times, Milliken knew or should have known that its PFAS-containing materials would significantly increase various health risks for Connecticut residents, including fire fighters.

106. This Court has personal jurisdiction over Milliken insofar as the tortious acts and injuries forming the basis of the Complaint arise from Milliken's contacts with Connecticut.

107. During the Class Period, Defendant Morning Pride was in the business of manufacturing and selling PFAS-containing turnout gear with the knowledge, intention, and reasonable expectation that such PFAS-containing turnout gear would be sold, used, and worn in Connecticut. At all relevant times, Morning Pride knew or should have known that its PFAS-containing turnout gear would significantly increase various health risks for Connecticut residents, including fire fighters.

108. This Court has personal jurisdiction over Morning Pride insofar as the tortious acts and injuries forming the basis of the Complaint arise from Morning Pride's contacts with Connecticut.

109.    Moreover, Morning Pride has consented to personal jurisdiction in Connecticut by registering with the Secretary of State of Connecticut to do business in Connecticut. *See* Conn. Gen. Stat. § 34-275a. Morning Pride has appointed a registered agent for service of process in Connecticut pursuant to Conn. Gen. Stat. §§ 34-275b(5) and 34-243n.

110.    During the Class Period, Defendant PBI was in the business of manufacturing and selling PFAS-containing materials with the knowledge, intention, and reasonable expectation that such PFAS-containing materials would be incorporated into fire fighter PPE sold, used, and worn in Connecticut. At all relevant times, PBI knew or should have known that its PFAS-containing materials would significantly increase various health risks for Connecticut residents, including fire fighters.

111.    This Court has personal jurisdiction over PBI insofar as the tortious acts and injuries forming the basis of the Complaint arise from PBI's contacts with Connecticut.

112.    During the Class Period, Defendant Safety Components was in the business of manufacturing and selling PFAS-containing materials with the knowledge, intention, and reasonable expectation that such PFAS-containing materials would be incorporated into fire fighter PPE sold, used, and worn in Connecticut. At all relevant times, Safety Components knew or should have known that its PFAS-containing materials would significantly increase various health risks for Connecticut residents, including fire fighters.

113.    This Court has personal jurisdiction over Safety Components insofar as the tortious acts and injuries forming the basis of the Complaint arise form Safety Components' contacts with Connecticut.

114.    During the Class Period, Defendant TenCate was in the business of manufacturing and selling PFAS-containing materials with the knowledge, intention, and reasonable expectation

that such PFAS-containing materials would be incorporated into fire fighter PPE sold, used, and worn in Connecticut. At all relevant times, TenCate knew or should have known that its PFAS-containing materials would significantly increase various health risks for Connecticut residents, including fire fighters.

115. This Court has personal jurisdiction over TenCate insofar as the tortious acts and injuries forming the basis of the Complaint arise from TenCate's contacts with Connecticut.

116. During the Class Period, Defendant Viking was in the business of manufacturing and selling PFAS-containing turnout gear with the knowledge, intention, and reasonable expectation that such PFAS-containing turnout gear would be sold, used, and worn in Connecticut. At all relevant times, Viking knew or should have known that its PFAS-containing turnout gear would significantly increase various health risks for Connecticut residents, including fire fighters.

117. This Court has personal jurisdiction over Viking insofar as the tortious acts and injuries forming the basis of the Complaint arise from Viking's contacts with Connecticut.

118. Moreover, Viking has consented to personal jurisdiction in Connecticut by registering with the Secretary of State of Connecticut to do business in Connecticut. *See* Conn. Gen. Stat. § 34-275a. Viking has appointed a registered agent for service of process in Connecticut pursuant to Conn. Gen. Stat. §§ 34-275b(5) and 34-243n.

119. Defendants have, at all relevant times, targeted and exploited the Connecticut market for their products.[1] Notably:

---

[1] Screenshots of relevant webpages accessible after submitting or selecting specific information are provided in accompanying exhibits. Exs. 1–3, 5, 7–8, 10.

a.    Defendants DuPont, Fire-Dex, Gentex, Globe, Honeywell, Morning Pride, PBI and Viking have dealers, partners, and/or suppliers throughout Connecticut that sell their products, or products containing their materials.[2]

b.    Defendant Gore's and Defendant Safety Components' sales territories include a Northeast region, with a dedicated Northeast sales representative that encompasses Connecticut.[3]

c.    Defendants 3M, Lion, and Milliken each have at least one sales representative dedicated to the state of Connecticut.[4]

d.    Defendants routinely visited Connecticut fire departments and those responsible for selecting fire fighter PPE to pitch them on specific products. For example, Defendants Fire-Dex, Milliken, and Morning Pride have each sent sales personnel to the Stamford Fire Department to pitch their turnout gear products in-person. Similarly, representatives for Morning Pride's

---

[2] *Dealer Locator*, DuPont, https://www.dupont.com/building/dealer-locator.html; *Shipman's Fire Equipment Co. Announces Fire-Dex as a New Line for Turnout Gear*, Fire-Dex (Apr. 2, 2020), https://blog.firedex.com/blog/shipmans-fire-equipment-co.-announces-fire-dex-as-a-new-line-for-turnout-gear#:~:text=Shipman's%20Fire%20Equipment%20Co.%2C%20a%20Connecticut%2Dbased%20distributor,has%20served%20municipal%20and%20volunteer%20fire%20departments%2C; *Find a Gentex Distributor*, Gentex Corporation, https://www.gentexcorp.com/find-a-distributor/ (listing Gentex's distributors, including some with offices in Connecticut); *see, e.g., Globe ATHLETIX^TM Jacket*, MSA The Safety Company, https://us.msasafety.com/p/athletixJacket; *Personal Protective Equipment – Partner Locator*, Honeywell, https://automation.honeywell.com/us/en/where-to-buy/personal-protective-equipment; s*ee, e.g., Morning Pride® TAILS^TM – Structural Turnout Gear*, Honeywell, https://automation.honeywell.com/us/en/products/personal-protective-equipment/first-responder-gear/structural-turnout-gear/morning-pride-tails-structural-turnout-gear; *see Where to Buy*, PBI Performance Products, https://www.pbiproducts.com/where-to-buy-pbi; *Find Dealer*, Viking Life-Saving Equipment, https://www.viking-fire.com/us/find-dealer/.

[3] *The Gore Team*, Gore-Tex Brand, https://www.goretexprofessional.com/sites/default/files/images/marketing-materials/Sales%20Territory%20Map_Update_mech.jpg; *Contact Us*, Safety Components, https://safetycomponents.com/contact-us/ (Safety Components is listed as one of Elevate Textiles' brands. *See* Elevate Textiles, https://www.elevatetextiles.com/).

[4] *Find a 3M Sales Rep – Safety and Industrial Solutions*, 3M, http://3m.com/3M/en_US/safety-us/sales-rep-locator/; *Find a Lion Sales Representative*, Lion, https://www.lionprotects.com/find-a-sales-rep; *Find My Sales Representative*, Milliken, https://www.milliken.com/en-us/businesses/floor-covering/contact-us/rep-locator#q=%40salesRepMarketRegions%3DCOMM_US-CT&enableQuerySyntax=true (multiple sales representatives assigned to Connecticut).

31

turnout gear have made in-person sales calls to the Norwalk Fire Department.

120. Defendants' websites also facilitate interactions between sales personnel and Connecticut residents.[5] Notably:

a. Defendants 3M, DuPont, Fire-Dex, Gentex, Globe, Gore, Honeywell, Innotex, InterTech, Lakeland, Lion, StedFast, TenCate, and Viking provide a contact form that consumers can submit to reach out to the companies' sales personnel directly.[6]

b. Defendants Elevate Textiles, PBI, and Safety Components provide contact information for customers, including a link through which customers can send an e-mail.[7]

---

[5] Screenshots of relevant webpages accessible after submitting or selecting specific information are provided in accompanying exhibits. Exs. 1, 4–6, 9–10.

[6] *3M Help Center*, 3M, https://www.3m.com/3M/en_US/company-us/help-center/ (offering a chat feature, as well as a form to send 3M a message); *Contact Us | Corteva Agriscience*, Corteva https://www.corteva.us/contact-us.html; *Contact Us*, DuPont, https://www.dupont.com/global-safety-contact-us.html?bsegment=Personal%20Protection%20(Aramids)&bsubsegment=Emergency%20Response&dfp=aramids-personal-protection; *Request a Quote*, Firedex, https://www.firedex.com/request-a-quote/ (Firedex offers a contact form to request a quote for products, as well as a form to sign up for its newsletter); *Contact Gentex*, Gentex Corporation, https://www.gentexcorp.com /contact/; *Request a Demo*, MSA The Safety Company, https://us.msasafety.com/athletix#demo (Through MSA Safety's website, Globe offers consumers a form to submit to request a demonstration of its products); *Contact Us*, Gore-Tex Brand, https://www.goretexprofessional.com/contact-us; *Contact Support*, Honeywell, https://www. honeywell.com/us/en/contact/support (A similar form is provided for Morning Pride products offered on Honeywell's website.); *Contact*, Innotex, https://innotexprotection.com/en/contact-us/; *Send Us a Request: Textiles & Apparel Services*, Intertek, https://www.intertek.com/textiles-apparel/contact/; *Contact Lakeland*, Lakeland Fire + Safety, https://www.lakeland.com/contact/?_gl=1*11281f0*_up*MQ..*_ga*MjEwNDcxNDE2NC4xNzQzMTkw Mjg1*_ga _1KLZQXLE0G*MTc0MzE5MDI4NC4xLjEuMTc0MzE5MDMyMS4wLjAuMA (offering a contact form and chat feature); Our Offices, Lion, https://www.lionprotects.com/contact-lion?hsCtaTracking=74da9fa9-2cd8-498a-9256-31d700e592ad%7Ceb28c18a-bb0f-438c-b5a9-b6f8cb6d807a; *Contact Us*, Stedfast, https://stedfast. com/contact-us; Contact Us, TenCate Protective Fabrics, https://eu.tencatefabrics.com/ en/contact?hsCta Tracking=078550bd-9ab8-43c9-ac5d-0c5ac981c1e4%7C37052125-6f4e-4301-b52c-922f3d2d0c42; *Contact Us*, Viking Life-Saving Equipment, https://www.viking-fire.com/us/contact/contact-us/.

[7] *Contact Us,* Elevate Textiles, https://www.elevatetextiles.com/contact-us/; *Contact Us*, PBI Performance Products, https://www.pbiproducts.com/contact-us; *Contact Us*, Safety Components, https://safetycomponents.com/contact-us/ (this includes contacts specific to different sales regions, including a Northeast Region encompassing Connecticut).

c.    Defendant Milliken provides a general contact form, as well as request forms for each product that customers can submit.[8]

d.    Defendants Lion, PBI and TenCate provide literature about their products for customers to download.[9]

e.    Defendants' public advertising statements are generally accessible to Connecticut customers on their websites and/or in publications accessible throughout the state.

121.    The entire target market for fire fighter PPE in the United States is approximately one million fire fighters. As demonstrated by their extensive marketing efforts described above, Defendants are competing for every one of these sales in all 50 states, including Connecticut.

122.    Turnout gear must be retired after 10 years, meaning that each year only a fraction of all turnout gear in the United States is replaced. Generally, fire fighters are issued a new set of station gear annually. Each Defendant is seeking to maximize its nationwide market share, including in Connecticut. For instance:

a.    PBI's website states that "PBI-blended products have been the preferred choice of active fire departments across the Americas and around the world for over 30 years . . . PBI Performance Products has long partnered with premier turnout gear and protective apparel manufacturers to provide the ultimate in PPE protection for firefighters." Visitors to the PBI website looking to purchase turnout gear are linked to the websites of its partner turnout gear manufacturers including, among others,

---

[8] *Connect With Us*, Milliken, https://www.milliken.com/en-us/businesses/textile/contact-us; *see, e.g., Milliken HorizonTM Outer Shell*, Milliken, https://www.milliken.com/en-us/businesses/textile/product/milliken-horizon-outer-shell (including a link to a product-specific form).

[9] *Literature Requests*, Lion, https://www.lionprotects.com/literature-requests; *Fabric Cutsheets*, PBI Performance Products, https://www.pbiproducts.com/download-literature; *see e.g.*, *Flex 7® Powered by PBI®*, TenCate Protective Fabrics, https://us.tencatefabrics.com/flex7 (providing a download for a technical product sheet).

Honeywell/Morning Pride, and Fire-Dex. PBI states that its fabrics protect 41% of all firefighters in North America, or "[m]ore firefighters … than any other fabrics." PBI states that its fiber is blended with DuPont's Kevlar® when it is spun into yarn to be used for fire fighter PPE. [10]

b. Elevate Textiles (parent of Safety Components), advertises itself as "The World's Leading Developer and Producer of FR Material," boasting that the "largest fire departments in the world trust in and wear FR materials made by Safety Components." It contains a representative list of fire departments that includes cities and countries throughout the world, as well as cities throughout the United States.[11]

c. Milliken Textiles states on its website that it has "been a trusted resource for hundreds of fire departments, firefighters, and municipalities all over the United States for more than 50 years" Further, its website states that it is the "exclusive manufacturer of TECGEN FR™ fabrics for FireDex®."[12]

123. Because Defendants targeted and exploited the Connecticut market for their products, their products were sold to, worn, and used by Plaintiffs and members of the proposed Classes within the state of Connecticut, as detailed herein.

**<u>SUBSTANTIVE ALLEGATIONS</u>**

**I.     GENERAL ALLEGATIONS REGARDING PFAS**

124. PFAS are a class of thousands of synthetic chemical compounds, which consist of nearly indestructible chains of carbon and fluorine atoms.

125. PFAS do not exist naturally in the environment.

---

[10] https://www.pbiproducts.com/about-pbi
[11] https://safetycomponents.com/home/markets/fire/
[12] https://www.milliken.com/en-gb/businesses/textile/fire-fighter-fabric

126.    PFAS were first developed in the 1930s and 1940s.

127.    PFAS' high chemical and thermal stability have led to their use in a wide range of commercial products and industries.

128.    PFAS' same qualities cause them to persist in the environment and in the human body for long (if not indefinite) periods of time, earning them the nickname "forever chemicals."

129.    In recent decades, researchers, environmentalists, and government agencies have all raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to absorb into and bioaccumulate in the human body.

130.    Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

131.    Peer-reviewed scientific research reflecting the best and most recent scientific information available has cautioned that any amount of PFAS exposure is hazardous to human health.

132.    PFAS exposure in humans can occur via dermal absorption, as well as ingestion and inhalation. PFAS also spread through humans by crossing the placenta from mother to fetus and by passing to infants through breast milk.

133.    When exposed to heat, PFAS can off-gas, break down, and degrade into highly mobile and toxic particles and dust,[13] *increasing* the risk of PFAS exposure via dermal absorption, ingestion, and inhalation.

134.    PFAS exposure has been linked to multiple, serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders,

---

[13] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7.

high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

135. PFAS have been found to concentrate in human blood, bones, and organs.

136. Presently, the vast majority of people in the United States are exposed to background levels of PFAS via drinking water, food, and other sources. However, certain populations have higher levels of PFAS exposure, including as an occupational hazard.

137. The thousands of PFAS in existence can be divided into two categories: non-polymeric and polymeric.

138. Thus far, most research has focused on the adverse effects of non-polymeric PFAS on human health rather than polymeric PFAS.

139. Non-polymeric PFAS include the two most widely used PFAS Chemicals: Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS").

140. PFOA and PFOS bioaccumulate in humans' blood and organs, including the kidneys and the liver.

141. PFOA and PFOS interfere with the human body's functions, including the functions of the organs and immune systems, leading to adverse health outcomes.

142. PFOA or PFOS exposure in any detectable amount is hazardous to human health. In fact, negative health effects may occur because of exposure to PFOA and PFOS at levels below most laboratories' ability to detect at this time.

143. The following is a non-exhaustive list of adverse health outcomes that can result from exposure to PFOA and PFOS, many of which can manifest after years of exposure:

a. increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate cancer, bladder cancer, breast cancer, and ovarian cancer;

36

b.   reduced ability of the body's immune system to fight off infections, including reduced vaccine response;

c.   interference with the body's natural hormones and liver enzymes;

d.   changes in liver enzymes;

e.   reproductive effects including decreased fertility;

f.   developmental effects or delays in children, including low birthweight, accelerated puberty, bone variations, or behavioral changes;

g.   increased cholesterol levels and/or risk of obesity;

h.   increased risk of high blood pressure or pre-eclampsia in pregnant women; and;

i.   interference with and suppression of vaccine response (decreased serum antibody concentrations) in children.

144.   PFOA has additionally been observed to cause Leydig cell tumors, pancreatic cancer cell tumors, and hepatocellular adenomas in rats.

145.   PFOS has additionally been observed to cause potentially human relevant tumors, including hepatocellular tumors in male and female rats and pancreatic islet cell carcinomas in male rats.

146.   The United States Environmental Protection Agency ("EPA") has classified both PFOA and PFOS as likely human carcinogens.

147.   The EPA has concluded that there is *no safe level* of PFOA or PFOS exposure in human beings.

148.   In 2022, the EPA initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and

Liability Act. In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

149. On or around April 10, 2024, the EPA finalized a National Primary Drinking Water Regulation (NPDWR) establishing legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water. The EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) for the six PFAS. Notably, the MCLGs for both PFOA and PFOS were listed as "Zero":

| Compound | Final MCLG | Final MCL (enforceable levels) |
|---|---|---|
| PFOA | Zero | 4.0 parts per trillion (ppt) (also expressed as ng/L) |
| PFOS | Zero | 4.0 ppt |
| PFHxS | 10 ppt | 10 ppt |
| PFNA | 10 ppt | 10 ppt |
| HFPO-DA (commonly known as GenX Chemicals) | 10 ppt | 10 ppt |
| Mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS | 1 (unitless) Hazard Index | 1 (unitless) Hazard Index |

150. The International Agency for Research on Cancer ("IARC") has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.

151. The IARC has classified PFOS as "possibly carcinogenic to humans" based on strong evidence that it has some key properties of a carcinogen in people who are exposed to it and limited evidence that it can cause cancer in lab animals.

152. In 2022, the California Office of Environmental Health Hazard Assessment ("OEHHA") listed PFOA as a chemical known to the state of California to cause cancer.

153.    While most research has focused on the adverse effects of non-polymeric PFAS on human health (e.g., PFOA and PFOS), the production, manufacturing, and use of polymeric PFAS is also hazardous to human health.[14]

154.    Polymeric PFAS include fluoropolymers and side-chain fluorinated polymers.

155.    Fluoropolymers include polytetrafluorethylene ("PTFE"), one of the most well-known and commonly used PFAS Chemicals.

156.    The use of fluoropolymers (including PTFE) in manufacturing and commercial products poses substantial risks to human health.

157.    When PTFE is used in commercial products such as textiles, other PFAS used in the manufacturing process will generally be present and pose substantial risks to human health.

158.    When PTFE, including PTFE present in fire fighter PPE, is heated to temperatures commonly found in fire fighting, it can produce PFOA and other PFAS compounds hazardous to human health.

159.    Peer-reviewed scientific research has cautioned that:

    a.    "there is no sufficient evidence to consider fluoropolymers as being of low concern for environmental and human health";

    b.    "a blanket statement that [fluoropolymers] cannot enter cells is factually inaccurate";

    c.    "there is no scientific basis to separate and subsequently remove fluoropolymers from discussions of other PFAS as a class or in terms of their impacts on human or environmental health";

---

[14] Lohmann R, Cousins IT, DeWitt JC, Glüge J, Goldenman G, Herzke D, Lindstrom AB, Miller MF, Ng CA, Patton S, Scheringer M, Trier X, Wang Z. *Are Fluoropolymers Really of Low Concern for Human and Environmental Health and Separate from Other PFAS?* Environ Sci Technol. 2020 Oct 20;54(20):12820-12828. doi: 10.1021/acs.est.0c03244. Epub 2020 Oct 12. PMID: 33043667; PMCID: PMC7700770.

d.    "[t]he conclusion that all fluoropolymers are of low concern . . . ignores major [PFAS] emissions linked to their production," among other issues; and

e.    it would be impossible to verify the safety of all fluoropolymer products on the market based on the information available in the public domain.[15]

160.    The use of side-chain fluorinated polymers in manufacturing and commercial products poses substantial risks to human health.

161.    The use of side-chain fluorinated polymers in manufacturing and commercial products such as textiles can lead (and often leads) to the formation of non-polymeric PFAS (e.g., PFOA and PFOS), which can then contaminate (and often contaminate) human beings, as well as the environment.

162.    The EPA has denied certain exemptions to side-chain fluorinated polymers as a result of the serious risks involved in their use.[16]

163.    The EPA has cautioned that it "can no longer conclude that [side-chain fluorinated polymers] 'will not present an unreasonable risk to human health or the environment.'"[17]

## II.    GENERAL ALLEGATIONS REGARDING PFAS-CONTAINING FIRE FIGHTER PPE

164.    Turnout gear is the specialized, multi-layered PPE worn by fire fighters to protect them from heat, flames, and impact in the course of structural fire fighting.

165.    Turnout gear includes several components, namely helmets, hoods, jackets, pants (with suspenders), boots, and gloves.

---

[15] *Id.*

[16] US EPA. *Premanufacture Notification Exemption for Polymers; Amendment of Polymer Exemption Rule to Exclude Certain Perfluorinated Polymers*; 2010; Vol. 75.

[17] *Id.*

166.    These components are made up of three layers: a durable water repellant outer shell, a middle moisture barrier, and an inner thermal liner closest to the wearer's skin.

167.    The primary purpose of the outer shell is to protect the fire fighter from direct flame.

168.    The primary purpose of the middle moisture barrier is to block the penetration of water, liquid chemicals, and heat, while also allowing perspiration and body heat to escape. Liquid resistance and vapor permeability are particularly important for the prevention of steam burns, which can occur if water and heat get trapped inside the turnout gear.

169.    The primary purpose of the thermal liner is to protect the fire fighter from ambient heat.

170.    Peer-reviewed scientific research has confirmed that *all three* layers of the turnout gear contain PFAS.

171.    In a 2020 study[18] conducted by a group of physicists at the University of Notre Dame (the "Peaslee study"), turnout gear (specifically, jackets and pants) was collected from fire fighters across the United States and tested. The study included turnout gear manufactured by Defendants Globe, Lion, and Honeywell, as well as turnout gear manufactured with specialty fabrics from Defendant Gore, over several production years.

172.    In the Peaslee study, the researchers found significant quantities of PFAS in every layer of both new (still in the original packaging) and used turnout gear.

---

[18] Graham F. Peaslee, John T. Wilkinson, Sean R. McGuinness, Meghanne Tighe, Nicholas Caterisano, Seryeong Lee, Alec Gonzales, Matthew Roddy, Simon Mills, and Krystle Mitchell
Environmental Science & Technology Letters 2020 7 (8), 594-599
DOI: 10.1021/acs.estlett.0c00410.

41

173.    In "every textile sample tested," the researchers found "very high" total fluorine levels (a reliable indicator of total PFAS concentration) in both the moisture barrier and outside shell layers.[19]

174.    The turnout gear also contained significant levels of PFAS Chemicals including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFBS, 6:2 FTS, and 8:2 FTS.

175.    In the middle moisture barriers, total fluorine levels were typically greater than 30%, a result too high to be quantified by particle induced gamma-ray emission and consistent with use of PTFE in the middle moisture barriers.

176.    In all three layers of tested turnout gear, PFOA was present at alarmingly high levels—for instance, in one set of gear that was tested the outer shell contained 182 parts per billion and the thermal liner contained 78 parts per billion.

177.    To put these numbers into perspective, the EPA has set the MCL for PFOA in drinking water at 4 parts per trillion. The amount of PFOA present in the turnout gear that was tested was 182,000 parts per trillion (182 parts per billion) in the outer shell and 78,000 parts per trillion (78 parts per billion) in the thermal liner. In the thermal liners, "significant fluorine signatures" were found, indicating that "PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[20]

---

[19] *Id.*
[20] *Id.*



Credit: *Environ. Sci. Technol. Lett.*

178.    "Startingly, garment-to-hand transfer of total fluorine [] was also observed when researchers simply manipulated the textiles in our laboratory," which is an observation that "strongly supports the premise that side-chain fluoropolymers and the PFAS they bind do release to the environment upon wear."[21]

179.    Lead researcher Graham Peaslee commented that fire fighter turnout gear is composed of "the most highly fluorinated textiles [he had] ever seen"[22] and that the level of PFAS in the turnout gear means that fire fighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high . . . ."[23]

---

[21] *Id*.

[22] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26?fbclid = IwAR3ktyIcasjnxHiv3RNDRJldZmunQleAEoS3Av225uOscj2hFbffVcO3-Go.

[23] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

180.    Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in fire fighters, with dermal absorption through direct contact between the fire fighters' skin and turnout gear being "a key exposure route."[24]

181.    Occupational cancer is presently the leading cause of line-of-duty death in the fire service.[25]

182.    Over the past thirty to forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to cancer.[26]

183.    From 2015 to 2020, 75% of the fire fighters added to the IAFF Fallen Fire Fighter Memorial died from occupational cancer.

184.    Seventy percent of fire fighters are predicted to die eventually from cancer, which is significantly higher than the general population.[27]

185.    There are established links between PFOA and testicular cancer, mesothelioma, non-Hodgkin's lymphoma, and prostate cancer. These are four of the top eight cancers that fire fighters contract more than the general public.[28]

186.    In recent years, the composition of turnout gear has been scrutinized by researchers, fire fighter interest groups, and government officials due to the adverse effects of PFAS on human health.

187.    Aircraft Rescue and Fire Fighting ("ARFF") is a type of fire fighting that involves the emergency response, mitigation, evacuation, and rescue of passengers and crew of aircraft involved in aviation accidents and incidents.

---

[24] G.E. Campbell, S. Glazer, B. Stinger, M. Thompson, and S. Thompson, *PFAS-free Moisture Barriers in Structural Firefighting Gear, in Toward a PFAS-free Future: Safer Alternatives to Forever Chemicals*, Green Chemistry Series No. 81 (Simona A. Bălan, Thomas A. Bruton, and Kimberly G. Hazard, ed., 2024).

[25] Peaslee, *supra* note 6.

[26] *Id*.

[27] *Id.*

[28] *Id.*

44

188.    In ARFF, fire fighters use and wear specialized PPE known as a "fire proximity suit."

189.    Fire proximity suits include several components, including hoods, coats, pants, boots, gloves or mitts, and a face-shield.

190.    Fire proximity suits are intentionally manufactured with and contain hazardous amounts of PFAS, including PTFE, PFOA, and PFOS.

191.    Fire fighters use and wear specialized PPE known as "station wear."

192.    Station wear is worn daily by fire fighters while on duty and also serves as an additional layer of heat protection underneath turnout gear.

193.    Station wear manufactured, in whole or in part, by Defendant DuPont includes flame-resistant short-sleeve shirts, flame-resistant long-sleeve shirts, and flame-resistant pants.

194.    Station wear manufactured, in whole or in part, by Defendant DuPont is intentionally manufactured with and contains hazardous amounts of PFAS, including PTFE, PFOA, and PFOS.

## III.    DEFENDANTS' INVOLVEMENT IN MANUFACTURING, MARKETING AND SELLING PFAS, PFAS-CONTAINING MATERIALS, AND PFAS-CONTAINING FIRE FIGHTER PPE.

195.    In 1938, a chemist employed by Defendant DuPont invented PTFE. Less than a decade later, DuPont commercialized PTFE.

196.    In or around 1947, Defendant 3M began manufacturing PFOA.

197.    By the 1950s, PFAS were widely used in commercial manufacturing, including by Defendants 3M and Dupont.

198.    Prior to the 1950s, PFAS had never been detected in the bodies or blood of human beings.

199.    3M and DuPont have historically been the largest global manufacturers of PFAS, dominating the industry within the United States.

200.    PFAS-containing products and materials manufactured and/or purchased within the United States generally contain PFAS manufactured by 3M, DuPont, or both.

201.    Since the 1950s, 3M and Dupont have continued to manufacture, market, and sell PFAS.

202.    DuPont has historically been a major user and purchaser of PFOA.

203.    DuPont's most famous use of PFOA is as a processing aid in the manufacture of PTFE and related fluoropolymers.

204.    PFOA is a key component in the manufacture of PTFE. In this process, PFOA is used as a surfactant and as a dispersing and wetting agent. Following the process, detectable amounts of PFOA remain.

205.    For many decades, 3M manufactured PFOA and sold it to DuPont; DuPont purchased and used 3M's PFOA in its manufacture of PTFE and related fluoropolymers.

206.    In 2000, the EPA identified 3M as the primary global manufacturer of PFOA and the only United States manufacturer of PFOS. The EPA also pressured 3M to phase out production of PFOA, and 3M announced that it would.

207.    While 3M now claims to have largely phased out its manufacture of new PFOA and PFOS within the United States, the EPA has expressed concern regarding the ongoing uses of existing stocks of the chemical compounds.

208.    In 2002, DuPont began manufacturing PFOA.

209.    By 2006, DuPont was the only company manufacturing PFOA within the United States.

46

210.    Numerous peer-reviewed studies have found that, after 2002, most PFOA found in the environment can be directly attributed to DuPont. For example, analysis of PFOA isomers in the environment shows that, after 2002, most PFOA is the linear isomer (consistent with DuPont's telomer-based manufacturing) rather than the mix of branch isomers 3M's manufacturing processes had previously produced.

211.    Presently and in recent years, any manufacturer or facility purchasing and/or using PFOA is likely purchasing and/or using PFOA manufactured and sold by DuPont.

212.    Presently and in recent years, whenever PTFE has been used in the manufacture of turnout gear, PFOA manufactured and sold by DuPont has generally been present in the turnout gear.

213.    In addition to PFAS, DuPont manufactures PFAS-containing materials, including Nomex® and Kevlar®.

214.    Nomex® and Kevlar® are ubiquitous in fire fighter PPE, including turnout gear and station wear.

215.    DuPont's website includes a section that contains information about its "Personal Protection" products where it states: "DuPont is proud to partner with the manufacturers listed below to bring the latest technological breakthroughs to emergency responders. For more information on PPE for emergency responders, visit the websites of our partners." The section contains links to the websites of Defendants Fire-Dex, Globe, Honeywell, Innotex, Lakeland, Lion, Safety Components, TenCate, and Viking, among other manufacturers, and boasts that these manufacturers make and sell products using DuPont's Nomex® and Kevlar®.[29]

---

[29] https://www.dupont.com/personal-protection/firefighter-fabrics-manufacturers.html (last visited Mar. 28, 2025).

47

216. In addition to PFAS and PFAS-containing materials, DuPont manufactures, markets, and sells station wear. DuPont's station wear is manufactured with and contains PFAS, including PTFE, PFOA, and PFOS.

217. In addition to its prodigious manufacture of PFOA until recently, 3M also manufactures PFAS-containing materials, including heat-resistant, reflective fabric branded as Scotchlite™ Reflective Material.

218. 3M's Scotchlite™ Reflective Material is manufactured specifically for use in turnout gear.

219. 3M markets, offers, and sells Scotchlite™ Reflective Material to turnout gear manufacturers and others in the turnout gear supply chain.

220. 3M advertises that its Scotchlite™ Reflective Material is able to withstand extreme heat conditions as compared to other, similar products or fabrics and is a material "used by firefighters worldwide."

221. 3M has itself acknowledged, as recently as 2024, that Scotchlite™ Reflective Material contains PFOA, PFOS, and PTFE.

222. 3M has claimed that Scotchlite™ Reflective Material contains PFOA, PFOS, and PTFE as "[b]y-product(s), impurity(ies), and/or unintended artifact(s) resulting from the formulation and/or manufacture of [the] material."

223. 3M uses PFOA, PFOS, and PTFE in the manufacture of Scotchlite™ Reflective Material, including as a treating agent.

224. In 1966, Defendant Globe began manufacturing, marketing, and selling turnout gear containing PFAS.

225. Since 1966, Globe has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M (including Scotchlite™ Reflective Material), DuPont (including Nomex® and Kevlar®), Gore, InterTech, PBI, and TenCate and PFAS manufactured by Defendants 3M and DuPont.

226. In 1969, Robert Gore, an employee of his father's company, Defendant Gore, invented an expanded form of PTFE ("ePTFE"). Shortly thereafter, Gore commercialized ePTFE.

227. In 1982, Gore began manufacturing, marketing, offering, and selling PFAS-containing materials and fabrics, including GORE-TEX® products, specifically for use by turnout gear manufacturers.

228. GORE-TEX® products generally include a surface coating known as durable water repellant (DWR), which is intentionally made of PFAS, including ePTFE.

229. In 1970, Defendant Lion began manufacturing, marketing, and selling turnout gear containing PFAS.

230. Since 1970, Lion has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M (including Scotchlite™ Reflective Material), DuPont (including Nomex® and Kevlar®), and Gore (including GORE-TEX®) and PFAS manufactured by Defendants 3M and DuPont.

231. In 1982, Defendant Viking began manufacturing, marketing, and selling turnout gear containing PFAS.

232. Since 1982, Viking has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M (including Scotchlite™ Reflective Material), DuPont (including Nomex®), Gore (including GORE-TEX®), PBI, Safety Components, and TenCate and PFAS manufactured by Defendants 3M and DuPont.

49

233.    In 1983, Defendant Fire-Dex began manufacturing, marketing, and selling turnout gear containing PFAS.

234.    Since 1983, Fire-Dex has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M (including Scotchlite™ Reflective Material), DuPont (including Nomex® and Kevlar®), Elevate Textiles, Gentex, Gore (including GORE-TEX®), InterTech, Milliken, PBI, Safety Components, StedFast, and Tencate and PFAS manufactured by Defendants 3M and DuPont.

235.    In 1986, Defendant Lakeland expanded into the fire service market and began manufacturing, marketing, and selling fire fighter PPE, including fire proximity suits containing PFAS.

236.    Since 1986, Lakeland has continued to manufacture, market, and sell fire proximity suits using Kevlar® manufactured by Defendant DuPont and containing PFAS, including PTFE, PFOA, and PFOS.

237.    In 2024, Lakeland publicly stated in response to a customer inquiry that "some" of the company's material suppliers use PFAS chemicals in manufacturing and stated that "trace amounts [of PFAS] may remain in the finished product."

238.    In or around 2001, Defendant Innotex began manufacturing, marketing, and selling turnout gear containing PFAS.

239.    Since 2001, Innotex has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont (including Nomex® and Kevlar®), PBI, Safety Components, StedFast, and TenCate and PFAS manufactured by Defendants 3M and/or DuPont.

240. In 2008, Defendant Honeywell acquired Norcross Safety Products LLC and began manufacturing, marketing, and selling turnout gear containing PFAS.

241. Since 2008, Honeywell has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont (including Nomex® and Kevlar®), Gore (including GORE-TEX®), InterTech, MorningPride, PBI, and StedFast and PFAS manufactured by Defendants 3M and/or DuPont. Honeywell manufactures, markets, and sells turnout gear manufactured, in whole or in part, by Defendant Morning Pride and under the Morning Pride® brand.

242. In 2009, Defendant DuPont began the commercial development of a potential replacement for PFOA, another PFAS compound known as HFPO-DA, under the trademark name "GenX." Studies have repeatedly shown that GenX is hazardous to human health; like other PFAS, GenX accumulates in human blood, may cause damage to the kidneys, liver, immune system, and reproductive organs, and may cause cancer.

243. In 2013, DuPont announced that it was planning to spin off its "performance chemicals business" into a new publicly traded company, which ultimately became Defendant Chemours.

244. In 2015, Chemours began manufacturing, marketing, and selling performance chemicals including PFAS.

245. Since 2015, Chemours has continued to manufacture, market, and sell performance chemicals including PFAS.

246. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the fire fighter PPE worn by the Union Plaintiffs'

members, the Fire Fighter Plaintiffs, and members of the Class and/or the PFAS-containing materials therein and/or the PFAS therein.

247. Defendants 3M and DuPont expected their PFAS to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach the Union Plaintiffs' members, the Volunteer Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Fire Fighter Class.

248. Defendants 3M, DuPont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, MorningPride, PBI, Safety Components, StedFast, and TenCate expected their PFAS-containing materials to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach the Union Plaintiffs' members, the Volunteer Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Fire Fighter Class.

249. Defendants Fire-Dex, Globe, Honeywell, Innotex, Lion, and Viking expected their turnout gear to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach the Union Plaintiffs' members, the Volunteer Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Fire Fighter Class.

250. Defendant Lakeland expected its fire proximity suits to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiff Joe Rousso and the other members of IAFF Local I-68.

## IV. DEFENDANTS' KNOWLEDGE OF THE DANGERS OF PFAS

### A. Defendant 3M's Long-Standing Knowledge of the Dangers of PFAS

251. Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

252.    3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

253.    As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. The findings of these studies were discussed internally (and often shared with DuPont) but were not publicized or shared with any regulatory agencies. Notably:

a.    In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

b.    In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack."

c.    By the 1970s, 3M had documented PFAS in fish and were aware that PFAS were hazardous to marine life.

d.    In 1975, 3M learned that there was a "universal presence" of PFAS in human blood samples taken from across the United States.

e.    In 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about potential health effects.

f.    In 1978, 3M conducted multiple PFOA and PFOS studies in monkeys and rats. The studies showed that PFOA and PFOS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."

g.    In 1978, 3M had to abort a study when all of the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of PFOS.

h.    In 1979, an internal 3M report discussing the studies on PFOA and PFOS stated that the PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies [] be undertaken as soon as possible."[30]

i.    In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."[31]

j.    In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal researching showing that PFAS were causing birth defects in rats.

k.    In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

l.    In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

254.    Section 8(e) of the Toxic Substances Control Act (TSCA) requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting

---

[30] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show*, THE INTERCEPT (July 31, 2018, 12:23 PM), https://www.typeinvestigations.org/investigation/2018/07/31/3m-knew-dangers-pfoa-pdos-decades-ago-internal-documents-show/.
[31] *Id.*

requirement has been included in the TSCA since its enactment in 1976. See Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

255.    Despite the decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

256.    In 1998, the EPA first learned that PFAS was in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

257.    In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS.

258.    In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[32]

259.    The same year, 3M announced that it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, 3M fell far short of transparency: Mike Roman, 3M's chairman and chief executive officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external

---

[32] *California sues 3M, DuPont over toxic 'forever chemicals'*, CNN (Nov. 10, 2022, 7:48 PM), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.

regulatory and business landscape for those we serve."[33] In connection with the announcement, 3M falsely maintained that "3M's products are safe for their intended uses."[34]

**B.    Defendant DuPont's Long-Standing Knowledge of the Dangers of PFAS**

260.    Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.

261.    Dupont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

262.    In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried over the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[35]

263.    In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."[36]

264.    As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. Notably:

        a.    In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house researchers at DuPont had confirmed that PFOA was associated with the enlargement of various, specific organs in rats.[37]

---

[33] *3M to Exit PFAS Manufacturing by the End of 2025*, 3M (Dec. 20, 2022), https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025.
[34] *Id.*
[35] Sheron Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception*, THE INTERCEPT (Aug. 11, 2015, 6:35 PM), https://theintercept.com/2015/08/11/dupont-chemistry-deception/.
[36] *Id.*
[37] *Id.*

b.    In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to a poison.

c.    In 1978, Dupont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns including increased rates of endocrine disorders.

d.    By 1979, Dupont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[38]

e.    In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study which suggested an association between PFAS exposure and birth defects.

f.    By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[39]

g.    By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

---

[38] *Id.*
[39] *Id.*

h.    In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[40]

i.    In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included study finding an association between prostate cancer and exposure to PFOA.[41]

265.    In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[42]

266.    In 2001, a class action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

---

[40] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, THE NEW YORK TIMES MAGAZINE (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.
[41] Lerner, *supra* note 23.
[42] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

267.    In 2003, a consultant service with substantial experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia.
> . . .
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[43]

268.    In 2005, the EPA reached a settlement with Dupont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute, $10.25 million, and further required DuPont to perform supplemental environmental projects worth $6.25 million.

269.    In 2015, DuPont spun off its "performance chemicals" business, as well as two-thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours.

270.    In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company

---

[43] Letter from P. Terrance Gaffney, Esq. of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

271.   In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing DuPont, along with 3M, for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role and maintain that California's claims were without merit:

> DuPont has never manufactured PFOA, PFOS or firefighting foam, said spokesperson Daniel Turner, referring to two PFAS substances. He added the company believes the complaint incorrectly names it as a defendant. "We believe these complaints are without merit . . . We look forward to vigorously defending our record of safety, health and environmental stewardship."[44]

### C.   The Remaining Defendants' Knowledge of the Dangers of PFAS

272.   Beyond 3M and DuPont, the remaining Defendants knew or should have known of the dangers of PFAS.

273.   In fact, over the years, many of the remaining Defendants have publicly acknowledged, whether in consumer advertising and/or product promotion, lobbying efforts, litigation, or otherwise, their awareness of increasing medical, environmental, governmental, and public concern regarding PFAS use and exposure.

274.   For example, in or around 2020, the City of Burlington, North Carolina enlisted Duke University scientists to investigate potential sources of PFAS that were discharging into the City's wastewater treatment plants. The City pinpointed Defendant Elevate Textiles as "its largest source of PFAS."[45] Thereafter, a settlement agreement required Elevate Textiles to install a closed-

---

[44] *California sues 3M, DuPont over toxic 'forever chemicals'*, *supra* note 20.
[45] Lisa Org, *Burlington will curb PFAS discharges, per legal settlement with Haw River Assembly*, NC NEWSLINE (Aug. 2, 2023), https://ncnewsline.com/2023/08/02/burlington-will-curb-pfas-discharges-per-legal-settlement-with-haw-river-assembly/.

loop system to capture contaminated wastewater from its production lines, and it was announced that Elevate Textiles would phase out its use of PFAS in *some of its products* by June 15, 2025.[46]

275.    Defendant Fire-Dex recently defended an action brought by its insurer seeking to effectively avoid its defense obligation for PFAS-related claims against the company. In its complaint, the insurer alleged that Fire-Dex had been repeatedly named in lawsuits brought by fire fighters and/or their spouses alleging bodily injuries due to PFAS exposure.

276.    Defendant Gore openly advertises that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]."[47] For example, in efforts to garner support for its open, long-standing commercial use of PTFE, Gore asserts:

> The present paper brings together fluoropolymer toxicity data, human clinical data, and physical, chemical, thermal, and biological data for review and assessment to show that fluoropolymers satisfy widely accepted assessment criteria to be considered as "polymers of low concern" (PLC) and to show that fluoropolymers are distinctly different enough from other classes of PFAS to not be grouped with them for hazard assessment or regulatory purposes.
>
> Scientists, regulators, and concerned communities often fall into one of two groups: one says all PFAS should be banned and the other says PFAS are so different that each must be evaluated, classified, and regulated individually. Barbara J. Henry, PhD, a toxicologist with [Gore], says there's a middle way forward if PFAS are grouped by their properties.[48]

277.    Defendant Honeywell has lobbied state officials, submitted comments, and indicated its intent to seek exemptions regarding a recently passed Minnesota law banning all non-essential uses of PFAS in 11 product categories, which will take full effect in 2032.[49]

---

[46] *Id.*

[47] *Gore's Commitment to Material Stewardship*, GORE, https://www.gore.com/about/materials-stewardship (last visited June 13, 2024).

[48] *Id.*

[49] Deena Winter, *Honeywell and other companies want exemptions to Amara's Law banning 'forever chemicals'*, MINNESOTA REFORMER (Mar 12. 2024), https://minnesotareformer.com/2024/03/12/honeywell-and-other-companies-want-exemptions-to-amaras-law-banning-forever-chemicals/.

278.    In 2023, Honeywell (along with manufacturing company Saint Gobain) reached a $45 million agreement with New York's Department of Environmental Conservation to implement a new water supply for the Hoosick Falls Village Water System and reimburse state taxpayers for the cost of the state's response to PFOA contamination in Hoosick Falls, New York.

279.    In or around 2021, Defendant StedFast spokesperson Mike Salvato presented on the topic of PFAS, PFOS, PFOA, and PTFE in turnout gear, acknowledging that "PFOS and PFOA have been found to be 'potentially harmful,'" but arguing that "[i]t is important to consider the trade-off of performance with perceived health risk if eliminating PFAS in gear." Salvato acknowledged that the "Peaslee study shows that turnout gear may 'shed' some PFAS" but argued "[o]rganizations should properly put into perspective the assumed risk with PFAS in turnout gear with other risks fire fighters face . . . . with the current materials available, PFAS is essential."

280.    Moreover, all Defendants were aware of an ongoing *global* movement toward eliminating PFAS from a myriad of consumer products, including textiles. Many private companies, including Home Depot, Lowes, and Staples, have recently begun to discontinue selling products containing any PFAS, as have several outdoor, durable clothing companies (e.g., Columbia and Marmot), clothing retailers (e.g., H&M, Levi Strauss & Co.), shoe companies (e.g., Adidas and New Balance), car seat manufacturers (e.g., Britax and Graco), furniture companies (e.g., IKEA), personal care companies (e.g., Johnson & Johnson and Oral-B), and textile manufacturing companies.

281.    All Defendants knew or should have known that fire fighter PPE containing PFAS was extremely dangerous to fire fighters such as the Union Plaintiffs' members, the Volunteer Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Fire Fighter Class in that it

placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

282. All Defendants knew or should have known that exposure to PFAS-contaminated materials and/or PFAS places humans at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

283. All Defendants knew or should have known that the fire fighter PPE, PFAS-containing materials, and/or PFAS therein would be used in the ways Plaintiffs have alleged they were used.

## V.   DEFENDANTS' FAILURE TO WARN PLAINTIFFS, PLAINTIFFS' MEMBERS, AND MEMBERS OF THE CLASSES OF THE DANGERS OF PFAS

284. As alleged above, Defendants knew or should have known that fire fighter PPE, including turnout gear, fire proximity suits, and station wear, containing PFAS was extremely dangerous to fire fighters such as the Union Plaintiffs' members, the Volunteer Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Fire Fighter Class in that it placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers. However, Defendants *did not warn the Union Plaintiffs, the Union Plaintiffs' members, the Volunteer Plaintiffs, the Volunteer Plaintiffs' members, the Fire Fighter Plaintiffs, or members of the Fire Fighter Class at any point* of such risks.

285. Quite the opposite—Defendants have continued to misrepresent the safety of PFAS and engaged in campaigns aimed to direct the public's attention away from the issue of PFAS in their products.

286.    Defendant 3M maintains and publicly advertises that "[PFAS] are safely used in many modern products for their important properties and can be safely manufactured."[50]

287.    As to PFOA and PFOS, 3M maintains and publicly advertises that:

Researchers from around the world have studied these materials for decades and haven't found a definitive causal relationship between PFOA or PFOS exposure and any health condition . . . . While some research shows that these materials are associated with negative health outcomes, other studies don't reach the same conclusions.[51]

288.    Defendant New DuPont maintains and publicly advertises that:

In June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi-industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFOS or firefighting foam. While DuPont is not a PFAS commodity chemical manufacture, it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society.[52]

289.    Defendant Chemours maintains and publicly advertises that: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030." Chemours further maintains and publicly advertises that "not all PFAS are the same," arguing that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."[53]

---

[50] *Health, Safety & Environmental Stewardship*, 3M, https://pfas.3m.com/health-safety-and-environmental-stewardship (last visited June 17, 2024).

[51] *How Fluorochemistries Are Safely Used*, 3M, https://pfas.3m.com/how-fluorochemistries-are-safely-used (last visited June 17, 2024).

[52] *DuPont de Nemours, Inc. Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS)*, DUPONT, https://www.dupont.com/pfas.html (last visited June 17, 2024).

[53] *Our Commitment to Responsible Chemistry*, CHEMOURS, https://www.chemours.com/en/sustainability/sustainability-safety/our-commitment-to-pfas-stewardship (last visited June 17, 2024).

290.    In 2017, Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of The Columbus Dispatch demanding the newspaper's *retraction* of a story headlined "Lawyer: Firefighters' gear may be hazardous." Schwartz asserted:

> PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile. All textiles we use are woven or knit with technical fibers that are engineered to be heat, flame and abrasion resistant, some of which are treated with a PTFE durable water repellant finish . . . . [B]ecause these manufacturers used PFOA in their manufacturing process as a processing aid, it is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn-out gear. However, based on all available scientific data, such nominal trace amounts . . . would not have posed any health risks to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear.
>
> . . . .
>
> We, as a part of the fire protective equipment industry, are concerned and saddened by the undeniable scientific evidence that firefighters have elevated cancer risks . . . . However, the elevated risks derives from the hazardous substances produced by the fire, not the turn out gear that protects firefighters.

291.    In 2017, Lion launched its NOT IN OUR HOUSE initiative to "spread awareness of the cancer threat facing the fire service" and "educat[e] firefighters on the actions they can take to reduce their exposure to cancer-causing agents."

292.    Since 2017, Lion's NOT IN OUR HOUSE initiative has emphasized raising awareness of fire fighters' exposure to Polycyclic Aromatic Hydrocarbons (PAHs), naturally occurring carcinogens, during fire situations, likely in order to distract from the issue of fire fighters' occupational exposure to PFAS.

293.    In 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job":

**HERE'S ALL YOU NEED TO KNOW
ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products.** The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PFTE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

**LION does not use PFOA or PFOS in our turnout gear or any of our protective products.**

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

294.    In 2019, Defendant Gore issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant."

295.    In 2020, Paul Chrostowski, Ph.D., a consultant hired by Lion, took out a full page in the publication Firefighter Nation to argue that turnout gear is completely safe and that any evidence to the contrary, including the Peaslee study, is unreliable fearmongering. Chrostowski argued:

> The evidence [] shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population. So even if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population . . . .
>
> At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.

296.    In 2021, Lion confirmed that the representations articulated by Chrostowski reflect the company's position.

297.    In 2021, Defendant Gore maintained in a New York Times article that its turnout gear products were safe for wearers.

298.    In 2022, Defendant 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

299.    Moreover, Defendants have repeatedly represented to the Union Plaintiffs' members, the Volunteer Plaintiffs' members, the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and the public that their products were safe for their intended uses, including the ways in which Plaintiffs have alleged they were used.

300.    For example, Defendant DuPont maintains and publicly advertises that turnout gear manufactured with DuPont's materials "work hard to help keep your professionals safe, inside and out," "help protect professionals even when the fire is out," and "are helping keep first responders safe."

301.    Defendant Fire-Dex maintains and publicly advertises that its turnout gear is made with "the best materials the industry has to offer" and provides the specific benefit of "reduc[ing] [] carcinogen exposure." Fire-Dex advertises that the company goes "beyond industry standards to ensure a proper fit for your comfort and safety," making its turnout gear products "key to keeping your crew safe!"

302.    Defendant Globe maintains and publicly advertises that the company is "committed to firefighter health & safety," and that:

> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our

mission remains unchanged: that men and women may work in safety and live in health.

303.    Defendant Gore maintains and publicly advertises that the company's protective fabrics enable fire fighters "to stay safe and engaged," emphasizing that to do their jobs, fire fighters "need protective garments that keep them protected with a limited amount of physiological burden."

304.    Defendant Honeywell maintains and publicly advertises that the company's "safety solutions protect the future of 500 million workers" and that its fire fighter turnout gear is "[d]esigned to provide safety," referring to its turnout gear products as "the pioneer of safety by design."

305.    Defendant Lion maintains and publicly advertises that the company "makes the gear emergency service providers, civilian responders and militaries need to stay safe in the line of duty," emphasizing that "[w]hen it comes to firefighting, safety is a top concern."

306.    Defendant StedFast maintains and publicly advertises that all of its products "are manufactured with safety in mind," asserting that "[k]eeping people safe is a core value of our business."

## VI.    DEFENDANTS' FAILURE TO PROVIDE SAFETY WARNINGS ON PRODUCT LABELS

307.    The fire fighter PPE, including turnout gear, fire proximity suits, and station wear worn by the Union Plaintiffs' members, the Volunteer Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Fire Fighter Class does not contain any labeling information or warnings:

   a.  indicating that the fire fighter PPE contains or may contain PFAS,

b.    indicating that the fire fighter PPE specifically contains or may specifically contain PFOA or PFOS,

c.    regarding the health risks associated with exposure to PFAS, or

d.    regarding the health risks associated with exposure to PFOA or PFOS.

308.    Below are photos typical of warning labels for turnout gear designed, manufactured, marketed, sold, and distributed by Defendants Globe, Honeywell, and Lion. As depicted below, the labels do not disclose that the turnout gear contains PFAS or PFAS-containing materials, and contain no warning that handling, wearing, or using the turnout gear as it was intended to be handled, worn, or used can result in exposure to PFAS and adverse effects to human health. Further, while the labels provide washing instructions, they do not advise that the turnout gear should be washed in a commercial extractor to prevent cross-contamination and PFAS exposure to family members who handle or wash the turnout gear with other garments in in-home washing machines.





Garment Safety Label



Garment Cleaning Label          Garment Information Label

Garment Liner Attachment Safety Label

Drag Rescue Device (DRD) Label



71

## VII.   PFAS LEGISLATION

309.   Defendants' knowledge of the dangers of PFAS and their utter failure to warn consumers or mitigate the known dangers of PFAS exposure caused state legislatures to take action to protect consumers. In 2018, the State of Washington became the first state to pass legislation restricting the use of firefighting foam, as well as PFAS-laden food packaging.

310.   Since 2018, at least 106 similar laws have been enacted in 24 states banning or restricting the use of PFAS in consumer goods ranging from food packaging to cookware, to stain-resistant coating for carpets and textiles.

311.   In 2024, 195 new bills were introduced in state legislatures across the country seeking to expand the list of products required to be PFAS-free.

312.   On June 5, 2024, Governor Ned Lamont signed into law Public Act 24-59 – An Act Concerning the Use of PFAS in Certain Products, one of the most far-reaching and restrictive PFAS bans in the country ("Connecticut PFAS Ban").

313.   The Connecticut PFAS Ban, which goes into effect on October 1, 2024, will phase out the use of PFAS in dozens of common consumer goods and safety products to which PFAS has been "intentionally added." Turnout gear is expressly encompassed by this legislation.

314.   As of January 1, 2026, turnout gear with intentionally added PFAS cannot be manufactured or sold in the State of Connecticut without providing notice to the customer that PFAS has been intentionally added and the reason why PFAS has been added.

315.   As of January 1, 2028, turnout gear with intentionally added PFAS cannot be sold or manufactured in the State of Connecticut.

316.   There is no waiver provision in the Connecticut law; all sellers and manufacturers must comply.

317.    Connecticut and Massachusetts have taken the lead in passing legislation that bans PFAS in fire fighter turnout gear. New York, New Jersey, Pennsylvania, Maine and Vermont are considering similar legislation in their current sessions.

318.    The fire fighter PPE industry is preparing for a transition to PFAS-free materials— something Defendants' insisted could not be done—until the market for PFAS-contaminated fire fighter PPE faced an existential threat.

## VIII.    DEFENDANTS' ABILITY TO DESIGN SAFER FIREFIGHTER PPE

319.    Despite Defendants' apparent position that PFAS is "essential" in fire fighter PPE, including turnout gear, fire proximity suits, and station wear, safer, PFAS-free fire fighter PPE was, at all relevant times, technologically and economically feasible.

320.    In fact, multiple Defendants already offer PFAS-free options for waterproof fabrics, durable fabrics, and/or outer shells in turnout gear.

321.    For example, in or around 2021, Defendant Gore announced its upcoming launch of a PFAS-free fabric-waterproofing technology, which was praised for its apparent potential to "greatly increase the availability of PFAS-free water-repellant garments."[54]

322.    In or around 2021, Todd Herring, Vice President of Product Innovation and Strategy at Defendant Fire-Dex stated in a press release that the company had "partnered with Milliken to develop a non-fluorinated version of our exclusive materials . . . that meets the increasing market demand for PFAS free PPE material options."[55]

---

[54] *WL Gore to release PFAS-free waterproof material for apparel*, ENHESA (Oct. 4, 2021), https://product.enhesa.com/346695/wl-gore-to-release-pfas-free-waterproof-material-for-apparel.

[55] *Fire-Dex Launches Non-Fluorinated PPE Fabrics*, FIREHOUSE (Feb. 17, 2021), https://www.firehouse.com/safety-health/ppe/turnout-gear/press-release/21210722/fire-dex-fire-dex-launches-non-fluorinated-ppe-fabrics    (emphasis added).

73

323.    In or around 2021, Deana Stankowski, Senior Offering Manager for first responder gear at Defendant Honeywell spoke out about Honeywell's newly available PFAS-free outer shell layer "options," explaining: "We are making sure that we have every PFAS-free outer shell available in the market as *part of our portfolio* . . . . We have customers field testing PFAS-free outer shells, and we will eventually transition over completely to PFAS free." Stankowski added:

> There's no reason to offer both options . . . . Any minor tradeoffs with PFAS-free fabrics are outweighed by worker safety. And the protection level is unchanged. PFAS-free gear offers the same thermal protection and moves the same way . . . . The color fastness and wear remain the same.[56]

324.    In or around 2022, a group of students at UC Berkley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in turnout gear and were able to offer multiple, alternative recommendations for manufacturers. For example, the students concluded that polyethylene could be used as a potential alternative to PTFE in the middle moisture barrier of fire fighter turnout gear.

325.    Also in 2022, Defendant Gore announced that it would begin offering a new, PFAS-free membrane in some, but not all, of its GORE-TEX® products.

326.    Gore's announcement explained that the membrane technology incorporates expanded polyethylene ("ePE") as an alternative to ePTFE.

327.    Gore's ePE membrane was only introduced "in a selection of consumer- end uses including general outdoor and lifestyle garments, lifestyle footwear and snow sports gloves from select customers including (but not limited to) Adidas, ARC'TERYX, Dakine, Patagonia, Reusch, Salomon and Ziener."

---

[56] Ronnie Wendt, *Innovations in Turnout Gear*, INDUSTRIAL FIRE WORLD (Mar. 17, 2021), https://www.industrialfireworld.com/598931/innovations-in-turnout-gear.

328.    Gore has not committed to eliminating PFAS from other GORE-TEX® products or from any materials or fabrics intended for use in fire fighter PPE.

329.    Defendant Milliken boasts that it is the "first and only U.S.-based manufacturer to offer a non-PFAS fabric for every layer of turnout gear." Milliken's website specifically cites PFAS legislation across the country, including the Connecticut legislation, as well as emerging concern over PFAS exposure in turnout gear as requiring innovation in the manufacture of fire fighter PPE. It states "[c]ompanies are responding to market demand and regulatory changes by innovating alternatives."[57] Milliken, along with the other Defendants, see a market opportunity to sell new, PFAS-free gear to each of the customers that it knowingly sold defective PFAS-cotnaminated gear to for decades.

330.    That Defendants were capable of innovating all along is demonstrated by the speed with which they have adapted in the face of potentially market-killing legislation.

## IX.    FIRE FIGHTER PLAINTIFFS AND MEMBERS OF THE FIRE FIGHTER CLASS, MEMBERS OF THE UNION PLAINTIFFS, AND THE PURCHASER CLASS HAVE BEEN AND WILL IN THE FUTURE BE HARMED BY THE PFAS-CONTAINING FIRE FIGHTER PPE MANUFACTURED, MARKETED AND SOLD BY DEFENDANTS.

331.    As alleged above, Plaintiffs are the Fire Fighter Class, the Purchaser Class, the Fire Fighter Plaintiffs and the Purchaser Plaintiffs, which include: the UPFFA, twelve fire fighter unions, which together represent the uniformed fire fighters currently serving the cities and towns of Stamford, Fairfield, Easton, Norwalk, Hartford, Stratford, Hamden, Groton, Torrington, New Canaan, Westport, and Wilton, Connecticut, as well as the Sikorsky Aircraft Fire Department in

---

[57]    https://www.milliken.com/en-us/businesses/textile/blogs/how-pfas-firefighter-gear-regulations-impact-turnout-gear

Stratford, Connecticut, the City of Stamford, the Old Mystic Fire Tax District, The Reliance Fire Company, Inc. and twelve individual fire fighters.

332.    The Stamford Fire Department provides fire protection and emergency medical services to a city of over 136,000 residents.

333.    The Fairfield Fire Department provides fire protection and emergency medical services to a town of over 61,000 residents.

334.    The City of Norwalk Fire Department provides fire protection and emergency medical services to a city of over 93,000 residents.

335.    The Hartford Fire Department provides fire protection and emergency medical services to a city of over 119,000 residents.

336.    The Easton Fire Department provides fire protection and emergency medical services to a town of approximately 7,600 residents.

337.    The Stratford Fire Department provides fire protection and emergency medical services to a town of over 52,000 residents.

338.    The Hamden Fire Department provides fire protection and emergency medical services to a town of over 61,000 residents.

339.    The City of Groton Fire Department provides fire protection and emergency medical services to a city of over 9,000 residents.

340.    The Torrington Fire Department provides fire protection and emergency medical services to a city of over 35,000 residents.

341.    The New Canaan Fire Department provides fire protection and emergency medical services to a town of over 20,000 residents.

342. The Westport Fire Department provides fire protection and emergency medical services to a town of over 27,000 residents.

343. The Wilton Fire Department provides fire protection and emergency medical services to a town of over 18,000 residents.

344. The Sikorsky Aircraft Fire Department provides emergency and ARFF protection for the 2.8 million-square foot Sikorsky Aircraft property in Stratford, Connecticut and outlying facilities in Bridgeport, Shelton, Trumbull, Stratford, and the Hudson Valley Regional Airport.

345. The Reliance Fire Company, Inc. (a/k/a The Old Mystic Fire Department) provides fire protection and emergency medical services to a town of between 17,000 and 50,000 (during the summer months) residents.

346. The Old Mystic Fire District is responsible for providing fire fighter PPE to its volunteer members. The Old Mystic Fire District owns 100 sets of turnout gear.

347. The Old Mystic Fire District replaces 10 sets per year.

348. The City of Stamford is responsible for providing fire fighter PPE to its 265 professional fire fighters and approximately 100 volunteer fire fighters.

349. Each professional fire fighter in Stamford is issued two sets of turnout gear. Turnout gear is replaced on a rotating schedule so that each fire fighter gets a new set of turnout gear approximately once every five years.

350. The City of Stamford currently owns 523 sets of turnout gear.

351. The City of Stamford purchases 50 new sets of turnout gear per year, at a cost of approximately $4,000 for the jacket and pants.

352. Each professional fire fighter is issued three sets of station wear upon starting and is issued one additional set of station wear annually thereafter. A set of station wear includes a long

sleeve shirt, a short sleeve shirt, and a pair of pants. During the Class Period, the City purchased and issued station wear made with Nomex®. The cost of station wear made with Nomex® varies, but is between $600 - $900 a set.

353.    Due to health concerns associated with PFAS, the City of Stamford now purchases cotton station wear. Cotton station wear which is considerably less expensive than station wear containing Nomex®.

354.    Throughout the Class Period, the City of Stamford and the Old Mystic Fire District and members of the Purchaser Classes described below have purchased turnout gear for use by the professional and volunteer fire fighters serving their communities (including helmets, hoods, jackets pants, boots, and gloves), which was designed, manufactured, marketed, distributed, and sold by Defendants Fire-Dex, Globe, Honeywell, and/or Lion and contained PFAS-contaminated materials supplied by Defendants 3M, Dupont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, MorningPride, PBI, Safety Components, StedFast, and/or TenCate, as well as PFAS supplied by Defendants 3M and/or DuPont.

355.    Throughout the Class Period, the City of Stamford and members of the Purchaser Classes described below have purchased station wear for use by professional fire fighters serving the residents of Stamford, Connecticut, which was designed, manufactured, and sold, in whole or in part, by Defendant DuPont and which contained PFAS-contaminated materials manufactured by DuPont and PFAS supplied by Defendants 3M and/or DuPont.

356.    Throughout the Class Period, the Union Plaintiffs' members, the Volunteer Plaintiffs' members, the Fire Fighter Plaintiffs, and members of the Fire Fighter Class described below have in the course of their duties as fire fighters used and worn fire fighter PPE, including turnout gear (including helmets, hoods, jackets, pants, boots, and gloves) fire proximity suits, and

station wear, which was designed, manufactured, marketed, distributed, and sold by Defendants DuPont, Fire-Dex, Globe, Honeywell, Innotex, Lakeland, Lion, and/or Viking and contained PFAS-contaminated materials supplied by Defendants 3M, DuPont, Elevate Textiles, Gentex, Gore, InterTech, Milliken, MorningPride, PBI, Safety Components, StedFast, and/or TenCate, as well as PFAS supplied by Defendants 3M and/or DuPont.

357.    Throughout the Class Period, the Union Plaintiffs' members, the Volunteer Plaintiffs' members, Fire Fighter Plaintiffs, and members of the Fire Fighter Class have used and worn the fire fighter PPE, including turnout gear, fire proximity suits, and station wear, for training purposes and in responding to fire situations and other emergencies and have depended upon the turnout gear for protection from extreme heat, flames, and other hazards.

358.    Throughout the Class Period, the Union Plaintiffs' members, the Volunteer Plaintiffs' members, Fire Fighter Plaintiffs, and members of the Fire Fighter Class have routinely stored the fire fighter PPE in the bunk rooms of their fire stations, as well as in their homes and vehicles.

359.    Throughout the Class Period, the Union Plaintiffs' members, the Volunteer Plaintiffs' members, Fire Fighter Plaintiffs, and members of the Fire Fighter Class have often used the fire fighter PPE for a period of several years without replacement.

360.    Throughout the Class Period, the Union Plaintiffs' members, the Volunteer Plaintiffs' members, Fire Fighter Plaintiffs, and members of the Fire Fighter Class have often washed the turnout gear and station wear at fire stations and in their homes along with their other clothing.

361.    The firefighter PPE (and, specifically, the turnout gear, fire proximity suits, and station wear) was intentionally made with PFAS, was intentionally treated with PFAS, and intentionally contained PFAS.

362.    The turnout gear was embedded with significant concentrations of PFAS in all three layers, including the thermal liners where PFAS comes into direct contact with skin.

363.    The turnout gear, fire proximity suits, and station wear were intentionally manufactured with and contained PTFE. Whenever PTFE is present in turnout gear, other PFAS used in the PTFE manufacturing process will generally be present and pose serious health risks to the wearer.[58]

364.    The turnout gear, fire proximity suits, and station wear were intentionally manufactured with and contained PFOA and PFOS.

365.    The PFAS present in the turnout gear, fire proximity suits, and station wear (including PFOA and PFOS) migrated from the turnout gear to the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs and to the environment, causing PFAS exposure and contamination.

366.    The PFAS present in the turnout gear, fire proximity suits, and station wear (including PFOA and PFOS) contaminated the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs via dermal absorption.

367.    The PFAS present in the turnout gear, fire proximity suits, and station wear (including PFOA and PFOS) contaminated the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs via ingestion and inhalation.

---

[58] *See, e.g.*, S D. J. Muensterman, I. A. Titaley, G. F. Peaslee, L. D. Minc, L. Cahuas, A. E. Rodowa, Y. Horiuchi, S. Yamane, T. N. J. Fouquet, J. C. Kissel, C. C. Carignan and J. A. Field, Environ. Sci. Technol., 2022, 56, 974-983.

368.    Plaintiffs, including the members of the Classes, did not know, and in the exercise of reasonable diligence could not have known, that the turnout gear, fire proximity suits, and station wear posed serious health risks when used as intended to be used (i.e., in the ordinary course of a fire fighter's duties) and in a foreseeable manner.

369.    Plaintiffs, including the members of the Classes, did not know, and in the exercise of reasonable diligence could not have known, that the turnout gear, fire proximity suits, and station wear contained significant levels of PFAS and, specifically, PFOA and PFOS, dangerous to health.

370.    Plaintiffs, including the members of the Classes, did not know, and in the exercise of reasonable diligence could not have known, of the PFAS dangers of the turnout gear, fire proximity suits, and station wear.

371.    The turnout gear, fire proximity suits, and station wear do not contain any labeling information or warnings indicating that the products specifically contain or may specifically contain PFOA or PFOS.

372.    The turnout gear, fire proximity suits, and station wear do not contain any labeling information or warnings regarding the health risks associated with exposure to PFAS.

373.    The turnout gear, fire proximity suits, and station wear do not contain any labeling information or warnings regarding the health risks associated with exposure to PFOA or PFOS.

374.    As a result of using and wearing the turnout gear, fire proximity suits, and station wear, the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs have suffered exposure to unsafe levels of PFAS and, specifically, PFOA and PFOS and will in the future continue to suffer such dangerous exposure.

375. As a result of such exposure, PFAS, including PFOA and PFOS, have suffered injury in that PFAS, including PFOA and PFOS, have accumulated in the blood and bodily tissue of the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs, who will continue to suffer such injury in the future.

376. As a result of such accumulations, the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs are at increased risk of developing adverse health conditions, including but not limited to various cancers, caused by PFAS, including PFOA and PFOS.

377. The Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs are likely to incur medical expenses as a result of their PFAS-related injuries and exposure to the PFAS-contaminated turnout gear, fire proximity suits, and station wear.

378. The Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs are likely to suffer emotional pain and distress as a result of their exposure to the PFAS-contaminated turnout gear, fire proximity suits, and station wear.

379. The Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs are likely to suffer other losses as a result of their exposure to the PFAS-contaminated turnout gear, fire proximity suits, and station wear.

380. The Purchaser Plaintiffs and the members of the Purchaser Class would not have purchased the turnout gear and station wear had they known the products were unsafe for their intended uses.

381. The Purchaser Plaintiffs and the members of the Purchaser Classes will need to replace all PFAS-laden fire fighter PPE they have previously purchased, as well as take measures

82

to mitigate the damage caused by the contaminated PPE, and have sustained economic damages as a result.

## CLASS ALLEGATIONS

382.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and as representatives of the Classes.

383.    Plaintiffs seek class certification of the classes defined as follows (the "Classes"):

**Fire Fighter (Product Liability) Class:**

All firefighters in the state of Connecticut who have worn or continue to wear PFAS-containing fire fighter PPE, including turnout gear, fire proximity suits, and station wear, that was manufactured, designed, or sold, in whole or in part, by any of the named Defendants during the Class Period.

**Nationwide Purchaser Class:**

All persons or entities in the United States who have purchased or caused to be purchased PFAS-containing fire fighter PPE that was manufactured, designed, or sold, in whole or in part, by any of the named Defendants during the Class Period.

**Connecticut Purchaser Sub-Class**

All persons or entities in the state of Connecticut who have purchased or caused to be purchased PFAS-containing fire fighter PPE that was manufactured, designed, or sold, in whole or in part, by any of the named Defendants during the Class Period.

Together with the Nationwide Purchaser Class, the "Purchaser Classes."

384.    Plaintiffs reserve the right to expand, narrow, or otherwise modify or refine the definition of the Classes based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

385.    Excluded from the Classes are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Classes; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

386.    **Ascertainability.** The proposed Classes are readily ascertainable because it is defined using objective criteria, so as to allow class members to determine if they are part of the Classes. Further, the members of the Classes can be readily identified through records and information in Defendants' possession, custody, or control.

387.    **Numerosity.** The Classes are so numerous that joinder of individual members is impracticable. While the exact number of members of the Classes is not known to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Fire Fighter Class and Nationwide Purchaser Class and over 100 members of the Connecticut Purchaser Sub-Class.

388.    **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Classes, including the following:

a.    Whether each Defendants' conduct was negligent;

b.    Whether Defendants' conduct was willful, wanton, reckless, intentional, malicious, and/or outrageous conduct in utter indifference to and/or conscious disregard for the health, safety, and well-being of others;

c.    Whether Defendants owed a duty of care to the members of the Class;

d.    Whether the duty of care owed to the members of the Class included the duty to protect against exposures to unsafe and unreasonably high levels of PFAS;

e.    Whether Defendants breached their duty to warn the members of the Class of, and protect the members of the Class from, the long-term health risks and consequences of exposure to high levels of PFAS;

f.    Whether the products manufactured by Defendants were merchantable;

g.    Whether the products manufactured by Defendants were suitable for their intended purpose;

h.    Whether medical monitoring and early detection will provide benefits to the members of the Class.

389.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs, Plaintiffs' members, and members of the Class sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiffs, Plaintiffs' members, and each member of the Class were directly caused by Defendants' wrongful conduct, and Plaintiffs and members of the Class assert similar claims for relief.

390.    **Adequacy.** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the

Class, and Defendants have no known defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel has any interest adverse to those of the other members of the Class.

391.    **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action is manageable. Plaintiffs know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

## TOLLING AND ESTOPPEL OF APPLICABLE STATUTE OF LIMITATIONS

### DISCOVERY RULE TOLLING

392.    Defendants had knowledge of the hazard to the health and safety of Plaintiffs, Plaintiffs' members, and Class members caused by exposure to PFAS Chemicals for decades.

393.    Beginning in the 1960s and continuing through to the 1990s, Defendants conducted internal studies that demonstrated the toxicity of PFAS Chemicals.

394.    Defendants knew or should have known that they were creating an unacceptable health risk to Plaintiffs, Plaintiffs' members, and Class members by designing, manufacturing, and selling fire fighter PPE that was "swimming" in PFAS.

395.    Defendants intentionally concealed this information from Plaintiffs, Plaintiffs' members, Class members, and the public.

396.    Defendants intentionally and continuously misrepresented the safety of the fire fighter PPE, PFAS-contaminated materials, and/or PFAS therein, assuring firefighters, the

government, and the public that the fire fighter PPE, PFAS-contaminated materials, and PFAS were safe.

397.    At all relevant times, Plaintiffs, Plaintiffs' members, and the Class members did not know or have reason to know of the Defendants' conduct that caused PFAS contamination.

398.    Neither Plaintiffs, Plaintiffs' members, nor any other Class members, through the exercise of reasonable care, could have discovered the conduct by Defendants alleged herein. Further, Plaintiffs, Plaintiffs' members, and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

399.    For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs and the Class members.

<u>FRAUDULENT CONCEALMENT TOLLING</u>

400.    Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiffs, Plaintiffs' members, and Class members for decades.

401.    Because of Defendants' active and ongoing concealment of the hazards of PFAS Chemicals, and the unique dangers posed to fire fighters through dermal absorption, ingestion, and inhalation of PFAS Chemicals through off-gassing and migration, Plaintiffs could not have reasonably discovered the causes of action alleged herein.

402.    For this reason, applicable limitations of actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of Plaintiffs or Class members should be tolled.

**FIRST CLAIM FOR RELIEF**
(By the Purchaser Plaintiffs, individually and on behalf of the Nationwide Purchaser Class and the Connecticut Purchaser Subclass)

87

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
(Against All Defendants)

403.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

404.    By operation of law, Defendants, as the manufacturers and sellers, in whole or in part, of the PFAS-contaminated turnout gear and station wear impliedly warranted to Plaintiffs City of Stamford and the Old Mystic Fire District and the members of the Purchaser Classes that the turnout gear and station wear were of merchantable quality and safe for their intended uses.

405.    Such implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in each state. *See, e.g.*, ALA. CODE §§ 7-2-314, *et seq.*; ALASKA STAT. §§ 45.02.314, *et seq.*; ARIZ. REV. STAT. ANN. §§ 47-2314, *et seq.*; ARK. CODE ANN. §§ 4-2-314, *et seq.*; CAL. COM. CODE §§ 2314, *et seq.*; COLO. REV. STAT. §§ 4-2-314, *et seq.*; CONN. GEN. STAT. ANN. §§ 42a-2-314, *et seq.*; DEL. CODE ANN. tit. 6, §§ 2-314, *et seq.*; D.C. CODE ANN. §§ 28:2-314, *et seq.*; FLA. STAT. ANN. §§ 672.314, *et seq.*; O.C.G.A. §§ 11-2-314, *et seq.*; HAW. REV. STAT. §§ 490:2-314, *et seq.*; IDAHO CODE §§ 28-2-314, *et seq.*; ILL. COMP. STAT. ANN. Ch. 810, 5/2-314, *et seq.*; IND. CODE ANN. §§ 26-1-2-314, *et seq.*; IOWA CODE ANN. §§ 554.2314, *et seq.*; KAN. STAT. ANN. §§ 84-2-314, *et seq.*; KY. REV. STAT. ANN. §§ 355.2-314, *et seq.*; LA. CIV. CODE ANN. art. 2520, *et seq.*; ME. REV. STAT. ANN. tit. 11, §§ 2-314, *et seq.*; MD. CODE ANN., Com. Law §§ 2-314, *et seq.*; MASS. GEN. LAWS ANN. Ch. 106, §§ 2-314, *et seq.*; MICH. COMP. LAWS ANN. §§ 440.2314, *et seq.*; MINN. STAT. ANN. §§ 336.2-314, *et seq.*; MISS. CODE ANN. §§ 75-2-314, *et seq.*; MO. REV. STAT. §§ 400.2-314, *et seq.*; MONT. CODE ANN. §§ 30-2-314, *et seq.*; NEB. REV. STAT. §§ 2-314, *et seq.*; NEV. REV. STAT. §§ 104.2314, *et seq.*; N.H. REV. STAT. ANN. §§ 382-A:2-314, *et seq.*; N.J. STAT. ANN. §§ 12A:2-314, *et seq.*; N.M. STAT. ANN. § 55-2-314, *et seq.*; N.Y. U.C.C. LAW §§ 2-314, *et seq.*; N.C. GEN. STAT. ANN. §§ 25-2-314, *et seq.*; N.D. CENT. CODE §§ 41-02-31, *et seq.*; OHIO

REV. CODE ANN. §§ 1302.27, *et seq.*; OKLA. STAT. tit. 12A, §§ 2-314, *et seq.*; OR. REV. STAT. §§ 72.3140, *et seq.*; 13 PA. STAT. ANN. §§ 2314, *et seq.*; R.I. GEN. LAWS §§ 6A-2-314, *et seq.*; S.C. CODE ANN. §§ 36-2-314, *et seq.*; S.D. CODIFIED LAWS §§ 57A-2-314, *et seq.*; TENN. CODE ANN. §§ 47-2-314, *et seq.*; TEX. BUS. & COM. CODE §§ 2.314, *et seq.*; UTAH CODE ANN. §§ 70A-2-314, *et seq.*; VA. CODE ANN. §§ 8.2-314, *et seq.*; VT. STAT. ANN. tit. 9A, §§ 2-314, *et seq.*; WASH. REV. CODE §§ 62A.2-314, *et seq.*; W. VA. CODE §§ 46-2-314, *et seq.*; WIS. STAT. ANN. §§ 402.314, *et seq.*; and WYO. STAT. ANN. §§ 34.1-2-314, *et seq.*

406.     Defendants breached the implied warranty of merchantability in connection with the manufacture, sale, and distribution of turnout gear and station wear. The turnout gear and station wear contained toxic levels of PFAS chemicals, rendering them unsuitable and unsafe for their intended purposes.

407.     Had the Purchaser Plaintiffs and the members of the Purchaser Classes known the turnout gear and station wear they were purchasing were unsafe for their intended uses, they would not have purchased the products.

408.     The Purchaser Plaintiffs and the members of the Purchaser Classes reasonably expected, at the time of purchase, that the turnout gear and station wear were safe for their intended uses.

409.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the Purchaser Plaintiffs and the members of the Purchaser Classes will need to replace all turnout gear and station wear they have previously purchased, take measures to mitigate the damage caused by the contaminated turnout gear and station wear, and have sustained damages in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
(By the Purchaser Plaintiffs, individually and on behalf of the Nationwide Purchaser Class and the
Connecticut Purchaser Subclass)

**BREACH OF THE IMPLIED WARRANTY OF USABILITY**
(Against All Defendants)

410.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

411.    By operation of law, Defendants, as the manufacturers and sellers, in whole or in part, of the PFAS-contaminated turnout gear and station wear, impliedly warranted to Purchasers and the Purchasers Classes that the turnout gear and station wear were usable for their ordinary and intended uses.

412.    Such implied warranty arises under U.C.C. § 2-314(3) as adopted in each state.

413.    Such implied warranty of usability, contained in U.C.C. § 2-314, has been codified in each state. *See, e.g.*, Ala. Code §§ 7-2-314, *et seq.*; Alaska Stat. §§ 45.02.314, *et seq.*; Ariz. Rev. Stat. Ann. §§ 47-2314, *et seq.*; Ark. Code Ann. §§ 4-2-314, *et seq.*; Cal. Com. Code §§ 2314, *et seq.*; Colo. Rev. Stat. §§ 4-2-314, *et seq.*; Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq.*; Del. Code Ann. tit. 6, §§ 2-314, *et seq.*; D.C. Code Ann. §§ 28:2-314, *et seq.*; Fla. Stat. Ann. §§ 672.314, *et seq.*; O.C.G.A. §§ 11-2-314, *et seq.*; Haw. Rev. Stat. §§ 490:2-314, *et seq.*; Idaho Code §§ 28-2-314, *et seq.*; Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.*; Ind. Code Ann. §§ 26-1-2-314, *et seq.*; Iowa Code Ann. §§ 554.2314, *et seq.*; Kan. Stat. Ann. §§ 84-2-314, *et seq.*; Ky. Rev. Stat. Ann. §§ 355.2-314, *et seq.*; La. Civ. Code Ann. art. 2520, *et seq.*; Me. Rev. Stat. Ann. tit. 11, §§ 2-314, *et seq.*; Md. Code Ann., Com. Law §§ 2-314, *et seq.*; Mass. Gen. Laws Ann. Ch. 106, §§ 2-314, *et seq.*; Mich. Comp. Laws Ann. §§ 440.2314, *et seq.*; Minn. Stat. Ann. §§ 336.2-314, *et seq.*; Miss. Code Ann. §§ 75-2-314, *et seq.*; Mo. Rev. Stat. §§ 400.2-314, *et seq.*; Mont. Code Ann. §§ 30-2-314, *et seq.*; Neb. Rev. Stat. §§ 2-314, *et seq.*; Nev. Rev. Stat. §§ 104.2314, *et seq.*; N.H. Rev. Stat.

90

Ann. §§ 382-A:2-314, *et seq*.; N.J. Stat. Ann. §§ 12A:2-314, *et seq*.; N.M. Stat. Ann. § 55-2-314, *et seq*.; N.Y. U.C.C. Law §§ 2-314, *et seq*.; N.C. Gen. Stat. Ann. §§ 25-2-314, *et seq*.; N.D. Cent. Code §§ 41-02-31, *et seq*.; Ohio Rev. Code Ann. §§ 1302.27, *et seq*.; Okla. Stat. tit. 12A, §§ 2-314, *et seq*.; Or. Rev. Stat. §§ 72.3140, *et seq*.; 13 Pa. Stat. Ann. §§ 2314, *et seq*.; R.I. Gen. Laws §§ 6A-2-314, *et seq*.; S.C. Code Ann. §§ 36-2-314, *et seq*.; S.D. Codified Laws §§ 57A-2-314, *et seq*.; Tenn. Code Ann. §§ 47-2-314, *et seq*.; Tex. Bus. & Com. Code §§ 2.314, *et seq*.; Utah Code Ann. §§ 70A-2-314, *et seq*.; Va. Code Ann. §§ 8.2-314, *et seq*.; Vt. Stat. Ann. tit. 9A, §§ 2-314, *et seq*.; Wash. Rev. Code §§ 62A.2-314, *et seq*.; W. Va. Code §§ 46-2-314, *et seq*.; Wis. Stat. Ann. §§ 402.314, *et seq*.; and Wyo. Stat. Ann. §§ 34.1-2-314, *et seq*.

414.    Defendants breached the implied warranty of usability in connection with the manufacture, sale, and distribution of turnout gear and station wear. The turnout gear and station wear contained toxic levels of PFAS chemicals, rendering the products unusable for their intended purposes.

415.    Had the Purchaser Plaintiffs and the members of the Purchaser Classes known the turnout gear and station wear they were purchasing were unusable for their intended uses, they would not have purchased the products.

416.    The Purchaser Plaintiffs and the members of the Purchaser Classes reasonably expected, at the time of purchase, that the turnout gear and station wear were usable for their intended uses.

417.     As a direct and proximate result of Defendants' breach of the implied warranty of usability, the Purchaser Plaintiffs and the members of the Purchaser Classes will need to replace all turnout gear and station wear they have previously purchased, take measures to mitigate the

damage caused by the contaminated turnout gear and station wear, and have sustained damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
(By the Purchaser Plaintiffs, individually and on behalf of the Connecticut Purchaser Subclass)

**THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**CONN. GEN. STAT. § 42-110a, *et seq.***
(Against All Defendants)

418.   The Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass re-allege and incorporate here the allegations set forth above.

419.   Each Defendant is a "person" within the meaning of CONN. GEN. STAT. § 42-110a(1) that engaged in "trade" and/or "commerce" as defined by CONN. GEN. STAT. § 42-110a(4) within the state of Connecticut.

420.   The Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass are "persons" within the meaning of CONN. GEN. STAT. § 42-110a(1).

421.   Each Defendant's deceptive and/or unfair actions in the conduct of trade and/or commerce within Connecticut caused the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass, acting reasonably under the circumstances, to suffer ascertainable harm through the purchase of PFAS-contaminated turnout gear and station wear to their detriment.

422.   Each Defendant's deceptive conduct was likely to, and did in fact, deceive and mislead the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass as to the safety and suitability of the turnout gear and station wear for their intended uses by the Fire Fighter Class members.

423.   Defendants also engaged in unfair conduct in connection with marketing and sale of the turnout gear and station wear to the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass in that their conduct: (1) caused the Purchaser Plaintiffs and the members of

92

the Connecticut Purchaser Subclass to purchase turnout gear and station wear that was contaminated with PFAS and was therefore worthless or worth less than they paid for it; (2) has caused or is likely to cause substantial bodily harm and personal injury to the intended end-users, including the Fire Fighter Plaintiffs and the Union Plaintiffs; (3) caused injury that could not have been reasonably avoided by the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass, and (4) caused injury to the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass that is not outweighed by any countervailing benefits to the Purchaser Plaintiffs and members of the Connecticut Purchaser Subclass.

424. Defendants' unfair conduct caused the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass to suffer ascertainable harm.

425. Defendants intentionally engaged in conduct that failed to prevent or mitigate PFAS contamination of turnout gear and station wear, despite being aware of its presence, and despite knowing the significant health risks associated with even low levels of PFAS exposure. Defendants repeatedly made public statements assuring the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass that the turnout gear and station wear were safe and fit to be used for their intended purposes. This unfair conduct caused substantial injury to the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass in that it caused them to purchase products that exposed the Fire Fighter Plaintiffs and Fire Fighter Class members to dangerous, hazardous levels of PFAS Chemicals. These injuries could not have been reasonably avoided by the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass as, due to Defendants' efforts to conceal the dangers of human exposure to PFAS, and their failure to prevent or mitigate these dangers by providing safer alternatives.

93

426. Because Defendants knew or should have known that their conduct was deceptive and/or unfair under CONN. GEN. STAT. § 42-110b(a), their conduct was willful and/or was undertaken with reckless disregard for the harm it would cause the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass.

427. The Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass reasonably expected, at the time of purchase, that the turnout gear and station wear were safe for their intended uses by their volunteer and employee fire fighters.

428. Had Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass known the turnout gear and station wear they were purchasing were contaminated with PFAS and unsafe for use, they would not have purchased the products.

429. As a direct and proximate result of Defendants' unfair and deceptive conduct, the Purchaser Plaintiffs and the members of the Connecticut Purchaser Subclass will need to replace all turnout gear and station wear they have previously purchased, take measures to mitigate the damage caused by the contaminated turnout gear and station wear, and have sustained damages in an amount to be determined at trial.

430. Accordingly, Plaintiffs, individually and on behalf of the Connecticut Purchaser Subclass, seek (a) a declaration that Defendants' conduct described above violates the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a, *et seq.;* (b) an award of actual damages; (c) an award of attorneys' fees and costs pursuant to CONN. GEN. STAT. § 42-110g(d); (d) an order enjoining Defendants from continuing to engage in the unfair and deceptive acts and practices described above; and (e) any further relief the Court deems just and proper.

### **FOURTH CLAIM FOR RELIEF**
(By the Purchaser Plaintiffs, the Connecticut Purchaser Subclass, the Union Plaintiffs, the Fire Fighter Plaintiffs and the Fire Fighter Class)

94

## THE CONNECTICUT PRODUCT LIABILITY ACT
### CONN. GEN. STAT. § 52-572m, *et seq.*
(Against All Defendants)

431.    Plaintiffs and the members of the Product Liability Class re-allege and incorporate here the allegations set forth above.

432.    As defined by the CPLA and at all relevant times, each Defendant was a "Product Seller" and/or a "Manufacturer" of the PFAS-contaminated fire fighter PPE, including turnout gear, proximity suits, and/or station wear, purchased, used and/or worn by Plaintiffs, Plaintiffs' members and employees, and members of the Fire Fighter Class. *See* CONN. GEN. STAT. § 52-572m(b)&(e).

### A.  CPLA STRICT LIABILITY DESIGN DEFECT
(Against All Defendants)

433.    Plaintiffs and the members of the Fire Fighter Class re-allege and incorporate here the allegations set forth above.

434.    At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, selling, and/or distributing commercial PFAS formulations, and fire fighter PPE products containing PFAS.

435.    Defendants' PFAS chemicals, and PPE products containing PFAS were not reasonably safe as designed at the time they left Defendants' control. The toxicity, volatility, tendency to enter the human body through dermal absorption and inhalation, inability to be contained, bioaccumulation, and environmental persistence and of Defendants' PFAS chemicals, and PPE products containing PFAS, rendered them unreasonably dangerous at all times.

436.    Defendants knew or should have known their PFAS chemicals, and PPE products containing PFAS, were not safe and were likely to cause toxic contamination. Defendants knew or should have known their PFAS chemicals, and PPE products containing PFAS, were unsafe to an

extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

437. These risks were not obvious to Plaintiffs or the public.

438. Defendants manufactured, distributed, marketed, promoted, and/or sold PFAS chemicals, and PPE products containing PFAS, despite such knowledge. The seriousness of the human health risk posed by Defendants' products far outweighs any purported social utility of Defendants' conduct in manufacturing and distributing their commercial PFAS chemicals, and PPE products containing PFAS. The rights, interests, and inconvenience to the Plaintiffs and general public far outweigh the rights, interests, and inconvenience to Defendants, which profited heavily from the manufacture, sale, and distribution of their commercial PFAS chemicals, and PPE products containing PFAS.

439. Practical and feasible alternative designs capable of reducing the Plaintiffs' injuries were available. Such alternatives include alternative chemical formulations. Alternative chemical formulations that would have reduced the Plaintiffs' injuries include the switch to PPE without PFAS, which would have materially decreased or eliminated the toxicity of PFAS whole providing fire fighters with appropriate PPE protection.

440. Defendants' conduct requires the Purchaser Plaintiffs and the Connecticut Purchaser Subclass to replace its fire fighter PPE and for the Fire Fighter Plaintiffs and the Fire Fighter Class to monitor and treat PFAS related diseases, and for the Union Plaintiffs to divert resources to advocate for safe PPE, to organize and educate members about the PFAS risks in PPE and how to minimize or eliminate them, among other injuries.

441.     The seriousness of the human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS chemicals, and PPE products containing PFAS, without disclosing the dangers posed to human health and the environment. The rights, interests, and inconvenience to the Plaintiffs and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS chemicals, and PPE products containing PFAS.

442.     The Purchaser Plaintiffs and Connecticut Purchaser Subclass have suffered and will continue to suffer injuries and damages to their public treasury as a result of Defendants' conduct and the presence of PFAS within fire fighter PPE. The Union Plaintiffs continue to suffer injuries and damages to their core missions and to be required to divert scarce resources to address the dangers of PFAS-laden PPE. The Fire Fighter Plaintiffs and Fire Fighter Class have suffered and will continue to suffer injuries and damages to their health and wellbeing. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced and to warn the Plaintiffs and the public about the human and environmental risks posed by its PFAS. Defendants are strictly liable for all damages arising out of their defectively designed PFAS chemicals, and PPE products containing PFAS.

443.     As a direct and proximate result of Defendants' acts and omissions, the Purchaser Plaintiffs and Connecticut Purchaser Subclass have suffered and will continue to suffer injuries and damages to their public treasury, in investigation, replacement of fire fighter PPE, disposal of PFAS-laden PPE, education and training for employees exposed to PFAS-laden PPE on how to reduce and mitigate risks, and other injuries, for which Defendants are strictly, jointly, and severally liable.

97

444.    As a direct and proximate result of Defendants' acts and omissions, the Union Plaintiffs have suffered and will continue to suffer injuries and damages to their core missions and by diverting their scarce resources to address the dangers of PFAS-laden PPE, for which Defendants are strictly, jointly, and severally liable.

## B.  CPLA – NEGLIGENCE
(Against All Defendants)

445.    Plaintiffs re-allege and incorporate here the allegations set forth above.

446.    As a Product Seller and/or Manufacturer as defined by the CPLA, each Defendant had a duty of reasonable care to avoid manufacturing and selling fire fighter PPE, including turnout gear, fire proximity suits, and/or station wear, and/or components thereof, contaminated with detectable, unsafe levels of PFAS to its customers, including the Purchaser Plaintiffs and the Connecticut Purchaser Subclass, and end users, which include the Fire Fighter Plaintiffs, the Fire Fighter Class and members of the Union Plaintiffs.

447.    The Fire Fighter Plaintiffs and the Fire Fighter Class and members of the Union Plaintiffs were known end users of each Defendant's products and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent manufacture and design of the PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof.

448.    The Purchaser Plaintiffs and the Connecticut Purchaser Subclass were known purchasers of each of Defendant's products and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent manufacture and design of the PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof.

449.    Each Defendant owed its purchasers and its end users a duty of reasonable care to eliminate or minimize PFAS contamination in the fire fighter PPE sold to its customers.

98

450. Defendants knew or should have known that their PFAS chemicals, and PPE products containing PFAS were not safe and were likely to leach PFAS into fire fighters' skin and to be inhaled and to endanger their health. Defendants knew or should have known their PFAS chemicals, and PPE products containing PFAS, were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

451. The seriousness of the environmental and human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS chemicals, and PPE products containing PFAS, without disclosing the dangers posed to human health and the environment. The rights, interests, and inconvenience to the Plaintiffs and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS chemicals, and PPE products containing PFAS.

452. Defendants breached their duty to use reasonable care in one or more of the following ways:

> a. By failing to prevent the contamination of the fire fighter PPE and/or components thereof purchased by the Purchaser Plaintiffs and the Connecticut Purchaser Subclass and used by the Fire Fighter Plaintiffs and members of the Fire Fighter Class;
>
> b. By failing to cease the manufacture, sale, and/or distribution of PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof after learning of the adverse health consequences associated with exposure to PFAS;

    c.     By failing to reduce or minimize the PFAS contamination in fire fighter PPE and/or the components thereof manufactured, sold, and distributed by each Defendant;

    d.     By failing to design and manufacture PFAS-free fire fighter PPE, including turnout gear, fire proximity suits, and station wear, and/or components thereof as an alternative to the PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof after learning of the adverse health consequences associated with PFAS exposure;

    e.     By negligently failing to warn their products' purchasers and users, including Plaintiffs.

300.   Defendants failed to exercise ordinary care because a reasonably careful company would not manufacture or distribute those products, would warn of the products' toxic and environmentally hazardous properties and instruct on the proper use and disposal thereof to minimize or mitigate such risks, and/or would take steps to enhance the safety and/or reduce the toxicity, persistence, and other effects of the products, among other reasons.

301.   As a direct and proximate result of each Defendant's negligence, the Fire Fighter Plaintiffs and members of the Fire Fighter Class were and are being exposed to dangerous levels of PFAS and the heightened risk of disease, physical injuries and medical expenses, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience because of their exposure to Defendants' PFAS-laden PPE. The Purchaser Plaintiffs and the Connecticut Purchaser Subclass will bear replacement costs and other costs to eliminate and mitigate the health risks of PFAS-laden PPE. The Union Plaintiffs have suffered and continue to suffer diversion of their resources to address the dangers of PFAS-laden PPE to their members.

301.    Defendants are thus liable to these Plaintiffs and members of the Fire Fighter Class for fair compensation for the resulting injuries, which includes replacement costs, education and advocacy costs, pain and suffering, reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury, diminution in earning capacity, and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

### C.  CPLA – FAILURE TO WARN
(Against All Defendants)

302.    Plaintiffs re-allege and incorporate here the allegations set forth above.

303.    As a Product Seller and/or Manufacturer as defined by the CPLA, each Defendant had a duty to adequately warn foreseeable purchasers and users of its fire fighter PPE, including turnout gear, fire proximity suits, and/or station wear, including the Purchaser Plaintiffs, the Connecticut Purchaser Subclass, the Fire Fighter Plaintiffs, the Fire Fighter Class, and the Union Plaintiffs of the dangers posed by the PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof sold for use by the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs.

304.    Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and supplied the PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof for sale and sold the PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof to the Purchaser Plaintiffs and the Connecticut Purchaser Subclass for use by the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs.

305.    At the time Defendants manufactured, marketed, promoted, sold, and/or distributed PFAS chemicals, and PPE products containing PFAS, they knew or should have known their PFAS

chemicals and PPE products containing PFAS were not safe and were likely to endanger fire fighter health.

306. Defendants possess and have always possessed superior knowledge, resources, experience, and other advantages, in comparison to anyone or any agency, including the Plaintiffs, concerning the manufacture, distribution, nature, and properties of PFAS used in PPE and PFAS-containing PPE.

307. By virtue of their economic power and analytical resources, including the employment of scientists such as chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat PFAS posed and poses to the fire fighters, and to Plaintiffs in particular.

308. Defendants had a duty to provide reasonable instructions and adequate warnings about the environmental and health hazards posed by PFAS.

309. Despite Defendants' knowledge and expertise, they failed to provide adequate warnings that their PFAS chemicals, and PPE products containing PFAS, were toxic and would cause this contamination, and to provide adequate instructions to minimize, mitigate, reduce, control, or eliminate such risks.

310. Defendants' PFAS chemicals, and PPE products containing PFAS were not reasonably safe at the time they left the Defendants' control because they lacked adequate warnings and instructions.

311. An adequate warning would have diminished the volume of PFAS absorbed or ingested by fire fighters or eliminated the use of PFAS-laden PPE altogether.

312. Defendants could have warned of this danger but failed to do so and intentionally concealed information to maximize their profits.

102

313.    Defendants continued to conceal the dangers of PFAS after they manufactured, distributed, marketed, promoted, and sold PFAS and PPE Products containing PFAS.

314.    Without adequate warnings or instructions, Defendants' PFAS and PPE products containing PFAS were unsafe to an extent beyond that which would be contemplated by an ordinary person.

315.    The facts relating to the hazards which PPE-related PFAS pose to fire fighters generally and to Plaintiffs in particular are not the sort of facts which the Purchaser Plaintiffs, the Connecticut Purchaser Subclass, the Fire Fighter Plaintiffs, members of the Fire Fighter Class or members of the Union Plaintiffs or the general public could ordinarily discover or protect themselves against absent sufficient warnings.

316.    Defendants knowingly failed to issue warnings or instructions concerning the environmental and human health dangers of PFAS, including contrary to the manner in which a reasonably prudent manufacturer would act in the same or similar circumstances

317.    The Fire Fighter Plaintiffs and members of the Fire Fighter Class utilized Defendants' PFAS-contaminated fire fighter PPE in a reasonably foreseeable and intended manner.

318.    Defendants' conduct caused and continues to cause injury to the Plaintiffs. The Fire Fighter Plaintiffs, and members of the Fire Fighter Class, were and are being exposed to dangerous levels of PFAS and the heightened risk of disease, physical injuries and medical expenses, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience because of their exposure to Defendants' PFAS-laden PPE. The Purchaser Plaintiffs and the Connecticut Purchaser Subclass, bear and continue to bear replacement costs and other costs to eliminate and mitigate the health risks of PFAS-laden PPE. The Union Plaintiffs have suffered and continue to suffer diversion of their resources to address the dangers of PFAS-laden PPE to their members.

319. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced and to warn Plaintiffs and the public about the human and environmental risks posed by PFAS and PFAS-laden PPE.

320. Defendants are strictly, jointly, and severally liable for all damages arising out of their failure to provide adequate warnings and instructions.

321. Defendants acted with reckless indifference to the Purchaser Plaintiffs and the Connecticut Purchaser Subclass, as well as to health and safety of the Fire Fighter Plaintiffs, the members of the Fire Fighter Class and members of the Union Plaintiffs by failing to provide adequate warnings of the known dangers of the PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof.

### D.  CPLA – NEGLIGENT DESIGN AND MANUFACTURE
(Against all Defendants)

322. Plaintiffs re-allege and incorporate here the allegations set forth above.

323. As a Product Seller and/or Manufacturer as defined by the CPLA, each Defendant engaged in testing, developing, designing, marketing, distributing, manufacturing, promoting, and selling the PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof purchased by the Purchaser Plaintiffs and the Connecticut Purchaser Subclass, and worn by the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs.

324. As a Product Seller and/or Manufacturer pursuant to the CPLA, each Defendant had a duty to make and sell fire fighter PPE and/or component thereof which were reasonably fit, suitable, and safe for their intended and/or foreseeable uses.

325. Each Defendant owed that duty to: (1) purchasers of the fire fighter PPE and (2) reasonably foreseeable users of the fire fighter PPE.

326.    The fire fighter PPE and/or components thereof manufactured and sold by the Defendants was used in a reasonably foreseeable manner and without substantial change in the condition thereof by the Fire Fighter Plaintiffs, members of the Fire Fighter Class and members of the Union Plaintiffs, and the fire fighter PPE was defective and unfit for its foreseeable use.

327.    At the time Defendants manufactured, distributed, and sold the fire fighter PPE and/or components thereof used by the Fire Fighter Plaintiffs, members of the Fire Fighter Class and members of the Union Plaintiffs, Defendants knew of the defective and unreasonably dangerous condition of the fire fighter PPE and/or components thereof that they manufactured and distributed.

328.    Defendants therefore knew or should have known that use of the fire fighter PPE worn by the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs would result in their exposure to and absorption and ingestion of unsafe, dangerous concentrations of PFAS Chemicals.

329.    The fire fighter PPE and/or components thereof developed, manufactured, distributed and sold by Defendants were defective in design and unreasonably dangerous because, among other things:

   a.    PFAS Chemicals, including but not limited to PFOA and PFOS, cause extensive and persistent contamination when they come into contact with skin, inhaled, or otherwise ingested;

   b.    Fire fighter PPE contaminated with detectable levels of PFAS Chemicals, including PFOA and PFOS, poses a significant threat to the health, safety, and welfare of fire fighters, who absorb PFAS Chemicals through their skin,

inhale, or otherwise ingest it when the PFAS Chemicals migrate out of the fabric; and

c.  Defendants did not design the fire fighter PPE and/or components thereof to prevent the dermal absorption, ingestion, or inhalation of PFAS Chemicals.

330.  Defendants failed and refused to implement changes in the design of the fire fighter PPE and/or components thereof that would have reduced or eliminated the dangers posed by the presence of PFAS in the fire fighter PPE, further exposing the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs to dangerous levels of PFAS Chemicals through their ordinary and intended use of fire fighter PPE and components thereof designed, manufactured, distributed, and sold by the Defendants.

331.  Throughout their conduct, Defendants failed to utilize the care required of a reasonably prudent manufacturer and seller of fire fighter PPE and/or components thereof under the circumstances, and the fire fighter PPE worn by the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs was, as a result of Defendants' conduct, defective and unreasonably dangerous.

332.  The defective and unreasonably dangerous condition of the fire fighter PPE and its component parts existed at the time the fire fighter PPE and its component parts were manufactured, distributed, and sold by Defendants.

333.  Defendants expected the fire fighter PPE to reach its ultimate user without substantial change in the condition in which the fire fighter PPE and its component parts were designed and manufactured, and the fire fighter PPE and its component parts did reach Plaintiffs,

Plaintiffs' members and employees, and members of the Fire Fighter Class without substantial change in condition.

334.    The foreseeable risk to the health and welfare of the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs posed by Defendants' fire fighter PPE and its component parts outweighs the cost to Defendants of reducing or eliminating such risk.

335.    Defendants knew or should have known about reasonably safer and feasible alternatives to the fire fighter PPE and/or its component parts manufactured and sold during the Class Period.

### E.  CPLA – MEDICAL MONITORING
(Fire Fighter Plaintiffs and Fire Fighter Class Against all Defendants)

336.    As a direct and proximate result of Defendants' conduct, including the design, manufacture, distribution, and sale of the PFAS-contaminated fire fighter PPE and/or the PFAS-contaminated components thereof, the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs have been exposed to hazardous levels of PFAS Chemicals through the dermal absorption, ingestion, and inhalation of PFAS Chemicals.

337.    The Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs' exposure to PFAS described herein has caused physical injuries and produced cellular changes in their bodies that substantially increase the risk of their developing cancers and other serious diseases, illnesses, and injuries as a result of their PFAS exposure.

338.    The Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs are at an increased risk of developing cancers and other illnesses, diseases, and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

107

339.    Effective medical testing for reliably early detection of cancers and other diseases and conditions related to PFAS Chemical exposure exists.

340.    Early detection, combined with prompt and effective treatment, will significantly decrease the risk of death and the severity of diseases, illnesses, and injuries for the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs.

341.    Such testing is periodically necessary and conforms with the standard of medical and scientific care when such PFAS exposures are known.

342.    Diagnostic testing of the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs for early detection of cancers and other illnesses, diseases, and disease processes caused by exposure to PFAS Chemicals is thus reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

343.    A medical monitoring program will allow for early detection and prompt and effective treatment of any serious disease, illness, or injury caused by PFAS exposure. A medical monitoring program will save lives, decrease the severity of illness, decrease the impact of illness on lives and families, and reduce the costs of caring for such illnesses, and are periodically necessary.

344.    The present value of the reasonable cost of such tests now and into the future can be calculated and known with reasonable certainty after further discovery is made.

345.    In the event that a stand-alone claim for medical monitoring cannot be maintained, Plaintiffs request in the alternative that medical monitoring be awarded as a form of relief in connection with their remaining claims.

## F.  CPLA – STATUTORY PUNITIVE DAMAGES
(Against all Defendants)

346.    The harm suffered by the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and the other Plaintiffs was the result of Defendants' reckless disregard for the safety of their product users and consumers, who were injured by their conduct.

347.    At all times relevant, the Defendants owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the Purchaser plaintiffs and the Connecticut Purchaser Subclass, as well as the health, safety, and well-being of the Fire Fighter Plaintiffs, members of the Fire Fighter Class and members of the Union Plaintiffs.

348.    Defendants were at all relevant times aware of the considerable health risks that can result from exposure to PFAS Chemicals and PFAS-contaminated fire fighter PPE, including the risk of causing various forms of cancer to fire fighters who were required to wear PFAS-contaminated fire fighter PPE repeatedly and over a span of years and decades.

349.    Defendants were at all relevant times aware that the fire fighter PPE and/or components thereof that they were selling for use by the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs was contaminated with significant quantities of PFAS.

350.    Defendants therefore at all relevant times knew that their design, manufacture, and sale of PFAS-contaminated fire fighter PPE and/or PFAS-contaminated components thereof would be likely to result in the exposure of the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs to PFOA and PFOS and other PFAS Chemicals, via dermal absorption, inhalation, and ingestion, which would likely cause significant personal injury to the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs.

109

351.    Notwithstanding this knowledge, Defendants acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the Purchaser Plaintiffs, the Connecticut Purchaser Subclass, and the health, safety, and well-being of the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs by, among other things:

a.    Failing to take reasonable steps to minimize and/or eliminate the presence of PFAS Chemicals in fire fighter PPE and/or the components thereof;

b.    Selling fire fighter PPE and/or components thereof for use by the Fire Fighter Plaintiffs, members of the Fire Fighter Class and members of the Union Plaintiffs that Defendants knew had significant and detectable (and therefore dangerous) concentrations of PFAS Chemicals and were thus likely to cause personal injury to the Fire Fighter Plaintiffs, members of the Fire Fighter Class and members of the Union Plaintiffs;

c.    Failing and refusing to implement changes in the design of the fire fighter PPE and/or the components thereof, including the utilization of alternative materials, that would have reduced the PFAS exposure to the Fire Fighter Plaintiffs, members of the Fire Fighter Class and members of the Union Plaintiffs to non-detectable levels despite knowing that the failure to do so would result in significant personal injury to the Fire Fighter Plaintiffs, members of the Fire Fighter Class, and members of the Union Plaintiffs; and

d.    Failing to warn Plaintiffs, Plaintiffs' members and employees, and members of the Fire Fighter Class that the fire fighter PPE and/or components thereof

110

that the Fire Fighter Plaintiffs and members of the Fire Fighter Class were routinely required to wear and that was designed, manufactured, and sold by Defendants, would result in significant personal injury to them.

352. As a direct and proximate result of Defendants' willful, wanton, and reckless conduct, the Purchaser Plaintiffs and the Connecticut Purchaser Subclass suffer and will continue to suffer the costs of replacing fire fighter PPE and other costs to mitigate and eliminate their dangers. The Fire Fighter Plaintiffs, members of the Fire Fighter Class suffered, presently suffer, and will continue to suffer personal injuries, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience. The Union Plaintiffs suffer the diversion of scarce resources to address the dangers of PFAS-laden PPE.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves, their members, and members of the Fire Fighter Class and the Connecticut Purchaser Subclass seek monetary and equitable relief, including:

1. Compensatory damages;

2. Attorneys' fees and costs pursuant to CONN. GEN. STAT. § 52-240a;

3. Statutory punitive damages pursuant to CONN. GEN. STAT. § 52-240b;

4. Statutory punitive damages pursuant to CONN. GEN. STAT. § 42a-110g(a);

5. Attorneys' fees and costs pursuant to CONN. GEN. STAT. § 42a-110g(d);

6. Equitable relief in the form of orders directing each Defendant to: a) correct its unfair and deceptive practices, b) contribute to the establishment of a diagnostic medical testing program and medical monitoring protocol for the Fire Fighter Plaintiffs and the Fire Fighter Class to monitor individuals' health and diagnose at an early stage any ailments that can result from exposure to PFAS Chemicals; and

111

7.    Such other relief as the Court deems appropriate.

WHEREFORE Plaintiff the Nationwide Purchaser Class seeks monetary relief including:

1.    Compensatory damages, and

2.    Such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury as to all issues so triable as a matter of right.

DATED:         April 21, 2025              Respectfully submitted,

**SILVER GOLUB & TEITELL LLP**

*/s/ Jennifer Sclar*
Jennifer Sclar (ct31554)
Ian W. Sloss (ct31244)
Kate Sayed (ct31667)
Samantha Blend (*pro hac vice forthcoming)*
ONE LANDMARK SQUARE, 15th FLOOR
STAMFORD, CT  06901
Tel. (203) 325-4491
isloss@sgtlaw.com
jsclar@sgtlaw.com
ksayed@sgtlaw.com

**GRANT & EISENHOFFER P.A.**

*/s/ Kyle J. McGee*
Kyle J. McGee (*pro hac vice forthcoming*)
Viola Vetter (*pro hac vice forthcoming*)
Jason H. Wilson (*pro hac vice forthcoming*)
Suzanne Sangree (*pro hac vice forthcoming*)
123 S. JUSTISON STREET
WILMINGTON, DE  19801
Tel.: (302) 622-7000
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com
ssangree@gelaw.com

*Attorneys for Plaintiffs*

# EXHIBIT 1





## Find a 3M Sales Rep - Safety and Industrial Solutions

To find a 3M Sales Rep, select the Product Specialist and enter your zip code below.

If you need general assistance to find out where to buy products, please **click here to go to the 3M Where to Buy page.**



| Specialist Name | Product Specialist | Email | Phone |
|---|---|---|---|
| RYAN NEAL | 3M Industrial Adhesives & Tapes Specialist | rneal@mmm.com | |
| BRANDON MILLAN | 3M Fire Specialist - SCBA | bsmillan@mmm.com | +1 (401) 965-1376 |
| THOMAS KALIS | 3M Abrasives Specialist | tkalis@mmm.com | |
| DANIEL CARTAGENA | 3M Collision Customer Specialist | dcartagena@mmm.com | |
| MATT BISSELL | 3M Electrical Customer Specialist | mbissell@mmm.com | |
| SARA LIND | 3M Packaging Specialist | slind2@mmm.com | |
| RYAN FENSTERMAKER | 3M Fire Barrier, Air Barrier & Insulation Cladding | rfenstermaker@mmm.com | +1 (732) 921-1503 |
| ALEX ZUPONECK-CARLSON | 3M Military and Federal Agency | acarlson7@mmm.com | +1 (540) 967 7844 |
| KAMELAH BARNETT | 3M Healthcare & Emergency Preparedness | kjefferson@mmm.com | +1 (202) 253-6950 |
| TODD STEVENSON | 3M Safety Specialist | t-stevenson@mmm.com | +1 (860) 770-9521 |
| KARL BERTELMANN | 3M Fall Protection Specialist | kbertelmann@bbcsgroup.com | +1 (508) 878-5137 |

# EXHIBIT 2



### Crop Protection Products Finder

**114 Products Found**

**Filter by Product Category**



Select Category

**Filter by Crop Type**

Select Crop

**Filter by State Registration**

Connecticut

**Accent® Q**

Herbicide

See how Accent® Q herbicide delivers selective postemergence grass and broadleaf weed control in field corn, seed corn, sweet corn and popcorn.

**Afforia®**

Herbicide

See how Afforia® herbicide helps achieve a clean seedbed with

# EXHIBIT 3



Products    Downloads    FAQ    Where to buy    🌐 United States ⌄

**DUPONT**    PBS Home    Products    Warranties    Applications    Solutions    News    Resources    About Us    Contact Us    🔍

## Dealer Locator

Zip/Postal Code*
06901

Zip/Postal Code Range
25 Miles

Show Results    Clear All

Showing closest results to **Stamford, CT 06901, USA**.
To refine results, select from the options below

Filter by    **Product Name**    Clear All

☐ MOR-AD™ Laminating Adhesive          ☐ Betafuse™ Laminating Adhesive          ☐ DuPont™ Adhesive/Primer          ☐ DuPont™ Flashing Tape
☐ DuPont™ FlexWrap™                    ☐ DuPont™ FlexWrap™ EZ                   ☐ DuPont™ RainVent™ Batten         ☐ DuPont™ Residential Sealant
☐ DuPont™ Sealant for Tyvek® Fluid     ☐ DuPont™ Sill Pan                       ☐ DuPont™ StraightFlash™           ☐ DuPont™ VersaFlange™
Applied System
☐ ENERFOAM™ Professional Foam Sealant  ☐ Froth-Pak™ Accessories                ☐ Froth-Pak™ Foam Insulation Kits  ☐ Froth-Pak™ Foam Insulation Refillable
                                                                                                                      Cylinders
☐ Froth-Pak™ Foam Sealant Kits         ☐ Froth-Pak™ Foam Sealant Refillable    ☐ Great Stuff Pro™                 ☐ Great Stuff™
                                         Cylinders
☐ Insta Stik™ Quik Set                 ☐ LIQUIDARMOR™ - CM Flashing and        ☐ LiquidArmor™ Flashing & Sealant  ☐ LIQUIDARMOR™ - LT Flashing and
                                         Sealant                                                                    Sealant

**1** Interstate & Lakeland Lumber
120 Selleck Street, Stamford,
CT 06902
Phone: (203) 348-3761
Distance : 1.12 mi.
Get Directions

**2** Ring's End
181 West Ave, Darien,
CT 06820-4312
Distance : 3.12 mi.
Get Directions



# EXHIBIT 4



# EXHIBIT 5



Home/ Firefighter Protective Clothing/ Turnout Jackets/ Globe ATHLETIX™Jacket

# Globe ATHLETIX™ Jacket

Innovative material technology enables an all-new athletic design with unique stretch fabrics that allow closer, body-contoured fit to provide unprecedented range of motion with less bulk, more flexibility, and lighter weight.

- More streamlined design with vertical seaming reduces oversize in front chest, bulk under SCBA, and stiffness in front closure
- PSI® STRETCH XT fabric with KEVLAR® allows closer, less bulky fit with unprecedented range of motion and more flexibility while providing premium thermal break open protection
- Fabric is finished with the FreeFAS durable water repellent, which is made without the use of intentionally added PFAS
- PSI® Stretch XT is built with ENFORCE'" Technology which increases the trap tear performance when compared to the prior version of PSI® Stretch
- More flexible seams are safety-stitched and double-needle top-stitched for strength but are less bulky and lay flatter

- **ASKAQUESTION**

WHERE TO BUY

( **REQUEST A DEMO** )

(,," SIF11'._ Certified toFPA 1971
(Structural Frre Fighting)
'-:Y MADE IN rnEU.SA



# EXHIBIT 6

# THE GORE TEAM

**JEFF JUNG**
Commercial Sales Leader
jeffjung@wlgore.com // 443.566.2469

**TROY GEIGER**
LES / Tech Rescue / CBRN Engineer
tgeiger@wlgore.com // 443.566.2310

**WADE KELLY**
Footwear Specialist/Business Development
wkelly@wlgore.com // 410.642.4103

**LISA TREVISAN**
Seminar Coordinator / Admin Support
ltrevisa@wlgore.com // 443.810.0182

**LUKE VOTAW**
Structural Fire Engineer
lvotaw@wlgore.com // 443.566.6232

**GEORGE HAJNASR**
Region: Northeast / Canada
ghajnasr@wlgore.com // 518.898.6740

**PAUL BENN**
Region: North Central
pbenn@wlgore.com // 630.219.8126

**TRAVIS DAVIS**
Region: Southeast
trdavis@wlgore.com // 443.553.3099

**RYAN HEMANS**
Region: Western US
rhemans@wlgore.com // 443.553.9895

**MATT WOOD**
Region: South Central / Virginia
mdwood@wlgore.com // 682.540.6061

**SEBASTIAN PAINCEIRA**
Region: Latin America
spaincei@wlgore.com // +54.911.4165.4700



# EXHIBIT 7

**Honeywell** | INDUSTRIAL AUTOMATION

Products   Software   Services   Industries   Support   News & Events   About Us

You are browsing the product catalog for    United States

⌂ > Products > Personal Protective Equipment > First Responder Gear > Structural Turnout Gear > Morning Pride® TAILS™ – Structural Turnout Gear

**STRUCTURAL TURNOUT GEAR**

# Morning Pride® TAILS™ – Structural Turnout Gear

Honeywell Morning Pride® TAILS™: The best just got better

Overview       Resources       Part Number

[ SUPPORT ]      [ WHERE TO BUY ]      [ CONTACT US ]

Honeywell Morning Pride® TAILS™ have been re-engineered using advanced patterning technology to provide a better fit, new features, and allow more range of motion and protection. The new Honeywell Morning Pride® TAILS™ have added new ergonomic and safety refinements.

The new Morning Pride® TAILS™ retain the classic features and benefits of the original that you probably wear, but have been re-engineered to provide a better fit, new features, and allow more range of motion and protection.

Now, all firefighters, including larger and smaller sized responders, can expect greater comfort, mobility and safety on the fireground.

PART OF THE MORNING PRIDE SERIES

**Click here to view the Morning Pride™ TAILS Overview Video**
Features and Benefits:

The Benefits You Rely On:

⌕

⬇ Save this page as PDF

**Honeywell** | INDUSTRIAL AUTOMATION

Products   Software   Services   Industries   Support   News & Events

⌂ > Where to Buy > Safety

# Personal Protective Equipment – Partner Locator

Interested in our Honeywell Personal Protective Equipment products? Explore the map to find an authorized distributor near you.
To shop our PPE at retail visit *ppe.honeywell.com*



| Select Country | Categories | Product Lines | Connecticut, USA | SEARCH | RESET |

CONTACT SALES

**Airgas Store Brookfield**
604 Federal Rd
Brookfield, Connecticut 6804
United States
Visit Airgas Store Brookfield online

[ DETAILS ]

**Airgas Store Cheshire**
140 Commerce Ct
Cheshire, Connecticut 6410
United States
Visit Airgas Store Cheshire online

1–28 of **28** Partners

# EXHIBIT 8





# EXHIBIT 9



NEWS    CAREERS    CONTACT US

WHO WE ARE    MARKETS ∨    INNOVATIONS

# We're part of a bigger family

Safety Components operates as part of Elevate Textiles with worldwide operations in the United States, Mexico, and China. Elevate Textiles offers global textile brands including American & Efird, Burlington, Cone Denim, Gütermann and Safety Components.

            Gütermann

# An Elevate Textiles Company

With a global array of premium fabric and thread solutions focused on innovation, sustainability and quality craftsmanship, Elevate Textiles provides products that surround us every day and in all facets of life. We offer advanced, high quality products and mission critical textile solutions across vast industries including fashion and functional apparel, footwear, military, fire, medical, athletic, automotive, aerospace, outdoor, and other specialty sectors. Elevate Textiles is committed to delivering solutions that protect and enhance our lives through its global manufacturing platform that includes 37 facilities across six continents and over 15,000 employees.





# North American Sales

### Western Region

Bill Black
858-243-4371
bblack@safetycomponents.com

### Midwest Region

Richard Lawrence
405-550-3733
rlawrence@safetycomponents.com

### Northeast Region

Dan Doyle
412-651-3976
ddoyle@safetycomponents.com

### Southern Region

Greg Yates
817-692-3263
gyates@safetycomponents.com

### Southeast Region

Guy Lucas
864-905-3416
glucas@safetycomponents.com

# EXHIBIT 10



# CONNECT WITH US

### OUR TEXTILE TEAM IS HERE FOR YOU

**Questions? Contact us today**

Are you a current customer?

Please Select

Market*

Please Select

First Name*

Last Name*

Business Email*

Phone number*

United  +1

Company*

Country*

Please Select

Message*

**FOLLOW OUR TEXTILE BUSINESS ON SOCIAL MEDIA**



# Milliken Horizon™ Outer Shell

COLORS:



CONTACT US  →

Milliken Horizon™ is a lightweight, non-PFAS outer shell fabric that maintains its color and tear strength, wash after wash and call after call.

