**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNIFORMED PROFESSIONAL FIRE FIGHTERS ASSOCIATION OF CONNECTICUT; STAMFORD PROFESSIONAL FIRE FIGHTERS ASSOCIATION, INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS LOCAL 786; FAIRFIELD FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 1426; STRATFORD PROFESSIONAL FIRE FIGHTERS, IAFF LOCAL 998; HAMDEN PROFESSIONAL FIRE FIGHTERS, IAFF LOCAL 2687; CITY OF GROTON FIRE FIGHTERS UNION, IAFF LOCAL 1964; HARTFORD FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 760; NEW CANAAN FIRE DEPARTMENT, IAFF LOCAL 3224; TORRINGTON FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 1567; WESTPORT UNIFORMED FIREFIGHTERS ASSOCIATION, IAFF LOCAL 1081; WILTON FIRE FIGHTERS, IAFF LOCAL 2233; SIKORSKY AIRCRAFT FIRE FIGHTERS, IAFF LOCAL I-68; NORWALK PROFESSIONAL FIRE FIGHTERS ASSOCIATION, IAFF LOCAL 830; THE RELIANCE FIRE COMPANY, INC.; PETER BROWN; PAUL ANDERSON; STEVE MICHALOVIC; DAN TOMPKINS; NELSON HWANG; WILLIAM TUTTLE; BRIAN DOANE; ARTURO ROSA; TIMOTHY E. O'DONNELL; JOE ROUSSO; MATTHEW WILLE; and TOM REICH, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

Civil No. 3:24-CV-1101 (AWT)

3M COMPANY (f/k/a MINNESOTA MINING AND MANUFACTURING COMPANY), EIDP, INC., DUPONT DE NEMOURS, INC., CHEMOURS COMPANY, CHEMOURS COMPANY FC, LLC, CORTEVA, INC., ELEVATE TEXTILES, INC., GENTEX CORPORATION, GLOBE MANUFACTURING COMPANY, LLC, W.L. GORE & ASSOCIATES, INC., FIRE-DEX GW, LLC, HONEYWELL SAFETY PRODUCTS USA, INC., INNOTEX CORP., INTERTECH GROUP, INC., LION GROUP, INC., LAKELAND INDUSTRIES, INC., MILLIKEN & COMPANY, MORNING PRIDE MANUFACTURING L.L.C., PBI PERFORMANCE PRODUCTS, INC., SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC., STEDFAST USA, INC., SOUTHERN MILLS, INC. d/b/a TENCATE PROTECTIVE FABRICS USA, and VIKING LIFE-SAVING EQUIPMENT AMERICA, INC.,

Defendants.

-------------------------------- x

**RULING ON DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM**

Defendant 3M moves to dismiss the Second Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The remaining defendants[1] – hereafter referred to as the Remaining Moving Defendants – also move to dismiss the Second Amended Complaint for lack of subject matter jurisdiction pursuant to

[1] Defendant Innotex Corp. joined the Remaining Moving Defendants' Motion to Dismiss, with the exception of one citation. See Notice by Innotex Corp. (ECF No. 421).

Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons below, 3M's Motion to Dismiss is being granted in part and denied in part, and the Remaining Moving Defendants' Motion to dismiss is also being granted in part and denied in part.

## I. BACKGROUND

The Second Amended Complaint sets forth claims against the defendants for "harm resulting from the purchase, use of, and dependence upon certain fire fighter personal protective equipment ('PPE') containing hazardous levels of toxic, carcinogenic per- and polyfluoroalkyl substances ('PFAS' or 'PFAS Chemicals.')." Second Amended Complaint (ECF No. 215) ("SAC") ¶ 2. The plaintiffs allege that the "[d]efendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the equipment, materials, and/or chemicals in Connecticut and caused harm to Plaintiffs, Plaintiffs' members, and members of the Class in Connecticut." Id. ¶ 69.

There are two categories of plaintiffs. The first category is "the UPFFA, a statewide labor organization representing all Professional Firefighters in the state of Connecticut, [and] twelve professional local fire fighter unions" (hereafter, the

"Union Plaintiffs"). SAC ¶ 1. Second, "twelve individual fire fighters . . . sue on behalf of themselves and other Connecticut fire fighters who are similarly situated" (hereafter, the "Firefighter Plaintiffs"). Id.

## II. LEGAL STANDARD

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it[.]'" Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l., 790 F.3d 411, 416-17 (2d. Cir. 2015) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). On a Rule 12(b)(1) motion to dismiss, the party asserting subject matter jurisdiction "bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005).

When deciding a motion to dismiss under Rule 12(b)(1), the court must accept as true all material factual allegations in the complaint. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

> When the Rule 12(b)(1) motion is facial, i.e., based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the "Pleading"), the plaintiff has no evidentiary burden. See, e.g., Amidax, 671 F.3d at 145. The task of the district court is to determine whether the Pleading "allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." Id.

Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016); see also John v. Whole Foods Mkt. Group, Inc., 858 F.3d 732, 737 (2d Cir. 2017) (further internal quotation marks and citations omitted) ("When the defendant asserts a 'facial' challenge to standing . . . courts should continue to draw from the pleadings all reasonable inferences in the plaintiff's favor and are to presum[e] that general allegations embrace those specific facts that are necessary to support the claim.").

"[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." Allen v. Wright, 468 U.S. 737, 752 (1984). "[A] plaintiff must demonstrate standing separately for each form of relief sought." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000).

"Standing is 'the threshold question in every federal case' . . . . Once this threshold is crossed, a plaintiff must still establish the elements of its causes of action to proceed with its case." In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig., 725 F.3d 65, 105 (2d Cir. 2013) (citations omitted).

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to

the plaintiff. See Scheuer, 416 U.S. at 236. Although a complaint "does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." Twombly, 550 U.S. at 555 (citations and internal quotations omitted). However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

"The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight

of the evidence which might be offered in support thereof.'" Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)). The issue on a motion to dismiss "is not whether [the] plaintiff will prevail, but whether [the plaintiff] is entitled to offer evidence to support his claims." United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 236).

In its review of a motion to dismiss for failure to state a claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993). "[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

## III. DISCUSSION

### A. Standing

"To pursue a claim in federal court, a plaintiff must satisfy the requirements of constitutional standing, a principle established by the 'case or controversy' requirement of Article III of our Constitution." In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig., 725 F.3d at 104.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)).

"It is well established that a plaintiff must demonstrate standing for each claim [s]he seeks to press . . . . [and] [t]hus, with respect to each asserted claim, [a] plaintiff must always have suffered a distinct and palpable injury to [her]self." Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 64 (2d Cir. 2012) (internal citations omitted).

#### 1. Purchaser Plaintiffs

The plaintiffs filed a Notice of Voluntary Dismissal of the claims of the City of Stamford and Old Mystic Fire District, both Purchaser Plaintiffs. See Notice of Voluntary Dismissal of

City of Stamford and Old Mystic Fire District (ECF No. 360). Consequently, the plaintiffs voluntarily dismissed three of the four claims in this case; the claims dismissed were brought by the City of Stamford, Old Mystic Fire District, and the Reliance Fire Company, Inc. See Order Approving Notice of Voluntary Dismissal (ECF No. 375). Therefore, the Purchaser Plaintiffs were terminated as parties, see id., and the court need not consider whether they have standing.

**2. Union Plaintiffs**

The Union Plaintiffs seek the establishment of a medical monitoring program and damages.

The Union Plaintiffs are organizations. See SAC ¶ 1. There are two ways in which an organization can have standing:

> It may sue on behalf of its members, in which case it must show, inter alia, that some particular member of the organization would have had standing to bring the suit individually. See, e.g., Warth v. Seldin, 422 U.S. 490, 511 (1975) (calling this approach "representational" standing); Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 649 (2d Cir. 1998) (calling it "associational" standing). In addition, an organization can "have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." Warth, 422 U.S. at 511; Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 n.19 (1982) ("[O]rganizations are entitled to sue on their own behalf...."). Under this theory of "organizational" standing, the organization is just another person—albeit a legal person—seeking to vindicate a right. To qualify, the organization itself "must 'meet[ ] the same standing test that applies to individuals.'" Irish Lesbian & Gay Org., 143 F.3d at 649.

New York Civil Liberties Union v. New York City Transit Auth.,

684 F.3d 286, 294 (2d Cir. 2012) (parallel citations omitted).[2] The Union Plaintiffs "bring this action against Defendants pursuant to the Connecticut Product Liability Act . . . on behalf of themselves and the Fire Fighter Class." SAC ¶ 6. In other words, the Union Plaintiffs assert both organizational and associational standing.

**a. Organizational Standing**

All of the defendants assert that the Union Plaintiffs lack organizational standing. The court disagrees.

"Like an individual, an organization may not establish standing simply based on the 'intensity of the litigant's interest' . . . 'no matter how longstanding the interest and no matter how qualified the organization[.]'" Food & Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 394 (2024) (internal citations omitted). Instead, an organization must demonstrate "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources" which "constitutes far more than simply a setback to the organization's abstract social interests." Havens, 455 U.S. at 379. "An organization cannot manufacture its own standing" by "simply . . . expending money

[2] The Remaining Moving Defendants assert that "[t]he complaint does not establish third-party standing." Remaining Defs.' Mem. at 24. The plaintiffs state that "[t]he Union Plaintiffs do not seek third-party standing." Pls. Mem. at 29, n.5. The court therefore does not address the defendants' argument as to third-party standing.

to gather information and advocate against the defendant's action." All. for Hippocratic Med., 602 U.S. at 394; see also Farm Sanctuary v. U.S. Dept. of Agric., 2026 WL 1030616, at *2 (2d Cir. Apr. 16, 2026) ("the diversion of an organization's resources or frustration of its mission . . . are inadequate to establish standing"). Unlike the organization in Alliance for Hippocratic Medicine, the organization in Havens, HOME, was "[c]ritically . . . not only an issue-advocacy organization, but also operated a housing counseling service." All. for Hippocratic Med., 602 U.S. at 395. Thus, "Haven's actions directly affected and interfered with HOME's core business activities." Id.; see also Havens, 455 U.S. at 379 ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."); Farm Sanctuary, 2026 WL 1030616 at *2 (declining to find that organizations had standing based on, inter alia, allegations of "increase[ed] . . . expenditures by increasing the number of pigs" that would require placement at sanctuaries; "significant costs" that would be incurred "to overhaul [the organization's] corporate engagement programs, re-train its volunteers, and develop new education materials;" and the loss of "access to information on which [the organization] relies for

its advocacy work").

Among the Union Plaintiffs is the Uniformed Professional Fire Fighters Association of Connecticut ("UPFFA"), which has as a "primary focus" "the health, safety, and well-being of its members." SAC ¶ 9. The Second Amended Complaint alleges that, as an affiliate of the International Association of Fire Fighters ("IAFF"), the UPFFA is bound by the IAFF's Constitution and By-Laws. See id. ¶¶ 10, 12. "The IAFF's Constitution and By-Laws provide that the objects of the International Association shall be to . . . b. secure just compensation for their services and equitable settlement of their grievances; c. promote as safe and healthy a working environment for fire fighters and emergency medical and rescue workers as is possible through modern technology; . . . g. encourage the formation of sick and death benefit funds; to promote the research and treatment of burns and other related health problems common to fire fighters and emergency medical and rescue workers . . . ." Id. ¶ 11(b), (c), and (g). The other Union Plaintiffs are likewise affiliates of the IAFF and members of the UPFFA. See id. ¶ 18 (The Fairfield Fire Fighters Association, IAFF Local 1426); ¶ 19 (Stratford Professional Fire Fighters, IAFF Local 988); ¶ 20 (Hamden Professional Fire Fighters, IAFF Local 2687); ¶ 21 (Groton Fire Fighters Union, IAFF Local 1694; ¶ 22 (Hartford Fire Fighters Association, IAFF Local 760); ¶ 23 (New Canaan Fire Department,

IAFF Local 3224); ¶ 24 (Torrington Fire Fighters Association, IAFF Local 1567); ¶ 25 (Westport Uniformed Firefighters Association, IAFF Local 1081); ¶ 26 (Wilton Fire Fighters, IAFF Local 2233); ¶ 27 Sikorsky Aircraft Fire Fighters, IAFF Local I-68); ¶ 28 (Norwalk Professional Fire Fighters Association, IAFF Local 830).

The plaintiffs allege in the Fourth Claim for Relief that the "[d]efendants' conduct requires . . . the Union Plaintiffs to divert resources to advocate for safe PPE, to organize and educate members about the PFAS risk in PPE and how to minimize or eliminate them, among other injuries." SAC ¶ 440. The Second Amended Complaint also alleges in the Forth Claim for Relief that "[t]he Union Plaintiffs continue to suffer injuries and damages to their core missions and to be required to divert scarce resources to address the dangers of PFAS-laden PPE." Id. ¶ 442. See also id. ¶¶ 444, 454, 472, 506 (making the same allegation).

The Remaining Moving Defendants contend that the Union Plaintiffs have not pleaded an injury-in-fact for purposes of establishing organizational standing because their "only alleged injury is that they have directed resources toward researching and educating their members about the alleged harms of PFAS." Remaining Defs.' Mem. in Support of Mot. to Dismiss for Lack of Subject Matter Juris. and Failure to State a Claim ("Remaining

Defs.' Mem.") (ECF No. 245-1) at 23.[3] The Remaining Moving Defendants cite to Alliance for Hippocratic Medicine, 602 U.S. 367, for the proposition that "[a]n organization cannot manufacture standing by diverting resources in response to a defendant's actions." Remaining Defs.' Mem. at 23. 3M likewise cites to Alliance for Hippocratic Medicine in support of its contention that the Union Plaintiffs "alleging a diversion-of-resources injury" is insufficient to establish "organizational standing to seek their own damages." 3M Mem. in Support of Mot. to Dismiss for Lack of Subject Matter Juris. and Failure to State a Claim ("3M Mem.") at 24.

In Connecticut Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC, the court distinguished between Havens and Alliance for Hippocratic Medicine. 167 F.4th 605, 618 (2d Cir. 2026) ("CoreLogic"). In CoreLogic, the Connecticut Fair Housing Center ("CFHC") "alleged that it diverted resources to investigate CoreLogic's conduct, to assist individuals whom the CFHC suspected were denied housing because of CoreLogic, and to develop educational programs about the use of criminal record screening products by housing providers." Id. The court rejected the plaintiff's argument that these allegations fell "squarely within the Havens tradition," concluding instead that "[t]he

[3] The page numbers cited to in this ruling for documents that have been electronically filed refer to the page numbers in the header of the documents and not to the page numbers in the original documents, if any.

choice of the CFHC to focus its resources on CoreLogic 'to the detriment of other spending priorities' does not qualify as an injury in fact that confers standing under Article III." Id. (quoting All. for Hippocratic Med., 602 U.S. at 394).

It is true that the Second Amended Complaint alleges, and the plaintiffs argue in their opposition, that they have been required to divert resources. See SAC ¶ 442; Pls.' Omnibus Mem. in Opp. to Defs.' Mots. to Dismiss ("Pls.' Opp.") (ECF No. 292) at 22. However, accepting as true all material factual allegations in the Second Amended Complaint and drawing reasonable inferences in favor of the plaintiffs, it also "affirmatively and plausibly," Carter, 822 F.3d at 56, alleges that the plaintiffs have suffered injury that goes beyond diversion of resources. The plaintiffs maintain that

> [t]hey provide services to their members; they negotiate and enforce contracts with fire departments to foster safe and healthy work environments, they provide training and resources to improve fire fighters' safety, skill, and efficiency, as well as to improve methods and technology for firefighting and emergency medical rescue. See, e.g., SAC ¶ 11.

Pls.' Opp. at 22. Paragraph 11 of the Second Amended Complaint refers to the objectives of each of the Union Plaintiffs, as set forth in the constitution and by-laws of the IAFF. The Second Amended Complaint alleges that the Union Plaintiffs "bring[] these claims to recover [their] costs and to further [their] core mission of fostering the health and safety of fire

fighters, especially [their] members." SAC ¶ 17; see also id. ¶¶ 18-28.

**b. Associational Standing**

All of the defendants assert that the Union Plaintiffs lack associational standing. The court agrees.

The Union Plaintiffs seek

> on behalf of themselves, their members, and members of the Fire Fighter Class . . . monetary and equitable relief . . . in the form of orders . . . directing each Defendant to: . . . b) contribute to the establishment of a diagnostic medical testing program and medical monitoring protocol for the Fire Fighter Plaintiffs and the Fire Fighter Class to monitor individuals' health and diagnose at an early stage any ailments that can result from exposure to PFAS Chemicals.

SAC at 111.

Under the three-pronged test for associational standing,

> the association has standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

Bano v. Union Carbide Corp., 361 F.3d 696, 713 (2d Cir. 2004) (quoting Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977)).

"[W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." Bano, 361 F.3d at 714 (quoting Warth, 422 U.S. at 515) (internal

quotation marks omitted). The Second Circuit in Bano acknowledged that it "know[s] of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members." Id. See also Warth, 422 U.S. at 515 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.").

**i. Medical Monitoring Claim**

The third prong of the associational standing test requires that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt, 432 U.S. at 343. In Bano the court found that "[p]roof of claims for medical monitoring under New York law would . . . require individualized injuries." Bano, 361 F.3d at 715. Under New York law, "to prevail on . . . a claim [for medical monitoring], 'a plaintiff must establish both that he or she was in fact exposed to the disease-causing agent and that there is a "rational basis" for his or her fear of contracting the disease.'" Bano, 361 F.3d at 715 (quoting Abusio v.

Consolidated Edison Co. of New York, Inc., 238 A.D.2d 454, 454 (2d Dep't 1997) (mem.)).

3M, relying on Bano, contends that "the Union Plaintiffs cannot establish associational standing to recover on their members' behalf" because "'an association' lacks 'standing to pursue damages claims on behalf of its members'" and "because 'a medical monitoring program' invariably 'require[s] the participation of the organizations' individual members." 3M's Mem. in Support of Mot. to Dismiss at 24.

The plaintiffs maintain that "[t]he Union Plaintiffs' request [of] equitable relief in the form of an order establishing an abatement fund for a medical monitoring program for the benefit of the Union Plaintiffs' members" does "not require individualized determinations of exposure" because the Second Amended Complaint alleges "that all of the Union Plaintiffs' members have absorbed, ingested, and inhaled PFAS by exposure to Defendants' PFAS-laden PPE." Pls.' Opp. at 29.[4]

In a case "consider[ing] the proof necessary to establish a claim for medical monitoring, the availability of which [was] a question of first impression under Connecticut law," the

[4] The plaintiffs also maintain that "[t]he Union Plaintiffs' request for equitable relief on behalf of their members . . . does not require individual member participation" because "[a]n order directing Defendants to test their products and issue appropriate warnings and establish and publish scientifically-proven protocols for the maintenance and handling of contaminated gear to mitigate the harm would not require the individual participation of union members." Pls.' Opp. at 29. Because the defendants do not dispute this point, the court does not address it.

Connecticut Supreme Court "assume[d], without deciding, that Connecticut law recognizes a claim for subclinical cellular injury that substantially increased the plaintiffs' risk of cancer and other asbestos related diseases." Dougan v. Sikorsky Aircraft Corp., 337 Conn. 27, 42 (2020). The Connecticut Supreme Court further "assume[d], without deciding, that the [elements outlined in Donovan v. Philip Morris USA, Inc., 455 Mass. 215 (2009)] govern proof of a medical monitoring claim." Id. at 42-43. In Donovan, the Massachusetts Supreme Court required

> that "each plaintiff" prove that "(1) [t]he defendant's negligence (2) caused (3) the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint."

Donovan, 455 Mass. at 226).

The requirement that each plaintiff prove that he or she was exposed to a hazardous substance that produced, at minimum, subcellular changes aligns with the requirement under New York law that a plaintiff prove that he or she was exposed to the disease-causing agent. This requirement means that medical monitoring--be it a claim or a remedy--requires individualized

participation.

In Bano the court stated: "We cannot envision a medical monitoring program that would not require the participation of the organizations' individual members." Bano, 361 F.3d at 715. The plaintiffs have not suggested a medical monitoring program that would not require the participation of the organizations' individual members. Instead, the plaintiffs state that "[c]ourts have more flexibility in applying [the] third prong [of the associational standing test] because it is a court-imposed prudential consideration and not a constitutional requirement." Pls.' Opp. at 28. While that is true, see Bano, 361 F.3d at 715, the Second Circuit has "see[n] no reason to relax it where, in order for the organizations to succeed in the lawsuit, there must be participation by the members themselves." Id.

Therefore, the Union Plaintiffs do not have associational standing to assert a medical monitoring claim.

**ii. Damages Claim**

The Remaining Moving Defendants contend that the Union Plaintiffs lack standing because "[a] claim for compensatory damages requires the participation of a group's individual members." Remaining Defs.' Mem. in Support of Mot. to Dismiss for Lack of Subject Matter Juris. and Failure to State a Claim at 24 (citation and internal quotation marks omitted).

The plaintiffs do not appear to dispute the defendants'

argument that an association does not have standing to pursue damages claims on behalf of its members. The Second Circuit in Bano noted that "[w]e know of no Supreme Court of federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members." Bano, 361 F.3d at 714. As damages claims by the individual members of the Union Plaintiffs would require the participation of the members themselves, the Union Plaintiffs lack associational standing to pursue damages claims on behalf of their members.

**3. Firefighter Plaintiffs**

Like the Union Plaintiffs, the Firefighter Plaintiffs seek the establishment of a medical monitoring program and damages.

All of the defendants assert that the Firefighter Plaintiffs lack standing because they have not alleged injury. The court disagrees.

**a. Injury-in-Fact - Damages**

All of the defendants contend that the Firefighter Plaintiffs lack standing to pursue damages because they have not alleged injury.

As noted above, "[i]njury in fact consists of 'an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" John, 858 F.3d at 736 (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016)).

> An injury in fact must be "particularized," and it must be "concrete." Spokeo, Inc. v. Robins, 578 U.S. 330, 340, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016). "Particularized" injuries "affect the plaintiff in a personal and individual way." Id. (internal quotation marks omitted). Concrete injuries are "physical, monetary, or cognizable intangible harm[s] traditionally recognized as providing a basis for a lawsuit in American courts." TransUnion LLC v. Ramirez, 594 U.S. [at 427].

Harty v. W. Point Realty, Inc., 28 F.4th 435, 442-43 (2d Cir. 2022); see also TransUnion LLC v. Ramirez, 594 U.S. 413, 424 (2021) ("the plaintiff's injury in fact [must] be 'concrete'— that is, 'real, and not abstract'").

3M contends that "[t]he Fire Fighter Plaintiffs have not alleged a past or present physical injury that could support their standing to sue for damages." 3M Mem. at 22. 3M argues that the Firefighter Plaintiffs' "sole allegation of past or present harm is that they have suffered subcellular injury that creates and/or increases the risk that in the future they might develop adverse health conditions," id. (citation and internal quotation marks omitted) (emphasis in original), which, according to 3M, is conclusory. 3M further argues that "alleged exposure with no physical manifestations and no qualified medical diagnosis does not amount to a concrete harm—even when paired with an allegedly increased risk of developing a future illness." Id. (citation and internal question marks omitted). The Remaining Moving Defendants argue that because the Firefighter Plaintiffs "do not allege . . . that they are

suffering from any physical manifestation of any symptom or disease arising from alleged exposure to PFAS in protective gear" or "the level of PFAS exposure they faced because of the gear," they lack standing. Remaining Defs.' Mem. at 25.

The plaintiffs maintain that "present exposure to known toxins is" an injury in fact and that the Firefighter Plaintiffs have made sufficient allegations as to their exposure. Pls.' Opp. at 23-24 (citations omitted).

The Second Amended Complaint alleges that the Firefighter Plaintiffs "have suffered subcellar injury that creates and increases the risk that [they] will develop cancers and other diseases." SAC ¶ 33; see also id. ¶¶ 34-43. The plaintiffs also make allegations as to the impact of PFAS on human health more generally. See, e.g., id. ¶¶ 129-31, 134-63.

In TransUnion the Supreme Court stated that "[c]entral to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." 594 U.S. at 417 (quoting Spokeo, 578 U.S. at 340-41). The Court specifically denoted "physical or monetary harms readily qualify as concrete injuries under Article III, and various intangible harms -- like reputational harms -- can also be concrete." Id. For example, in Conservation Law Foundation, Inc. v. All-Star Transportation, LLC the court found that "air pollutant exposure . . . [is a]

recognized injur[y]-in-fact," and that "health concerns stemming from air pollutants and 'uncertainty' regarding whether unlawful 'actions expose [plaintiffs] to excess air pollution are sufficient to establish injury-in-fact." No. 3:21-CV-201 (SRU), 2024 WL 2089330 at *3, reconsideration denied, No. 3:21-CV-201, 2024 WL 3638258 (D. Conn. May 9, 2024); see also Conservation Law Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 87 (1st Cir. 2025) ("First, we hold that 'breathing and smelling polluted air' are both injuries-in-fact, even when unaccompanied by additional associated harms. To reach this conclusion, we follow the Supreme Court's directive to look to 'harm[s] traditionally recognized as providing' bases for lawsuits 'in American courts' to gauge whether an asserted harm is cognizable. TransUnion, 594 U.S. at 417."); Sommerville v. Union Carbide Corp., 149 F.4th 408, 420 (4th Cir. 2025), cert. denied, No. 25-919, 2026 WL 1463201 (an injury was sufficiently concrete where the plaintiff's claim was "not that the [defendant's] emissions may have harmed her by putting her at a higher risk of eventually getting cancer," but that the defendant exposed her to emissions "in such quantities that she must, in a qualified physician's opinion, pay for and undergo periodic diagnostic medical examinations now") (emphasis in original).

Contrary to the defendants' assertions, the Firefighter Plaintiffs have not merely alleged the risk of future harm.

Rather, they have alleged that harm has already occurred, the results of which have not yet manifested. See SAC ¶ 33-43. This is sufficient to constitute an injury-in-fact for the purposes of standing.

The Remaining Moving Defendants also argue that the Firefighter Plaintiffs "do not allege the level of PFAS exposure they faced because of the gear," which, inter alia, "forecloses Article III standing." Remaining Defs.' Mem. at 25. However,

> [t]o survive a motion to dismiss, [the plaintiff] need not present more specific scientific evidence or statistical verification to prove that the risk actually exists. See, e.g., Bennett v. Spear, 520 U.S. 154, 168 (1997) (noting that at the pleading stage, standing will be upheld where a plaintiff provides some support for his claim of standing and it is possible to "presume facts under which [the plaintiff] will be injured").

Baur v. Veneman, 352 F.3d 625, 642 (2d Cir. 2003).

The Remaining Moving Defendants argue that "PFAS is nearly ubiquitous in modern life and every person in the United States has been exposed to it." Remaining Defs.' Mem. at 27 (internal quotation marks and citations omitted). "As the Supreme Court . . . explained in Fed. Election Comm'n v. Akins, 524 U.S. 11, 24 (1998), injury-in-fact may be found although the asserted harm is 'widely shared' if the harm is sufficiently concrete and particularized." Baur, 352 F.3d at 635. While the plaintiffs do allege that "the vast majority of people in the United States are exposed to background levels of PFAS via drinking water,

food, and other sources," they also allege that "certain populations have higher levels of PFAS exposure, including as an occupational hazard." SAC ¶ 136. The plaintiffs make additional allegations as to the PFAS exposure and resulting injury experienced by individual Firefighter Plaintiffs. See SAC ¶¶ 33-43.

Therefore, the Firefighter Plaintiffs have standing to pursue damages.

**b. Injury-in-Fact – Injunctive Relief**

3M contends that the Firefighter Plaintiffs lack standing to pursue prospective relief because they have not sufficiently alleged injury.

In their Prayer for Relief, the Firefighter Plaintiffs seek, inter alia,

> equitable relief in the form of orders . . . directing each Defendant to: . . . b) contribute to the establishment of a diagnostic medical testing program and medical monitoring protocol for the Fire Fighter Plaintiffs and the Fire Fighter Class to monitor individuals' health and diagnose at an early stage any ailments that can result from exposure to PFAS Chemicals.

SAC at ¶ 111.[5]

[5] The plaintiffs also include in their Prayer for Relief a request for an order "directing each Defendant to . . . correct its unfair and deceptive practices." SAC at 111. However, the plaintiffs argue that the now-dismissed Purchaser Plaintiffs have standing to seek injunctive relief, including such an order. See Pls.' Opp. at 26. The plaintiffs do not argue that any other plaintiff or group of plaintiffs have such standing. Elsewhere than in the Prayer for Relief, the Second Amended Complaint appears to seek such an order on behalf of the Purchaser Plaintiffs. See SAC ¶ 430 (seeking "an order enjoining Defendants from continuing to engage in the unfair and deceptive acts and practices described" in the section outlining the Purchaser

3M argues that the Firefighter Plaintiffs lack standing for their claims for prospective relief because they "do not allege that they are imminently likely to suffer substantial physical harm from their alleged exposure to PFAS." 3M Mem. at 22. The Remaining Moving Defendants argue that "a risk of future harm without the present manifestation of any symptoms arising from exposure to a toxin at levels sufficient to create health complications also does not adequately plead injury-in-fact for purposes of an injunctive relief claim." Remaining Defs.' Mem. at 26.

"Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 111-12 (1983)).

While "[c]ourts have sometimes stated that a plaintiff could not 'rely on past injury to satisfy the injury requirement' that is part of 'the constitutional minimum of standing to seek injunctive relief' . . . such a view rests upon the fact that 'injunctive relief' is usually 'a forward-looking remedy.'" Meidl v. Aetna, Inc., No. 15-CV-1319 (JCH), 2017 WL

Plaintiffs' claim for relief under CUTPA). Therefore, the court only addresses whether the Firefighter Plaintiffs have standing to seek an order directing each defendant to contribute to the establishment of a medical testing program and medical monitoring protocol.

1831916, at *4 (D. Conn. May 4, 2017) (citations omitted). Instead, "when seeking prospective injunctive relief, the plaintiff must prove the likelihood of future or continuing harm." Pungitore v. Barbera, 506 Fed. Appx. 40, 41 (2d Cir. 2012) (first emphasis added) (citing Lyons, 461 U.S. at 111). In contrast, "in certain instances, an injunction can be a form of retrospective relief," which does not require a likelihood of future harm "because retrospective relief, which seeks to remedy past harm, would benefit a plaintiff who has suffered past harm regardless of the plaintiff's likelihood of future harm." Meidl, 2017 WL 1831916, at *5.

The relief sought here by the plaintiffs would require the defendants to "contribute to the establishment of a diagnostic medical testing program and medical monitoring protocol." SAC at 111. This constitutes equitable relief that is retrospective, as it would remedy alleged injuries already incurred. Therefore, the plaintiffs need not show "the sort of imminent and substantial risk of future harm" 3M says is "necessary to obtain prospective relief." 3M Reply at 13.

The Connecticut Supreme Court "did not settle [the] central issue of whether to permit medical monitoring in the absence of some present manifestation of a physical injury." Clinger v. Edgewell Pers. Care Brands, LLC, No. 3:21-CV-1040 (JAM), 2023 WL 2477499, at *8 (D. Conn. March 13, 2023) (internal quotation

marks omitted) (citing Dougan, 337 Conn. at 45-46). In Clinger the court "decline[d] . . . to 'requir[e] plaintiffs to manifest physical symptoms before receiving medical monitoring,' which would seem to 'defeat the purpose of that remedy.'" Id. (second alteration in original) (quoting Baker v. Saint-Gobain Performance Plastics Corp., 232 F. Supp. 3d 233, 252 (N.D.N.Y. 2017)). To the extent the defendants argue that the Firefighter Plaintiffs must allege a present manifestation of a physical injury in order to seek medical monitoring, the court finds the reasoning in Clinger persuasive.

Therefore, the Firefighter Plaintiffs have sufficiently alleged an injury in fact to support standing to seek the establishment of a diagnostic medical testing program and medical monitoring protocol.

**4. Causation as to 3M**

3M asserts that the Firefighter Plaintiffs lack standing because they have not alleged causation as to 3M. The court disagrees.

For Article III standing, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (alterations in original) (internal

quotation marks omitted). "The traceability requirement for Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury." Chevron Corp. v. Donziger, 833 F.3d 74, 121 (2d Cir. 2016) (internal quotation marks omitted). "The traceability requirement focuses on whether the asserted injury could have been a consequence of the actions of the defendant rather than being attributable to the independent acts of some other person not before the court." Id. (internal quotation marks omitted); see also Evolution Fast Food One, LP v. HVFG, LLC, 720 F. Supp. 3d 251, 263 (S.D.N.Y. 2024) (quoting Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 42 (1976)) ("The causation requirement is not met where the injury 'results from the independent action of some third party not before the court.'").

3M contends that the Second Amended Complaint "deficiently pleads causation in at least two respects": by improperly grouping defendants together and failing to "specify which Defendant undertook what act"; and by failing to make allegations that "support a plausible inference that 3M bears responsibility for the particular PFAS compounds . . . that were allegedly processed and incorporated into Plaintiffs' turnout gear." 3M Mot Mem. at 18-20 (internal quotation marks and

citation omitted).[6] The plaintiffs maintain that the Second Amended Complaint contains "dozens of detailed allegations about 3M's pervasive role in the PFAS supply chain which are sufficient to establish traceability for the Plaintiffs' claims." Pls.' Opp. at 30.

It is true, for example, that based on the allegations in the Second Amended Complaint "it remains possible that one of the 11 other listed Defendants, not 3M, supplied the alleged PFAS-containing materials in Plaintiffs' equipment; that DuPont, not 3M, supplied the 'PFAS'; and that a nonparty supplier supplied either or both." 3M Mem. at 19. But as Iqbal, on which 3M relies, states, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). For a facial challenge to standing like this one, "[t]he task of the district court is to determine whether the Pleading 'allege[s] facts that

[6] 3M argues that the "Plaintiffs have failed to allege the requisite causal connection to 3M to satisfy both Article III standing and each of their causes of action." 3M Mem. at 21. Statutory standing "refers to a nonjurisdictional inquiry that does not implicate 'the court's statutory or constitutional power to adjudicate the case.'" Evolution Fast Food One, LP v. HVFG, LLC, 720 F. Supp. 3d 251, 260 (S.D.N.Y. 2024) (quoting Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 128 n.4 (2014) (emphasis in original)). In light of this distinction, "a lack of statutory standing requires dismissal for failure to state a claim, while lack of Article III standing requires dismissal for lack of subject matter jurisdiction." Id. (internal quotation marks and citation omitted) (emphasis in original). Therefore, the court addresses 3M's argument as to lack of causation for the plaintiffs' claims under the CPLA, see 3M Mem. at 18, under Federal Rule of Civil Procedure 12(b)(6).

affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'" John, 858 F.3d 732 (2d Cir. 2017) (second and third alteration in original) (quoting Carter, 822 F.3d at 56-57). That it is possible that DuPont or a non-party supplier, rather than 3M, supplied the PFAS referred to in a particular allegation does not make the plaintiffs' standing implausible. The Second Amended Complaint alleges that the defendants "form a small ecosystem of interdependent entities that produce specialized products for a niche group of purchasers and users," SAC ¶ 75, and that "PFAS-containing products and materials manufactured and/or purchased within the United States generally contain PFAS manufactured by 3M, DuPont, or both." Id. ¶ 199. The Second Amended Complaint also alleges that "[i]n 2000, the EPA identified 3M as the primary global manufacturer of PFOA and the only United States manufacturer of PFOS." SAC ¶ 206. While the Second Amended Complaint alleges that "[b]y 2006, DuPont was the only company manufacturing PFOA within the United States," id. ¶ 209, and "3M now claims to have largely phased out its manufacture of new PFOA and PFOS within the United States," id. ¶ 207, it also alleges that "the EPA has expressed concern regarding the ongoing uses of existing stocks of the chemical compounds." Id. In addition, the plaintiffs allege that "3M also manufactures PFAS-containing materials, including . . . Scotchlite™ Reflective Materials," which is sold "to turnout

gear manufacturers and others in the turnout gear supply chain." Id. ¶¶ 217, 219. At this stage of the litigation, these allegations are sufficient to support causation as to 3M for purposes of standing.

**B. Failure to State a Claim**

Because the plaintiffs have dismissed the Purchaser Plaintiffs along with three of the four claims in this case, the court addresses only the Connecticut Products Liability Act (CPLA) claims, the Fourth Claim for Relief.

"The CPLA provides the exclusive remedy in Connecticut for all claims against a product seller for harm caused by the product." L. Z. v. BigAirBag B.V., 691 F. Supp. 3d 451, 459 (D. Conn. 2023) (citing Conn. Gen. Stat. §§ 52-572m(b), 52-572n(a); Gerrity v. R.J. Reynolds Tobacco Co., 263 Conn. 120, 128, 818 A.2d 769 (2003)).

> Specifically, the CPLA allows a plaintiff to bring a single product liability claim arising from theories of strict liability, negligence, failure to warn, breach of express or implied warranty, and misrepresentation, allowing for simplified pleading. Conn. Gen. Stat. § 52-572m(b); LaMontagne v. E.I. Du Pont de Nemours & Co., 41 F.3d 846, 855 (2d Cir. 1994) (citing Winslow v. Lewis-Shepard, Inc., 212 Conn. 462, 470-71, 562 A.2d 517 (1989)); Moss v. Wyeth Inc., 872 F. Supp. 2d 162, 165 (D. Conn. 2012).

L. Z., 691 F. Supp. 3d at 459. "Even though the CPLA provides for only a single cause of action, a plaintiff may 'assert various common law theories of liability thereunder.'" Hunte v. Abbott Laboratories, Inc., 556 F. Supp. 3d 70, 82 (D. Conn.

2021) (quoting Phila. Indem. Ins. Co. v. Lennox Indus., Inc., No. 3:18-cv-217 (CSH), 2019 WL 1258918, at *2 (D. Conn. Mar. 18, 2019)). Under the CPLA, a product liability claim "include[s] but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent." Conn. Gen. Stat. Ann. § 52-572m(b).

> All such claims, whether alleging a design defect, manufacturing defect or failure to warn defect, are governed by the same elements that this court has applied since it adopted [Restatement (Second) of Torts)] § 402A: "(1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition." (Emphasis omitted; internal quotation marks omitted.) Izzarelli v. R.J. Reynolds Tobacco Co., [321 Conn. 172, 185-86 (2016)].

Bifolck v. Philip Morris, Inc., 324 Conn. 402, 434 (2016).

The Second Amended Complaint asserts strict liability design defect, see SAC ¶¶ 433-44; negligence, see SAC ¶¶ 445-55; failure to warn, see SAC ¶¶ 456-75; negligent design and manufacture, see SAC ¶¶ 476-89; and medical monitoring, see SAC ¶¶ 490-99, all under the CPLA. The plaintiffs seek statutory punitive damages pursuant to the CPLA. See SAC ¶¶ 500-506; Conn. Gen. Stat. Ann. § 52-240b (permitting punitive damages in

product liability actions "if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product").

**1. Cognizable Injuries Under the CPLA**

The Remaining Moving Defendants contend that the Firefighter Plaintiffs' allegation of "subcellular injury that creates and increases the risk that they will develop cancers and other diseases . . . does not satisfy the injury element of the CPLA." Remaining Defs.' Mem. at 40. The Remaining Moving Defendants argue that "[t]he Connecticut Supreme Court has twice signaled its reluctance to allow CPLA claims based on subclinical injuries." Id. Similarly, 3M argues that "the Fire Fighter Plaintiffs have not alleged any injury sufficient to state a CPLA claim" because the allegations are "exposure-only." 3M Mem. at 23. The plaintiffs maintain that this "argument requires the Court to adopt a factual conclusion at the motion to dismiss stage, namely that the injuries alleged in the SAC do not constitute actual injuries," and that "other Connecticut courts . . . have declined to decide these issues at the motion to dismiss stage." Pls.' Opp. at 53.

The Connecticut Supreme Court has "assume[d], without deciding, that Connecticut law recognizes a claim for subclinical cellular injury that substantially increased the

plaintiffs' risk of cancer and other . . . diseases." Dougan, 337 Conn. at 43. In Dougan, it found that the plaintiffs failed to create a genuine issue of material fact as to whether medical monitoring was necessary because, inter alia, the plaintiffs offered insufficient evidence that each plaintiff suffered subcellular harm that substantially increased his risk of injury. See id. at 45-48. In Poce, the Connecticut Court of Appeals, concluding that the complaint was devoid of "allegations that any physical manifestation occurred as a result of the exposure," held "that 'actual injury' as an element of negligence requires the pleading and proof of some physical component of injury." Poce v. O & G Indus., Inc., 210 Conn. App. 82, 95-96, cert. denied, 342 Conn. 910 (2022). "Considered together, Poce and Dougan suggest that an actual physical injury is generally required to adequately plead a negligence claim, and, when risk of injury is alleged, it should include an allegation that sub-clinical injury has occurred." Griffin Health Services Corp. v. Novo Nordisk Inc., No. 3:24-CV-01045 (JCH), 2025 WL 448440, at *4 (D. Conn. Feb. 10, 2025). Here, the plaintiffs have made such allegations.

The Second Amended Complaint alleges:

> The following is a non-exhaustive list of adverse health outcomes that can result from exposure to PFOA and PFOS, many of which can manifest after years of exposure:
>
> a. increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate cancer, bladder

cancer, breast cancer, and ovarian cancer;
b. reduced ability of the body's immune system to fight off infections, including reduced vaccine response;
c. interference with the body's natural hormones and liver enzymes;
d. changes in liver enzymes;
e. reproductive effects including decreased fertility;
f. developmental effects or delays in children, including low birthweight, accelerated puberty, bone variations, or behavioral changes;
g. increased cholesterol levels and/or risk of obesity;
h. increased risk of high blood pressure or pre-eclampsia in pregnant women; and;
i. interference with and suppression of vaccine response (decreased serum antibody concentrations) in children.

SAC ¶ 143. It also alleges that "[t]he United States Environmental Protection Agency ('EPA') has classified both PFOA and PFOS as likely human carcinogens," and that "[t]he EPA has concluded that there is no safe level of PFOA or PFOS exposure in human beings." Id. ¶¶ 146-47; see also id. ¶¶ 144-45, 150-61 (making allegations with respect to the health dangers posed by PFAS). The plaintiffs have not alleged that any of the individual firefighters named in this action or any other Connecticut firefighters have manifested any of the identified health effects. Instead, the plaintiffs allege that the Firefighter Plaintiffs have "suffered subcellular injury that creates and increases the risk that [they] will develop cancers and other diseases." SAC ¶ 32; see also id. ¶¶ 33-43 (making the same allegation). At this stage of the litigation, these

allegations of subcellular injury are sufficient for purposes of alleging a physical injury as required under the CPLA.

**2. CPLA Strict Liability--Design Defect**

The Second Amended Complaint claims that the "Defendants are strictly liable for all damages arising out of their defectively designed PFAS chemicals, and PPE products containing PFAS." SAC ¶ 442.

"Strict tort liability 'relieves the plaintiff from proving that the manufacturer was negligent and allows the plaintiff to establish instead the defective condition of the product as the principal basis of liability.'" L. Z., 691 F. Supp. at 459 (quoting Potter v. Chi. Pneumatic Tool Co., 241 Conn. 199, 210 (1997)).

> "To recover under the doctrine of strict liability in tort, a 'plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition.'" Metro. Prop. & Cas. Ins. Co. v. Deere & Co., 302 Conn. 123, 131, 25 A.3d 571 (2011).

L. Z., 691 F. Supp. 3d at 459.

"For a strict liability claim alleging design defect, the plaintiff may prove [that a product was in a defective condition unreasonably dangerous to the consumer or user] under the risk-utility test or under a consumer expectation test." Bifolck, 324

Conn. at 434.

> Under the risk-utility test . . . a product is in a defective condition unreasonably dangerous to the consumer or user if:
>
> (1) A reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. In considering whether there is a reasonable alternative design, the jury must consider the feasibility of the alternative. Other relevant factors that a jury may consider include, but are not limited to, the ability of the alternative design to reduce the product's danger without unreasonably impairing its usefulness, longevity, maintenance, and esthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger [the "reasonable alternative design theory"]; or
>
> (2) The product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product. The factors that a jury may consider include, but are not limited to, the magnitude and probability of the risk of harm, the instructions and warnings accompanying the product, the utility of the product in relation to the range of consumer choices among products, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing [the "manifestly unreasonable design theory"].

Id. at 434-35 (footnote omitted). "[T]hese theories are not mutually exclusive." Id. at 435. Instead, "[a] plaintiff may consistently allege that a product had excessive preventable danger (reasonable alternative design) and that the product was too dangerous to market to the consumer irrespective of whether it could have been designed to be safer (manifestly unreasonable design)." Id.

> The reasonable consumer standard in relation to a manifestly unreasonable design refers to the consumer to whom the product is marketed. Thus, when a product has been designed for and marketed to a limited group with specialized needs and/or knowledge, such as industrial equipment not suited for use by the general public, and the product is accompanied by adequate warnings, whether the product's design is manifestly unreasonable is determined by reference to the intended consumer.

Id. at n.18. "At the pleading stage, courts do not require detailed factual allegations that a design defect renders a product unreasonably dangerous; rather, the complaint must simply identify a specific problem with the product's design." L. Z., 691 F. Supp. at 462.

Under the consumer expectation test, "a product is in a defective condition unreasonably dangerous to the consumer or user only if it is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" Bifolck, 324 Conn. at 436 (quoting Restatement (Second) of Torts § 402A, cmt. (i), p. 352). "The product must fail to meet legitimate, commonly held, minimum safety expectations of that product when it is used in an intended or reasonably foreseeable manner." Id. Considerations include "consumers' experience with the product, the seller's express representations, and product safety laws." Id. "The ordinary consumer expectation test is reserved for cases in which the product failed to meet the ordinary consumer's minimum

safety expectations, such as res ipsa type cases." Izzarelli, 321 Conn. at 194.

Because the ordinary consumer expectation test is the secondary test, see Bifolck, 324 Conn. at 436, the court first analyzes the plaintiffs' allegations under the risk-utility test.

The plaintiffs allege that 3M has manufactured "defectively designed PFAS chemicals" and that "3M also manufactures PFAS-containing materials" "specifically for use in turnout gear." SAC ¶¶ 217-18.

**a. Manufacturing PFAS Chemicals**

The plaintiffs contend that "every one of [the manifestly unreasonable design theory] factors weighs in favor of a finding that PFAS . . . [is] manifestly unreasonable in its design." Pls.' Opp. at 58.[7] They assert that the "serious adverse consequences to human health, well-being, and quality of life" are "concerns [that] are not (and will never be) outweighed by any benefit provided by PFAS." Id.

3M argues that "the CPLA may not be used to 'effectively . . . ban commonly used and useful products, thus usurping [the] legislature's authority over such matters.'" 3M Mem. at 36

[7] Because the plaintiffs do not assert that "[a] reasonable alternative design [of the PFAS] was available that would have avoided or reduced the risk of harm," Bifolck, 324 Conn. at 434, the court analyzes PFAS chemicals based on the manifestly unreasonable design theory.

(omission and alteration in original) (quoting Izzarelli, 321 Conn. at 205). But in Izzarelli, the court explained:

> Insofar as the defendant contends that application of the modified consumer expectation test to circumstances like the present case could effectively allow a jury to ban commonly used and useful products, thus usurping our legislature's authority over such matters, we find such concerns too speculative to warrant a contrary rule. We have every confidence that the possibility of such outlier verdicts could be addressed through a motion for judgment notwithstanding the verdict.

Id. The Connecticut Supreme Court also stated that its earlier decision in "Potter plainly reflects this court's understanding that, except where preempted by the liability act, the legislature left the development of product liability standards to the common law." Id. at 204-05.

3M also argues that "courts around the country have recognized that allegedly 'harmful ingredients that are characteristic of the product' cannot supply the basis for a defective-design claim." 3M Mem. at 36 (citing Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co., 768 N.W.2d 674, 684-85 (Wis. 2009); Town of Lexington v. Pharmacia Corp., 133 F. Supp. 3d 258, 270 (D. Mass. 2015)); see also 3M Reply at 27 (the risk-utility and consumer expectation tests "evaluate the danger of defective conditions, not of product characteristics").

The Restatement (Second) of Torts provides that "[t]he defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence

or quantity, but also from foreign objects contained in the product, from decay or deterioration before sale, or from the way in which the product is prepared or packed." Restatement (Second) of Torts § 402A cmt. h (1965) (emphasis added). See Bifolck, 324 Conn. at 434 ("All [product liability] . . . claims, whether alleging a design defect, manufacturing defect or failure to warn defect, are governed by the same elements that this court has applied since it adopted § 402A."). Courts in other jurisdictions have followed this approach. See Godoy, 768 N.W.2d at 688 ("A claim for defective design cannot be maintained where the presence of lead is the alleged defect in design, and its very presence is a characteristic of the product itself."); Town of Lexington v. Pharmacia Corp., 133 F. Supp. 3d 258, 269 (D. Mass. 2015) (rejecting a design defect claim and stating that "PCBs cannot be PCBs without the presence of PCBs themselves, along with their inherent characteristics"); Town of Westport v. Monsanto Co., No. CV 14-12041, 2017 WL 1347671, at *5 (D. Mass. April 7, 2017), aff'd, 877 F.3d 58 (1st Cir. 2017) (rejecting a design defect claim where "the evidence presented . . . does not show an alternative design but, rather, the complete replacement of one item for another"). See also Rougeau v. Ahlstrom Rhinelander, LLC, 785 F. Supp. 3d 438, 451 (W.D. Wis. 2025) (the plaintiffs "allege[d] that 3M chose to manufacture, design, formulate, distribute, supply, sell, and

market 'products containing PFAS' and that "[s]hould discovery reveal that PFAS are an inherent part of 3M's products, the result may prove fatal to plaintiffs' defective design claim") (emphasis in original).

Taking as true the plaintiff's allegations that, for example, "any amount of PFAS exposure is hazardous to human health," SAC ¶ 131, the defects of PFAS alleged are characteristic of PFAS itself. Therefore, the strict liability design defect claim against 3M for manufacturing PFAS is being dismissed.

**b. PFAS-Containing Materials Manufactured by 3M**

3M argues: "As to the Reflective Material manufactured by 3M, Plaintiffs acknowledge that any PFAS were not intentionally added. Compl. ¶ 222." 3M Mem. at 37. However, paragraph 222 alleges only that 3M claims that any PFAS were not intentionally added: "3M has claimed that Scotchlite™ Reflective Material contains PFOA, PFOS, and PTFE as '[b]y-product(s), impurity(ies), and/or unintended artifact(s) resulting from the formulation and/or manufacture of [the] material.'" SAC ¶ 222. Moreover, the Second Amended Complaint goes on to allege: "3M uses PFOA, PFOS, and PTFE in the manufacture of Scotchlite™ Reflective Material, including as a treating agent." SAC ¶ 223. Thus, the plaintiffs have sufficiently alleged that 3M PFAS

contained in the Reflective Material were part of the products' design.

3M contends that the plaintiffs' CPLA strict liability claim fails as to 3M because the Second Amended Complaint fails to allege unreasonable danger. 3M argues that "the complaint must . . . identify a specific problem with the product's design." 3M Mem. at 35. (citation omitted) (omission in original). 3M also argues that the claim fails because "the Complaint does not provide 'any specifics at all about [any] reasonable alternative design' for those PFAS." Id. at 36. 3M further argues that the Second Amended Complaint focuses "on alleged defects in the design of Fire Protective Equipment, which 3M did not control and was not involved in, rather than on materials that 3M might have supplied to the manufacturers." Id. at 35-36. The plaintiffs maintain that the allegations in the Second Amended Complaint satisfy both theories under the risk-utility test, as well as the ordinary consumer expectation test. The plaintiffs argue that their "allegations establish that every one of . . . [the manifestly unreasonable] factors weighs in favor of a finding that PFAS and the products that incorporate it are manifestly unreasonable in design." Pls.' Opp. at 58. The plaintiffs further argue that they "allege that a reasonable alternative design exists, PFAS-free PPE, and could have been available at a much earlier date than it was, had 3M

and the other Defendants not concealed the risks and engaged in a disinformation campaign that PFAS-laden PPE were safe." Id. at 58-59.

As to the manifestly unreasonable design theory, the Second Amended Complaint includes allegations about the dangers of PFAS, including their persistence "in the human body for long (if not indefinite) periods of time," SAC ¶ 128, that "the best and most recent scientific information available has cautioned that any amount of PFAS exposure is hazardous to human health," SAC ¶ 131, and that "PFAS exposure has been linked to multiple, serious adverse health effects in humans," SAC ¶ 134. See also SAC ¶¶ 129-130, 132-133, 135-136, 140-153, 157-163. The plaintiffs also make allegations as to the warnings on the firefighter personal protective equipment. See SAC ¶¶ 307-08. In addition, the Second Amended Complaint includes allegations about statements by 3M as to the safety of PFAS, see, e.g., SAC ¶¶ 286-87, 298, and statements and marketing by other defendants as to the safety of their firefighter gear, see SAC ¶¶ 285, 288-97, 299-306.

In light of the foregoing and the factors identified in Bifolck, the Second Amended Complaint includes sufficient factual allegations for purposes of the manifestly unreasonable design theory.

As to the reasonable alternative design theory, the Second

Amended Complaint alleges that "PFAS-free fire fighter PPE was, at all relevant times, technologically and economically feasible." SAC ¶ 319. The Second Amended Complaint also alleges that "multiple Defendants already offer PFAS-free options for waterproof fabrics, durable fabrics, and/or outer shells in turnout gear," and gives examples of such PFAS-free options or efforts to provide such options. Id. ¶ 320; see id. ¶¶ 321-29.

"A plaintiff is not required to plead a specific alternative design to survive a motion to dismiss." L. Z., 691 F. Supp. 3d at 462. "[T]he Connecticut Supreme Court has consistently held that proof of a feasible alternative design (a euphemism for avoidability) is not an essential element of a plaintiff's prima facie case for defective design." Moss v. Wyeth Inc., 872 F. Supp. 2d 162, 169 (D. Conn. 2012); see also Rougeau v. Ahlstrom Rhinelander, LLC, 785 F. Supp. 3d 438, 452 (W.D. Wis. 2025) (finding that the plaintiffs' allegations "that 3M 'phased out the production of PFOS in approximately 2002 and will exit all PFAS manufacturing by the end of 2025'" "at least arguably supports an inference that reasonable, safer alternative products existed without the use of PFAS"). Compare Karazin v. Wright Med. Tech., Inc., No. 3:17CV823 (JBA), 2018 WL 4398250, at *5 (D. Conn. Sept. 14, 2018), reconsideration denied, No. 3:17CV823 (JBA), 2018 WL 6067235 (further internal quotation marks omitted) (third alteration in original) (finding

that the "only remaining factual allegation in support of [the plaintiffs'] . . . design defect claim is the assertion that the Profemur Z's design was 'inherently unstable,'" which "alone is not sufficient to raise [Plaintiffs'] entitlement to relief above the speculative level").

In light of the foregoing and the factors identified in Bifolck, the Second Amended Complaint includes sufficient factual allegations for purposes of the reasonable alternative design theory.

Because the allegations in the Second Amended Complaint are sufficient for purposes of the risk-utility test based on the manifestly unreasonable design and reasonable alternative design theories, and the Connecticut Supreme Court has indicated that the consumer expectation test is a secondary test, the court does not reach the consumer expectation test. See Izzarelli, 321 Conn. at 202-203 ("[W]e hold that, under our product liability law, the ordinary consumer expectation test is reserved for those limited cases in which a product fails to meet a consumer's legitimate, commonly accepted minimum safety expectations.").

Therefore 3M's motion to dismiss is being denied as to the strict liability design defect claim based on 3M's manufacture of PFAS-containing materials specifically for use in turnout gear.

**3. CPLA Negligence--Existence of a Duty of Care**

The Second Amended Complaint claims that "[a]s a Product Seller and/or Manufacturer as defined by the CPLA, each Defendant had a duty of reasonable care to avoid manufacturing and selling fire fighter PPE . . . contaminated with detectable, unsafe levels of PFAS." SAC ¶ 446. Because "the CPLA does not alter the substance of a plaintiff's rights or the facts that a plaintiff must prove in order to prevail," "any sub-claim brought under the CPLA . . . must sufficiently allege all elements that would be required at common law." Phila. Indem. Ins. Co., 2019 WL 1258918, at *2 (internal quotation marks and citation omitted).

"The existence of a duty of care is an essential element of negligence." Ward v. Greene, 267 Conn. 539, 547 (2004) (citation omitted). "Although it has been said that no universal test for [duty] ever has been formulated . . . [t]he ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised." Gomes v. Commercial Union Ins. Co., 258 Conn. 603, 615 (2001) (first alteration and omission in original). Under Connecticut law,

> '[T]he test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its

> negligent conduct should extend to the particular consequences or particular plaintiff in the case.' (Internal quotation marks omitted.) Lodge v. Arett Sales Corp., 246 Conn. 563, 572, 717 A.2d 215 (1998).

Id. at 616.

> [I]n considering whether public policy suggests the imposition of a duty, we ... consider the following four factors: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions.

Lawrence v. O & G Indus., Inc., 319 Conn. 641, 650 (2015) (citation omitted).

As to both the plaintiffs' negligence and negligent-design-and-manufacture claims, 3M contends that the claims fail because the Second Amended Complaint does not allege that 3M owed the plaintiffs any duty. 3M argues that "the Complaint confirms that 3M's involvement is far too remote for it to have owed a duty to Plaintiffs." 3M Mem. at 37 (internal quotation marks omitted). The plaintiffs maintain that "3M's relationship with Plaintiffs is sufficiently direct—3M knowingly manufactured, sold, and distributed both PFAS and PFAS-containing materials that were incorporated into PPE purchased, used, and worn by plaintiffs." Pls.' Opp. at 60 (emphasis in original).

The Second Amended Complaint alleges that 3M "ha[s] historically been the largest global manufacturer[] of PFAS, dominating the industry within the United States," and that

"PFAS-containing products and materials manufactured and/or purchased within the United States generally contain PFAS manufactured by 3M, DuPont, or both." SAC ¶¶ 199, 200. It alleges that "3M also manufactures PFAS-containing materials, including Scotchlite™ Reflective Material," which is "manufactured specifically for use in turnout gear." Id. ¶¶ 217, 218. In addition, the Second Amended Complaint alleges that the "[d]efendants . . . form a small ecosystem of interdependent entities that produce specialized products for a niche group of purchasers and users," id. ¶ 75, and that other defendants manufactured, marketed, and sold turnout gear containing PFAS-containing materials supplied by 3M and PFAS manufactured by 3M. See, e.g., id. ¶¶ 225, 230, 232, 234, 239, 241. Furthermore, the Second Amended Complaint includes allegations that 3M was aware of the alleged danger posed by PFAS. See, e.g., id. ¶¶ 252-259.

These allegations suggest that an ordinary entity in 3M's position, knowing what 3M knew or should have known, would anticipate that harm of the general nature that was allegedly suffered by the Firefighter Plaintiffs was likely to result. Thus, the plaintiffs have sufficiently alleged that 3M owed them a duty. Compare Phila. Indem. Ins. Co., 2019 WL 1258918 at *7 ("As a threshold matter, Plaintiff offers no facts even explaining the relationship between Plaintiff and either Defendant," and "[t]here are, for example, no allegations of

prior incidents, safety records, or studies that would put the Defendants on actual or constructive notice of any defect in the product.”); RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 382, 388 (1994) (finding, in a case where an employer brought a claim “against a third party tortfeasor to recover for economic loss in the form of increased workers’ compensation premiums and lost dividends arising out of the tortfeasor’s negligence[,]” that “[i]n the absence of a controlling statute or overriding public policy consideration,” the economic harm was “too remote to be chargeable to the defendant third party tortfeasor”).

Therefore, 3M’s motion to dismiss is being denied as to the negligence and negligent-design-and-manufacture claims.

**4. CPLA--Failure to Warn**

The Second Amended Complaint claims that the “Defendants had a duty to provide reasonable instructions and adequate warnings about the environmental and health hazards posed by PFAS” and “they failed to provide adequate warnings . . . and to provide adequate instructions to minimize, mitigate, reduce, control, or eliminate” the risks of PFAS. SAC ¶¶ 461-62.

“A product may be defective ‘because a manufacturer or seller failed to warn of the product’s unreasonably dangerous propensities.’” L.Z., 691 F. Supp. 3d at 464 (quoting Sharp v. Wyatt, Inc., 31 Conn. App. 824, 833 (1993)). “Under the CPLA, a product seller is liable for a plaintiff’s injuries when a

product lacks adequate warnings directed to the person best positioned to keep the plaintiff from being hurt, and if the plaintiff would not have been injured if the warnings had been provided." Klorczyk v. Sears, Roebuck & Co., No. 3:13-CV-00257 (JAM), 2019 WL 1433645, at *13 (D. Conn. Mar. 29, 2019) (citing Conn. Gen. Stat. § 52-572q).

> Courts evaluating a failure to warn claim engage in a three-step analysis. See Karavitis v. Makita U.S.A., Inc., 243 F. Supp. 3d 235, 252–53 (D. Conn. 2017). First, a plaintiff must satisfy the five elements governing all product liability claims, as described above. See id. at 252. Second, the plaintiff must show that product instructions or warnings "were required, and ... [whether] they were adequate." Id. In that determination, the following factors are relevant: "(1) [t]he likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions." Id. at 252–53 (quoting Conn. Gen. Stat. § 52-572q(b)). Third, a plaintiff must establish that "if adequate warnings or instructions had been provided, the claimant would not have suffered the harm." Id. at 253 (quoting Conn. Gen. Stat. § 52-572q(c)).

Hunte, 556 F. Supp. 3d at 83; see also Haesche v. Kissner, 229 Conn. 213, 218 (1994) ("The issue of causation in warnings cases is governed by § 52–572q(c), which states that 'the [plaintiff] shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the [plaintiff] would not have suffered the harm.'")(alterations in original).

3M contends that the plaintiffs' failure-to-warn theory

fails for the reason that the Second Amended Complaint "does not allege what warnings 3M (as opposed to final-stage manufacturers) allegedly failed to provide, or to whom 3M should have offered warnings," and also for the reason that any warning "would have made no difference . . . because the Complaint alleges that the Fire Protective Equipment final-stage and component manufacturers already 'knew' 'at all relevant times' that their products contained PFAS and that PFAS allegedly risked injury to Plaintiffs, yet continued to produce their gear with PFAS. Compl. ¶ 504." 3M Mem. at 39 (emphasis in original).

"A plaintiff is generally not required to plead detailed factual allegations regarding exactly what instructions should have been provided, as that information might not [be] available to the plaintiff prior to discovery." L. Z., 691 F. Supp. 3d at 465 (citation and internal quotation marks omitted); see also Karazin, 2018 WL 4398250 at *5 (internal citation and quotation marks omitted) (rejecting defendant's request for detailed factual allegations as to exactly what instructions should have been provided because "that information is both the type of detailed or elaborate factual allegations not required at this stage of litigation . . . and some of it likely the type of information that could not be available to Plaintiffs prior to discovery").

A plaintiff must, however, make allegations "about what

warnings were provided [and] how they were inadequate." L.Z., 691 F. Supp. 3d at 465 (citing Leonard v. Gen. Motors L.L.C., 504 F. Supp. 3d 73, 98 (D. Conn. 2020) (dismissing a failure to warn claim where the plaintiff "failed to offer any specific factual allegations concerning the warnings he did receive and how they were deficient"); Schulz v. Medtronic, Inc., No. 3:21-CV-00414 (MPS), 2022 WL 503960, at *3 (D. Conn. Feb. 18, 2022) (same); DiBlasi v. Smith & Nephew, Inc., No. 3:20CV566 (MPS), 2021 WL 619509, at *3 (D. Conn. Feb. 17, 2021) (same); Mals v. Smith & Nephew, Inc., No. 3:19-CV-01770 (VLB), 2020 WL 3270835, at *6 (D. Conn. June 17, 2020) (same).

The Second Amended Complaint alleges that the firefighter PPE at issue

> does not contain any labeling information or warnings:
> a. indicating that the fire fighter PPE contains or may contain PFAS,
> b. indicating that the fire fighter PPE specifically contains or may specifically contain PFOA or PFOS,
> c. regarding the health risks associated with exposure to PFAS, or
> d. regarding the health risks associated with exposure to PFOA or PFOS.

SAC ¶ 307. The Second Amended Complaint includes "photos of typical of warning labels for turnout gear designed, manufactured, marketed, sold, and distributed by Defendants Globe, Honeywell, and Lion," and alleges that "the labels do not disclose that the turnout gear contains PFAS or PFAS-containing materials, and contain no warning that handling, wearing, or

using the turnout gear as it was intended to be handled, worn, or used can result in exposure to PFAS and adverse effects to human health." Id. ¶ 308. The Second Amended Complaint also alleges that the warning labels "do not advise that the turnout gear should be washed in a commercial extractor to prevent cross-contamination and PFAS exposure to family members who handle or wash the turnout gear with other garments in in-home washing machines." Id. ¶ 308. While the plaintiffs' allegations in subparagraphs 307(a) and (b) do not appear to apply to 3M as a PFAS manufacturer, those in subparagraphs 307(c) and (d) do. Also, the Second Amended Complaint alleges that 3M, in addition to manufacturing and selling PFAS, manufactured and sold "PFAS-containing materials, including Scotchlite™ Reflective Material." Id. ¶ 77.

These allegations as to what warnings were provided and how they were inadequate are sufficient. Compare L. Z., 691 F. Supp. 3d. at 465 (finding that the "Plaintiff has alleged nothing about what warnings were provided or how they were inadequate, and the absence of such allegations renders her claim fatally deficient.").

3M argues that "any warning 3M could have given to the other Defendants would have been futile" because "the Complaint alleges that the other Defendants knew their products contained PFAS and knew about its health hazards." 3M Reply at 27-28. The

plaintiffs maintain that they "are allowed to assert inconsistent facts in support of alternative claims," and thus "are allowed to allege that the PPE Manufacturers 'knew or should have known' about the hazards of PFAS, while alleging that 3M's failure to warn them caused the inclusion of harmful PFAS chemicals in PPE." Pls. Mem. at 60-61 (citation omitted). The court agrees. See Hunte, 556 F. Supp. 3d at 84 (the plaintiff argued both that the defendant had a duty to warn the plaintiff's parents of the asserted danger and that the defendant failed to warn medical professionals).

Therefore, 3M's motion to dismiss is being denied as to the failure to warn claim.

**5. CPLA--Medical Monitoring and Statutory Punitive Damages**

The Second Amended Complaint includes a CPLA claim for medical monitoring. See SAC ¶¶ 490-99. Paragraph 499 of the Second Amended Complaint states: "In the event that a stand-alone claim for medical monitoring cannot be maintained, Plaintiffs request in the alternative that medical monitoring be awarded as a form of relief in connection with their remaining claims." See also SAC at ¶ 111 (The plaintiffs seek "[e]equitable relief in the form of orders directing each Defendant to . . . contribute to the establishment of a diagnostic medical testing program and medical monitoring protocol for the Fire Fighter Plaintiffs and the Fire Fighter

Class."). In addition, the plaintiffs seek statutory punitive damages under the CPLA. See id. at ¶¶ 500-506.

3M argues that "neither [medical monitoring nor statutory punitive damages] constitutes a cognizable standalone theory for relief." 3M Mem. at 40. Similarly, the Remaining Moving Defendants argue that "[u]nder Connecticut law, medical monitoring is a remedy, not a cause of action." Remaining Defs.' Mem. at 43. In response to the defendants' argument that medical monitoring is not a cause of action under Connecticut law, the plaintiffs state: "Defendants further argue that medical monitoring is not a standalone claim under Connecticut law. . . Here, plaintiffs seek medical monitoring as a remedy under the CPLA. See SAC ¶¶ 490-499. Plaintiffs should be able to recover medical monitoring costs because they are among the 'harm' caused by Defendants' products." Pls.' Opp. at 55. Furthermore, the plaintiffs argue:

> Defendants point to the fact that, in recent years, the Supreme Court has twice had the opportunity to recognize medical monitoring but has yet to do so. Far from shutting the door on medical monitoring, however, these cases indicate that it is a viable remedy in Connecticut. See Dougan v. Sikorsky Aircraft Corp., 337 Conn. 27, 28, (2020); Poce v. O & G Indus., Inc., 342 Conn. 910 (2022).

Id. Thus, the plaintiffs do not contest the defendants' position that medical monitoring is not a cause of action under

Connecticut law.[8]

The Plaintiffs take a similar position with respect to statutory punitive damages. They state: "3M further argues that 'punitive damages' is not a standalone theory under the CPLA. Like with 'medical monitoring,' Plaintiffs plead 'punitive damages' as a theory of relief." Pls.' Opp. at 56 n.18.

Therefore, the motions to dismiss are being granted as to any standalone claims for medical monitoring and statutory punitive damages, but not as to those remedies.

**6. CPLA - Recoverable Damages**

The defendants contend that the Union Plaintiffs' CPLA claims must be dismissed because they have failed to allege recoverable damages under the CPLA. 3M argues that the Union Plaintiffs' "alleged damages for education and training are

[8] In Dougan, the Connecticut Supreme Court observed: "Although medical monitoring is no longer a novel theory of recovery in many states, whether such recovery is permitted in Connecticut is still an open question of law." Dougan, 337 Conn. at 36. The Court stated:

> Although there are some differences between the [recognition of a standalone cause of action or a remedy], the elements of proof for either approach to medical monitoring are the same. See 1 J. McLaughlin, Class Actions (16th Ed. 2019) § 5:18 ("The distinction between recognizing medical monitoring as an independent cause of action and allowing it solely as a remedial measure has practical consequences. If medical monitoring is not an independent cause of action, then the plaintiff must establish all elements of an independent basis of recovery, and the defendants may assert all available affirmative defenses as against individuals. However, the elements of proof for medical monitoring as a cause of action and as a remedy remain the same and must be established by the plaintiffs." (Footnote omitted.)).

Id. at 29 n.4.

consequential damages unavailable under the CPLA." 3M Mem. at 39. The Remaining Moving Defendants also argue that "the union plaintiffs allege that damages arise from their decision to direct resources toward issues related to the presence of PFAS in protective gear," and these "are, at most, consequential economic losses . . . not recoverable under the CPLA." Remaining Defs.' Mem. at 42.

"Under [Connecticut] General Statutes § 52-572n(a), a product liability action may be brought only for 'harm caused by a product.'" Sylvan R. Shemitz Designs, Inc. v. Newark Corp., 291 Conn. 224, 232 (2009). Conn. Gen. Stat. § 52-572n(c) provides that "commercial loss caused by a product is not harm and may not be recovered by a commercial claimant in a product liability claim." Instead, "[a]n action for commercial loss caused by a product" is governed by the Uniform Commercial Code. Conn. Gen. Stat. § 52-572n(c). However, "[t]he Union Plaintiffs claim damages for the costs they have incurred to investigate and confirm that Defendants' products are defective and cause harm to their members, and to mitigate those harms. . . . [T]he Union Plaintiffs also seek injunctive relief [potentially including adequate warnings and instructions on mitigating property damage and personal injury, prohibitions against deceptive marketing, and an order to buy back defective equipment]." Pls.' Opp. at 57.

Based on the foregoing, the Union Plaintiffs have sufficiently alleged recoverable damages under the CPLA.

**IV. CONCLUSION**

For the reasons set forth above, each of Defendant 3M Company's Motion to Dismiss (ECF No. 252) and Moving Defendants' Motion to Dismiss Plaintiff's Amended Second Complaint (ECF No. 245) is hereby GRANTED in part and DENIED in part. The Union Plaintiffs do not have associational standing to bring medical monitoring or damages claims; the CPLA strict liability design defect claim against 3M for manufacturing PFAS is dismissed; and any CPLA causes of action for medical monitoring and statutory punitive damages are dismissed.

It is so ordered.

Dated this 15th day of September 2026, at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge